1
2
3
4
5
6
7
8
9
10

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

11

MAGDALENA K. FOSS,

12

Plaintiff,

No.

13

vs.

COMPLAINT FOR DAMAGES

14

KING COUNTY, WASHINGTON and LAURA
M. ALSPACH; THE CITY OF MONROE,
WASHINGTON and PAUL HENDERSON

15
16

Defendants.

17

        COMES NOW the Plaintiff, by and through her attorney of record, Dean Prather of Dean

18

Prather Esq. PLLC, and for her complaint against Defendants alleges as follows:

19
20

PRELIMINARY STATEMENT

21

        The United States and Washington State constitutions guarantee each citizen the right to free

22

speech, which includes, but is not limited to, "…freedom of speech…and to petition the

23

Government for a redress of grievances." (*Amendment I, US Const.*), and "Every person may freely

24
25

speak, write and publish on all subjects, being responsible for the abuse of that right." (*Art I § 5,*

26

*Washington State Const.*). The Fourteenth Amendment of the US Constitution states, in part, that

27

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens

28

of the United States; nor shall any state deprive any person of life, liberty, or property, without due

DEAN PRATHER ESQ. PLLC
1300 W HOLLY ST #203
BELLINGHAM, WA 98225
(360) 643-0499 • (360) 838-6605 (FAX)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

process of law; nor deny to any person within its jurisdiction the equal protection of the laws." (*Amendment XIV, § 1, US Const.*) The Ninth Circuit affirmed this as recently as 2020, when in *Sampson v. County of Los Angeles, et al, 974 F.3d 1012 (9th Cir. 2020)* the Court denied a lower court finding of qualified immunity and found that the Appellees violated Appellants First Amendment rights to free speech and Fourteenth Amendment rights to equal protection under the law, when it retaliated against Appellee for filing a sexual harassment claim against a public official.

Here, Plaintiff made a social media post as a private citizen, on a private Facebook page, being critical of the King County Sheriff's Office and personnel under its employ and supervision. The post did not threaten to harm, or to incite others to bring harm to, any person or entity. The post simply expressed Plaintiff's personal opinion about the practices and policy violations that she felt were relevant to her situation and to the lives of other citizens in her community. In making this post, Plaintiff exercised her free speech rights – rights that were enshrined into our laws when our founders put quill to parchment to establish our founding laws and documents. For exercising her enshrined right to speak freely and redress grievances against the government, the Defendants conspired to maliciously prosecute Plaintiff. In doing so, the Defendants violated Plaintiff's First Amendment right to free speech, and Defendant's Fourteenth Amendment rights to equal protection and due process under the law, in an illegal and tortious conspiracy to deprive Plaintiff of her life, liberty, and property. Also, in doing so, Defendants violated numerous state and federal laws, and committed several tortious acts. Accordingly, Plaintiff brings this action to hold Defendants accountable for their egregious acts and illegal activities, and to seek restitution for the damage and harm that was brought upon Plaintiff and continues to present day.

COMPLAINT FOR DAMAGES - 2

<div align="center">I. JURISDICTION AND VENUE</div>

1.      The Court has jurisdiction over this action under 28 U.S.C. § 1331.

2.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because some or all Defendants reside within this judicial district and because all or substantially all of the acts or omissions giving rise to this action arose from events occurring within this judicial district.

3.      The Court has the authority to provide the relief requested under the Supremacy Clause, U.S. Const. art. VI, cl. 2, as well as 28 U.S.C. 2201, and 2202, and the Court's inherent equitable powers.

<div align="center">II. CAUSES OF ACTION</div>

State Statutory Law Violations

1.  Malicious Prosecution - RCW 9.62.010(1). Defendants, working together in a conspiracy to maliciously prosecute Plaintiff for exercising her right of free speech, planned, organized, and executed a scheme to falsely charge Plaintiff with a felony, with no probable cause to support the false charge. Here is the text of the law:

> Every person who shall, maliciously and without probable cause therefor, cause or
>
> attempt to cause another to be arrested or proceeded against for any crime of which
>
> he or she is innocent:
>
> (1) If such crime be a felony, is guilty of a class C felony and shall be punished by
>
> imprisonment in a state correctional facility for not more than five years; and
>
> (2) If such crime be a gross misdemeanor or misdemeanor, shall be guilty of a
>
> misdemeanor.

Here, Defendant Paul Henderson ("Henderson"), a detective employed by the City of

COMPLAINT FOR DAMAGES - 3

DEAN PRATHER ESQ. PLLC
1300 W HOLLY ST #203
BELLINGHAM, WA 98225
(360) 643-0499   •   (360) 838-6605 (FAX)

Monroe Police Department, filed false charges against Plaintiff, without probable cause and without evidence to support those false charges, while ignoring various forms of exculpatory evidence and without undertaking any form of proper investigation into the facts and circumstances surrounding the purported criminal acts that he charged Plaintiff with committing. <u>EXHIBIT 1</u> attached hereto is the investigative report and superform charging document that was prepared and submitted by Henderson to the prosecutor. <u>EXHIBIT 2</u> attached hereto is documentation of the filed false charge that was uncovered by a public records request. The charges filed were felonies, and thus, according to RCW 9.62.010 (1), Henderson committed a felony when he filed these false charges without probable cause to support the charges. Working in concert with Henderson, Defendant Laura M. Alspach ("Alspach"), a deputy then employed by the King County Sheriff's Department (contracting with the City of Shoreline to provide police services) as part of a criminal conspiracy, is also guilty of malicious prosecution of Plaintiff for her part in the below described conspiracy. Alspach, then and now, was and is a member of the Washington State Bar Association, admitted to the practice of law on June 7, 2010, under bar #42524. As such, Alspach has a heightened understanding of the law, and would have known that what she and Henderson were undertaking was a criminal conspiracy to maliciously prosecute Plaintiff without probable cause to do so.

Because the charges filed against Plaintiff were felonies, Alspach and Henderson each committed felonies in the pursuit and filing of these false charges.

2.   <u>Criminal Conspiracy - RCW 9A.28.040</u>. Plaintiff repeats and re-alleges the allegations contained in every paragraph of all preceding paragraphs and by reference thereto incorporates the same herein as if set forth in full. Alspach and Henderson worked together in a criminal conspiracy to maliciously prosecute Plaintiff. <u>EXHIBIT 3</u> attached hereto is just one piece of evidence

COMPLAINT FOR DAMAGES - 4

proving that Henderson and Alspach were working in tandem to maliciously prosecute Plaintiff. Alspach, defying orders from executive command staff, and working at the behest of her City of Shoreline command staff, surreptitiously moved the malicious prosecution from King County's jurisdiction to the City of Monroe, without authority to do so, and knowing that no crimes had been committed by Plaintiff. Again, as a member of the bar, Alspach has a heightened understanding of the law, and would have known that what she and Henderson were undertaking was a criminal conspiracy to maliciously prosecute Plaintiff without probable cause to do so.

State Common Law Violation

3. Breach of Contract. Plaintiff repeats and re-alleges the allegations contained in every paragraph of all preceding paragraphs and by reference thereto incorporates the same herein as if set forth in full.   Plaintiff and Defendant King County, Washington ("King County") (together, "the Parties") entered into an Employment Claim Settlement Agreement and Release of All Claims on October 4, 2018 (the "Agreement"). A copy of the Agreement is attached hereto at EXHIBIT 4. Under the terms of the Agreement, the Parties agreed to withdraw and end any and all pursuits of claims, investigations and disciplinary processes undertaken prior to the date of the Agreement. Through the illegal actions of its employee Alspach, King County is in violation of both the terms and the spirit of the Agreement. By providing internal investigation documents that existed prior to the Agreement date, King County, through its employee Alspach, violated the terms of the Agreement. Throughout the investigative report and charging document at EXHIBIT 1, Henderson cites to numerous King County internal investigation documents that were, by Agreement between the Parties, to be restricted from use in any future investigation or proceeding. Further, the use of these internal investigation documents violates the holding in *Garrity v. State of New Jersey, 385*

DEAN PRATHER ESQ. PLLC
1300 W HOLLY ST #203
BELLINGHAM, WA 98225
(360) 643-0499  •  (360) 838-6605 (FAX)

1  *U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967)*, further discussed below in the Federal Code and

2  Constitutional Violations section of this Complaint.

3

4

5  State Constitutional Violation

6      4.      Violation of Art I § 5, Washington State Constitution. Plaintiff repeats and re-

7  alleges the allegations contained in every paragraph of all preceding paragraphs and by reference

8  thereto incorporates the same herein as if set forth in full. "Every person may freely speak, write

9  and publish on all subjects, being responsible for the abuse of that right." (Art I § 5, Washington

10  State Const.). Here, Plaintiff was engaged in constitutionally protected speech, raising issue of

11  public concern regarding the conduct of public officials in their official duties. This fact is

12  supported by the report compiled by Brenda L. Bannon ("Bannon"), attorney at Ogletree Deakins,

13  who was contracted by King County to investigate allegations of bias by then Deputy Jeremy Muir,

14  relating to allegations made by Deputy Muir (refer to EXHIBIT 5 attached hereto). The report is

15  entitled "*Workplace Investigation Summary Report; King County Sheriff's Office IIU2021-172*

16  ("the Bannon Report"). At page 40 of the Bannon Report, Bannon rightfully refers to Plaintiff's

17  Facebook posts in the following way: "Foss was speaking as a private citizen arguably about topics

18  of public concern regarding a public officer under the First Amendment." We agree. And, being

19  that the protections of  Article I § 5, of the Washington State Constitution are on-point with those

20  afforded under Amendment I of the US Constitution, we will let Bannon's finding speak for itself.

21  For exercising her rights to free speech and redress of grievances, Plaintiff was criminally pursued

22  by the King County Sheriff's Office and the City of Monroe Police Department in a conspiracy to

23  deprive her of her life, liberty, and property, in clear violation of Plaintiff's established rights under

24  Article I § 5 of the Washington State Constitution.

25

26

27

28

COMPLAINT FOR DAMAGES - 6

Federal Code, Common Law, and Constitutional Violations

4.      Violation of Amendment I of the United States Constitution. Plaintiff repeats and re-alleges the allegations contained in every paragraph of all preceding paragraphs and by reference thereto incorporates the same herein as if set forth in full. The United States Constitution guarantees each citizen the right to free speech, which includes, but is not limited to, "…freedom of speech…and to petition the Government for a redress of grievances." (*Amendment I, US Const.),* Here, Plaintiff was engaged in constitutionally protected speech, raising issue of public concern regarding the conduct of public officials in their official duties. This fact is supported by the report compiled by Brenda L. Bannon ("Bannon"), attorney at Ogletree Deakins, who was contracted by King County to investigate allegations of bias by then Deputy Jeremy Muir. The report is entitled "Workplace Investigation Summary Report; King County Sheriff's Office IIU2021-172 ("the Bannon report"). At page 40 of the Bannon report, Bannon rightfully refers to Plaintiff's Facebook posts in the following way: "Foss was speaking as a private citizen arguably about topics of public concern regarding a public officer under the First Amendment." We agree. For exercising her rights to free speech and redress of grievances, Plaintiff was criminally pursued by the King County Sheriff's and the City of Monroe Police Department in a conspiracy to deprive her of her life, liberty, and property, in clear violation of Plaintiff's established rights under Amendment I of the U.S. Constitution.

5.      Violation of Amendment IV of the United States Constitution and 42 U.S.C. § 1983. Plaintiff repeats and re-alleges the allegations contained in every paragraph of all preceding paragraphs and by reference thereto incorporates the same herein as if set forth in full. In 2022, the United States Supreme Court held in *Thompson v. Clark* that ""In sum, we hold that

DEAN PRATHER ESQ. PLLC
1300 W HOLLY ST #203
BELLINGHAM, WA 98225
(360) 643-0499 • (360) 838-6605 (FAX)

a Fourth Amendment claim under § 1983 for malicious prosecution does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence. A plaintiff need only show that the criminal prosecution ended without a conviction." *Thompson v. Clark, 142 S.Ct. 1332 (2022)*. Here, a malicious prosecution was undertaken by Defendants Henderson and Alspach in a criminal conspiracy to falsely charge Plaintiff with felonies for exercising her rights to free speech and redress of grievances. Henderson filed the charges with the prosecutor, and the prosecutor declined to prosecute. For their part, Henderson and Alspach violated both state law and the holding in *Thompson v. Clark*, thus violating Plaintiff's Fourth Amendment rights, and thus exposing themselves and their employers to a Fourth Amendment claim under 42 U.S.C. § 1983.

6.      Violation of Amendment XIV § 1, US Constitution and of the holding in *Garrity v. State of New Jersey*. Plaintiff repeats and re-alleges the allegations contained in every paragraph of all preceding paragraphs and by reference thereto incorporates the same herein as if set forth in full. When public employees are compelled to give a statement in an official inquiry, their statements are protected by the Fourteenth Amendment of the US Constitution, and they are advised of those protections with what is known as a "Garrity Admonishment" (see EXHIBIT 6 attached hereto) which is provided to them before they give any statement. This document states, among other things, the following: "…neither your statements nor any information or evidence which is gained by reason of such statements can be used against you in *any* subsequent criminal proceedings." (Italics added for emphasis). It also states, in part, "…that if you refuse to answer question relating to the performance of your official duties or fitness for duty, you will be subject to department charges, which could result in your dismissal from the department." Garrity Admonishments are the end-result of the holding in *Garrity v. State of New Jersey*, wherein the

DEAN PRATHER ESQ. PLLC
1300 W HOLLY ST #203
BELLINGHAM, WA 98225
(360) 643-0499 • (360) 838-6605 (FAX)

court stated the following in their ruling: "We now hold the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic…" *Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).*

Here, Plaintiff was an employee of King County, Washington, when she was compelled to provide statements in numerous internal inquiries relating to both criminal violations and internal policy violations. These internal inquiries were based upon complaints by other King County employees and/or citizens at large. Plaintiff simply followed King County policy by cooperating with the inquiries under threat of termination for non-cooperation. This is *Garrity* protected speech by a public employee. Henderson referenced Plaintiff's *Garrity* protected and compelled participation in his charging document attached at EXHIBIT 1. The supporting investigative file references IIU investigations initiated by others wherein Plaintiff was compelled to give statements, as a basis for the false felony charges filed against Plaintiff by Henderson. The file content references numerous IIU investigations and falsely attributes the initiation of these investigations to Plaintiff. Use of these *Garrity* protected statements is a clear violation of the U.S. Supremes Court's holding in that case, and are a violation of the Fourteenth Amendment to the US Constitution.

To Plaintiff's knowledge and belief, Henderson was and still is the President of the Monroe Police Officer's Guild. Because of this position, Henderson would have understood that when he used internal investigations to investigate and charge Plaintiff criminally, he was violating the holding in *Garrity* and he should have also understood that a violation of *Garrity* is equivalent to a Fourteenth Amendment violation. Alspach, being a member of the Washington State Bar

COMPLAINT FOR DAMAGES - 9

DEAN PRATHER ESQ. PLLC
1300 W HOLLY ST #203
BELLINGHAM, WA 98225
(360) 643-0499 • (360) 838-6605 (FAX)

Association, would also know that her actions and participation violated *Garrity,* and she would also know that a violation of *Garrity* is equivalent to a Fourteenth Amendment violation. This heightened understanding of the laws makes the actions undertaken by Henderson and Alspach as described in this Complaint even more egregious, and the actions of Henderson and Alspach become highly actionable by Plaintiff.

7.      <u>Deprivation of Rights Under Color of Law – 18 U.S. Code § 242</u>. Plaintiff repeats and re-alleges the allegations contained in every paragraph of all preceding paragraphs and by reference thereto incorporates the same herein as if set forth in full. "Section 242 of Title 18 makes it a crime for a person acting under color of any law to willfully deprive a person of a right or privilege protected by the Constitution or laws of the United States. For the purpose of Section 242, acts under 'color of law' include acts not only done by federal, state, or local officials within their lawful authority, but also acts done beyond the bounds of that official's lawful authority, if the acts are done while the official is purporting to or pretending to act in the performance of his/her official duties. Persons acting under color of law within the meaning of this statute include police officers, prisons guards and other law enforcement officials, as well as judges, care providers in public health facilities, and others who are acting as public officials. It is not necessary that the crime be motivated by animus toward the race, color, religion, sex, handicap, familial status or national origin of the victim." (*United States Department of Justice, Deprivation of Rights Under Color of Law, https://www.justice.gov/crt/deprivation-rights-under-color-law#:~:text=Summary%3A,laws%20of%20the%20United%20States*.)

Here, Alspach and Henderson, acting under color of law as agents of their respective law enforcement agencies, conspired to criminally prosecute Plaintiff for exercising her rights to free speech as afforded to her under the United States and Washington State Constitutions. And, in

DEAN PRATHER ESQ. PLLC
1300 W HOLLY ST #203
BELLINGHAM, WA 98225
(360) 643-0499  •  (360) 838-6605 (FAX)

violation of *Garrity* which amounts to a violation of Violation of Amendment XIV § 1, Alspach

and Henderson violated Plaintiff's due process rights. These acts were undertaken under the color

of law and thus violate 18 U.S. Code § 242. And, as noted in the Introduction section of this

Complaint, the Ninth Circuit affirmed in *Sampson v. County of Los Angeles, et al, 974 F.3d 1012*

*(9th Cir. 2020)* that qualified immunity is not available to law enforcement personnel who violate

First Amendment rights to free speech and Fourteenth Amendment rights to equal protection under

the law in an act of retaliation for exercising rights of free speech.

<u>RESPONDEAT SUPERIOR</u>

7.      Plaintiff repeats and re-alleges the allegations contained in every paragraph of all

preceding paragraphs and by reference thereto incorporates the same herein as if set forth in full.

The 9th Circuit held that "…a government entity…may be held liable under section 1983 when

the execution of the entity's policy or custom results in the deprivation of civil rights." *Ortiz v.*

*County of Orange, 42 F.3d 1401 (9th Cir. 1994).* The Court held that the Appelant thereunder,

like Plaintiff herein, must allege that the policies and practices of the governmental agency were

part and parcel of the deprivation of rights being litigated, thus proving that the entity is

responsible for the actions of its employees under the Respondeat Superior doctrine. Here, King

County has a long and torrid history of allowing its law enforcement officers to violate policy,

laws, and the rights of its citizens, and repeating that history without corrective action over a

period of decades, continuing to this day. Because little or no discipline is meted out to law

enforcement officers who violate law and policy, King County has essentially green-lighted its

law enforcement officers to act with impunity in their unlawful and off-policy pursuits. And

although we do not find similar practices at the City of Monroe, we do find them at King County,

DEAN PRATHER ESQ. PLLC
1300 W HOLLY ST #203
BELLINGHAM, WA 98225
(360) 643-0499  •  (360) 838-6605 (FAX)

and we place proportionate responsibility for the acts of Alspach on King County due to its

continuous lack of discipline of its officers and its failure to reform its law enforcement from

within through policy changes and corrective actions. Problems that were identified as early as

2006 by the Blue Ribbon panel and in the 2012 King County Auditor's report have yet to be

corrected and persist to this day. The King County Sheriff's Department continues to hire and

promote deputies with a history of violating policy, violating the rights of citizens, and violating

the law. It places corrupt deputies in charge of investigations, and even in charge of its internal

investigative unit, where inconsistent and contradictory statements are ignored, and

corroborating evidence that would lead to findings of misconduct by deputies are swept under

the rug, leading to countless accusations being construed as "unfounded" when there is

substantial evidence to find that the complaints have merit.

<div align="center">RELIEF REQUESTED</div>

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

a.    An    Order    from    this    Court    requiring    public

statement by Defendants King County and City of Monroe, apologizing to Plaintiff for the

actions of their rogue employees, and taking full responsibility for the actions of those

employees.

b.    Declaratory Remedy on the Breach of Contract cause of action.

c.    Financial Damages on the above-enumerated causes of action.

d.    Equitable Relief by order of the Court requiring Defendant's to stop

engaging in the activities outlined above in this Complaint, ordering a deep and detailed audit and

investigation of the corrupt practices within the King County Sheriff's Department, and ordering

DEAN PRATHER ESQ. PLLC
1300 W HOLLY ST #203
BELLINGHAM, WA 98225
(360) 643-0499  •  (360) 838-6605 (FAX)

1  Federal oversight of that detailed audit and investigation. And for Specific Performance requiring

2  an Action Plan based upon the findings of that detailed audit and investigation.

3          e.      Plaintiff's reasonable attorney's fees, court costs and such other and further

4  relief as the Court may deem proper.

5          DATED this 6th day of December 2022.

6

7                                      DEAN PRATHER ESQ. PLLC

8

9

10                                     _____
                                       Dean Prather, WSBA #56335
11                                     Attorney for Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES - 13

EXHIBIT 1

EXHIBIT 1



# Monroe Police Department
# Detail



**Print Date/Time:** 11/05/2020 14:05
**Login ID:** mm2097
**Case Number:** 2020-00003313

Monroe Police Department
**ORI Number:** WA0311200

## Case Details:

| | | | |
|---|---|---|---|
| **Case Number:** | 2020-00003313 | **Incident Type:** | Stalking |
| **Location:** | 15591 168TH AVE SE | **Occurred From:** | 01/15/2015 15:00 |
| | MONROE,WA 98272 | **Occurred Thru:** | 01/21/2020 15:00 |
| | | **Reported Date:** | 02/19/2020 11:14 Wednesday |
| **Reporting Officer ID:** | MM2055-Henderson | **Status:** Closed | **Status Date:** 02/20/2020 |
| | | **Disposition:** Case Filed | **Disposition Date:** 03/31/2020 |
| **Assigned Bureau:** | Investigations Div | | |

### Case Assignments:

| Assigned Officer | Assignment Date/Time | Assignment Type | Assigned By Officer | Due Date/Time |
|---|---|---|---|---|

| Associated Cases | Status | | Assisting ORIs | Role |
|---|---|---|---|---|

| Modus Operandi | | **Solvability Factors** | **Weight** |
|---|---|---|---|
| | | Belief that crime may be solved with publicity | 1.000 |
| | | Does the crime indicate a pattern? | 1.000 |
| | | Is the crime of a community sensitive nature? | 2.000 |
| | | Can a suspect be located? | 1.000 |
| | | Can a suspect be identified? | 1.000 |
| | | Can a suspect be named? | 2.000 |
| | | | **Total: 8.000** |

### Offenses

| No. | Group/ORI | Crime Code | Statute | Description | Counts |
|---|---|---|---|---|---|
| 1 | State | 13C | 9A.46.020.2B.DV | HARASSMENT PREV CONV OR THREAT TO KILL DV | 1 |
| 2 | State | 13C | 9A.46.110.5B.DV | STALKING FELONY DV | 1 |



# Monroe Police Department
## Detail



**Print Date/Time:**  11/05/2020 14:05
**Login ID:**  mm2097
**Case Number:**  2020-00003313

Monroe Police Department
**ORI Number:**  WA0311200

**Offense #**    1

| | | | | |
|---|---|---|---|---|
| **Group/ORI:** State | **Crime Code:** 13C | **Statute:** 9A.46.020.2B. DV | **Counts:** 1 | **Attempt/ Commit Code:** Commit |

**Description:**  HARASSMENT PREV CONV OR THREAT TO KILL DV

**Offense Date:**  10/27/2019

| | | |
|---|---|---|
| **NCIC Code:** 1316 | **Scene Code:** Home or Residence | **Bias/Motivation:** *None (No Bias) |
| Offense Status: | Status Date: | Occupancy Code: |
| Clery Location: | **Domestic Code:** Yes | Child Abuse: |
| Arson Code: | Aiding/Abetting: | Sub-Code: |
| Gang Related: | # of Juveniles: | **IBR Seq. No:** 1 |
| # of Adults: | Abandoned Structure: | Household Status: |
| Property Damage Amt.: | Carjacking: | |
| Domestic Circumstance: | Order of Protection: | Premise Code: |
| Accosting Situation: | Anit-reproductive rights crime: | Prior Inv - Victim: |
| Gambling Motivated: | Prior Inv - Offender: | Cargo Theft: |
| Special Circumstances: | Hate Bias Indicator: | Precipitating Event: |

| **Offender Suspected of Using** | | **Victim Suspected of Using** | |
|---|---|---|---|
| **Alcohol:** | Unknown | Alcohol: | |
| **Drugs:** | Unknown | Drugs: | |
| **Computer:** | Unknown | Computer: | |
| Aggravated Assault/ Homicide Circumstances #1: | | Aggravated Assault/ Homicide Circumstances #2: | |
| Aggravated Assault/ Homicide Remarks #1: | | Aggravated Assault/ Homicide Remarks #2: | |
| Justifiable Homicide Circumstances : | | Justifiable Homicide Code : | Larceny Type: |
| Method of Entry Type: | | Method of Entry : | |
| Point of Entry: | | # of Premises Entered : | |
| Method of Exit Type: | | Method of Exit : | |
| Point of Exit: | | How Left Scene: | |
| Direction of Travel: | | | |
| Counterfeit Type: | | Counterfeit Status: | Counterfeit Amount: |

| **Evidence Collected** | **Criminal Activity** | **Tools Used** | **Security Systems** |
|---|---|---|---|
| | Gang - None or Unknown | | |

 

# Monroe Police Department
## Detail

| | |
|---|---|
| **Print Date/Time:** 11/05/2020 14:05 | Monroe Police Department |
| **Login ID:** mm2097 | **ORI Number:** WA0311200 |
| **Case Number:** 2020-00003313 | |

**Offense #**    2

| | | | |
|---|---|---|---|
| **Group/ORI:** State | **Crime Code:** 13C | **Statute:** 9A.46.110.5B. DV | **Counts:** 1 | **Attempt/ Commit Code:** Commit |

| | | | |
|---|---|---|---|
| **Description:** STALKING FELONY DV | | | **Offense Date:** 10/20/2019 |
| **NCIC Code:** 1316 | **Scene Code:** Home or Residence | | **Bias/Motivation:** *None (No Bias) |
| Offense Status: | Status Date: | | Occupancy Code: |
| Clery Location: | **Domestic Code:** Yes | | Child Abuse: |
| Arson Code: | Aiding/Abetting: | | Sub-Code: |
| Gang Related: | # of Juveniles: | | **IBR Seq. No:** 2 |
| # of Adults: | Abandoned Structure: | | Household Status: |
| Property Damage Amt.: | Carjacking: | | |
| Domestic Circumstance: | Order of Protection: | | Premise Code: |
| Accosting Situation: | Anit-reproductive rights crime: | | Prior Inv - Victim: |
| Gambling Motivated: | Prior Inv - Offender: | | Cargo Theft: |
| Special Circumstances: | Hate Bias Indicator: | | Precipitating Event: |

**Offender Suspected of Using**                **Victim Suspected of Using**

| | | |
|---|---|---|
| **Alcohol:** Unknown | Alcohol: | |
| **Drugs:** Unknown | Drugs: | |
| **Computer:** Yes | Computer: | |
| Aggravated Assault/ Homicide Circumstances #1: | Aggravated Assault/ Homicide Circumstances #2: | |
| Aggravated Assault/ Homicide Remarks #1: | Aggravated Assault/ Homicide Remarks #2: | |
| Justifiable Homicide Circumstances : | Justifiable Homicide Code : | Larceny Type: |
| Method of Entry Type: | Method of Entry : | |
| Point of Entry: | # of Premises Entered : | |
| Method of Exit Type: | Method of Exit : | |
| Point of Exit: | How Left Scene: | |
| Direction of Travel: | | |
| Counterfeit Type: | Counterfeit Status: | Counterfeit Amount: |

**Evidence Collected**      **Criminal Activity**      **Tools Used**      **Security Systems**

Gang - None or Unknown

## Subjects

| Type | No. | Name | Address | Phone | Race | Sex | DOB/Age |
|---|---|---|---|---|---|---|---|
| Arrestee | 1 | FOSS, MAGDALENA KRISTIN | 22718 135TH AVE SE<br><br>KENT,WA 98042-3730 | | White | Female | ▇▇▇ |
| Victim | 1 | MUIR, JEREMY ALFRED | 15591 168TH AVE SE<br>MONROE,WA 98272 | ▇▇▇ | White | Male | ▇▇▇ |




# Monroe Police Department
## Detail

**Print Date/Time:** 11/05/2020 14:05
**Login ID:** mm2097
**Case Number:** 2020-00003313

Monroe Police Department
**ORI Number:** WA0311200

**<u>Subject #</u>**      **<u>1-Arrestee</u>**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Primary:** | No | | | | | | |
| **Name:** | FOSS, MAGDALENA KRISTIN | **Race:** | White | **Sex:** | Female | **DOB:** | ▮ |
| **Address:** | 22718 135TH AVE SE | **Height:** | 6ft 0 in | **Weight:** | 175.0 lbs. | **Build:** | |
| | KENT WA 98042-3730 | **Eyes:** | BRO | **Hair:** | | **Age:** | ▮ |
| **Primary Phone:** | | **SSN:** | | **DVL #:** | ▮ | **State:** | WA |
| **Resident Type:** | | **Resident Status:** | | | | **Statement Type:** | |
| **Disposition:** | | **Date:** | | | | **Custody Status:** | |

**<u>Related Offenses</u>**

| Group/ORI | Crime Code | Statute | Description |
|---|---|---|---|
| State | 13C | 9A.46.110.5B.DV | STALKING FELONY DV |
| State | 13C | 9A.46.020.2B.DV | HARASSMENT PREV CONV OR THREAT TO KILL DV |

**<u>Related Weapons</u>**

**<u>Victim/Offender Relationship</u>**

| No. | Type | Name | Relationship |
|---|---|---|---|
| 1 | Arrestee | FOSS,MAGDALENA KRISTIN | Otherwise Known |

| | | |
|---|---|---|
| **Transported By:** | **Extent of Injury:** | **Hospital:** |
| **Domestic Violence:** | **Domestic Violence Referrals:** | **Federal Agencies Involved:** |
| **Condition:** | **Medical Treatment:** | |

**<u>Missing Person Information</u>**




# Monroe Police Department
## Detail

**Print Date/Time:** 11/05/2020 14:05
**Login ID:** mm2097
**Case Number:** 2020-00003313

Monroe Police Department
**ORI Number:** WA0311200

**Subject #**   **1-Victim**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Primary:** | No | **Victim Type:** | Individual | | | |
| **Name:** | MUIR, JEREMY ALFRED | **Race:** | White | **Sex:** | Male | **DOB:** ▉ |
| **Address:** | 15591 168TH AVE SE | **Height:** | 5ft 10 in | **Weight:** | 190.0 lbs. | **Build:** |
| | MONROE WA 98272 | **Eyes:** | BLU | **Hair:** | BRO | **Age:** ▉ |
| **Primary Phone:** | (360) 991-4596 | **SSN:** | | **DVL #:** ▉ | | **State:** WA |

**Resident Type:**    **Resident Status:**    **Statement Type:**
**Disposition:**    **Date:**    **Custody Status:**

**Related Offenses**

| Group/ORI | Crime Code | Statute | Description |
|---|---|---|---|
| State | 13C | 9A.46.110.5B.DV | STALKING FELONY DV |
| State | 13C | 9A.46.020.2B.DV | HARASSMENT PREV CONV OR THREAT TO KILL DV |

**Related Weapons**

**Victim/Offender Relationship**

**Transported By:**    **Extent of Injury:**    **Hospital:**
**Domestic Violence:**    **Domestic Violence Referrals:**    **Federal Agencies Involved:**
**Condition:**    **Medical Treatment:**

**Missing Person Information**

## Arrests

| Arrest No. | Name | Address | Date/Time | Type | Age |
|---|---|---|---|---|---|
| 4328A | FOSS, MAGDALENA KRISTIN | , | 03/26/2020 12:00 | Referred | ▉ |




# Monroe Police Department
## Detail

**Print Date/Time:** 11/05/2020 14:05
**Login ID:** mm2097
**Case Number:** 2020-00003313

Monroe Police Department
**ORI Number:** WA0311200

**Arrest #** 4328 A

| | | | | | | |
|---|---|---|---|---|---|---|
| **Name:** | FOSS, MAGDALENA KRISTIN | **Date/Time:** | 03/26/2020 12:00 | **Type:** | Referred | **Status:** |
| **Address:** | 22718 135TH AVE SE | **Race:** | White | **Sex:** | Female | **DOB:** |
| | KENT, WA 98042-3730 | **Height:** | 6ft 0 in | **Weight:** | 175.0 lbs. | **Build:** |
| | | **Eyes:** | BRO | **Hair:** | | **Marital:** |
| | | **SSN:** | | **DVL#:** | | **State:** WA |

**Location:** ,

**ID Procedure:**                    **Miranda ID:**                    **Miranda Date/Time:**
**Age at Arrest:** 39                **Resident Type:**                 **Resident Status:**
**Basis For Caution:**               **Arrest Result Of:**              **Clears Case:**
**Alcohol Influence:**               **Drug Influence:**                **Resisted Arrest:**
**Statement Type:**                  **Statement  ID:**

| Arresting Officers | Bureau | School Resource Officer | Weapon Codes | Feature |
|---|---|---|---|---|
| MM2055-Henderson | | No | Unarmed | |

**Condition:**                       **Medical Treatment:**
**Transported By:**                  **Extent of Injury:**              **Hospital:**

**Associated Numbers**

**Warrant ORI:**                     **Warrant Number:**
**Booking ORI:**                     **Booking Number:**
**Court ORI:**                       **Court Case Number:**

**Arrest Charges**

| No. | Group/ORI | Crime Code | Statute | Description |
|---|---|---|---|---|
| 1 | State | 13C | 9A.46.110.5B.DV | STALKING FELONY DV |

| **Counts:** | 1 | **Charge Date/Time:** | 03/26/2020 12:00 | **Attempt/Commit:** | Commit |
|---|---|---|---|---|---|
| **Domestic:** | | **Plea:** | | **Larceny:** | |
| **Disposition:** | | **Disposition Date:** | | **NCIC Code:** | 1316 |
| **Court Date/Time:** | | **Bond Date/Time:** | | **Other ORI:** | No |
| **Court Disposition:** | | | **Court Disposition Date:** | | |

## Property



# Monroe Police Department
## Detail



**Print Date/Time:** 11/05/2020 14:05
**Login ID:** mm2097
**Case Number:** 2020-00003313

Monroe Police Department
**ORI Number:** WA0311200

| Date | Code | Type | Make | Model | Description | Tag No. | Item No. |
|------|------|------|------|-------|-------------|---------|----------|
| 10/28/2020 | Evidence | Digital Media | | | Documents provided Maggie Foss | 2020-00003313 | 11 |
| 06/30/2020 | Evidence | Photographs | | | Facebook post made by Shoreline PD | 2020-00003313 | 10 |
| 06/18/2020 | Evidence | Photographs | | | Screen captures and photographs provided by Jeremy Muir | 2020-00003313 | 9 |
| 06/03/2020 | Evidence | Digital Media | | | Screenshot of Shoreline PD Facebook post and comments | 2020-00003313 | 8 |
| 05/25/2020 | Evidence | Recordings | | | Voicemail left on Gayle Hanks' phone | 2020-00003313 | 5 |
| 05/25/2020 | Evidence | Recordings | | | Audio recorded interview of Gayle Hanks | 2020-00003313 | 4 |
| 05/26/2020 | Evidence | Photographs | | | Pictures at home of Gayle Hanks (Facebook posts and answering machine) | 2020-00003313 | 7 |
| 05/26/2020 | Evidence | Photographs | | | Screenshots of emails (provided by Jeremy Muir) | 2020-00003313 | 6 |
| 02/19/2020 | Evidence | Digital Media | | | Documents (on USB drive) provided by Det. Alspach | 2020-00003313 | 2 |
| 02/19/2020 | Evidence | Other | | | Letter mailed to Shoreline Police Chief Ledford | 2020-00003313 | 3 |
| 02/19/2020 | Evidence | Photographs | | | Facebook posts provided by Nan Skinner | 2020-00003313 | 1 |

**Seq #**   11

| | | | | |
|---|---|---|---|---|
| **Tag Number:** 2020-00003313 | **Item Number:** 11 | | | |
| **Property Codes:** | **Property Type:** Digital Media | **Property Class:** | | **Date Received:** 10/28/2020 |
| Evidence | **UCR Value:** | **Initial Value:** | | **Stolen Location:** |
| **Quantity:** | **Unit of Measure:** | **Measurement Source:** | | |
| **Description:** Documents provided Maggie Foss | | **Officer Remarks:** | | |
| **Make:** | **Model:** | **Style:** | **Style Desc:** | |
| **Year:** | **OAN:** | **Serial #:** | **Color:** | |
| **Condition:** | **Reg. Type:** | **Reg. ORI:** | **Reg. Number:** | |
| **Reg. State:** | **Reg. Year:** | **Reg. Date:** | **Reg. Expiration:** | |

**Recovery Information**

| | | | |
|---|---|---|---|
| **Location:** | **Date:** | **Code:** | **Value:** |
| **RFOJ?:** | **ORI:** | **Recovered Address:** | |

**Associated Subjects**

| Type | Name | Address | Phone | Notified How | Date |
|------|------|---------|-------|--------------|------|
| Owner | | | | | |

**Insurance Company:**          **Policy Number:**          **Lein Holder:**




# Monroe Police Department
# Detail

**Print Date/Time:** 11/05/2020 14:05
**Login ID:** mm2097
**Case Number:** 2020-00003313

Monroe Police Department
**ORI Number:** WA0311200

<u>Chain of Custody</u>

| Date | Transaction | From | From Role | To | To Role |
|------|-------------|------|-----------|-----|---------|
| 10/28/2020 13:32 | **Type:** Intake | MM2055-Paul Henderson | | MM2102-Allison Prohn | |
| | **Code:** Initial | | | | |
| | **Remarks:** | | | | |

**Seq #**   10

| **Tag Number:** | 2020-00003313 | **Item Number:** | 10 | | |
|-----------------|---------------|-------------------|----|-|-|
| **Property Codes:** | **Property Type:** Photographs | **Property Class:** | | **Date Received:** | 06/30/2020 |
| Evidence | **UCR Value:** | **Initial Value:** | | **Stolen Location:** | |
| **Quantity:** | **Unit of Measure:** | **Measurement Source:** | | | |

**Description:**   Facebook post made by Shoreline PD      **Officer Remarks:**

| **Make:** | **Model:** | **Style:** | **Style Desc:** |
|-----------|-----------|------------|------------------|
| **Year:** | **OAN:** | **Serial #:** | **Color:** |
| **Condition:** | **Reg. Type:** | **Reg. ORI:** | **Reg. Number:** |
| **Reg. State:** | **Reg. Year:** | **Reg. Date:** | **Reg. Expiration:** |

<u>Recovery Information</u>

| **Location:** | **Date:** | **Code:** | **Value:** |
|---------------|-----------|-----------|------------|
| **RFOJ?:** | **ORI:** | **Recovered Address:** | |

<u>Associated Subjects</u>

| Type | Name | Address | Phone | Notified How | Date |
|------|------|---------|-------|--------------|------|
| Owner | | | | | |

**Insurance Company:**          **Policy Number:**          **Lein Holder:**

<u>Chain of Custody</u>

| Date | Transaction | From | From Role | To | To Role |
|------|-------------|------|-----------|-----|---------|
| 06/30/2020 09:05 | **Type:** Intake | MM2055-Paul Henderson | | MM2102-Allison Prohn | |
| | **Code:** Initial | | | | |
| | **Remarks:** | | | | |

**Seq #**   9

| **Tag Number:** | 2020-00003313 | **Item Number:** | 9 | | |
|-----------------|---------------|-------------------|----|-|-|
| **Property Codes:** | **Property Type:** Photographs | **Property Class:** | | **Date Received:** | 06/18/2020 |
| Evidence | **UCR Value:** | **Initial Value:** | | **Stolen Location:** | |
| **Quantity:** | **Unit of Measure:** | **Measurement Source:** | | | |

**Description:**   Screen captures and photographs provided by Jeremy Muir      **Officer Remarks:**

| **Make:** | **Model:** | **Style:** | **Style Desc:** |
|-----------|-----------|------------|------------------|
| **Year:** | **OAN:** | **Serial #:** | **Color:** |
| **Condition:** | **Reg. Type:** | **Reg. ORI:** | **Reg. Number:** |
| **Reg. State:** | **Reg. Year:** | **Reg. Date:** | **Reg. Expiration:** |

<u>Recovery Information</u>

| **Location:** | **Date:** | **Code:** | **Value:** |
|---------------|-----------|-----------|------------|
| **RFOJ?:** | **ORI:** | **Recovered Address:** | |

<u>Associated Subjects</u>

| Type | Name | Address | Phone | Notified How | Date |
|------|------|---------|-------|--------------|------|
| Owner | | | | | |

**Insurance Company:**          **Policy Number:**          **Lein Holder:**



# Monroe Police Department
## Detail



**Print Date/Time:**   11/05/2020 14:05                      Monroe Police Department
**Login ID:**   mm2097                                       **ORI Number:**   WA0311200
**Case Number:**   2020-00003313

<u>**Chain of Custody**</u>

| Date | Transaction | From | From Role | To | To Role |
|------|-------------|------|-----------|-----|---------|
| 06/18/2020 13:11 | **Type:** Intake **Code:** Initial **Remarks:** | MM2055-Paul Henderson | | MM2102-Allison Prohn | |

**Seq #**   8

**Tag Number:** 2020-00003313   **Item Number:**   8

| <u>Property Codes:</u> | **Property Type:** Digital Media | Property Class: | | **Date Received:** | 06/03/2020 |
|---|---|---|---|---|---|
| Evidence | UCR Value: | Initial Value: | | Stolen Location: | |
| Quantity: | Unit of Measure: | Measurement Source: | | | |
| **Description:** | Screenshot of Shoreline PD Facebook post and comments | Officer Remarks: | | | |
| Make: | Model: | Style: | | Style Desc: | |
| Year: | OAN: | Serial #: | | Color: | |
| Condition: | Reg. Type: | Reg. ORI: | | Reg. Number: | |
| Reg. State: | Reg. Year: | Reg. Date: | | Reg. Expiration: | |

<u>**Recovery Information**</u>

| Location: | Date: | Code: | Value: |
|---|---|---|---|
| RFOJ?: | ORI: | Recovered Address: | |

<u>**Associated Subjects**</u>

| Type | Name | Address | Phone | Notified How | Date |
|------|------|---------|-------|--------------|------|
| Owner | | | | | |

| Insurance Company: | Policy Number: | Lein Holder: |
|---|---|---|

<u>**Chain of Custody**</u>

| Date | Transaction | From | From Role | To | To Role |
|------|-------------|------|-----------|-----|---------|
| 06/03/2020 12:41 | **Type:** Intake **Code:** Initial **Remarks:** | MM2055-Paul Henderson | | MM2102-Allison Prohn | |



# Monroe Police Department
## Detail



**Print Date/Time:** 11/05/2020 14:05
**Login ID:** mm2097
**Case Number:** 2020-00003313

Monroe Police Department
**ORI Number:** WA0311200

**Seq #** 7

| **Tag Number:** 2020-00003313 | **Item Number:** 5 | | | |
|---|---|---|---|---|
| **Property Codes:** | **Property Type:** Recordings | **Property Class:** | | **Date Received:** 05/25/2020 |
| Evidence | **UCR Value:** | **Initial Value:** | | **Stolen Location:** |
| **Quantity:** | **Unit of Measure:** | **Measurement Source:** | | |
| **Description:** Voicemail left on Gayle Hanks' phone | | **Officer Remarks:** | | |
| **Make:** | **Model:** | **Style:** | | **Style Desc:** |
| **Year:** | **OAN:** | **Serial #:** | | **Color:** |
| **Condition:** | **Reg. Type:** | **Reg. ORI:** | | **Reg. Number:** |
| **Reg. State:** | **Reg. Year:** | **Reg. Date:** | | **Reg. Expiration:** |

**Recovery Information**

| **Location:** | **Date:** | **Code:** | **Value:** |
|---|---|---|---|
| **RFOJ?:** | **ORI:** | **Recovered Address:** | |

**Associated Subjects**

| Type | Name | Address | Phone | Notified How | Date |
|---|---|---|---|---|---|
| Owner | | | | | |

**Insurance Company:**          **Policy Number:**          **Lein Holder:**

**Chain of Custody**

| Date | Transaction | From | From Role | To | To Role |
|---|---|---|---|---|---|
| 05/25/2020 09:55 | **Type:** Intake | MM2055-Paul Henderson | | MM2102-Allison Prohn | |
| | **Code:** Initial | | | | |
| | **Remarks:** | | | | |

**Seq #** 6

| **Tag Number:** 2020-00003313 | **Item Number:** 4 | | | |
|---|---|---|---|---|
| **Property Codes:** | **Property Type:** Recordings | **Property Class:** | | **Date Received:** 05/25/2020 |
| Evidence | **UCR Value:** | **Initial Value:** | | **Stolen Location:** |
| **Quantity:** | **Unit of Measure:** | **Measurement Source:** | | |
| **Description:** Audio recorded interview of Gayle Hanks | | **Officer Remarks:** | | |
| **Make:** | **Model:** | **Style:** | | **Style Desc:** |
| **Year:** | **OAN:** | **Serial #:** | | **Color:** |
| **Condition:** | **Reg. Type:** | **Reg. ORI:** | | **Reg. Number:** |
| **Reg. State:** | **Reg. Year:** | **Reg. Date:** | | **Reg. Expiration:** |

**Recovery Information**

| **Location:** | **Date:** | **Code:** | **Value:** |
|---|---|---|---|
| **RFOJ?:** | **ORI:** | **Recovered Address:** | |

**Associated Subjects**

| Type | Name | Address | Phone | Notified How | Date |
|---|---|---|---|---|---|
| Owner | | | | | |

**Insurance Company:**          **Policy Number:**          **Lein Holder:**



# Monroe Police Department
## Detail



**Print Date/Time:** 11/05/2020 14:05
**Login ID:** mm2097
**Case Number:** 2020-00003313

Monroe Police Department
**ORI Number:** WA0311200

<u>**Chain of Custody**</u>

| Date | Transaction | From | From Role | To | To Role |
|---|---|---|---|---|---|
| 05/25/2020 09:55 | **Type:** Intake | MM2055-Paul Henderson | | MM2102-Allison Prohn | |
| | **Code:** Initial | | | | |
| | **Remarks:** | | | | |

**Seq #** 5

**Tag Number:** 2020-00003313   **Item Number:** 7

| **Property Codes:** | **Property Type:** Photographs | Property Class: | | **Date Received:** 05/26/2020 |
|---|---|---|---|---|
| Evidence | UCR Value: | Initial Value: | | Stolen Location: |

| Quantity: | Unit of Measure: | Measurement Source: | |
|---|---|---|---|

**Description:** Pictures at home of Gayle Hanks (Facebook posts and answering machine)   Officer Remarks:

| Make: | Model: | Style: | Style Desc: |
|---|---|---|---|
| Year: | OAN: | Serial #: | Color: |
| Condition: | Reg. Type: | Reg. ORI: | Reg. Number: |
| Reg. State: | Reg. Year: | Reg. Date: | Reg. Expiration: |

<u>**Recovery Information**</u>

| Location: | Date: | Code: | Value: |
|---|---|---|---|
| RFOJ?: | ORI: | Recovered Address: | |

<u>**Associated Subjects**</u>

| Type | Name | Address | Phone | Notified How | Date |
|---|---|---|---|---|---|
| Owner | | | | | |

| Insurance Company: | Policy Number: | Lein Holder: |
|---|---|---|

<u>**Chain of Custody**</u>

| Date | Transaction | From | From Role | To | To Role |
|---|---|---|---|---|---|
| 05/26/2020 08:35 | **Type:** Intake | MM2055-Paul Henderson | | MM2102-Allison Prohn | |
| | **Code:** Initial | | | | |
| | **Remarks:** | | | | |

 

# Monroe Police Department
# Detail

**Print Date/Time:** 11/05/2020 14:05
**Login ID:** mm2097
**Case Number:** 2020-00003313

Monroe Police Department
**ORI Number:** WA0311200

**Seq #** 4

**Tag Number:** 2020-00003313 **Item Number:** 6
**Property Codes:** **Property Type:** Photographs **Property Class:** **Date Received:** 05/26/2020
Evidence **UCR Value:** **Initial Value:** **Stolen Location:**
**Quantity:** **Unit of Measure:** **Measurement Source:**
**Description:** Screenshots of emails (provided by Jeremy Muir) **Officer Remarks:**
**Make:** **Model:** **Style:** **Style Desc:**
**Year:** **OAN:** **Serial #:** **Color:**
**Condition:** **Reg. Type:** **Reg. ORI:** **Reg. Number:**
**Reg. State:** **Reg. Year:** **Reg. Date:** **Reg. Expiration:**

**Recovery Information**

**Location:** **Date:** **Code:** **Value:**
**RFOJ?:** **ORI:** **Recovered Address:**

**Associated Subjects**

| Type | Name | Address | Phone | Notified How | Date |
|------|------|---------|-------|--------------|------|
| Owner | | | | | |

**Insurance Company:** **Policy Number:** **Lein Holder:**

**Chain of Custody**

| Date | Transaction | From | From Role | To | To Role |
|------|-------------|------|-----------|-----|---------|
| 05/26/2020 08:35 | **Type:** Intake | MM2055-Paul Henderson | | MM2102-Allison Prohn | |
| | **Code:** Initial | | | | |
| | **Remarks:** | | | | |

**Seq #** 3

**Tag Number:** 2020-00003313 **Item Number:** 2
**Property Codes:** **Property Type:** Digital Media **Property Class:** **Date Received:** 02/19/2020
Evidence **UCR Value:** **Initial Value:** **Stolen Location:**
**Quantity:** **Unit of Measure:** **Measurement Source:**
**Description:** Documents (on USB drive) provided by Det. Alspach **Officer Remarks:**
**Make:** **Model:** **Style:** **Style Desc:**
**Year:** **OAN:** **Serial #:** **Color:**
**Condition:** **Reg. Type:** **Reg. ORI:** **Reg. Number:**
**Reg. State:** **Reg. Year:** **Reg. Date:** **Reg. Expiration:**

**Recovery Information**

**Location:** **Date:** **Code:** **Value:**
**RFOJ?:** **ORI:** **Recovered Address:**

**Associated Subjects**

| Type | Name | Address | Phone | Notified How | Date |
|------|------|---------|-------|--------------|------|
| Owner | | | | | |

**Insurance Company:** **Policy Number:** **Lein Holder:**



# Monroe Police Department
## Detail



**Print Date/Time:** 11/05/2020 14:05
**Login ID:** mm2097
**Case Number:** 2020-00003313

Monroe Police Department
**ORI Number:** WA0311200

<u>**Chain of Custody**</u>

| Date | Transaction | | From | From Role | To | To Role |
|---|---|---|---|---|---|---|
| 02/19/2020 17:58 | **Type:** | Intake | MM2055-Paul Henderson | | MM2090-Renee' Acree | |
| | **Code:** | Initial | | | | |
| | **Remarks:** | | | | | |

**Seq #** 2

**Tag Number:** 2020-00003313 **Item Number:** 3

| Property Codes: | Property Type: | Other | Property Class: | | Date Received: | 02/19/2020 |
|---|---|---|---|---|---|---|
| Evidence | UCR Value: | | Initial Value: | | Stolen Location: | |
| Quantity: | Unit of Measure: | | Measurement Source: | | | |
| **Description:** | Letter mailed to Shoreline Police Chief Ledford | | Officer Remarks: | | | |
| Make: | Model: | | Style: | | Style Desc: | |
| Year: | OAN: | | Serial #: | | Color: | |
| Condition: | Reg. Type: | | Reg. ORI: | | Reg. Number: | |
| Reg. State: | Reg. Year: | | Reg. Date: | | Reg. Expiration: | |

<u>**Recovery Information**</u>

| Location: | Date: | Code: | Value: |
|---|---|---|---|
| RFOJ?: | ORI: | Recovered Address: | |

<u>**Associated Subjects**</u>

| Type | Name | Address | Phone | Notified How | Date |
|---|---|---|---|---|---|
| Owner | | | | | |

| Insurance Company: | Policy Number: | Lein Holder: |
|---|---|---|

<u>**Chain of Custody**</u>

| Date | Transaction | | From | From Role | To | To Role |
|---|---|---|---|---|---|---|
| 02/19/2020 17:58 | **Type:** | Intake | MM2055-Paul Henderson | | MM2090-Renee' Acree | |
| | **Code:** | Initial | | | | |
| | **Remarks:** | | | | | |
| 02/20/2020 11:34 | **Type:** | Release | MM2090-Renee' Acree | Property Officer | WSP Latent Lab | |
| | **Code:** | Lab Analysis | | | | |
| | **Expected Return Date:** | | | | | |
| | **Remarks:** | | | | | |
| 03/04/2020 15:37 | **Type:** | Intake | MM2090-Renee' Acree | Property Officer | MM2090-Renee' Acree | Property Officer |
| | **Code:** | Returned from Lab Analysis | | | | |
| | **Remarks:** | | | | | |



# Monroe Police Department
## Detail



**Print Date/Time:** 11/05/2020 14:05
**Login ID:** mm2097
**Case Number:** 2020-00003313

Monroe Police Department
**ORI Number:** WA0311200

**Seq #** 1

**Tag Number:** 2020-00003313     **Item Number:** 1

| Property Codes: | Property Type: | Photographs | Property Class: | | Date Received: | 02/19/2020 |
|---|---|---|---|---|---|---|
| Evidence | UCR Value: | | Initial Value: | | Stolen Location: | |
| Quantity: | Unit of Measure: | | Measurement Source: | | | |

**Description:** Facebook posts provided by Nan Skinner     **Officer Remarks:**

| Make: | Model: | Style: | Style Desc: |
|---|---|---|---|
| Year: | OAN: | Serial #: | Color: |
| Condition: | Reg. Type: | Reg. ORI: | Reg. Number: |
| Reg. State: | Reg. Year: | Reg. Date: | Reg. Expiration: |

**Recovery Information**

| Location: | Date: | Code: | Value: |
|---|---|---|---|
| RFOJ?: | ORI: | Recovered Address: | |

**Associated Subjects**

| Type | Name | Address | Phone | Notified How | Date |
|---|---|---|---|---|---|
| Owner | | | | | |

| Insurance Company: | | Policy Number: | | Lein Holder: | |
|---|---|---|---|---|---|

**Chain of Custody**

| Date | Transaction | From | From Role | To | To Role |
|---|---|---|---|---|---|
| 02/19/2020 17:43 | **Type:** Intake | MM2055-Paul Henderson | | MM2090-Renee' Acree | |
| | **Code:** Initial | | | | |
| | **Remarks:** | | | | |

## Vehicles

| No. | Role | Vehicle Type | Year | Make | Model | Color | License Plate | State |
|---|---|---|---|---|---|---|---|---|

**Supervisor**                                                                                     **Date:**

**Routing:**

- ☐ Liquor Board
- ☐ Dawson Place
- ☐ Juvenile Court
- ☐ Juvenile Prosecutor
- ☐ Mental Health
- ☐ APS
- ☐ CPS
- ☐ Other_____
- ☐ County Prosecutor
- ☐ Domestic Violence Unit
- ☐ City Prosecutor
- ☐ Detectives

**MM Case, Officer: mm2055, Supervisor: mm2042, Merged By:  mm2051**

| | | | |
|---|---|---|---|
| | **MONROE POLICE DEPARTMENT**<br>818 W Main St<br>Monroe, WA 98272<br>(360) 794-6300 | **Initial Case Report** | |
| | | Case Report # **2020-00003313** | |

| | | | |
|---|---|---|---|
| **EVENT** | OCCURRED INCIDENT TYPE<br>**Harassment** | DATE/TIME REPORTED<br>**02/19/2020    15:00** | ASSOCIATED CASES |
| | LOCATION OF OCCURRENCE<br>**15591 168TH AVE SE**<br>**MONROE, WA 98272** | OCCURRED DATE/TIME<br>**01/15/2015    15:00**<br>OCCURRED THROUGH<br>**01/21/2020    15:00** | |

| | STATUTE / DESCRIPTION | Counts | Attempt/Commit |
|---|---|---|---|
| **OFFENSES** | **HARASSMENT PREV CONV OR THREAT TO KILL DV**<br>9A.46.020.2B.DV | 1 | **Commit** |
| | **STALKING FELONY DV**<br>9A.46.110.5B.DV | 1 | **Commit** |
| | | | |

| | | | |
|---|---|---|---|
| **SUBJECT** | ☐ NON-DISCLOSURE | | |
| | SUBJECT TYPE<br>**Victim** | NAME<br>**Adult / MUIR, JEREMY ALFRED** | DOB / AGE RANGE |
| | ADDRESS<br>**15591 168TH AVE SE**<br>**MONROE, WA 98272-1458** | | PRIMARY PHONE<br><br>SECONDARY PHONE |

| | RACE<br>**White** | SEX<br>**Male** | HEIGHT<br>**5' 10** | WEIGHT<br>**190** | HAIR | EYE<br>**BLU** |
|---|---|---|---|---|---|---|
| | DL NUMBER | | DL STATE<br>**WA** | EMPLOYER | | |

| | | | |
|---|---|---|---|
| **SUBJECT** | ☐ NON-DISCLOSURE | | |
| | SUBJECT TYPE<br>**Suspect** | NAME<br>**Adult / FOSS, MAGDALENA KRISTIN** | DOB / AGE RANGE |
| | ADDRESS<br>**22718 135TH AVE SE**<br>**KENT, WA 98042-3730** | | PRIMARY PHONE<br><br>SECONDARY PHONE |

| | RACE<br>**White** | SEX<br>**Female** | HEIGHT<br>**6' 0** | WEIGHT<br>**175** | HAIR | EYE<br>**BRO** |
|---|---|---|---|---|---|---|
| | DL NUMBER | | DL STATE<br>**WA** | EMPLOYER | | |

| | | | |
|---|---|---|---|
| **VEHICLE** | PROPERTY CODE | YEAR | COLOR |
| | TYPE /<br>MAKE / | MODEL / | |
| | PLATE | STATE | VIN | VALUE |
| | DESCRIPTION | | |

| | | | |
|---|---|---|---|
| **PROPERTY** | PROPERTY CODE | | |
| | SERIAL NUMBER | QTY/UNIT OF MEASURE | VALUE | COLOR |
| | TYPE /<br>MAKE / | MODEL / | |
| | DESCRIPTION | | |

| | | |
|---|---|---|
| REPORTING OFFICER / ID #<br>**Henderson, Paul**          **2055** | APPROVING SUPERVISOR<br>**Ryan, Paul** | |

Complete report details do not print in this format.



**MONROE POLICE DEPARTMENT**
818 W Main St
Monroe, WA 98272
(360) 794-6300

| Initial Case Report |
|---|
| Case Report #  **2020-00003313** |

## NARRATIVE

This report was created by Detective Henderson in order to add involved subjects to the case. No further information at this time.

This report was submitted from an electronic device owned, issued, or maintained by a law enforcement agency using my user ID and password. I certify or declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

| REPORTING OFFICER  ID # | | APPROVING SUPERVISOR |
|---|---|---|
| **Henderson, Paul** | **2055** | **Ryan, Paul** |
| LOCATION SIGNED  **Snohomish County, WA** | | DATE SIGNED  **02/20/2020** |

This officer's narrative is complete when an approving supervisor's name is attached. Complete report details do not print in this format.

**MM Superform, Officer: mm2055, Supervisor: mm2022, Merged By:  mm2040**

## SNOHOMISH COUNTY SUPERFORM

<table>
<tr><td rowspan="2">COURT</td><td>ARREST TYPE:<br>Referred</td><td colspan="2">AGENCY:<br>Monroe Police Department</td><td colspan="2">DEPUTY/OFFICER/TROOPER:<br>Henderson, Paul</td><td>CASE#:<br>2020-00003313</td></tr>
<tr><td colspan="2">[X] SUPERIOR        [ ] JUVENILE</td><td>JUV#</td><td colspan="2">REF#</td><td></td></tr>
</table>

DISTRICT/MUNI. COURT:     Snohomish County Superior Court

<table>
<tr><td rowspan="8">SUSPECT DATA</td><td colspan="2">DATE AND TIME OF ARREST:<br>03/26/2020    12:00</td><td>BOOKING / ADMISSION   DATE/TIME:<br>/    /    Hours</td><td colspan="2">RELEASE   DATE / TIME:</td><td colspan="2">IDENTITY IN DOUBT?   YES  NO<br>EXPLAIN:</td></tr>
<tr><td colspan="2">NAME: LAST<br>FOSS</td><td>FIRST<br>MAGDALENA</td><td colspan="2">MIDDLE<br>KRISTIN</td><td>DOB:</td><td>Interpreter needed?  No<br>Lang:</td></tr>
<tr><td>SEX:<br>Female</td><td>RACE:<br>W</td><td>HGT:<br>6' 0</td><td>WGT:<br>175</td><td>HAIR:<br>BRO</td><td>EYES:<br>BRO</td><td>DRIVER'S LN:</td><td>STATE:<br>WA</td><td>CDL?</td><td>SSN#:<br>--</td></tr>
<tr><td colspan="4">LAST KNOWN ADDRESS:<br>22718 135TH AVE SE</td><td colspan="2">CITY:<br>KENT</td><td>STATE:<br>WA</td><td>ZIP:<br>98042-3730</td></tr>
<tr><td colspan="2">HOME PHONE:</td><td>OTHER. PHONE:</td><td colspan="2">ALIAS(S) / AKA(S):</td><td colspan="2">GANG AFFILIATION</td></tr>
<tr><td colspan="2">EMPLOYER:</td><td>CITY:</td><td colspan="2">W-PHONE:</td><td colspan="2">SOURCE OF LKA & EMPLOYER. INFO</td></tr>
</table>

<table>
<tr><td rowspan="10">PARENT/GUARDIAN<br>(Juveniles only)</td><td>FATHER:</td><td>ADDRESS:</td><td>CITY:</td><td>ST:</td><td>ZIP:</td><td>HOME PHONE:</td></tr>
<tr><td>MOTHER:</td><td>ADDRESS:</td><td>CITY:</td><td>ST:</td><td>ZIP:</td><td>HOME PHONE:</td></tr>
<tr><td>STEP: [ ] MOTHER. [ ] FATHER.</td><td>ADDRESS:</td><td>CITY:</td><td>ST:</td><td>ZIP:</td><td>HOME PHONE:</td></tr>
<tr><td>GUARDIAN /FOSTER/DSHS</td><td>ADDRESS:</td><td>CITY:</td><td>ST:</td><td>ZIP:</td><td>PHONE:</td></tr>
<tr><td>FATHER'S EMPLOYER:</td><td>WORK NUMBER:</td><td colspan="2">MOTHER'S EMPLOYER:</td><td colspan="2">WORK NUMBER:</td></tr>
<tr><td>DETENTION<br>NOTIFICATION<br>(Youth Center Use Only)</td><td colspan="3">PARENTS, GUARDIANS,  CUSTODIANS  NOTIFIED:<br><br>BY WHOM:</td><td colspan="2">HOW:<br><br>WHY NOT?</td></tr>
</table>

<table>
<tr><td rowspan="4">SUSPECT'S<br>VEHICLE INFO</td><td>VEHICLE LICENSE NO.</td><td>STATE</td><td>EXPIRES:</td><td>VEH. YR.:</td><td colspan="2">MAKE/MODEL:</td><td>STYLE:</td><td>COLOR:</td></tr>
<tr><td>TRAILER #1 LICENSE:</td><td>STATE:</td><td>EXPIRES:</td><td>TR. YR.:</td><td colspan="2">TRAILER #2 LICENSE:</td><td>STATE:    EXPIRES:</td><td>TR. YR.</td></tr>
<tr><td colspan="2">OWNER (COMPANY IF OTHER. THAN DRIVER:</td><td colspan="2">ADDRESS:</td><td colspan="2">CITY:</td><td>STATE:</td><td>ZIP:</td></tr>
<tr><td>ACCIDENT:<br>NO NR R I F</td><td>BAC READING:<br><br>BAC #1      BAC #2</td><td colspan="2">COMMERICAL VEHICLE:<br>[ ] YES [ ] NO</td><td>HAZMAT?<br>[ ] YES [ ] NO</td><td>EXEMPT VEHICLE: [ ] FARM [ ] R.V. [ ] FIRE<br>[ ] OTHER:</td><td colspan="2">PASS UNDER 16:<br>[ ] YES [ ] NO</td></tr>
</table>

<table>
<tr><td rowspan="2">HEALTH<br>&SAFETY</td><td colspan="4">HEALTH:<br>[ ] AUTO ACCIDENT          [ ] CONTAGIOUS          [ ] MENTAL ISSUES          [ ] OTHER<br>[ ] CHRONIC HEALTH ISSUES  [ ] INJURED             [ ] SUICIDAL</td></tr>
<tr><td colspan="4">EXPLAIN:</td></tr>
</table>

<table>
<tr><td>SUSPECT<br>DATA</td><td>NUMBER OF CO-SUSPECTS:          NAMES:</td></tr>
</table>

# SNOHOMISH COUNTY SUPERFORM

| | OFFENSE LOCATION: | | | CITY: | | STATE: | | DATE AND TIME OF OFFENSE: | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **OFFENSE DATA** | ARREST LOCATION (IF DIFFERENT): | | | WERE DRUGS INVOLVED IN THIS INCIDENT? IF YES, LIST DRUG(S) TYPE: | | | WAS ALCOHOL INVOLVED IN THIS INCIDENT? EXPLAIN: | | | |
| | | COUNT | ATTEMPT / COMMIT | | | CHARGE: (i.e. Assault4°) | | | | |
| | COURT OF RECORD | | CLASS | CONSPIRE / SOLICIT | WARRANT ARREST | RCW, Municipal or County Code (I. E. 9A.36.04I ) | | Warrant or Citation # Number | | Bail |
| 1 | DV [X] | 1 | Commit | | | STALKING FELONY DV | | | | |
| 1 | SUP | Felony C | | | [ ] | 9A.46.110.5B.DV | | | | $ |
| 2 | DV [ ] | | | | | | | | | |
| 2 | | | | | [ ] | | | | | $ |
| 3 | DV [ ] | | | | | | | | | |
| 3 | | | | | [ ] | | | | | $ |
| 4 | DV [ ] | | | | | | | | | |
| 4 | | | | | [ ] | | | | | $ |

| | NOTIFY ON RELEASE? **No** | IF UNABLE TO CONTACT, NOTIFY 911? **No** | | IF DV, REQUEST N.C. ORDER? **Yes** | FIREARMS IN HOME? **Yes** | | PRIOR UNREPORTED VIOLENCE? **No** | CHILDREN PRESENT? AGES: |
|---|---|---|---|---|---|---|---|---|
| **VICTIM INFO – DV, VIO, SAU, TRAFFIC** | VICTIM NAME: LAST **MUIR** | | FIRST **JEREMY** | MIDDLE **ALFRED** | DATE OF BIRTH | PHONE: | | ALT. PHONE: |
| | VICTIM'S ADDRESS: **15591 168TH AVE SE** | | | | CITY: **MONROE** | | STATE **WA** | ZIP: **98272-1458** |
| | SUSPECT RELATIONSHIP TO VICTIM: **Acquaintance** | | EMERGENCY / ALTERNATE CONTACT: | | | | EMERGENCY / ALTERNATE CONTACT PHONE: | |
| | GUARDIAN NAME AND PHONE NUMBER (IF VICTIM IS A MINOR): | | | | NEXT OF KIN – NAME AND PHONE NUMBER (IF VICTIM IS DECEASED): | | | |

| | TOTAL CASH: | TO JAIL PROPERTY: |
|---|---|---|
| **SUSPECT'S PROPERTY** | PROPERTY IMPOUNDED TO EVIDENCE: | OTHER PROPERTY: |
| | SEIZED FIREARM FOR FORFEITURE? YES / NO EXPLAIN: | |

| | WILL LIKELY FAIL TO APPEAR FOR FURTHER PROCEEDINGS: | WILL INTIMIDATE OR INTERFERE WITH ADMINISTRATION OF JUSTICE: |
|---|---|---|
| **OBJECTIONS TO RELEASE** | DETENTION REQUIRED TO PROTECT ARRESTEE FROM HERSELF/HIMSELF | COMMITTED A CRIME WHILE ANOTHER CASE IS PENDING: |
| | DESCRIBE RELATION TO VIC: ASSAULTIVE: | PHYSICAL INJURY TO VICTIM / WITNESS / OFFICER: |
| | WEAPONS INVOLVED? EXPLAIN: | DANGER / THREAT TO COMMUNITY IF RELEASED? |
| | U. S. CITIZEN? **Yes** OTHER: (FTA, LACK OF COMMUNITY TIES, ETC.) | |
| | REASON: | |

| | CONTROLLED SUBSTANCE | | TYPES & AMOUNTS (WEIGHTS) | |
|---|---|---|---|---|
| **PHYSICAL EVIDENCE** | WEIGHED AND FIELD TESTED? | YES / NO | | |
| | WEIGHED AND FIELD TESTED? | YES / NO | | |
| | WEIGHED AND FIELD TESTED? | YES / NO | | |
| | VEHICLE INFORMATION STOLEN VEH. REPORT ATTACHED? YES / NO | FAIR MARKET VALUE. $ | PROPERTY (Stolen, Recovered, Damaged, Etc): | FAIR MARKET VALUE $ |

Suspect's Name: **FOSS, MAGDALENA KRISTIN**                    Case # **2020-00003313**

# SNOHOMISH COUNTY SUPERFORM

### Synopsis / PC for Arrest
#### (Include all elements of the crimes, date of violation, and location of crimes)

**2020-3313: Prosecutor Summary**

In March of 2010, Jeremy Muir and Maggie Foss both worked for the King County Sheriff's Office (KCSO); Muir as a Deputy and Foss as a 911 dispatcher. The two went out to a bar with a group of friends and afterwards went to the house of one of the friends (Kerri Halberg). The two had sexual intercourse under a blanket that was provided by Halberg after she instructed them not to have sex on the couch. Another resident named Nick Baisch walked in on them having sex. Muir and Foss decided to drive to Foss's home, at which point she gave him another condom before having sexual intercourse a second time. They did not continue a sexual relationship but did see each other at social gatherings.

Four years later in 2014, Jeremy Muir was dating Brandy Drake who was a co-worker of Maggie Foss. The two women were at a party together when Foss told Drake of her own sexual encounter with Muir, detailing how she passed out before Muir began having sex with her. When Drake asked Foss to clarify if she was insinuating the sex was not consensual, Foss replied, "Not really". Afterwards, Drake called Muir to explain the conversation she just had with Foss. Muir immediately self-reported the conversation to his supervisor, who in turn reported it to the KCSO Internal Investigations Unit (IIU 2014-106). Based on witness testimony and Foss's own admission of not being raped, the investigation was closed as unfounded.

Prior to this investigation, Maggie Foss and Jeremy Davy (also a KCSO Deputy) were married in 2013. In 2014, the two of them began filing Public Records Disclosure Requests specifically related to Jeremy Muir. In 2015, Maggie Foss filed a criminal complaint based on the same sexual assault report that was previously investigated by IIU. The criminal investigation was forwarded to the King County Prosecutor's Office who ultimately declined the case. Since then, multiple IIU investigations into Jeremy Muir have been opened based on complaints made by Maggie Foss and Jeremy Davy. Derogatory social media posts made by Maggie Foss have been increasing in frequency and shared thousands of times. In many of these posts, Maggie Foss claims that Muir "acquaintance-raped" her while posting pictures of Muir and telling readers to be cautious of this "dirty cop". These posts have been made on multiple platforms to include Facebook, Instagram and Twitter.

Foss has been making the posts directly to Facebook pages associated with locations where Muir is known to work as a Deputy, including his current assignment in the City of Shoreline and where he works overtime shifts in the City of Burien. This has resulted in citizen complaints, a change in Muir's work assignment based on threats made on social media, and other changes in Muir's work environment. Between 2013 and 2020, Foss repeatedly harassed Muir as shown in the following examples:

1. Foss continues to make social media posts naming Jeremy Muir as a sexual predator and rapist. The posts are

I certify or declare under the penalty of perjury under the laws of the State of Washington that the forgoing statement is true and correct. (RCW 9A.72.085)

| OFFICER'S NAME: Henderson, Paul | PER # 2055 | CONTACT # | TRANSPORT OFFICER |
|---|---|---|---|

| OFFICER'S SIGNATURE: | Snohomish County | WA | 03/26/2020 | PRECINCT / STATION |
|---|---|---|---|---|
| | Location signed: City | State | Date | |

This document was submitted to the Snohomish County Prosecutor's Office on a device that is owned, issued, or maintained by a criminal justice agency.

| IBR CLEARANCE (ONE) | INSUFF / CLD | COPIES MADE FOR: | | JUV | DET | PREC | CTH | SPEC | DATA ENTRY | Approved By: |
|---|---|---|---|---|---|---|---|---|---|---|
| ARR/A | EXC/A | OTHER / CLD | PA | DPS | | MH | OTHER: | | | |
| ARR/J | EXC/J | UNF | PAT | DSHS | | | | | | |

Rev. 2/24/2015

# SNOHOMISH COUNTY SUPERFORM

### Synopsis / PC for Arrest
#### (Include all elements of the crimes, date of violation, and location of crimes)

made on her own social media accounts as well as Facebook groups for Shoreline and Burien communities where Muir works, even though Foss does not live in either location.

2.  Between August 1, 2014 and September 13, 2016, Maggie Foss and her husband Jeremy Davy made over 150 Public Disclosure Requests (PDR) specifically referencing Jeremy Muir.

3.  While obtaining contact information through PDR's, Foss communicated with numerous individuals that Muir contacted during the performance of his official duties. Foss would file complaints on their behalf in order to have internal investigations opened against Muir.

4.  Foss has used public disclosure requests to obtain complaints made about Muir to his employer, and subsequently spread the allegations in those reports across social media, even when the complaints were investigated and found to be meritless.

5.  Foss is believed to have sent anonymous letters to his neighbors, police chief, and city administrator stating that Muir is a sexual predator.

6.  Based on a conversation overheard by his patrol partner, Muir believes that Foss is offering cash to people he has contacted during the performance of his official duties in order to entice complaints/internal investigations against him.

7.  Even after a KCSO Internal Investigation determined the rape allegation to be unfounded and a separate criminal investigation was declined by the King County Prosecutor's Office, Maggie Foss continues to spread unsubstantiated claims of Muir being a rapist and sexual predator on a multitude of social media platforms. These posts include Muir's full name, personal images, and what he does for work.

8.  While working as a KCSO dispatcher in July 2017, Maggie Foss took a 911 call from Brandon Vandemeer. While on the call, Vandemeer mentioned an earlier incident in which Muir issued him a traffic citation. Foss suggested that Muir lied about the citation and suggested he file a complaint to IIU while also giving Vandemeer the phone number to make the complaint. A subsequent Internal Investigation against Maggie Foss (IIU 2017-137) sustained findings of willful violations of the KCSO Code of Conduct, Ridicule of a member of the department, and conduct unbecoming. Maggie Foss resigned from KCSO immediately afterwards.

9.  Foss continues to willfully spread misinformation with the intent of placing Jeremy Muir's life in danger and directly impacting his ability to perform the official duties of law enforcement. This is evident with the content of posts, the requests to have others share the post (which she claims have been shared over 3,000 times), and Foss's own admission to make posts in specific community locations where Muir is known to work as a King County Sheriff's Office Deputy.

10. Foss filed a report with KCSO IIU stating she spoke with Muir's ex-wife, Rena Muir. Foss claimed that Rena was the victim of a crime at the hands of Jeremy Muir. The allegation was investigated and non-sustained.

11. Foss filed a report with KCSO IIU stating she spoke with Muir's other ex-wife, Lindsay Johanson. Foss claimed that Lindsay was the victim of a crime at the hands of Jeremy Muir. The allegation was investigated and non-sustained.

12. Jeremy Davy (Maggie Foss's husband) filed a report to KCSO Internal Investigation Unit alleging that after Muir

I certify or declare under the penalty of perjury under the laws of the State of Washington that the foregoing statement is true and correct. (RCW 9A.72.085)

| OFFICER'S NAME | Henderson, Paul | PER # | 2055 | CONTACT # | | TRANSPORT OFFICER | |

| OFFICER'S SIGNATURE: | | Snohomish County | WA | 03/26/2020 | PRECINCT / STATION |

Location signed: City   State   Date

This document was submitted to the Snohomish County Prosecutor's Office on a device that is owned, issued, or maintained by a criminal justice agency.

| IBR CLEARANCE (ONE) | INSUFF / CLD | COPIES MADE FOR: | | JUV | DET   PREC   CTH   SPEC | DATA ENTRY | Approved By: |
| ( ) ARR/A   EXC/A | OTHER / CLO | ( ) PA   DBS | | MH | OTHER: | | |
| ( ) ARR/J   EXC/J | LINE | ( ) PAT   DSHS | | | | | |

Rev. 2/24/2015

# SNOHOMISH COUNTY SUPERFORM

### Synopsis / PC for Arrest
#### (Include all elements of the crimes, date of violation, and location of crimes)

responded to a domestic violence call, he returned to the home and had sex with the victim (IIU 2015-150). The subsequent investigation revealed the allegations to be unfounded.

The actions by Maggie Foss not only show a six-year history of continued harassment, but also a clear intent to negatively influence Jeremy Muir's performance as a law enforcement officer. Muir describes feeling "harassed, intimidated and in fear of my safety as well as in fear for my career as a law enforcement officer". The emotional impact has been witnessed by numerous co-workers, including his superiors, and ultimately resulted in Muir needing professional counseling. The financial impact has caused significant loss of monthly income that Muir had been consistently receiving for multiple years. Muir also lost the ability to work at a local teen center where he enjoyed using his law enforcement career to mentor youth. Perhaps most importantly, the harassment negatively impacted the safety of Jeremy Muir and his co-workers to the point that leadership required him to work in a 2-man car due to concerns of retaliation from the public based on social media posts made by Maggie Foss. She also "liked" comments on her posts which insinuated Jeremy Muir being killed while working as a law enforcement officer. Maggie Foss admits on her own social media posts to specifically targeting audiences who reside in the same location where she believes Jeremy Muir would be performing his official duties as a law enforcement officer.

I certify or declare under the penalty of perjury under the laws of the State of Washington that the forgoing statement is true and correct. (RCW 9A.72.085)

OFFICER'S NAME  **Henderson, Paul**  PER # **2055**  CONTACT #     TRANSPORT OFFICER

OFFICER'S SIGNATURE:     **Snohomish County** , WA  **03/26/2020**  PRECINCT / STATION
              Location signed: City  State  Date

This document was submitted to the Snohomish County Prosecutor's Office on a device that is owned, issued, or maintained by a criminal justice agency.

| IBR CLEARANCE (ONE) | ( ) INSUFF / CLG | COPIES MADE FOR: | | | | DATA ENTRY | Approved By: |
|---|---|---|---|---|---|---|---|
| ( ) ARR/A ( ) EXC/A | ( ) OTHER / CLG | ( ) PA | ( ) DES | ( ) JUV | ( ) DET PREC CTH SPEC | | |
| ( ) ARR/J ( ) EXC/J | ( ) UNF | ( ) PAT | ( ) DSHS | ( ) MH | ( ) OTHER: | | |

Rev. 2/24/2015

# 2020-03313, Report, Henderson

**AGENCY NAME**
**Monroe Police Department**
   **Case Number**
**#2020-00003313**
   **Incident Date/Time**
**02-19-2020**


**My name is Paul Henderson and I am a Commissioned Police Detective for the City of Monroe.**
**01-16-2020**

**Detective Sergeant Hatch informed me of information related to a possible victim of harassment who had been identified as Jeremy Muir. I was told that Muir lives in Monroe and previously filed a police report related to letters being mailed to his neighbors with written cards inside advising that Muir is a sexual predator (Monroe Case 2019-21441). According to that report, Muir believes the person responsible is Maggie Foss; a woman he says has been harassing him since 2015, stemming from a rape allegation. According to Detective Sergeant Hatch, the harassment by Maggie Foss has significantly increased over the past few months and is now affecting his employment as a deputy for the King County Sheriff's Office (KCSO) with his current assignment at Shoreline Police Department (Contract City through KCSO). I was instructed to contact Detective Laura Alspach (King County Sheriff's Office – Shoreline Police) regarding information related to Jeremy Muir. Shoreline Police Department was requesting that an independent agency look into the allegations made by Jeremy Muir. Detective Sergeant Hatch also informed me that Jeremy Muir would be providing a statement detailing the history between him and Maggie Foss.**

**I contacted Detective Alspach, who agreed to meet with me on January 21, 2020.**

**01-21-2020**

**I met with Detective Alspach who described in detail what information had already been gathered. She was first briefed on the situation back in November (2019) of a possible stalking/harassment case between Jeremy Muir and Maggie Foss, with whom he had a prior sexual relationship with. Since that relationship, Foss has accused Muir of rape, harassment, and other serious crimes. Foss has posted numerous accusations all over social media claiming that Muir is a sexual predator. More recently, Foss has been posting the accusations on Facebook pages associated with locations where Muir is known to work as a Deputy. This has resulted in citizen complaints, a change in Muir's work assignment based on threats made on social media, and other changes in Muir's work environment. Detective Alspach gave me a copy of her report, which detailed her interview with Muir, as well as a detailed list of events pertaining to social media posts and other events directly related to this case. Detective Alspach provided other documents to include her handwritten notes, a summary of the internal investigation reference the rape allegation made by Maggie Foss, and copies of social media posts made by Maggie Foss to include Facebook, Instagram, and Twitter.**

**Detective Alspach informed me that as of this morning, there was another post made by Maggie Foss on a "Shoreline" Facebook page that was not affiliated with the city. The Facebook group is called "Shoreline Living" and an employee of the City of Shoreline who is a member of this Facebook group became concerned after reading the post and forwarded the post contents to city officials, including City Manager Debbie Tarry and Shoreline Police Chief Shawn Ledford. Detective Alspach explained how these two individuals had received handwritten cards in the mail very similar to the cards received by Muir's neighbors. City Manager Debbie Tarry opened her letter to find a card with the message, "Jeremy Muir is a sexual predator" written inside. When she confronted Chief Ledford about this, he acknowledged receipt of an identical envelope that had yet to be opened. Detective Alspach had the unopened letter in her possession, which was preserved inside an evidence bag. She transferred the letter to my possession, along with a thumb drive containing numerous social media posts made by Maggie Foss, to include the subsequent comments and "likes". Both of these items were booked into evidence. It should be noted that in all instances of the mailed letter (Monroe PD and Shoreline PD), the return address was listed as "J. Muir" with his home address. The unopened letter was sent to the Washington State Patrol Crime Laboratory for fingerprint analysis.**

**In my conversation with Detective Alspach, I learned that as a result of the Facebook post on "Shoreline Living", Jeremy Muir began riding with another KCSO Deputy for his own personal safety and to prevent any acts of retaliation against him. This was effective as of November 12, 2019. Only a few days prior to this, Kanwal Yousuf shared a post made by Maggie Foss onto her own Instagram account. Yousuf is a City of Shoreline employee who worked at the Shoreline Teen Recreation Center with Jeremy Muir. Yousuf had made a previous complaint against Muir which had been investigated (IIU 2018-17645) and found to have no valid complaints or policy violations. Based on Yousuf's Instagram post, she only proceeded to make additional allegations against Muir after being contacted by Maggie Foss. Jeremy Muir has been working overtime as a Deputy for the Shoreline Teen Recreation Center. Due to concerns based on the social media posts made by Maggie Foss, Muir was forced to stop working at this facility; something he had consistently been doing for nearly three years.**

Furthermore, Detective Alspach learned that Maggie Foss shared a derogatory Facebook post on another Facebook page called "Take back Burien". According to the post, Foss wrote that she decided to post on this specific page because she heard that Jeremy Muir works overtime in Burien from time to time. The derogatory social media posts by Maggie Foss referencing Jeremy Muir had been shared numerous times; each with their own list of comments. One such comment which was subsequently "liked" by Maggie Foss stated, "For that Muir dude hope he never walks the mainline… he'll diffently [sic] come up missing!!". There was another incident on December 17, 2019 at the King County Jail when Muir's patrol partner, Deputy Gaffin, was noticed by an inmate as working for the City of Shoreline. The inmate said a girl named Amanda spoke to a woman who offered her $100 to meet at a Starbucks to talk about Shoreline Deputy Muir. Detective Alspach expounded on the many instances when internal investigations were opened against Deputy Muir based on complaints made by Maggie Foss. There were also indications that Foss was conducting numerous records disclosure requests on dispatched calls and cases where Muir had responded as a Deputy and then subsequently contacting individuals involved in these cases to persuade them into filing complaints against Muir. Detective Alspach noted that prior to Maggie Foss leaving her job as a dispatcher for KCSO, there had been an internal investigation against her for multiple conduct violations.

After meeting with Detective Alspach, I attempted to locate the Facebook Administrator (Admin) for the page "Shoreline Living". One of the Admins was listed as Nan Skinner and I was also able to locate a phone number for her. My intent was to contact Skinner in hopes of documenting the post that Maggie Foss made on this specific Facebook page. I called Skinner and left a voicemail asking her to call me back.

**01-22-2020**

I spoke to Nan Skinner over the phone and requested that she "record" the Facebook post to include all comments. Skinner explained how Foss had actually made the post twice. Since making the post, comments had been turned off but the post had been allowed to remain in place. Later the same day, Skinner sent me an email with images from the Facebook post. These images were booked into evidence.

In the post, Maggie Foss begins by explaining it has been exactly three months since she "shared my post about the corrupt King County Sheriff's Office's complete botched and biased handling of my rape by KSCO Officer Jeremy Muir, which HE reported, (not me)." Foss goes on to brag that her post has been shared over 3,000 times before describing in great detail how the investigation into her rape was full of corruption and cover ups. There were numerous comments below the post, one of which was made by someone named Kealani Lynn Simpson in which she states, "I believe you. I also made it a point to go into the teen center and voice my concerns over Muir having contact with the teens there, (my son), and they said he wasn't allowed to be there. Idk what that means, but they knew exactly who Muir is…"

Nan Skinner also said she located the same post by Maggie Foss on other Facebook groups she belongs to, including a group called "Gift Everything Shoreline". One of the screen shots she recorded was a re-posting of Maggie Foss's original post onto another Facebook group that Skinner was a part of. This post included multiple images of Jeremy Muir and was shared by Heidie Katzen. Another screen shot provided by Skinner showed a picture of Jeremy Muir that was shared by Maggie Foss onto a Facebook group. Over the next couple of weeks, I attempted to have Skinner provide screen shots of all the Facebook groups she was a part of where Maggie Foss had shared her post of Jeremy Muir, or where someone had shared the post. Skinner was unable to document any further instances where the post was shared.

**02-19-2020**

I received a signed typed out statement from Jeremy Muir in which he detailed the long history of harassment by Maggie Foss. Muir explains how Foss began harassing him in the beginning of 2015 based on her false claim that he sexually assaulted her. Muir goes on to explain a list of actions by Foss which occurred after the false sexual assault claim to include the following:

Foss continues to make social media posts naming Jeremy Muir as a sexual predator or rapist along with images of him. These posts are not only made on her own social media accounts, but also on Facebook groups for Shoreline and Burien communities in which Muir works, even though Foss does not live in either location.
Foss has used public disclosure requests to obtain complaints made about Muir to his employer, and subsequently spread the allegations in those reports across social media, even when the complaints were investigated and found to be meritless.
Foss has sent anonymous letters to his neighbors, police chief, and city administrator stating that Muir is a sexual predator.
Based on the conversation overheard by his patrol partner, Muir believes that Foss is offering cash to people he has contacted while working in order to entice complaints/internal investigations against him.
Between August 1, 2014 and September 13, 2016, Maggie Foss and her husband Jeremy Davy (also a Deputy with KCSO) made over 150 Public Disclosure Requests (PDR) specifically referencing Jeremy Muir. Maggie Foss used complaints from the results of these PDR's to make reports against Muir to the KCSO Internal Investigations Unit.
Even after a KCSO Internal Investigation determined the rape allegation to be unfounded and a separate criminal investigation declined by the King County Prosecutor's Office, Maggie Foss continues to spread unsubstantiated claims of Muir being a rapist and sexual predator on a multitude of social media platforms. These posts include Muir's full name, personal images, and what he does for work.
While working as a KCSO dispatcher in July 2017, Maggie Foss took a 911 call from Brandon Vandemeer. While on the call,

Vandemeer mentioned an earlier incident in which Muir issued him a traffic citation. Foss suggested that Muir lied about the citation and suggested he file a complaint to IIU while also giving Vandemeer the phone number to make the complaint. A subsequent Internal Investigation against Maggie Foss (IIU 2017-137) sustained findings of willful violations of the KCSO Code of Conduct, Ridicule of a member of the department, and conduct unbecoming. Maggie Foss resigned from KCSO immediately afterwards.

Foss continues to willfully spread misinformation with the intent of placing Jeremy Muir's life in danger. This is evident with not only the content of posts, but also the request to have others share the post as well as the specific community locations where Foss is spreading the false allegations.

Maggie Foss is intentionally trying to ruin Muir's career as a law enforcement officer which is evident through her repeated social media posts claiming Muir's involvement in multiple criminal acts, contacting those who Muir has been involved with on a professional level to entice complaints against Muir, and specifically directing unfounded allegations towards populations where Muir works (Shoreline and Burien Facebook pages) as well as specific establishments (employees at Shoreline Teen Recreation Center and employees at the City of Shoreline). *NOTE: After posting to the "Shoreline Living" Facebook page, a comment was made that Muir was no longer allowed to work there, to which Foss replied, "OMG, that IS progress! If nothing else happens, at least he cannot victimize underage kids at the teen center! I'm ecstatic to hear this!!"

In his statement, Jeremy Muir also provided context of how he met Maggie Foss and the subsequent sexual relationship. The following is a brief synopsis of his story:

In March of 2010, both of them worked for KCSO; Foss as a 911 dispatcher and Muir as a Deputy. They went out to a bar with a group of friends and afterwards went to the house of one of the friends (Kerri Halberg). The two had consensual sex while under a blanket and were seen doing so by another resident named Nick Baisch. Kerri Halberg had also witnessed the two of them making out in the house and specifically told them not to have sex on her couch while giving them the blanket. Foss and Muir decided to drive to Foss's home, at which point she gave him another condom and they has sexual intercourse a second time. The following morning, they had coffee together and Muir drove Foss back to her car. The two of them had been on a few dates before then and continued to see each other at social gatherings. It wasn't until four years later in 2014 when Muir learned that Foss was claiming the sexual intercourse was not consensual. Jeremy Muir was dating Brandy Drake, who was a co-worker of Maggie Foss. While the two women were at a party together, Foss told Drake of her own sexual encounter with Muir, detailing how he passed out before Muir began having sex with her. When Drake asked Foss to clarify if she was insinuating the sex was not consensual, Foss replied, "Not really". Afterwards, Drake called Muir to explain the conversation she just had with Foss. Muir immediately self-reported the conversation to his supervisor, who in turn reported it to the Internal Investigations Unit (IIU 2014-106). Based on witness testimony and Foss's own admission of not being raped, the investigation was closed as unfounded. Prior to this investigation, Maggie Foss and Jeremy Davy (also a KCSO Deputy) were married in 2013. In 2014, the two of them began filing Public Records Disclosure Requests specifically related to Jeremy Muir. In 2015, Maggie Foss filed a criminal complaint based on the same sexual assault report that had previously been investigated by IIU. The criminal investigation was forwarded to the King County Prosecutor's Office who ultimately declined the case. Since then, multiple IIU investigations into Jeremy Muir have been opened based on complaints made by Maggie Foss and Jeremy Davy. Derogatory social media posts have been increasing in frequency and have been shared thousands of times. In many of these posts, Maggie Foss claims that Muir "acquaintance-raped" her.

Jeremy Muir concludes his statement by describing how the continued harassment by Maggie Foss has affected his personal and professional life. To help cope with the "constant onslaught of attacks from Maggie", Muir began seeing a psychiatrist in November of 2019. On numerous occasions, Muir met with his superiors to complain about the harassment and provided them with documentation of the social media posts made by Foss, but nothing was ever done to help him. Due to concerns generated from the social media posts made by Maggie Foss, Muir lost his ability to work at the Shoreline Teen Recreation Center which not only impacted his ability to continue mentoring and fostering relationships with local participants, but also caused a significant loss of income. Muir had been working here for nearly three years which consistently provided him with over $12,000 of income per year. Furthermore, out of concern for his safety, Muir was assigned a car partner for approximately six weeks at which time he lost out on his usual overtime, costing him thousands of dollars. Jeremy Muir describes his co-workers seeing how he is affected by the social media posts. He has changed from being passionate about law enforcement to a deputy who feels the necessity to always be defensive. His safety and the safety of those who work with him is in doubt as more citizens voice complaints of a sexual predator working for the Shoreline Police Department, solely based on the social media posts made by Maggie Foss. After six years of constant false accusations, complaints, and continued harassment, Muir describes feeling "harassed, intimidated and in fear of my safety as well as in fear for my career as a law enforcement officer". He describes his behavior at home as being paranoid to the extent that he will no longer answer phone calls unless he knows who is calling. He also won't answer the front door and is always looking for damage to his home and vehicle. He is having to explain the situation to neighbors because of the letters that Foss sent to them. He is constantly having to explain everything to friends and acquaintances who see the social media posts made by Foss or shared by Foss's original postings. Since he doesn't feel safe at home, Muir is currently getting his house ready to sell but is unsure of his future because it may be impossible to get another law enforcement job with a "Scarlett Letter" attached to his name.

03-10-2020

I received a Washington State Patrol Crime Laboratory Report for the envelope containing a 'Thank You' card. This is the piece of mail that had been sent to Shoreline Police Chief Shawn Ledford. The results found no friction ridge impressions on the envelope, 'Thank You' card, or stamp. The report was added to the case file.

**SYNOPSIS**

During the course of this investigation, I reviewed the verbiage associated with multiple RCW laws to include Harassment, Stalking, and Cyberstalking.  Under RCW 9A.46.110 (Stalking), heading (5) (b) (v), the stalker's victim is or was a law enforcement officer and the stalking was used to influence the victim's performance of official duties.  Since stalking is defined as intentional or repeated harassment, this statute appears to match the actions taken by Maggie Foss.  In addition to the occurrences detailed earlier in this report, the following are further examples of the overwhelming amount of intentional harassment by Maggie Foss:

Foss filed a report with KCSO IIU stating she spoke with Muir's ex-wife, Rena Muir.  Foss claimed that Rena was the victim of a crime at the hands of Jeremy Muir.  The allegation was investigated and non-sustained.
Foss filed a report with KCSO IIU stating she spoke with Muir's other ex-wife, Lindsay Johanson.  Foss claimed that Lindsay was the victim of a crime at the hands of Jeremy Muir.  The allegation was investigated and non-sustained.
Foss contacted numerous other individuals that Muir contacted during the performance of his official duties.  Foss would file complaints on their behalf in order to have internal investigations opened against Muir.
While working as a 911 dispatcher, Foss attempted to elicit a complaint against Muir by convincing a citizen who had called into 911 that Jeremy Muir was a corrupt law enforcement officer.
Jeremy Davy (Maggie Foss's husband) filed a report to KCSO Internal Investigation Unit alleging that after Muir responded to a domestic violence call, he returned to the home to have sex with the victim (IIU 2015-150).  The subsequent investigation revealed the allegations to be unfounded.
Between August 2016 and September 2016, Maggie Foss and/or Jeremy Davy made over 150 Public Disclosure Requests requesting information pertaining to Jeremy Muir.  It is likely Foss used this information to contact subjects that Jeremy Muir contacted during the performance of his official duties.

The actions by Maggie Foss not only show a six-year history of continued harassment, but also a clear intent to negatively influence Jeremy Muir's performance as a law enforcement officer.  The emotional impact has been witnessed by numerous co-workers, including his superiors, and ultimately resulted in Muir needing professional counseling.  The financial impact has caused significant loss of monthly income that Muir had been consistently receiving for multiple years.  Muir also lost the ability to work at a local teen center where he enjoyed using his law enforcement career to mentor youth.  Perhaps most importantly, the harassment negatively impacted the safety of Jeremy Muir and his co-workers to the point that leadership required him to work in a 2-man car due to concerns of retaliation from the public based on social media posts made by Maggie Foss.  Not only were her posts shared over 3,000 times as of this report, but Maggie Foss also "liked" comments on her posts which insinuated Jeremy Muir being killed while working as a law enforcement officer.  Maggie Foss admits on her own social media posts to specifically targeting audiences who reside in the same location where she believes Jeremy Muir would be performing his official duties as a law enforcement officer.

After investigation, Maggie Foss is being charged with felony Stalking under RCW 9A.46.110.  This case will be sent to the Snohomish County Prosecutor's Office for review.

NOTE: Due to the sensitive nature of this investigation, I decided not to contact Maggie Foss in order to limit the potential of further actions that could place Jeremey Muir or other members of the King County Sheriff's Office in harms way.  Once this case has been reviewed at the Snohomish County Prosecutor's Office, a determination can be made into if and when Maggie Foss should be contacted.

This report was submitted from an electronic device owned, issued, or maintained by a law enforcement agency using my user ID and password.  I certify or declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.
OFFICER NAME / I.D. NUMBER
Detective Henderson #2055
   Location
Monroe, Washington
   Date of Report
02/19/2020

# 2020-03313, Follow up, Henderson

AGENCY NAME
Monroe Police Department
   Case Number
#2020-00003313
   Incident Date/Time

**02-19-2020**


**My name is Paul Henderson and I am a Commissioned Police Detective for the City of Monroe.**
**May 16, 2020**

**I received a text message on my department issued cell phone from Jeremy Muir regarding an email he received at work. He also forwarded multiple screenshots of the email, including his own email showing the response he forwarded to his superiors. When I returned to work after the weekend, the screenshots of the emails were booked into evidence.**

**May 18, 2020**

**I called Jeremy and spoke with him regarding the text messages that he sent me over the weekend. Jeremy explained the email he received (which was also sent to his sergeant) was from Susie Kroll, a Mental Health Professional (MHP) who contracts with the King County Sheriff's Office. Susie explains in her email that she contacted a woman named Gail during the performance of her duties. Gail mentioned speaking to a woman who claimed to be the victim of sexual assault by Jeremy Muir and that KCSO had paid her off with $90,000.00. Gail also said she found out there was proof from a public record that Jeremy raped someone in the back of his patrol vehicle.**

**Jeremy said that I should speak directly with Susie Kroll to get specifics. I asked if Jeremy knew of Gail and had contact information for her. Jeremy said that he has contacted Gail in the past while working as a Deputy for KCSO. He advised that Susie might have a phone number to contact Gail. Jeremy was concerned because he believed it was Maggie Foss who had told this information to Gail. If this was the case, Jeremy believes that Maggie is continuing to spread disinformation to community members and thereby destroying his career.**

**May 20, 2020**

**I called Susie Kroll (206-963-3145) and spoke to her over the phone. Susie said the person she was referring to in the email was Gail Hanks. Susie explained how Gail has been having disputes with her neighbors since 2008, so she has had numerous contacts with Gail and is currently working with her through the Radar Outreach Program. Susie also mentioned that in the past she had responded to this same location with Muir while he was working as a KCSO Deputy. Susie didn't go into specifics, but did mention Gail possibly suffering from mental health issues. It was during her last contact with Gail when she began mentioning random accusations against Jeremy Muir. Since it was way off topic from what Susie was trying to accomplish, she tried to steer the conversation away from Jeremy. However, Susie told me that Gail mentioned hearing this information from a woman claiming to have been sexually assaulted by Jeremy and then paid off by KCSO. Susie gave me a number for Gail so that I could speak directly to her. The number was 206-363-9050.**

**May 21, 2020**

**I called Gayle Hanks and asked her about information she received regarding accusations against Jeremy Muir. Gayle explained that back in February she was contacted by a woman named Maggie Foss. Maggie had left a recording on her home answering machine describing how Jeremy was corrupt and what he had done. Gayle said that Maggie had left a phone number to call her back and she did so the same day, speaking with Maggie in person regarding the allegations. Maggie also directed her to a Facebook post which Gayle had reposted on her own Facebook page. Gayle said that she still had the recording on her answering machine. I asked Gayle if I could go to her home and record the message that Maggie had left. Gayle agreed and gave me her address of 1231 NE 184th Place, Shoreline, WA 98155.**

**After arriving at Gayle's house, she let me inside and we sat down upstairs in her living room. Gayle began explaining her history with the neighbors, Jeremy Muir, Susie Kroll, and other members of the King County Sheriff's Office. She said that Jeremy has contacted her on a few occasions related to 911 calls either by her or her neighbors. During one of the most recent contacts, she did not like the way he presented himself and filed a complaint against him with the King County Sheriff's Office. Gayle believed her first contact with Jeremy was back in January of 2015 and that she filed the complaint against him in May of 2019.**

**Gayle continued on by describing how she received a message on her answering machine from someone named Maggie Foss. This message was left back on February 17, 2020 and detailed Maggie's history with Jeremy while calling him a corrupt cop and describing how King County Sheriff's Office was covering for him. I asked Gayle how Maggie would have gotten her phone number and how she would have known to contact Gayle specifically regarding Jeremy. Gayle explained that Maggie said she found her information via a records disclosure request, which Gayle believes to be the complaint she filed against Jeremy. Gayle had called Maggie back on the same day the message was left.**

**Gayle walked me into her kitchen where the answering machine was located. She began playing the saved messages and the second message (out of six messages) was from a woman stating her name was Maggie Foss. I listened to the entire recording (approximately 90 seconds in length) and then recorded the message with Gayle's permission. In the recording, Maggie mentions that she found out**

about Gayle through a records disclosure request. I also took pictures of the answering machine; showing the message was left on February 17th at 2:47 pm.

Gayle also showed me her computer where she had already brought up the Facebook post made by Maggie Foss that she subsequently shared on her own Facebook page. I immediately recognized the post as being the same one that I had recorded previously during this investigation when Maggie Foss had posted it to multiple Facebook accounts. I took a photograph of the computer screen, which showed the post being shared to Gayle's Facebook page on February 17, 2020 (the same day Gayle spoke to Maggie on the phone). Gayle also agreed to provide an audio recorded statement, which began at approximately 5:12 pm and concluded at 5:32 pm.

After returning to the police department, I booked the photographs and recordings into evidence. I also requested the answering machine message and Gayle's audio recorded statement be transcribed.

This report was submitted from an electronic device owned, issued, or maintained by a law enforcement agency using my user ID and password. I certify or declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.
OFFICER NAME / I.D. NUMBER
Detective Henderson #2055
   Location
Monroe, Washington
   Date of Report
05/25/2020


# 2020-03313, Follow up #2, Henderson


AGENCY NAME
Monroe Police Department
   Case Number
#2020-00003313
   Incident Date/Time
02-19-2020


My name is Paul Henderson and I am a Commissioned Police Detective for the City of Monroe.
June 2, 2020

I received text messages from Jeremy Muir to include screen captures of a social media post on the Shoreline Police Department Facebook page. Jeremy explained how the comments showed continued repercussions from the false information that Maggie Foss had been spreading about him. He advised that I capture the entire post and all comments in order to see everything and not just the specific screen captures that he recorded.

June 3, 2020

I went onto the Shoreline Department Facebook page and documented the specific post Jeremy was referring to in his text. I also documented all corresponding comments. The post was made on June 1, 2020 and references the death of George Floyd (Minnesota Police Department incident) while relaying Shoreline's commitment to maintaining community trust. At the time of documentation, there were 40 comments and numerous sub-comments. There were at least nine comments specifically naming "Jeremy Muir" in reference to him being a sociopath, racist, rapist, predator and other derogatory terms.

The documented Facebook post and comments were booked into evidence.

This report was submitted from an electronic device owned, issued, or maintained by a law enforcement agency using my user ID and password. I certify or declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.
OFFICER NAME / I.D. NUMBER
Detective Henderson #2055
   Location
Monroe, Washington
   Date of Report
06/03/2020

# 2020-03313, Follow up #3, Henderson

**AGENCY NAME**
**Monroe Police Department**
  **Case Number**
**#2020-00003313**
  **Incident Date/Time**
**02-19-2020**

**My name is Paul Henderson and I am a Commissioned Police Detective for the City of Monroe.**
**June 6, 2020**

**I received text messages from Jeremy Muir to include photographs taken by other King County Sheriff's Deputies who were working at the Shoreline Black Lives Mater rally. The pictures depicted signs held by demonstrators which specifically referenced Jeremy Muir.**

**Over the next two weeks, I continued to receive text messages from Jeremy Muir with screen captures or photographs. These included Facebook posts made by the Shoreline Police Department with related comments, pictures of two signs found outside the Shoreline courthouse stating "SHORELINE POLICE HARBOR WHITE SUPREMECY" and "FIRE JEREMY MUIR", and Facebook posts on the Facebook pages of "Seattle Antifascist Action" and "Emerald City Antifa" depicting images of Jeremy Muir which are the same pictures previously posted on Facebook by Maggie Foss.**

**June 10, 2020**

**Jeremy Muir sent a text message explaining that Maggie Foss had filed another records disclosure on him. He sent a screenshot of an email notification for the records disclosure request.**

**June 17, 2020**

**Jeremy Muir sent me text messages to include screen captures of a Facebook post made by the Shoreline Police Department. The post was titled "Wednesday Wisdom" and related to emergency water preparation. One of the comments made by "JG Brown" stated, "How about focusing on firing that racist rapist Jeremy Muir or are we still ignoring that".**

**All of the documents/screen captures/photographs I had received from Jeremy Muir were booked into evidence.**

**This report was submitted from an electronic device owned, issued, or maintained by a law enforcement agency using my user ID and password. I certify or declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.**
**OFFICER NAME / I.D. NUMBER**
**Detective Henderson #2055**
  **Location**
**Monroe, Washington**
  **Date of Report**
**06/18/2020**

# 2020-03313, Follow up #4, Henderson

**AGENCY NAME**
**Monroe Police Department**
  **Case Number**
**#2020-00003313**
  **Incident Date/Time**
**02-19-2020**

**My name is Paul Henderson and I am a Commissioned Police Detective for the City of Monroe.**
**June 22, 2020**

**I received a voicemail from Maggie Foss with the phone number showing 206-351-6956.  On the message she left, Maggie explained she had questions for me regarding this case and requested that I call her back while dictating her phone number.**

**June 23, 2020**

**I attempted to call Maggie Foss but there was no answer so I left a voicemail.  Approximately 15 minutes later she called me back.  As I answered the phone, I could hear a female talking to someone else and based on what she was saying, I recognized that she or the person she was talking to may be recording the phone call.  After introducing myself, Maggie identified herself and began asking questions about the case.  I explained the case was still open and I was limited on information that could be released.  Maggie then said that her husband was also listening and put me on speakerphone.  A male voice spoke up but I do not recall if this person ever said their name.  The three of us spoke for around 15 minutes in regards to the case.  Since I was not able to release much information, I explained my expectation of the case being closed by the end of the week and at that time Maggie and her husband should begin receiving records pertaining to their individual records disclosure requests.  I also said that after they had the records, I would be happy to speak with them again and would also be happy to accept a statement on their behalf.  Maggie seemed upset that she was listed as a suspect in this case and that charges had been filed with the prosecutor's office.  Maggie explained how the only thing she ever did was make a post on Facebook regarding Jeremy Muir raping her.  She also claimed how other victims of Jeremy Muir's behavior had reached out to speak with her.**

**June 25, 2020**

**I received a text message from Jeremy Muir saying that Shoreline PD made a post on Facebook regarding the alleged sexual assault between him and Maggie Foss.  I replied that I would capture the post after waiting a few days for potential comments.**

**June 30, 2020**

**I took a screen capture of the Shoreline PD Facebook post related to the topic of Jeremy Muir's sexual assault investigation.  The screen capture included all of the comments and this digital image was booked into evidence.  NOTE: A reply to the last comment was unable to load even after multiple attempts.**

**This report was submitted from an electronic device owned, issued, or maintained by a law enforcement agency using my user ID and password.  I certify or declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.**
**OFFICER NAME / I.D. NUMBER**
**Detective Henderson #2055**
**  Location**
**Monroe, Washington**
**  Date of Report**
**06/30/2020**


# 2020-03313, Follow up #5, Henderson


**AGENCY NAME**
**Monroe Police Department**
**  Case Number**
**#2020-00003313**
**  Incident Date/Time**
**02-19-2020**


**My name is Paul Henderson and I am a Commissioned Police Detective for the City of Monroe.**
**October 01, 2020**

**I received a voicemail from Maggie Foss requesting my email address so she could forward paperwork regarding a complaint against Jeremy Muir for filing a false police report.**

**October 2, 2020**

I sent Foss a text message with my email address, telling her that I would be happy to take any paperwork and add it to the current case file.  I also informed her that if she was wanting to file a report of criminal activity, it would need to be done in the jurisdiction where the alleged criminal activity occurred.

**October 7, 2020**

I received a text message from Foss advising she had been told by Sergeant Clark of the Kent Police Department that her report regarding false reporting and false swearing needed to be filed at the Monroe Police Department.

**October 8, 2020**

I sent a text message to Foss asking her to send me everything and that I would forward it to the prosecutor with an updated report. Foss replied by asking if she could call me.  We spoke on the phone regarding her statement, which she was still in the process of being completed.  Foss explained that it was going to take her some more time to complete the statement and supporting documents.  I told Foss that she could email me everything when it was done.

**October 20, 2020**

I received an email from Maggie Foss with an attachment titled, "Memorandum of Facts".  The email also included a link to a Dropbox account for "associated evidence mag000 thru mag020".  All of the files were downloaded and booked into evidence.  Due to the overall size, the files were burned onto a compact disc (CD).  It should also be noted that the first file (mag000) is Maggie's statement titled "Memorandum of Facts" which was also included as an attachment on the email she sent.  I also sent an email reply to Foss confirming that I had received her statement.

I spent the following weeks reading over Foss's exhaustive and extremely detailed 92-page statement in which she references numerous files associated within the Dropbox account included in her email.  The following is a brief synopsis of her statement:

Maggie Foss never intended for information related to being sexually assaulted by Jeremy Muir to be publicly released, nor did she initiate any criminal or civil case on the matter.  It was Jeremy who initiated the internal investigation which led to the subsequent criminal investigation.  Jeremy has initiated numerous Public Disclosure Requests (PDR) on Maggie Foss (while she worked as a dispatcher for the King County Sheriff's Office) and her husband Jeremy Davy, who currently works as a deputy for the King County Sheriff's Office.  In order to defend herself from misinformation, poorly conducted investigations, and false allegations made by Jeremy Muir, Maggie has been forced to defend herself.  Part of her defense has been grounded in documents from PDR's on Jeremy Muir in order to prove his allegations are baseless.  In one such example, Jeremy filed a complaint alleging that Maggie was submitting PDR's related to him while she was on duty.  The complaint was initially sustained until Maggie made a PDR of her own work records to prove that she had not been on duty, at which point the finding was reversed (Memorandum of Facts, page 61).

Furthermore, Maggie alleges that Jeremy deliberately takes information out of context or withholds details in order to either protect himself or make Maggie look bad (Memorandum of Facts, page 69).  She references a sentence from his own statement where he says, "I believe this may have been when Maggie Foss contacted Amanda Sasnett to obtain information, she included in her complaint against me under case number IIU2016-146".  Maggie explains that Jeremy previously filed a complaint against her husband under IIU2016-070 alleging Jeremy Davy was using his position to investigate on behalf of Maggie.  The investigation proved these allegations were false and according to Maggie Foss, Jeremy knows they were proven false because he obtained a copy of the internal investigation findings through PDR.  The complaint made against Jeremy regarding Amanda Sasnett had nothing to do with Maggie Foss or her husband.  Once again, Maggie was forced to defend herself and her family by responding to false allegations made by Jeremy Muir, which included the use of PDR for records required to prove her innocence.

In her statement (Memorandum of Facts, page 70), Maggie writes, "What Mr. Muir is doing is filing harassment complaints against Maggie Foss and then crying harassment when the information Maggie Foss uses to defend herself blows back on him."  She later explains, "It is hard for Mr. Muir to claim to be the victim of harassment complaints when Mr. Muir is the one filing the harassment complaints (mag018)".  Maggie denies having anything to do with the cards that were sent to Jeremy's neighbors or the city officials at his workplace.  Her statement goes into great detail regarding the sexual assault and subsequent investigations coming to fruition years later.  Maggie explains how she initially did not want to give a statement when asked about the sexual assault during the initial internal investigation.  However, when a criminal investigation was opened, she felt compelled to give a truthful statement, especially considering she was employed by the same agency conducting the investigation.  Her request to give a statement in person was refused.  The investigation as a whole was completely inept with inaccurate dates, conflicting testimony, and no attempt to locate key witnesses, among many other discrepancies.  Both Maggie and her husband feel the system has failed them and continues to do so as they find it necessary to defend themselves by repeated attacks at the hands of Jeremy Muir.

The documents provided by Maggie Foss to back up her statement include but are not limited to: emails, internal investigation reports and findings, police case reports, text messages, phone records, timelines, police radio traffic, work schedules, bank statements, social

media posts, handwriting samples, PDR requests, and calendars.

This report was submitted from an electronic device owned, issued, or maintained by a law enforcement agency using my user ID and password.  I certify or declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

**OFFICER NAME / I.D. NUMBER**
**Detective Henderson #2055**
  **Location**
**Monroe, Washington**
  **Date of Report**
**10/28/2020**

# Follow Up Notes

### FOLLOW UP NOTES

CASE NUMBER  ~~2FF~~ *2020* - 33 13

OFFENSE

VICTIM/COMPLAINANT

| DATE | NOTES | TIME |
|---|---|---|
| | "SHORELINE LIVING" | |
| | NAN SKINNER (REAL ESTATE AGENT)   206-734-9289   ~~206-523-7653~~ | |
| | TIFFANY BLOOD | |
| | POSTED 1-20-2020 (COMMENTING OFF) | |
| | CALLED NAN ON 1-22-2020 / SHE WILL ATTEMPT TO | |
| | CAPTURE BOTH TIMES IT WAS POSTED AND COMMENTS | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Statement, Muir, Jeremy**

Case #: 2020 - 3313

# MONROE POLICE DEPARTMENT

[ ] Suspect [X] Victim [ ] Witness Statement

*MUIR*

Statement of: MUIR, JEREMY A _____ Date of Birth: ██████████
             (Last name, First & Middle Initial)

Home Address: 15591 168 AV SE _____ City/State/Zip: Monroe, WA 98272 _____

Business Address: _____

Email Address:
jeremymuir30@gmail.com

Home Phone # ( ) _____ - _____    Business Phone # ( ) _____ - _____

Cellular Phone # (360)991-4596_____    Driver's License Number: ████████ State: WA _____

If you have property/items that have been: __Lost __Found __Stolen __Damaged/Vandalized __Graffiti __Forged
__Counterfeited. *Please provide the estimated dollar amount of loss $_____.*

__JAM____*Initial here if you would like to request non-disclosure as allowed by RCW 42.56.240. See back of this form for explanation.*

1 My name is Jeremy Muir. I reside in Monroe Washington. The purpose of this statement is to express what has been happening to me
2 based on the actions of Maggie Foss.
3 Beginning in 2015, Maggie Foss began harassing me based on her false claim that I sexually assaulted her. Her claim was contradicted
4 by several eyewitnesses who disproved her version of events, and has been investigated and found meritless several times. Despite this,
5 Maggie Foss has repeatedly tried to have me disciplined or fired from my job as a King County Sheriff's Deputy by spreading false
6 claims I was a "sexual predator" or "rapist." She has made this false claim including in letters sent anonymously to my neighbors and
7 workplace supervisor, and in social media posts on Facebook groups for the Shoreline and Burien communities in which I work,
8 although she does not live in Shoreline or Burien. She has used public disclosure requests to obtain complaints made about me to my
9 employer and spread the allegations in those reports on social media, even when the complaints had been investigated and found to be
10 meritless. I recently learned from a fellow deputy about a conversation he overheard in King County Jail last month, in which a
11 detainee claimed his friend had been offered cash by a woman who wanted to meet and discuss allegations about me. I believe the
12 woman offering cash for information about me wash Maggie Foss, based on her other attempts to spread false allegations about me. I
13 believe her continuing conduct is intended to cause me to suffer employment consequences, and to cause the members of the
14 community in which I work to be hostile towards me. To my knowledge, Maggie Foss's most recent social media post about me was
15 on January 20, 2020, which she encouraged others to share.
16 Following is a summary of Maggie Foss's conduct, and my background with her. Because there have been so many incidents of
17 harassment, this summary may not include all instances of her harassing conduct.
18 March 2010 sexual encounter
19 Maggie Foss's false claim involves consensual sexual encounter we had in in March 2010. At the time, Maggie and I both worked at
20 the King County Sheriff's Office. She was a 911 dispatcher and I was a deputy; neither of us supervised or managed the other. We
21 ended up at a friend's house after going out to a bar with my friend Keri Halberg, and had consensual sex under a blanket at the house.
22 After another resident of the house walked in on us, Maggie Foss and I went back to her home. There she gave me another condom,
23 and we had sex a second time. The next morning, we got coffee and I took her to retrieve her car. We had been on a few dates before
24 then, and continued to see each other socially afterwards.
25 Four years later, in 2014, I first learned Maggie Foss began claiming she hadn't consented to sex. In August 2014, Maggie Foss told
26 her coworker Brandy Drake about our sexual encounter while the two were at a party. I had begun dating Brandy Drake earlier this
27 year, and they began discussing me. Maggie Foss said that the night the two of us had sex, she had passed out before I started having
28 sex with her. When Brandy Drake asked Maggie Foss to clarify if she meant to say the encounter was non-consensual, Maggie Foss
29 said, "not really".
30 Two separate investigations conclude the 2010 encounter was not sexual assault

I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.
Date: 02/19/20   Time: 1640   Place Statement Taken: Monroe _____

Signed: _~Jerry Muir~_    Witnessed by: _R__ _____

(DO NOT WRITE ON THE BACK. PLEASE ASK FOR ADDITIONAL STATEMENT FORMS)

Case #: 2020- 3313

# MONROE POLICE DEPARTMENT

[ ] Suspect [X] Victim [ ] Witness Statement

Statement of: ~~MUR~~, JEREMY A    *MUIR*    Date of Birth ████████
        (Last name, First & Middle Initial)

Home Address: 15591 168 AV SE _____ City/State/Zip: Monroe, WA 98272 _____

Business Address: _____

Email Address:
jeremymuir30@gmail.com

Home Phone # ( ) _____ - _____    Business Phone # ( ) _____ - _____

Cellular Phone # (360)991-4596 _____ Driver's License Number: ████████ State: WA _____

If you have property/items that have been: __Lost __Found __Stolen __Damaged/Vandalized __Graffiti __Forged __Counterfeited. *Please provide the estimated dollar amount of loss $_____.*

___JAM____*Initial here if you would like to request non-disclosure as allowed by RCW 42.56.240. See back of this form for explanation.*

1  Afterwards, Brandy Drake called me and explained the conversation to me. I immediately self-reported the conversation to Sgt. Wing
2  Woo with the King County Sheriff's Office, who reported it to the Internal Affairs Unit (IIU). IIU investigated the incident under file
3  number IIU 2014-106.
4  The IIU investigation cleared me and determined that Maggie Foss's claim I had nonconsensual sex with her was unfounded. Two
5  eyewitnesses, Keri Halberg and Nick Baisch, gave statements to the IIU indicating that Maggie Foss and I had engaged in consensual
6  behavior. Kerri Halberg was the friend whose house we had returned to, and who had seen us making out before sex. Nick Baisch was
7  the other resident at the house who had walked in on us while we were having sex. In Keri Halberg's statement, she indicated that
8  Maggie Foss and I had been flirtatious throughout the night, and appeared to be engaged in consensual behavior. Keri Halberg stated
9  that though Maggie Foss did not appear to be drunk enough to pass out that night. Keri Halberg also stated said that a few weeks later
10 Maggie Foss told her that she and I were just going to be friends going forward, but that Foss said nothing to indicate that the she had
11 not consented to sex, or felt she had been assaulted.
12 As part of the IIU investigation, Maggie Foss was contacted by Sgt. Francis Carlson. Although Maggie Foss claimed I had taken
13 advantage of her, she told Sgt. Carlson she never said it was rape. Maggie Foss also said didn't want to be involved in the investigation
14 and did not want to give a recorded statement to IIU at that time.
15 The IIU investigation was completed and the allegations against me were cleared as unfounded.
16 In 2015, after the IIU investigation closed, Maggie Foss made a criminal complaint based on the same events that had been
17 investigated and cleared by IIU. Maggie Foss's accusation was investigated by Special Assault Unit Sgt. Jessica Sullivan, and
18 forwarded to the King County Prosecuting Attorney's Office (KCSO Case 15-077590). The King County Prosecuting Attorney's
19 Office declined the case. Deputy Prosecutor Charles Sturgis indicated the reasons for the declination included the eyewitness testimony
20 contradicting Maggie Foss's claim, and the fact that even in her version of events, she admitted to having consensual sex even after the
21 alleged rape.
22 <u>False workplace complaints using information obtained through Public Disclosure Requests</u>
23 In 2014, Maggie Foss and her husband, Jeremy Davy (also a deputy with the King County Sheriff's Office) began filing Public
24 Disclosure Requests for complaints made against me in my role as a deputy sheriff. The two had married in 2013. I later learned from
25 the Public Disclosure Unit that between August 1, 2014, and September 13, 2016, Maggie Foss and Jeremy Davy had made over 150
26 Public Disclosure Requests (PDRs) about me. Maggie Foss and her husband began using complaints from the results of these PDRs to
27 make reports against me to IIU.
28 In 2015, Jeremy Davy made a complaint to IIU falsely claiming that after responding to a domestic violence call, I had gone back to
29 the victim's house to have sex with her. The complaint was investigated under case number IIU 1015-150 by Sgt. Pat Raftis, who
30 determined the allegations were unfounded.

I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.
Date: 02/19/20    Time: 1640    Place Statement Taken: *(signature) Monroe*

Signed: *(signature)*    Witnessed by: *(signature)*

(DO NOT WRITE ON THE BACK. PLEASE ASK FOR ADDITIONAL STATEMENT FORMS)

2013

Case #: 2020- 3313

# MONROE POLICE DEPARTMENT
[ ] Suspect [X] Victim [ ] Witness  Statement

MVIR

Statement of: ~~MUR~~, JEREMY A _____  Date of Birth: ████████
(Last name, First & Middle Initial)

Home Address: 15591 168 AV SE _____  City/State/Zip: Monroe, WA 98272 _____

Business Address: _____

Email Address:
jeremymuir30@gmail.com _____

Home Phone # (    ) _____ - _____    Business Phone # (    ) _____ - _____

Cellular Phone # (360)991-4596 _____    Driver's License Number: ████████ State: WA _____

If you have property/items that have been: __Lost __Found __Stolen __Damaged/Vandalized __Graffiti __Forged __Counterfeited. *Please provide the estimated dollar amount of loss $ _____.*

__JAM____*Initial here if you would like to request non-disclosure as allowed by RCW 42.56.240. See back of this form for explanation.*

1  In 2016, Maggie Foss filed a complaint with King County IIU making multiple allegations that were investigated under case number
2  IIU 2016-146. Maggie Foss had contacted a woman I had arrested in 2013 named Amanda Sasnet, to obtain information to use in her
3  complaint. Maggie Foss claimed I had falsified to arrest report. The claim was investigated and determined to be unfounded. Maggie
4  Foss also contacted my two ex-wives, Rena Muir and Lindsay Johnson, and made false accusations I had been abusive. These claims
5  were also investigated and determined to be unfounded. Finally, Maggie Foss contacted Katherine Oehlsen, and claimed I had
6  unlawfully used my authority to initiate a traffic stop of Ms. Oehlsen. This is the only part of the complaint that was sustained, after it
7  was determined I hadn't had a valid reason to pull over Ms. Oehlson. All of Maggie Foss's other accusations were determined to be
8  unfounded.
9  None of the people Maggie Foss contacted initiated contact with the Sheriff's Office to complain.  Maggie Foss contacted them and
10  made complaints to IIU herself.
11  In August 2016, an IIU investigation under case number 2016-070 sustained a misconduct allegation against Maggie Foss for
12  conducting personal business while on duty for submitting PDRs relating to me while at work.
13  IIU investigated Maggie Foss again in 2017, under case number IIU 2017-137, for statements she made about me while taking a 911
14  call. In July 2017, while taking a 911 call in her job as a dispatcher, Maggie Foss took a call from a man named Brandon Vandemeer.
15  During the call Brandon Vandemeer mentioned an earlier incident in which I had issued him a traffic citation for driving without a
16  seatbelt, which he admitted. Maggie Foss began questioning Brandon Vandemeer about me while on the 911 call, suggesting to him
17  that I had lied about the citation, and telling Vandemeer that she believed him over me because I had a "history". She encouraged him
18  to file a complaint against me with IIU, and provided him with IIU's number. The IIU investigation against Maggie Foss sustained
19  findings of willful violations of the Sheriff's Office's code of conduct, ridicule of a member of the department, and conduct
20  unbecoming.
21  In 2018 Maggie resigned from the KCSO.
22  Social media and anonymous harassment
23  On September 23, 2019, I received an unsolicited text from a friend that contained a link to Maggie Foss's Twitter page.  Maggie Foss
24  had made several posts which each included a photo of me, obtained from my Facebook page, and a caption reading "This is the rapist
25  cop Jeremy Muir". She followed this with a series of other tweets repeating the accusations she had made to IIU, which she treated as
26  true even though the complaints had not been sustained after IIU investigation.  The tweets were dated September 22, 2019.
27  I immediately notified my sergeant, Sgt. Heather Volpe, of the tweet.  On October 4, 2019 advised my chief, Chief Shawn Ledford, of
28  the tweet.
29  On October 20, 2019, I was at home in Monroe when I was notified by a friend of more social media posts against me by Maggie Foss,
30  this time on Facebook.  The Facebook post contained the same pictures as her Twitter posts plus one more.  In the post, Maggie Foss

I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.
Date: 02/17/20 ____  Time: 1640 ____  Place Statement Taken: Monroe _____

Signed: _~~Jerry Muir~~_ ____  Witnessed by: _R_____

**(DO NOT WRITE ON THE BACK.  PLEASE ASK FOR ADDITIONAL STATEMENT FORMS)**

Case #: 2020 - 3313

# MONROE POLICE DEPARTMENT

[ ] Suspect [X] Victim [ ] Witness Statement

*MUIR*

Statement of: MUR, JEREMY A _____ Date of Birth: ██████████
(Last name, First & Middle Initial)

Home Address: 15591 168 AV SE _____ City/State/Zip: Monroe, WA 98272 _____

Business Address: _____

Email Address:
jeremymuir30@gmail.com
_____

Home Phone # ( )_____-_____  Business Phone # ( )_____-_____

Cellular Phone # (360)991-4596_____  Driver's License Number: ████████ State: WA _____

If you have property/items that have been: __Lost __Found __Stolen __Damaged/Vandalized __Graffiti __Forged __Counterfeited. *Please provide the estimated dollar amount of loss $_____.*

__*JAM*____*Initial here if you would like to request non-disclosure as allowed by RCW 42.56.240. See back of this form for explanation.*

1 falsely claimed I had planned on shooting someone for "street cred" and afterwards planting a gun to justify the shooting; that I had
2 "acquaintance-raped" her; and that I had engaged in the conduct she had falsely accused me of in her IIU complaints. She also falsely
3 accused me of being racist and dishonest; and that the Sheriff's Office was a "good ol' boys club" that had covered up my "crimes".
4 At the end of her post she wrote "I urge anyone and everyone who may encounter Jeremy Muir to IMMEDIATELY film him because
5 unfortunately your word means NOTHING against the word of a cop, even a cop who has been caught in lies", and "Feel free to share
6 if you like. Knowledge is power."
7 I again reached out to Sgt. Volpe and advised her of the new post. On October 22, 2019 I provided copies of the post to Chief
8 Ledford.
9 On October 27, 2019, I was at my house in Monroe when I had my neighbor Tamara Haberlack and her husband come to the house.
10 When I opened the door they asked me if everything was okay. Tamara Haberlack had received a blue envelope addressed to her, and
11 with my name and address as the return address. The envelope contained a thank you card with a handwritten message that said,
12 "JEREMY MUIR IS A SEXUAL PREDATOR". I kept the letter, called Monroe PD, and filed a police report (MPD 19-21441). I
13 later learned two to three other neighbors had gotten similar letters.
14 On November 7, 2019, I learned Chief Ledford and the Shoreline City Manager Debbie Tarry had each received envelops with my
15 return address, and containing card with accusations similar to those received by my neighbors. Based on her previous accusations
16 against me, I am certain these cards were sent by Maggie Foss.
17 On November 7, 2019, Chief Ledford and others in the Shoreline Police Department received an email from a Shoreline resident,
18 Corinna Sullivan. Sullivan wrote, "It's been widely spread that one of your male Deputies has been accused of rape, sexual assault,
19 abuse, racism, and bigotry, harassment, and stalking." Sullivan continued by explaining her concerns for her safety as well as the
20 safety of her children based on these allegations.
21 On November 8, 2019, Kanwal Yousuf reposted pictures of Maggie's Facebook post onto her Instagram account. Yousuf is a previous
22 employee of the Shoreline Parks Department and had worked with me at the Shoreline Teen Rec Center. Yousuf had filed a complaint
23 against me on December 6, 2018, Sgt Volpe had investigated the accusation (IIU 2018-17645). Sgt Volpe took a recorded interview
24 with Yousuf and discovered there were no valid complaints or policy violations to report. In Yousuf's Instagram post she expresses
25 how she was reached out to by Maggie.
26 On November 9, 2019, I learned Maggie Foss had repeated her post of false accusations against me on a private Facebook page called
27 "Shoreline Living". Shoreline living is a page for Shoreline residents. Shoreline living has about 5200 members. Maggie Foss does
28 not live or work in Shoreline; to the best of my knowledge she and her husband live in Kent.
29 On December 2, 2019, I learned Maggie Foss had repeated her post of false accusations against me on the Facebook page "Take Back
30 Burien". Maggie Foss does not live or work in Burien.

I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.
Date: 02/19/20 _____ Time: 1640 _____ Place Statement Taken: Monroe _____

Signed: _Jerry Muir_ _____ Witnessed by: _DL_ _____

(DO NOT WRITE ON THE BACK. PLEASE ASK FOR ADDITIONAL STATEMENT FORMS)

2013

Case #: 2020-3313

# MONROE POLICE DEPARTMENT

[ ] Suspect [X] Victim [ ] Witness  Statement

Statement of: ~~MUIR~~ MUIR, JEREMY A _____    Date of Birth: ▮▮▮▮▮
(Last name, First & Middle Initial)
Home Address: 15591 168 AV SE_____    City/State/Zip: Monroe, WA 98272_____

Business Address: _____

Email Address:
jeremymuir30@gmail.com_____

Home Phone # (    )_____-_____    Business Phone # (    )_____-_____

Cellular Phone # (360)991-4596_____    Driver's License Number: ▮▮▮▮▮▮ State: WA_____

If you have property/items that have been: __Lost __Found __Stolen __Damaged/Vandalized __Graffiti __Forged __Counterfeited. *Please provide the estimated dollar amount of loss  $_____.*

__JAM____*Initial here if you would like to request non-disclosure as allowed by RCW 42.56.240. See back of this form for explanation.*

1  On December 17, 2019, Deputy Gaffin informed me he overheard a conversation in the King County Jail where a male claimed his
2  friend "Amanda" was contacted and offered $100.00 to meet at a Starbucks and talk about Shoreline Deputy Muir. I believe this may
3  have been when Maggie Foss contacted Amanda Sasnett, to obtain information she included in her complaint against me under case
4  number IIU 2016-146.
5  On January 20, 2020, Maggie Foss made another lengthy entry to the Shoreline Living Facebook group. In it, she claimed it was "false
6  information" that the Sheriff's Office had investigated her complaint or my conduct, falsely claimed I had engaged in "misconduct"
7  with prostitutes, and repeatedly referred to me as a "rapist" and a "PROTECTED PREDATOR". She also boasted her posts about me
8  had been shared "over 3,000 times," and encouraged readers to spread the post: "I made this post public, so share if you care." In the
9  comments to her post, an administrator of the Shoreline Living group wrote her that "Admins are in agreement that your diatribe
10  doesn't necessarily belong here, but as a courtesy we've left it up and turned off commenting rather than deleting."
11  <u>Impact of harassment</u>
12  Maggie Foss's harassment has caused me extreme distress and affected my ability to carry out my duties. I believe it has also made me
13  less safe in my work as a sheriff's deputy.
14  On November 4, 2019, I started to see a psychiatrist to learn coping mechanisms to be able to cope with the constant onslaught of
15  attacks from Maggie, as well as my frustration that my department, a law enforcement agency, had done nothing to assist me.
16  On November 6, 2019, I met with my Captain Tony Garza. Captain Garza was concerned about my safety after finding out about the
17  Facebook posts and letters going to my neighbors. Captain Garza was concerned a citizen may try to retaliate against me while I was
18  working after seeing the Facebook post. Captain Garza told me he believed the Facebook posts and mail to my neighbors constituted
19  harassment. Captain Garza told me he was surprised the King County Sheriff's Office was not doing anything even though they were
20  aware of the situation.
21  On November 19, 2019, I had a meeting with Captain Garza, Captain Mark Konoske, Chief Ledford and Deputy Greg McKinney. The
22  chief informed me he and the captains had a meeting with the City of Shoreline parks manager, the teen rec center manager, the teen
23  rec center staff, then the teen rec center Youth Outreach Leaders (YOLO, teen employees / staff) to discuss the Facebook and
24  Instagram post. Chief Ledford told me the staff was obviously concerned about the posts. Chief Ledford explained to the staff and
25  managers the accusations against me were not true, explained they had been investigated and even offered to provide the
26  investigations. The managers and staff were receptive and their concerns were alleviated. The YOLO staff was frustrated and said if I
27  was working there they would refuse to work there. The YOLO staff would not listen to the Shoreline Chief or Captains and some
28  walked out of the meeting. The chief advised me of the meeting and told me I am free to continue to work at the Teen Rec Center and
29  that he would support me but that he would not advise it. Both Chief Ledford and Captain Konoske expressed concerns that the
30  YOLO staff may make up false accusations against me based on the posts they saw.

I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.
Date: 02/19/20____ Time: 1640____ Place Statement Taken: Monroe_____
Signed: _Jeremy Muir_____    Witnessed by: _PC_____

(DO NOT WRITE ON THE BACK. PLEASE ASK FOR ADDITIONAL STATEMENT FORMS)

2013

Case #: 2020-3313

# MONROE POLICE DEPARTMENT

[ ] Suspect [X] Victim [ ] Witness Statement

MUIR

Statement of: MUR, JEREMY A _____    Date of Birth: _____
(Last name, First & Middle Initial)

Home Address: 15591 168 AV SE _____    City/State/Zip: Monroe, WA 98272 _____

Business Address: _____

Email Address:
jeremymuir30@gmail.com _____

Home Phone # ( ) _____-_____    Business Phone # ( ) _____-_____

Cellular Phone # (360)991-4596_____    Driver's License Number: _____ State: WA _____

If you have property/items that have been: __Lost __Found __Stolen __Damaged/Vandalized __Graffiti __Forged __Counterfeited. *Please provide the estimated dollar amount of loss* $_____.

__JAM____ *Initial here if you would like to request non-disclosure as allowed by RCW 42.56.240. See back of this form for explanation.*

1  I value the program and the positive impact the police can have on the youth at the program. I had mentored and fostered relationships
2  of trust with multiple participants. I voluntarily removed myself from the Teen Rec Center program. I had been working the Rec
3  Center consistently since January of 2017.
4  This hurt me significantly financially as this is a on duty overtime job that provided me with an average of approximately $1080.00 a
5  month in additional income as well as benefiting my retirement.
6  On November 12, 2019, as a result of the publicity Maggie Foss's post was getting and out of concern for my safety and the potential
7  for more false allegations, I voluntarily began to ride in a car with a partner while at work. I continued to ride with a partner until
8  December 27, 2019.
9  I have not had any contact with Maggie Foss or her husband Jeremy Davy since 2014. I blocked both of them on Facebook in 2014. I
10  have no idea how Maggie Foss got the pictures of me off my Facebook to post on her Facebook post.
11  Since the original false accusation of rape in 2014 the only thing I have wanted is for this to stop. In January 2018 Sgt Volpe jokingly
12  said to me, "It's a new year, think positive". 2018 was a better year but the onslaught of attacks from Maggie Foss has been coming
13  since 2014, it is now 2020. I have been dealing with a person making false accusations against me for almost six years.
14  I find Maggie's prying into my life, filing false accusations against me, posting false statements about me online and posting others un-
15  vetted comments about me to be malicious, unwelcome and offensive. I feel harassed, intimidated and in fear of my safety as well as in
16  fear for my career as a law enforcement officer. I am frightened for what she may do in the future as well as what she may cause others
17  to do. I feel her actions have affected me mentally as well as psychologically.
18  My coworkers have seen these posts have their effect on me. I am not as happy, joyful or outgoing at work as I usually am. I have
19  gone from being passionate about my job to being in a defensive manner. I do not contact as many traffic offenders as I used to for
20  fear of someone recognizing me from the post or a false accusation being made against me.
21  These posts have affected me financially as well. Besides losing the 16 hours a month of overtime at the Teen Rec Center I lost out on
22  all the overtime I could have worked in the time I was doubled up in a car with a partner. I was consistently averaging 16 – 24 hours
23  of overtime every paycheck (twice a month). I missed out on an additional $2160 - $3240 a month in overtime and retirement benefits
24  for a total of a six week span. I am permanently out the consistent 16 hours of overtime a month provided by the Teen Rec Center.
25  Taking a financial hit of over $2000.00 a month is not easy.
26  At home I am more cautious. I do not answer the front door without checking the security cameras. I do not answer phone numbers I
27  don't know. I constantly look for fresh damage to my house and truck before getting into it.
28  I have had to explain the situation to people in my neighborhood who have either received letters or seen the Facebook posts. I have
29  been contacted in public in Monroe by friends who have asked me what is going on. I have been called, texted or otherwise messaged,
30  by previous women I have dated telling me they have seen the post and can't believe someone would post something so outside of who

I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.
Date: 06/7/20 ____    Time: 1640 ____    Place Statement Taken: Monroe _____

Signed: _____    Witnessed by: _____

(DO NOT WRITE ON THE BACK. PLEASE ASK FOR ADDITIONAL STATEMENT FORMS)

Case #: 2020-3313

# MONROE POLICE DEPARTMENT

[ ] Suspect [X] Victim [ ] Witness Statement

*MUIR*

Statement of: ~~MUR~~, JEREMY A _____   Date of Birth: ▮▮▮▮▮▮

(Last name, First & Middle Initial)

Home Address: 15591 168 AV SE _____   City/State/Zip: Monroe, WA 98272 _____

Business Address: _____

Email Address:
jeremymuir30@gmail.com _____

Home Phone # ( ) _____ - _____   Business Phone # ( ) _____ - _____

Cellular Phone # (360)991-4596 _____   Driver's License Number: ▮▮▮▮▮▮▮▮ State: WA _____

If you have property/items that have been: __Lost __Found __Stolen __Damaged/Vandalized __Graffiti __Forged __Counterfeited. *Please provide the estimated dollar amount of loss* $_____.

__*JAM*_____*Initial here if you would like to request non-disclosure as allowed by RCW 42.56.240. See back of this form for explanation.*

1  I am.
2  I have considered moving out of the state in an attempt to get away from Maggie Foss and her actions against me. I am in the process
3  of fixing my house up to sell. The main problem I have is with her accusations, even though proven untrue by investigation, it will be
4  very hard for me to get a job in law enforcement anywhere.
5  I feel I have a Scarlett Letter attached to my name with the publication of proven false accusations against me.
6  To sum it all up I do not feel safe. Maggie Foss has escalated from trying to harass me at work through the IIU process to now putting
7  me on trial online. I believe Maggie Foss sent the anonymous letters accusing me of being a "sexual predator" to my neighbors and
8  supervisors, which included my home on the return address. I do not feel safe in my own house, and don't know what else I can do
9  except make this report.
10 I just want my life back and to be able to live a life free of being harassed.
11

I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Date: 03/19/20   Time: 1640   Place Statement Taken: Monroe _____

Signed: _____   Witnessed by: _____

(DO NOT WRITE ON THE BACK. PLEASE ASK FOR ADDITIONAL STATEMENT FORMS)

2013

# Statement of Maggie Foss

### *Memorandum of Facts*

On Saturday, March 27, 2010, Maggie Foss, and Jeremy Muir engaged in two acts of sexual intercourse between 2:10 am and 2:58 am.

The two acts of sexual intercourse occurred in two separate locations approximately six miles apart.

The second act of sexual intercourse lasted approximately 20-seconds before Maggie Foss got angry, pushed Mr. Muir off, and ended any further sexual intercourse between the two.

Mr. Muir did not ejaculate during either act of sexual intercourse.

Mr. Muir says the sex was consensual. Maggie Foss says the sex was not consensual.

In February 2020, Mr. Muir provided Detective Henderson of the Monroe police, a sworn written statement wherein he described his relationship with Maggie Foss as a "dating relationship" and he classified his allegations of harassment against Maggie Foss as domestic violence.

This had the expressed purpose of making Mr. Muir's allegations of harassment a mandatory arrest situation for the Monroe police.

Maggie Foss has asserted from the beginning that she did not have a dating relationship with Mr. Muir in any capacity and that she told him she would not date him when they met in person for the first time on March 17, 2010.

> *It is important to note that Mr. Muir has not asserted from the beginning that his relationship with Maggie Foss was a dating relationship that should have been classified as domestic violence.*

Mr. Muir had made three previous complaints against Maggie Foss: IIU2014-106, SAL2015-145, and IIU2016-070.

In all three of these complaints, Mr. Muir had not alleged a dating relationship or classified his relationship with Maggie Foss as a domestic relationship.

In the letter to the Shoreline precinct commander, Chief Ledford, that initiated IIU2016-070, Mr. Muir correctly identified the incident with Maggie Foss as a, *"one-night sexual encounter."*

Mr. Muir did not start asserting a dating-domestic relationship with Maggie Foss until August 15, 2017, when Mr. Muir filed a staged harassment complaint against Maggie Foss with the King County Sheriff's Office, IIU2017-154.

On August 15, 2017, Mr. Muir refused to provide Sergeant Volpe, Maggie Foss's name or describe his relationship with Maggie Foss in detail, but he implied to Sergeant Volpe that his relationship with the unnamed dispatcher was a dating relationship and should be considered a domestic relationship. He also implied that the harassment he was reporting was potentially criminal in nature.

Mr. Muir has no physical evidence to substantiate his assertion that he was in a dating-domestic relationship with Maggie Foss at any period during 2010.

Mr. Muir does not have any photographs, credit card statements, bank statements, phone records, Facebook messages, text messages, or other evidence to substantiate his assertion of a dating relationship.

Maggie Foss, on the other hand, has bank statements, credit card statements, Facebook messages, phone records, and a King County CAD log that directly contradicts Mr. Muir's assertion that he was in a dating relationship with Maggie Foss in 2010.

Mr. Muir's criminal complaints of harassment and stalking against Maggie Foss are based on the following King County administrative and criminal investigations and Monroe Police criminal investigations:

> *IIU2014-106 (King County)*
>
> *15-0077590 (King County)*
>
> *IIU2015-083 (King County)*
>
> *IIU2015-150 (King County)*
>
> *SAL2015-145 (King County)*
>
> *IIU2016-070 (King County)*
>
> *IIU2016-146 (King County)*
>
> *IIU2017-137 (King County)*
>
> *IIU2017-154 (King County)*
>
> *2019-00021441 (Monroe PD)*
>
> *C190046254 (King County)*
>
> *IIU2019-541 (King County)*
>
> *2020-00003313 (Monroe PD)*

*On December 4, 2019, Mr. Muir provided Detective Alspach a verbal statement about his criminal complaint against Maggie Foss, C190046254 (**mag001**).*

On February 19, 2020, Mr. Muir provided Detective Henderson a sworn written statement for criminal investigation 2020-00003313 (**mag001**).

Mr. Muir's sworn written statement to Detective Henderson consisted of seven pages.

The Revised Code of Washington, 9a.76.175, required Mr. Muir to provide truthful facts in his sworn, written statement to Detective Henderson.

A statement Detective Henderson subsequently relied on to write an arrest affidavit against Maggie Foss.

RCW 9a.72.040 states that a person is guilty of false swearing if he or she makes a false statement, which he or she knows to be false, under an oath required or authorized by law.

RCW 9a.72.080 states every unqualified statement that one does not know to be true is equivalent to a statement of that which he or she knows to be false.

Mr. Muir swore under an oath required and authorized by law that his written statement to Detective Henderson was the truth.

Maggie Foss has the right to have every assertion Mr. Muir and Detective Alspach used to substantiate the criminal complaints in C190046254 and 2020-00003313 examined in minute detail and compared to Maggie Foss's physical evidence to substantiate or contradict truthful fact.

A careful analysis of Mr. Muir's written statement showed the following untrue and inaccurate statements of fact:

Page one, line three – Mr. Muir wrote *"Beginning in 2015, Maggie Foss began harassing me based on her false claim that I sexually assaulted her (mag002).*

This is not true.

Maggie Foss had no personal contact with Mr. Muir after July 30, 2014.

Maggie Foss had little professional contact with Mr. Muir after August 18, 2014.

Maggie Foss had almost no professional contact with Mr. Muir after March 8, 2015.

Maggie Foss did not go to the King County Sheriff's Office and make any complaint against Mr. Muir in 2014, 2015, 2016, 2017, 2018, or 2019.

The only complaint ever filed against Mr. Muir occurred in 2015 and was made by Maggie Foss's husband, Jeremy Davy, IIU2015-150.

During Davy's interview for his complaint against an IIU investigator, Sergeant Frances Carlson, Davy gave the IIU commander, Captain Jesse Anderson, a memo Davy had written documenting a rumor Davy had heard about Mr. Muir after Mr. Muir named himself a rape suspect in IIU2014-106.

The IIU commander, Captain Jesse Anderson, took Davy's memo and initiated the IIU2015-150 investigation.

Maggie Foss was not involved in the IIU2015-150 investigation. She was not a listed witness. She did not provide any written statements, she was not interviewed in the investigation, and she did not provide any information to the sheriff's office related to this investigation.

What Mr. Muir is classifying as harassment in 2015 was Maggie Foss making public record requests for King County Sheriff's Office records related to Mr. Muir; Jesse Anderson; Frances Carlson; Jessica Sullivan, IIU2014-106; IIU2015-083; SAL2015-145; IIU2015-150; and case # 15-0077590.

Mr. Muir is also classifying Maggie Foss talking to private citizens in 2015 and 2016, who were willing to talk to her, as harassment, but Mr. Muir has no legal standing to make such a claim.

Mr. Muir has no legal authority to regulate or prevent private citizen to private citizen exchange of information.

Not one of the private citizens who talked to Maggie Foss contacted Mr. Muir or informed Mr. Muir of their conversations with Maggie Foss.

Maggie Foss did not tell the King County Sheriff's Office any information about those conversations with private citizens until Mr. Muir filed a harassment complaint against Maggie Foss in 2016 during which Maggie Foss was compelled to give a truthful statement, IIU2016-070.

Mr. Muir did not learn of the information Maggie Foss provided the King County Sheriff's Office in IIU2016-070 until the investigation was complete and Mr. Muir made a public record request for the IIU2016-070 documentation.

Maggie Foss seeking information through public records request, private conversations, and hiring a lawyer are legal means of obtaining information and addressing civil grievances.

They are not illegal actions.

Subsequently, Mr. Muir cannot classify any of these actions as harassment.

But Mr. Muir's continued and repeated attempts to do so over the last six years substantiates Mr. Muir's retaliatory intent.


Page one, line 23 – Mr. Muir wrote, *"…We had been on a few dates before then, and continued to see each other socially afterwards" (mag003).*

This is not true.

Mr. Muir was describing the night of the sexual assault trying to portray it as consensual sex.

This sentence came at the end of the paragraph and was the entire extent of Mr. Muir's description of his relationship with Maggie Foss.

This sentence does not accurately reflect the events leading up to the sexual assault.


In January of 2010, Maggie Foss was working the graveyard shift, 11:00 pm to 7:00 am.

From January 1 to February 15, 2010, Mr. Muir's phone number did not appear in Maggie Foss's phone records at all.

On February 15, 2010, Mr. Muir's phone number appeared for the first time in Maggie Foss's phone records as text message contact.

This was the first documented contact between Mr. Muir and Maggie Foss and this contact occurred while Maggie Foss was at work, 11:00 pm to 7:00 am.

According to Maggie Foss, Maggie never gave Mr. Muir her personal phone number. According to Maggie, she was dispatching the Southwest radio when she got a text message from an unknown phone number. When she asked who it was, Mr. Muir identified himself.

Maggie Foss believes it likely that Mr. Muir got her personal phone number from PERS, a King County employee information data base.

> *Maggie Foss's CAD history substantiated that she was dispatching the Southwest radio on February 15, 2010 as described.*
>
> *Maggie Foss's phone records substantiate that the first documented contact between Maggie Foss and Mr. Muir was an in-coming text from Mr. Muir's personal cellphone number on February 15, 2010 as described (1of38 line 1328).*

Mr. Muir's phone number would continue to appear periodically in Maggie Foss's phone records as text message contact between February 15 and March 15, 2010.

In addition to the numerous text message contacts, there was one phone call between Maggie Foss and Mr. Muir during this period.

This phone call occurred while Maggie Foss was at work, 11:00 pm to 7:00 am.

All of Mr. Muir's text message contact with Maggie Foss between February 15 and March 15, 2010 occurred while Maggie Foss was at work, 11:00 pm to 7:00 am.

The few times Mr. Muir's phone number showed up as a text message contact when Maggie Foss was off-duty, Maggie Foss did not reply.

March 15, 2010 was Maggie Foss's last night on the graveyard shift.

In the early morning hours of March 16, 2010, Maggie Foss posted to Facebook that this was her last shift on graveyard.

Mr. Muir commented on the post stating Maggie would be missed.

This Facebook comment proves Mr. Muir knew Maggie Foss was working the graveyard shift on March 16, 2010.

Mr. Muir in his interview for IIU2014-106, said the following:

> *"Met Maggie February 2010 to March 2010. Um, I had drinks with Maggie in Renton after her shift before March 12th of 2010. Um, she was working swing shift at the time and got off around 11 o'clock."*

Maggie Foss's Cad log, phone records, and Mr. Muir's comment on the March 16, 2010 Facebook post prove Mr. Muir's verbal statement to Sergeant Carlson that Mr. Muir had drinks with Maggie Foss after her swing shift before March 12, 2010 is not true.

Mr. Muir's written statement to Detective Henderson that Mr. Muir had been on a few dates with Maggie Foss before March 17, 2010 is equally not true.

Mr. Muir's only contact with Maggie Foss between February 15 and March 16, 2010 had been text message contact or phone contact while Maggie Foss was at work, 11:00 pm to 7:00 am.

Mr. Muir did not meet Maggie Foss in person until March 17, 2010, sometime after 11:36 pm.

Maggie Foss's phone records and Facebook messages substantiated the following events happened between 12:00 am on March 16, 2010 and 11:59 pm on March 18, 2010:

March 16, 2010 – Maggie Foss had text message contact with Will Mitchem, Marcy Smith, and Mr. Muir.


*Maggie Foss was working 12:00 am to 7:00 am.*


1:38 am – Foss to Muir.

1:41 am – Muir to Foss.

1:47 am – Muir to Foss.

2:51 am – Muir to Foss.

3:01 am – Foss to Muir.


This was Maggie Foss's last shift on graveyard.

The date-time stamp of Maggie's Facebook post showed March 16, 2010 but does not show the time.

Maggie posted to Facebook this was her last night on graves.

Mr. Muir was working the graveyard shift and commented on the post telling Maggie she would "be missed" shortly after the post went up.

Mr. Muir's post was the third comment in the string.

The date stamp on Mr. Muir's comment showed March 16, 2010, but again did not give the time.

However, Maggie Foss was clearly at work on her last night on graves and the March 16 date stamp means the post and comments occurred between midnight and 7:00 am.

Mr. Muir's comment on Maggie Foss's Facebook post proved on March 16, 2010, Mr. Muir knew Maggie Foss was working the graveyard shift.

March 26, 2010 continued:

4:22 am – Muir to Foss.

4:59 am – Foss to Muir.

5:59 am – Muir to Foss.

5:59 am – Muir to Foss.

6:38 am – Foss to Muir.

*Maggie Foss got off work at 7:00 am.*

March 16, 2010 continued:

*Maggie Foss was not working.*

2:03 pm – Muir to Foss.

2:03 pm – Foss to Muir.

2:07 pm – Muir to Foss.

2:09 pm – Foss to Muir.

2:16 pm – Foss to Muir.

2:19 pm – Muir to Foss.

2:22 pm – Foss to Muir.

2:28 pm – Foss to Muir.

2:37 pm – Muir to Foss.

*2:38 pm – Foss to Muir.*

*This was Mr. Muir's last phone contact with Maggie Foss on March 16, 2010.*

3:53 pm – Smith to Foss.

3:54 pm – Foss to Smith.

3:55 pm – Smith to Foss.

3:56 pm – Smith to Foss.

4:20 pm – Foss to Smith.

4:28 pm – Smith to Foss.

4:34 pm – Smith to Foss.

4:34 pm – Foss to Smith.

4:38 pm – Smith to Foss.

4:39 pm – Foss to Smith.

4:40 pm – Smith to Foss.


*4:40 pm* – Maggie Foss responded to a Facebook message Marcy Smith had sent her.

Maggie Foss told Marcy Smith Maggie needed a night out, so Maggie was going to the "club tomorrow."

The next day was March 17, 2010, St. Patrick's Day.

Maggie asked Smith if Smith would like to meet before going to the club for drinks and something to eat.

The club Maggie was referring to was Swannies Underground Comedy Club in downtown Seattle.

Maggie Foss and Marcy Smith met while working as cocktail waitresses at the Swannies Underground Comedy Club in 2006.

Smith still worked at Swannies part-time. Smith was scheduled to work the Underground Comedy Bar at 7:00 pm on St. Patrick's Day.

Maggie Foss, while not officially employed at Swannies, knew the wait-staff and owner well.

Maggie's main social circle and primary hang-out spot was the Swannies Underground Comedy Club because even though she was not officially on the payroll, she still received employee discounts on food and drinks.

In exchange, If Maggie was hanging out in the bar and it was busy, she would frequently grab a tray, help the staff sling drinks until it slowed down, and then go back to sitting at the bar with the owner.

Maggie was well-liked by the staff and well-liked by the owner. Maggie had full run of the bar and could come and go as she pleased.

Maggie Foss and Marcy Smith's plans were to meet at Seattle Lighting at 5:00 pm and hang out at the King Street bar until Smith's shift started at 7:00 pm.

*Mr. Muir was not included in Maggie Foss and Marcy Smith's plans.*

4:41 pm – Foss to Smith.

4:42 pm – Foss to Smith.

4:44 pm – Foss to Smith.

4:45 pm – Foss to Smith.

4:45 pm – Smith to Foss.

4:48 pm – Foss to Smith.

4:48 pm – Foss to Smith.

4:49 pm – Foss to Smith.

4:49 pm – Foss to Smith.

4:53 pm – Smith to Foss.

4:54 pm – Foss to Smith.

4:54 pm – Foss to Smith.

5:14 pm – Foss to Smith.

5:14 pm – Foss to Smith.

5:14 pm – Foss to Smith.

6:10 pm – Smith to Foss.

6:10 pm – Smith to Foss.

6:14 pm – Foss to Smith.

6:14 pm – Foss to Smith.

6:21 pm – Smith to Foss.

6:47 pm – Foss – Smith.

7:32 pm – Smith to Foss.

7:43 pm – Smith to Foss.

==March 17, 2010, St. Patrick's Day== – Maggie Foss had text message contact with Will Mitchem, Marcy Smith, and Mr. Muir.

***Maggie Foss was not working.***

12:42 am – Foss to Smith.

12:54 am – Mitchem to Foss.

12:54 am – Mitchem to Foss.

1:10 am – Foss to Mitchem.

1:29 am – Mitchem to Foss.

1:29 am – Mitchem to Foss.

1:39 am – Foss to Mitchem.

1:39 am – Foss to Mitchem.

1:39 am – Foss to Mitchem.

1:39 am – Foss to Mitchem.

1:42 am – Foss to Mitchem.

1:42 am – Foss to Mitchem.

1:49 am – Mitchem to Foss.

1:56 am – Foss to Mitchem.

2:00 am – Mitchem to Foss.

2:01 am – Foss to Mitchem.

2:09 am – Foss to Mitchem.

2:12 am – Mitchem to Foss.

2:22 am – Foss to Mitchem.

2:22 am – Foss to Mitchem.

2:22 am – Foss to Mitchem.

2:25 am – Foss to Mitchem.

2:25 am – Foss to Mitchem.

2:25 am – Foss to Mitchem.

`          2:27 am – Mitchem to Foss.

2:28 am – Mitchem to Foss.

2:28 am – Mitchem to Foss.

2:31 am – Foss to Mitchem.


Maggie Foss had been dating Will Mitchem since December of 2009.

In February of 2010, Maggie Foss asked Will Mitchem if they were dating exclusively and Mitchem said yes.

Maggie was emotionally involved with Mitchem and had strong feelings for him. Maggie believed she was in a monogamous relationship with Mitchem.

During this text message conversation, Mitchem told Maggie Foss he wanted to date other people. He was willing to stay in a friend with benefits relationship with Maggie, but he did not want to be in an exclusive relationship with her.

Maggie's feelings were extremely hurt by the fact Mitchem did not want to be in a monogamous relationship and because Mitchem told her via text message, not in person.


March 17, 2010 – Maggie Foss wrote Will Mitchem a long Facebook message.

The exact time Maggie Foss wrote the message is unknown. The date stamp does not include the time.

This Facebook message was Maggie Foss breaking off her approximate four-month relationship with Will Mitchem.

The first few sentences of Maggie's message read as follows:

> *"When we got off the phone w/each other today I was so excited to see u tomorrow night and couldn't wait to feel u again and cuddle with u in ur warm bed. But then I couldn't help but think about all the things you said to me and my emotions overrode my desire for you."*

> *"You really hurt my feelings…"*


The message continued for two pages and was primarily about how much Maggie cared for Mitchem and how badly he had hurt her feelings.

Ultimately, Maggie broke off her relationship with Mitchem in this Facebook message because Maggie was looking for a serious relationship, Mitchem would not commit to a serious

relationship, and Maggie had too much respect for herself to be Mitchem's *"little play thing"* or his *"fuck friend"* who made him *"cum."*

Maggie Foss looking forward to seeing Will Mitchem *"tomorrow night"* contradicts Mr. Muir's claim that he and Maggie Foss were in a dating relationship on or before March 17, 2010.

Up until March 17, 2010, Maggie Foss was in a committed, monogamous relationship with Will Mitchem.

Maggie Foss breaking off her relationship with Will Mitchem because he would not commit to a monogamous relationship contradicts Mr. Muir's narrative that Maggie Foss and Mr. Muir were looking to establish a casual dating relationship as described by Mr. Muir in his interview for IIU2014-106:

> *"SGT. CARLSON: Were you trying to start a relationship with Maggie the night this occurred?*
>
> *DEPUTY MUIR: I think it was more we were trying to have like a dating relationship, not a, not anything more than that. I was currently going through a divorce with my first wife, and Maggie and I both made it clear to each other we weren't looking for anything serious. I had kids. She wasn't interested in kids. Um, she had a very. . .she has a very different lifestyle than I do. She (unintelligible) she has dogs. She. . .whatever she does. Um, I have my kids. My kids are my life, and I focus on my kids; so anybody that's not really interested in kids, unfortunately, is just not a good match."*

March 17, 2010, St. Patrick's Day continued:

*11:29 am* – Marcy Smith sent Maggie Foss a Facebook message confirming Smith was going to take Maggie to the King Street bar as planned.

Smith told Maggie where to park and then confirmed Maggie knew how to get to Smith's desk.

This substantiated Maggie Foss was meeting Marcy Smith at Seattle Lighting at a specific spot, Smith's desk.

12:37 pm – Smith to Foss.

12:37 pm – Smith to Foss.

12:37 pm – Smith to Foss.

12:58 pm – Foss to Smith.

1:03 pm – Smith to Foss.

*1:03 pm* – Maggie Foss confirmed via Facebook she knew how to get to Marcy Smith's desk and confirmed Maggie would be at Smith's desk at 5:00 pm.

*Mr. Muir was not included in these plans.*

*5:00 pm* – Maggie Foss met Marcy Smith at Seattle Lighting as planned.

> *Maggie's financial records showed a $3.00 parking pass purchase for downtown Seattle on March 17, 2010, but the records do not specify a time.*

*5:59 pm – Mr. Muir sent a text message to Maggie Foss.*

Mr. Muir's last contact with Maggie Foss had been at *2:38 pm on March 16, 2010*.

Maggie Foss and Marcy Smith made their plans to meet at Seattle Lighting, before going to the King Street bar and Swannies Underground Comedy Club, at *4:40 pm on March 16, 2010.*

Mr. Muir had no phone or text message contact with Maggie Foss *between 2:38 pm on March 16 and 5:59 pm on March 17* wherein he could have been invited or been made aware of Maggie Foss and Marcy Smith's plans.

> *Maggie Foss's phone records and the Facebook messages with Marcy Smith prove Mr. Muir's assertion that he was on date with Maggie Foss on March 17, 2010 is not true.*

> *On March 17, 2010 at 5:59 pm, Mr. Muir had not asked Maggie Foss out on a date, did not have plans to meet her for drinks and was not included in Maggie Foss and Marcy Smith's plans to hang-out at the Swannies Underground Comedy Club.*

> *At 5:59 pm, Mr. Muir had no idea where Maggie Foss was or what Maggie Foss was doing.*

6:17 pm – Foss to Muir.

6:20 pm – Foss to Muir.

6:23 pm – Muir to Foss.

6:23 pm – Foss to Muir.

There is no physical evidence to substantiate Maggie Foss and Marcy Smith's movements post-meeting at Seattle Lighting. They were at the King Street bar for a period but when they arrived and left cannot be determined.

Smith was scheduled to clock in at the Swannies Underground Comedy Club at 7:00 pm and Maggie and Smith were at Swannies Underground Comedy Club by that time.

Smith clocked in on-schedule and went downstairs to the Comedy Underground to cover the floor during the show.

Maggie remained at the bar on the main floor, drinking alone.

Another woman, Anna Nowickiweiss, was also sitting alone at the bar.

Maggie and Nowickiweiss were strangers but Maggie is very gregarious.

Maggie introduced herself to Nowickiweiss, struck up a conversation, and soon found herself sitting next to Nowickiweiss hanging out.

Maggie would have four drinks at Swannies Comedy Club over the course of the evening.

> *Maggie's financial records showed a transaction at Swannies Comedy Club for $16.00 on March 17, 2010.*

A $16.00 dollar tab for four drinks seems low, even by 2010 prices. But, when proper context is set, Maggie's tab matches perfectly.

Maggie received employee discounts on her drinks at Swannies Comedy Club which is why Swannies was a primary hang-out spot for Maggie.

Maggie was being charged $4.00 a cocktail.

$4.00 a cocktail times four cocktails = $16.00 and is a perfect match.

*8:19 pm* – Muir to Foss.

*8:20 pm* – Foss to Muir.

*8:21 pm* – Foss to Muir.

According to Maggie Foss, during this text message string, Mr. Muir asked Maggie if Mr. Muir could come hang-out with Maggie.

Maggie told him it was a free country and clearly must have told him where she was at, otherwise Mr. Muir would never have been able to find her because Swannies Underground Comedy Club was not a hang-out spot for Mr. Muir. He had never been there before.

Maggie Foss had not met Mr. Muir face to face.

Her only contact with Mr. Muir had been text messages, Facebook, and the King County computer system.

8:47 pm – Arne Foss to Maggie Foss.

9:18 pm – Maggie Foss to Arne Foss.

9:20 pm – Arne Foss to Maggie Foss.

*9:28 pm* – Mr. Muir called Maggie Foss. This phone call lasted one minute.

> *Maggie does not remember if she spoke with Mr. Muir in person or not.*

*9:46 pm* – Foss to Jim Cooper.

*9:46 pm* – Foss to Cooper.

*11:01 pm* – Cooper to Foss.

*11:36 pm* – Foss to Cooper.

Maggie Foss and Jim Cooper had an on again – off again intimate relationship that had been going on for about four years.

The Swannies Underground Comedy Club was a hang-out spot for both Maggie and Cooper. Maggie and Cooper met in 2006 when Maggie was waiting tables at the club.

Maggie and Cooper had genuine chemistry together.

In addition to being lovers, they were good friends.

If either one of them were dating someone else, they would hang out at the comedy club as friends.

If they were both single, it was game on.

Regardless of what state their physical relationship was in, on or off, they were genuine friends.

Jim Cooper was an intimate confidant of Maggie Foss who could make her laugh.

Maggie Foss had just broken up with Will Mitchem sometime earlier in the day. Maggie's feelings were extremely hurt.

Maggie Foss was looking for an intimate confidant to talk to, someone who could make her laugh and take her mind of things. Jim Cooper fit that bill perfectly because he was a good drinking buddy and funny.

Jim Cooper was at work at the time.

The *9:46 pm* text to Jim Cooper was Maggie Foss reaching out to Cooper and inviting him to join her at Swannies after his shift.

This substantiates that whatever communication had occurred between Maggie Foss and Mr. Muir at *9:28 pm*, Maggie Foss was not on a date with Mr. Muir, was not anticipating Mr. Muir's arrival, and was not thinking about Mr. Muir.

Maggie Foss had not met Mr. Muir in person before. Her only contact with Mr. Muir up to March 17, 2010 had been the King County computer system, Facebook, and phone.

Maggie Foss did not know Mr. Muir or Keri Halberg and neither had crossed into Maggie Foss's social circle before March 17.

On March 17, 2010, at 9:46 pm, Mr. Muir and Keri Halberg were nobody to Maggie Foss.

The *11:01 pm* text from Jim Cooper to Maggie Foss was Cooper telling Maggie he was on his way.

There is no physical evidence to substantiate when Maggie Foss, Jim Cooper, and Anna Nowickiweiss met at the comedy club.

But there is a Facebook message that shows Anna Nowickiweiss was inside Maggie Foss's social circle at the right time.

The date stamp on the Facebook message was March 19, 2010.

The women were making plans to meet at the Swannies Comedy Club on March 20, 2010. Maggie Foss was scheduled to work on March 20, 2010.

Maggie identified that she would be getting to Swannies around 11:20 pm. This would be consistent with Maggie getting off work at 11:00 pm.

*Maggie's work schedule substantiated she worked March 20, 2010 as described.*

Even though the exact time Jim Cooper met Maggie Foss, and Anna Nowickiweiss, at Swannies Underground Comedy Club on March 17, 2010, cannot be determined, Maggie Foss's last text to Jim Cooper at *11:36 pm* substantiates Cooper was not yet at the comedy club at 11:36 pm.

All three were at Swannies Comedy Club together when Mr. Muir and Keri Halberg showed up.

Maggie Foss, Anna Nowickiweiss, and Jim Cooper being together at Swannies when Mr. Muir and Keri Halberg showed up substantiates Mr. Muir and Halberg's arrival at Swannies had to have occurred *after 11:36 pm.*

By the time Mr. Muir and Keri Halberg arrived at Swannies, the only customers left in the bar were regulars like Maggie Foss and Jim Cooper. Mr. Muir's description of Swannies being dead was accurate.

It was regulars only.

Mr. Muir and Keri Halberg would convince Maggie Foss to go to an Irish bar in Burien, McKelly's Bar and Grill, under the guise that an Irish bar would be more happening, especially on St. Patrick's Day.

Maggie Foss invited Jim Cooper and Anna Nowickiweiss to go with them but Cooper and Nowickiweiss declined.

What is clear from Maggie Foss's Facebook messages, phone records, and CAD log is Mr. Muir's narrative that he was on a date with Maggie Foss and was in a dating relationship with Maggie Foss is false.

What is also clear from the Facebook messages and phone records is that Maggie Foss throughout the course of the day on March 17, 2010, was not thinking about Mr. Muir, had no plans to meet Mr. Muir for drinks, and did not have plans to go on a date with him.

Maggie Foss was doing her own thing, in her own social circles, with her own friends, to which Mr. Muir was not included or invited.

Mr. Muir tracked Maggie Foss down and interjected himself into Maggie Foss's social circle by design.

Had Mr. Muir's intention been to go out with his friend Keri Halberg as he described in IIU2014-106, he would not have been able to locate Maggie Foss which would have prevented Mr. Muir from interjecting himself into Maggie Foss's social circle:

> "Um, I was gonna go out with my friend and ex-roommate Carrie Halberg. Um, her phone number is on the form for you. It's 206-331-8600. I'd boarded with her after I had been in the Academy due to me living in Vancouver. You know, my family is still living in Vancouver, so until I got residence, I rented a room from Carrie. Um, Carrie and I were gonna go out for St. Patrick's Day. I don't remember how Maggie was invited, or if she invited me or I invited her. Um, we met at a bar in downtown Seattle. I don't remember the name of the bar. It was. . .it's close, close to here, somewhere off Fourth, I believe. Um, met at a bar. I drove, picked up Carrie from her house. We drove to the bar, met Maggie at the bar, had a few drinks."

Mr. Muir's role as the primary instigator was proven by the fact that all three phone contacts between Maggie Foss and Mr. Muir on March 17, 2010 were initiated by Mr. Muir.

Had Mr. Muir not been reached out to Maggie Foss to track her down, he would never have found her because Maggie Foss was not reaching out to Mr. Muir, she was reaching out to Jim Cooper.

Maggie Foss and Mr. Muir's next in-person contact occurred on March 26, 2010.

March 26, 2010 @ 6:22 am – Mr. Muir sent Maggie Foss and Allison Sierra a Facebook message.

The message asked Maggie if she was still game and asked Sierra if she was going to hang with the cool people.

This was a group invite to go out for drinks.

This was the same subterfuge Mr. Muir used to try and get a coffee barista, Katie Oehlsen, to go out with him in 2012, IIU2016-146.

March 26, 2010 @ 9:49 am – Maggie Foss replied via Facebook.

Maggie's response was she would "stop by for a drink or two."

Maggie went on to say Sierra had the day off and had other plans.

Maggie asked if Keri was coming.

This substantiates there were alternate threads of conversation occurring, with multiple people, about getting together.

Multiple threads of conversation with multiple people about going out directly contradicts Muir's dating-relationship narrative.


March 26, 2010 @ 2:34 pm – Allison Sierra replied via Facebook saying she had a sick kid and would need stay home.


March 26, 2010 – Mr. Muir commented on Allison Sierra's message.

There was no date time stamp on the comment.

Mr. Muir made a comment to Sierra about having to fight for daycare.

Mr. Muir made a comment if Maggie wanted to learn about kids she needed "three shots of kids."

Mr. Muir replied directly to Maggie's question about Keri stating he was waiting to hear back from "Keri."

> *Mr. Muir has three children.*
>
> *Mr. Muir has identified Keri Halberg as an eyewitness who was with Mr. Muir and Maggie Foss during the timeline leading up to the sex to include the moments just before the rape.*

Mr. Muir replying to Maggie and Sierra in the same message substantiated multiple threads of conversation with different people.

Again, multiple threads of conversation with multiple people directly contradicts Mr. Muir's dating-relationship narrative.

18

March 26, 2010 @ 3:23 pm – Maggie Foss sent a Facebook message to Allison Sierra and Mr. Muir.

Maggie wrote, "Lol Damn that was only St. Patrick's Day. I usually can hold my liq!"

It is not clear who Maggie was talking to. The precipitator comment is not available.

Mr. Muir claimed, in his interview for IIU2014-106, he had a one-night, consensual sex encounter, with Maggie Foss on Friday, March 12; and Wednesday, March 17, Saint Patrick's Day.

Mr. Muir claimed there was a prior contact between Maggie Foss and Mr. Muir before the night of the sexual assault.

Keri Halberg was present for both contacts, but Mr. Muir claimed she was only present for the second contact.

Maggie Foss and Mr. Muir both agreed the sexual intercourse occurred during the second contact.

Maggie Foss's CAD log, phone records, Facebook messages, and financial records proved Mr. Muir could not have contacted with Maggie Foss prior to March 17, 2010 as he described.

March 17, 2010 was the first contact as described by Maggie Foss and Mr. Muir.

March 26, 2010 was the second contact wherein the sexual intercourse occurred.

Mr. Muir and Keri Halberg have never testified to any fact substantiating their whereabouts or activities on March 26, 2010.

On March 26, 2010, when Mr. Muir claimed he was meeting Maggie Foss at Swannies Underground Comedy Club, Maggie Foss was at the King County Sheriff's Office Communication Center, dispatching the Metro radio.

Maggie would not be relieved from the Metro radio until shift change at 11:00 pm.

March 26, 2010 – Maggie had text message contact with Amy Sagiao-Lemafa and Mr. Muir.

*Maggie Foss was working, 3 pm to 11 pm.*

3:49 pm – Muir to Foss.

3:50 pm – Foss to Muir.

3:50 pm – Foss to Muir.


6:27 pm – Muir to Foss.

6:28 pm – Foss to Muir.

6:29 pm – Muir to Foss.

6:29 pm – Foss to Muir.

6:30 pm – Foss to Muir.

6:33 pm – Muir to Foss.

6:37 pm – Foss to Muir.

7:19 pm – Foss to Muir.


7:50 pm – Foss to Sagiao-Lemafa.

7:50 pm – Sagiao-Lemafa to Foss.

7:53 pm – Sagiao-Lemafa to Foss.

7:54 pm – Foss to Sagiao-Lemafa.

7:54 pm – Foss to Sagiao-Lemafa.

7:55 pm – Sagiao-Lemafa to Foss.

7:56 pm – Foss to Sagiao-Lemafa.


8:05 pm – Muir to Foss.


8:16 pm – Foss to Muir.


8:32 pm – Sagiao-Lemafa to Foss.

8:24 pm – Foss to Sagiao-Lemafa.

8:29 pm – Foss to Sagiao-Lemafa.

8:37 pm – Sagiao-Lemafa to Foss.

8:51 pm – Muir to Foss.

8:53 pm – Foss to Muir.

8:53 pm – Foss to Muir.

8:53 pm – Muir to Foss.

8:56 pm – Muir to Foss.

8:56 pm – Muir to Foss.

8:58 pm – Foss to Muir.

8:59 pm – Muir to Foss.

8:59 pm – Foss to Muir.

9:00 pm – Muir to Foss.

9:01 pm – Foss to Muir.


9:09 pm – Muir to Foss.

9:11 pm – Foss to Muir.

10:24 pm – Muir to Foss.

10:26 pm – Foss to Muir.


10:27 pm – Muir to Foss.

10:27 pm – Muir to Foss.

10:28 pm – Foss to Muir.


These text messages between Maggie Foss and Mr. Muir substantiates the two were not yet together.

This contradicts Mr. Muir's narrative that he met Maggie Foss at Swannies Comedy Club and then drove back Keri Halberg's house.

This substantiates Maggie Foss's narrative that she was at work.

*Maggie Foss's CAD history proves Maggie Foss was dispatching the Metro radio until 11:00 pm on March 26, 2010.*


11:01 pm – Sagiao-Lemafa to Foss.

11:14 pm – Foss to Sagiao-Lemafa.

**11:15 pm** – Sagiao-Lemafa to Foss.

This text message string was Maggie Foss and Amy Sagiao-Lemafa coordinating their link-up in Burien after Maggie was off-work.

Maggie Foss and Amy Sagiao-Lemafa both substantiate they met near the Burien library and went inside McKelly's Bar and Grill to meet Mr. Muir, Keri Halberg, and at least one other male.

Mr. Muir contends Amy Sagiao-Lemafa was not present, but Mr. Muir has no evidence other than a faulty memory to substantiate his assertion.

Maggie Foss says Amy Sagiao-Lemafa was there.

Amy Sagiao-Lemafa says she was there.

Here is physical evidence showing Maggie Foss contacting Amy Sagiao-Lemafa on the right day at the right time to coordinating a link-up in Burien.


March 26, 2010 @ 11:30 pm – Mr. Muir invited a group of people to McKelly's Bar and Grill for drinks via Facebook.

The Facebook post showed the guest list included Allison Sierra, Carissa Tom, Maggie Foss, Keri Halberg, and a King County deputy named Dearth

Maggie Foss invited Amy Sagiao-Lemafa, in part because of a March 22, 2010 Facebook conversation between the two.

Amy Sagiao-Lemafa did not know anyone else in the group.

Maggie Foss was working the swing shift. Maggie Foss was dispatching the Metro radio and got off at 11 pm.

Maggie Foss drove from the Comm Center to Burien and parked near the Burien Library.

The drive from the Comm Center to Burien City Center takes 13 to 18-minutes depending on traffic.

Maggie Foss arrived downtown Burien at approximately 11:20 pm where she met Amy Sagiao-Lemafa outside and both went in to McKelly's Bar and Grill together.

Maggie Foss remembered Mr. Muir, Keir Halberg, and two other males being in the bar when they entered.

Amy Sagiao-Lemafa remembered Mr. Muir, Keri Halberg, and one male. She did not remember two.

Maggie Foss believed the two males were Halberg's friends.

The two males could have been Keri Halberg's tenants, John Rausch, and Nick Baisch.

There is also the possibility of a third, unidentified roommate.

Mr. Muir claimed this get together happened on Friday, March 12, 2010, St. Patrick's Day.

Mr. Muir identifying March 12 as the Friday before St. Patrick's Day proved he looked at a calendar to coordinate his list of events:

> *"DEPUTY MUIR: No. Mick Kelly's is actually in Burien. Um, St. Patrick's Day night out we, was actually the 12th, um, it was the Friday the 12th before St. Patrick's Day."*

Mr. Muir wrote this erroneous date on his list of events as he remembered them:

> *"St. Patrick's Night out – 03/12/2010."*

*St. Patrick's Day is always March 17. In 2010, it was a Wednesday.*

*What Mr. Muir wrote on his list of events was that he had a one-night sexual encounter with Maggie Foss on Friday, March 12, 2010 and Wednesday, March 17, 2010.*

*Verbally, Mr. Muir told Sergeant Carlson it was St. Patrick's Day night out, Wednesday March 17, 2010. He then verbally changed it to Friday the 12th before St. Patrick's Day. A few moments later, he went back to it being St. Patrick's Day night.*

*What makes the contradictions in Mr. Muir's verbal statements so important is Mr. Muir had his list of events in his hand and was reading from it. Even though Mr. Muir was reading from his list of events in his hand, Mr. Muir could not keep his dates straight.*

Keri Halberg claimed this get together happened on St. Paddy's Day, March 17, 2010.

Mr. Muir and Keri Halberg claimed only Mr. Muir, Keri Halberg, and Maggie Foss were present.

> *The other individuals present have never been identified.*

Maggie Foss's CAD log, phone records, credit card statements, bank statements, and the March 26 Facebook invite prove Mr. Muir and Keir Halberg are testifying to the wrong day.

Maggie Foss being at the Communication Center until 11:00 pm proves Mr. Muir's pre-sex timeline did not happen in the manner that Mr. Muir described during his interview for IIU2014-106.

> *Mr. Muir and Keri Halberg did not meet Maggie Foss at the Swannies Comedy Club and Maggie Foss did not follow Mr. Muir and Keri Halberg to Halberg's house as Mr. Muir described.*

Mr. Muir and Keri Halberg have never testified to any fact about where they were, who they were with, or what they were doing on March 26, 2010.

Maggie initially bought herself a vodka cranberry drink.

The others were drinking beer.

Amy Sagiao-Lemafa remembered Mr. Muir being attracted to Maggie Foss and hitting on her.

Amy Sagiao-Lemafa described Maggie Foss and Mr. Muir as flirting.

However, Amy Sagiao-Lemafa and Maggie Foss went to the bathroom where Sagiao-Lemafa asked Maggie if Maggie was interested in Mr. Muir and Maggie emphatically told Sagiao-Lemafa, "No!"

Maggie told Sagiao-Lemafa she was not attracted to Mr. Muir and had told him so to his face on March 17, 2010.

Three things that had turned Maggie off on March 17, 2010 were as follows:

Mr. Muir was married with three kids.

Mr. Muir was critical of Maggie Foss renting an apartment instead of owning a home like he did. According to Maggie Foss, it was almost as if Mr. Muir was in competition with Maggie Foss.

Mr. Muir mocked his wife's suicide attempt to Maggie.

Maggie Foss found the mocking of Rena Muir's suicide attempt to be particularly distasteful.

> In IIU2014-106, Mr. Muir substantiated that he and Maggie Foss were not a good match because she was not interested in kids and his three kids were his whole life.

> In IIU2016-070, Mr. Muir substantiated his telling Maggie Foss about Rena Muir's suicide attempt when he complained about how Maggie Foss knew about Rena Muir's suicide attempt. In IIU2016-070, Mr. Muir accused Maggie Foss of misusing the King County records systems to learn of Rena Muir's suicide attempt, clearly forgetting that Maggie Foss had been aware of the suicide attempt since March 17, 2010 because Mr. Muir had bragged to her that, "No Judge alive would give a crazy suicidal bitch custody of **MY** kids!"

Amy Sagiao-Lemafa knew, from her long friendship with Maggie Foss, that Maggie Foss did not date men with multiple kids.

According to Maggie Foss and Amy Sagiao-Lemafa, when they returned to the table, they found Mr. Muir had ordered a round of six vodka cranberry drinks. The server had spread the drinks out around the table.

One drink each, was sitting in front of all the people at the table.

Six drinks would be consistent with Maggie Foss's memory of how many people were at the table: Muir, Halberg, Maggie, Sagiao-Lemafa, and two unidentified males.

When Maggie Foss sat down, Mr. Muir gathered up all the vodka cranberry drinks and put them in front of Maggie, insisting she needed to unwind because of her recent break-up with Will Mitchem.

This was consistent with Mr. Muir's rape manifesto, paragraph 2 titled "Whores …"

> *"Whores come in all sizes and shapes and can usually be found at the local bar or club…"*

> *"Contrary to popular belief whores do have some standards, these lower with alcohol but remember they are there…"*

> *"Remember – whores are good for one thing and one thing only – getting your numbers up."*

Maggie Foss was embarrassed, so she bought a round of beers for the table.

> *Maggie Foss's financial statements showed a purchase at McKelly's on March 26, 2010, for $45.00.*

> *$45.00 is consistent with buying a round of beers for six people.*

Amy Sagiao-Lemafa decided to leave and offered to give Maggie Foss a ride home.

Mr. Muir and Keri Halberg both insisted they would take care of Maggie.

Amy Sagiao-Lemafa was worried about Maggie and told her husband about Mr. Muir's behavior towards Maggie when Sagiao-Lemafa got home but believed it would be okay because Mr. Muir was a cop.

Maggie Foss remained at McKelly's Bar and Grill.

March 27, 2010 @ 00:58 am – Maggie Foss started texting her ex-boyfriend Will Mitchem.

Maggie Foss was still at McKelly's Bar and Grill with Mr. Muir and Keri Halberg.

Amy Sagiao-Lemafa had gone home.

The whereabouts of the other male or males is unknown.

Will Mitchem was working.

Maggie Foss and Will Mitchem's text message contact was a string, 22 in all.

00:58 am – Foss texted Mitchem.

01:14 am – Mitchem texted Foss.

01:18 am – Foss texted Mitchem.

01:19 am – Mitchem texted Foss.

01:26 am – Foss texted Mitchem.

01:33 am – Mitchem texted Foss.

01:33 am – Foss texted Mitchem.

01:33 am – Foss texted Mitchem.

01:34 am – Mitchem texted Foss.

01:36 am – Foss texted Mitchem.

01:39 am – Mitchem texted Foss.

01:42 am – Foss texted Mitchem.

01:43 am – Mitchem texted Foss.

01:53 am – Foss texted Mitchem.

01:59 am – Mitchem texted Foss.


When the bar closed, Mr. Muir offered to give Keri Halberg a ride to Halberg's house, and Maggie Foss a ride to Maggie's apartment.

When the group reached Keri Halberg's house, Mr. Muir told Maggie Foss he needed to talk to Keri Halberg inside and he insisted Maggie come inside too.

Maggie Foss went inside and sat on a couch in the living room just inside the front door.

Maggie continued texting Will Mitchem.


02:07 am – Foss texted Mitchem.

02:07 am – Foss texted Mitchem.

02:08 am – Mitchem texted Foss.

02:09 am – Foss texted Mitchem.

02:10 am – Mitchem texted Foss, line 273 of Foss's phone records.

Unknown – Foss texted Mitchem, line 274 of Foss's phone records. This line was cut-off by the phone company when they processed Maggie's phone record.

Maggie Foss and Will Mitchem's back and forth text message conversation abruptly ended after line 274.

Mr. Muir had a short conversation with Keri Halberg and then Halberg went to bed for the night.

Mr. Muir sat down next to Maggie on the couch and leaned in to kiss her.

Maggie leaned away.

Mr. Muir pushed Maggie onto the floor and pulled her pants down.

> *This was consistent with Lindsay Johanson's description of how Mr. Muir initiated sexual intercourse during their relationship, IIU2016-146.*
>
> *Lindsay Johanson is Mr. Muir's second ex-wife.*
>
> *This was consistent with Muir's rape manifesto, chapter six:*
>
> *"Don't be a puss … if you are going to do something do it full steam ahead!"*

Maggie repeatedly asked Mr. Muir what he was doing and told him to stop, using the word no multiple times.

Maggie tried to pull her pants back up with her right hand, but Mr. Muir knocked her hand away.

Mr. Muir vaginally penetrated Maggie and engaged in sexual intercourse without her consent.

Maggie was frozen with shock and humiliation.

Maggie was afraid someone was going to walk in on them

Maggie was disgusted by the fact she was half naked lying on a stranger's dirty floor.

Maggie was struggling to come up with a solution. Her noes were being ignored and were not working so she had to come up with a different tactic.

Maggie told Mr. Muir if they were going to engage in sexual intercourse, they should do it back at Maggie's apartment.

Maggie's apartment offered privacy and a bed.

Mr. Muir agreed and stopped the sexual intercourse.

Mr. Muir did not ejaculate.

Mr. Muir's failure to ejaculate contradicts Mr. Muir's "dating" and "relationship" narrative.

Mr. Muir drove Maggie Foss to Maggie's apartment where they entered the bedroom and again engaged in sexual intercourse.

Maggie was traumatized and still in shock. According to Maggie, her brain was in freeze mode. Maggie described freeze mode as being, not fight or flight, just blank.

However, Maggie's brain freeze did not last long once she was back inside the safety of her own apartment.

According to both Maggie Foss and Mr. Muir, this second act of sexual intercourse lasted approximately 20 seconds before Maggie got angry, told Mr. Muir no, and physically pushed him off.

Mr. Muir stopped, and no further sexual activity occurred.


Mr. Muir did not ejaculate.

Mr. Muir's failure to ejaculate a second time contradicts Mr. Muir's "dating" and "relationship" narrative.


Maggie Foss got up and went into the bathroom under the pretext of needing to urinate but what she really wanted to do was talk to her ex-boyfriend, Will Mitchem.

According to Maggie, she called Will Mitchem while sitting on her toilet shortly after the sexual intercourse ended.

Maggie Foss's phone records showed the following:

> *02:57 am – Maggie Foss called Will Mitchem. This phone call lasted one minute. Mr. Mitchem did not answer, and Maggie left a voicemail.*

> *02:58 am – Maggie Foss called Will Mitchem a second time. This phone call lasted two minutes. Maggie does not remember if she left a second voicemail, but the two-minute duration substantiates that she did.*


In the morning, Mr. Muir drove Maggie Foss back to her car in Burien.

According to Mr. Muir, they stopped and got coffee.

According to Maggie Foss, they drove straight to Maggie's car in Burien and Maggie did not speak to Mr. Muir at all.

The date was Saturday, March 27, 2010.

Mr. Muir's written list of events as he remembered them states he drove Maggie Foss back to her car in downtown Burien, IIU2014-106.

*Mr. Muir's list of events was consistent with Maggie Foss being parked near the Burien Library.*

*Mr. Muir's list of events contradicts Mr. Muir's narrative wherein he told Sergeant Carlson, Maggie Foss parked her car at Keri Halberg's house, IIU2014-106.*

*Keri Halberg's address is 311 SW 146th ST in Burien. This was a half a mile away and in a residential section of Burien, not downtown.*

08:41 am – Foss texted Mitchem, line 275 of Foss's phone records.

08:42 am – Mitchem texted Foss.

08:42 am – Foss texted Mitchem.

08:45 am – Mitchem texted Foss.

08:45 am – Foss texted Mitchem.

08:46 am – Foss texted Mitchem.

08:49 am – Mitchem texted Foss.

08:49 am – Mitchem texted Foss.

09:05 am – Foss texted Mitchem.

09:06 am – Foss texted Mitchem.

09:12 am – Mitchem texted Foss.

09:12 am – Mitchem texted Foss.

09:14 am – Foss texted Mitchem.

09:20 am – Mitchem texted Foss.

09:22 am – Foss called Mitchem. This phone call lasted eight minutes.

Mr. Muir told Sergeant Carlson in his interview for IIU2014-106, that the sexual chemistry at Keri Halberg's house was enabled because Mr. Muir and Maggie Foss were "happy and giddy."

Mr. Muir told Sergeant Carlson in his interview for IIU2014-106, the sexual chemistry at Maggie Foss's apartment was destroyed by Maggie Foss "talking" about Will Mitchem.

Maggie Foss's phone records prove Maggie Foss was texting Will Mitchem a full hour before arriving at Keri Halberg's house.

Maggie Foss was texting Will Mitchem while she was sitting on Keri Halberg's couch during Mr. Muir's so-called "happy and giddy" timeline.

Maggie Foss tried to call Will Mitchem twice in the middle of Mr. Muir's "consensual sex" timeline.

Maggie Foss texted and called Will Mitchem first thing in the morning.

Will Mitchem was the person Maggie Foss was talking to when she was pushed off the couch and the rape was initiated.

Maggie Foss tried to call Will Mitchem immediately after the rape ended.

Will Mitchem was the first-person Maggie talked to after the rape.

Maggie Foss was not talking "*about Will Mitchem*", Maggie Foss was talking to Will Mitchem.


March 27, 2010 – Maggie Foss had text message contact with Mr. Muir.


*Maggie Foss was not working.*


1:08 pm – Muir to Foss.

1:10 pm – Foss to Muir.


March 27, 2010 – Maggie Foss had text message contact with Mr. Muir.


*Maggie Foss was working, 3 pm to 11 pm.*


*10:55 pm – Muir to Foss.*

*11:32 pm – Foss to Muir.*


March 27, 2010 – Maggie Foss met Mr. Muir at the Giants Causeway Pub in Renton Washington at the end of Maggie's swing shift.


The Giants Causeway Pub was located at 201 Williams Ave S, Renton Washington.

This was just down the hill from the Comm Center near the I405 S-curves,

This location matched Mr. Muir's description of where he met Maggie for the "first time," exactly:

*"DEPUTY MUIR: Um, basically I'll read it off. Met Maggie February 2010 to March 2010. Um, I had drinks with Maggie in Renton after her shift before March 12th of 2010. Um, she was working swing shift at the time and got off around 11 o'clock. We met at a bar close to the Com Center off 405, if I recall correctly, um."*

Mr. Muir's description of meeting Maggie Foss for drinks after her swing shift matched Maggie's work schedule on March 27, 2010, swing shift 3:00 pm to 11:00 pm.

The 10:55 pm text and the 11:32 pm text were consistent with Maggie Foss and Mr. Muir coordinating a link-up after Maggie's swing shift on March 27, 2010.

Mr. Muir saying, he met Maggie Foss for drinks for the first time after Maggie's swing shift, does not match Maggie Foss's graveyard schedule prior to March 16, 2010, 11:00 pm to 7:00 am.

When Maggie Foss walked into the Causeway Bar and Grill, Mr. Muir made a joke about the sex being the worst sex he had ever had.

Maggie was angry and told Mr. Muir, "That's what happens when you have sex with someone against their will."

According to Maggie, Mr. Muir recognized Maggie's anger and apologized.

In IIU2014-106, Mr. Muir claimed he could not remember apologizing, but he admitted this conversation occurred.

However, Sergeant Carlson's follow-up report contradicted Mr. Muir when she wrote that Mr. Muir apologized to Maggie.

*It is important to note that during the IIU2014-106 rape investigation, Sergeant Carlson interviewed Mr. Muir no less than five times off the record. Her department and personal cell phone records substantiate 37-minutes of interview time which she did not record or take field notes. She also did not document these interviews in her IIU report.*

*Mr. Muir's official interview was only 39-minutes.*

*There is a strong likelihood that Mr. Muir made multiple conflicting and contradictory statements during the off-record interviews, given how many conflicting and contradictory statements he made during his official interview.*

*Sergeant Carlson contradicting Mr. Muir's denial that he apologized is most likely the result of cross contamination between the off-record interviews and the on-record interviews by an incompetent and disorganized investigator.*

Mr. Muir could not remember if the conversation occurred by text message, Facebook message, or phone call.

*Maggie Foss's phone records prove the conversation was not by text message or phone call.*

*Maggie Foss and Mr. Muir do not have any evidence this conversation occurred via Facebook.*

*The only way left for this conversation to have occurred is in-person.*

*This substantiates Maggie Foss's assertion that this meeting occurred in person at the Giants Causeway Bar and Grill.*

According to Maggie Foss, Maggie accepted Mr. Muir's apology. Maggie Foss hated the idea of being a victim. She chose to pretend it never happened. Maggie felt this was her best way of coping.

According to Maggie Foss, she and Mr. Muir agreed to pretend the sexual intercourse did not happen and both agreed they were never going to speak about it again.

In Mr. Muir's interview for IIU2014-106, Mr. Muir admitted it was "bad sex," that it lasted about 20-seconds, and that Maggie Foss and Mr. Muir agreed they were not going to do it anymore.

Mr. Muir admitting the sex only lasted 20-seconds; Mr. Muir admitting it was bad sex; combined with Mr. Muir's failure to ejaculate not once but twice, contradicts Mr. Muir's "date" narrative and Mr. Muir's "relationship" narrative.

Mr. Muir admitting that it was bad sex and Maggie Foss and Mr. Muir were not going to have sex again substantiates Mr. Muir cannot use any social contact between Mr. Muir and Maggie Foss after this conversation as proof of a domestic or dating relationship.

What is clear from the facts and evidence is Mr. Muir's single sentence, *"…we had been on a few dates before then, and continued to see each other socially afterwards,"* is this sentence is not true or accurate.

Maggie Foss and Mr. Muir never went out on a traditional one-on-one date.

On March 17, 2010, Mr. Muir and Keri Halberg tracked Maggie Foss down and crashed her social circle to get close to her and lure her to a location of comfort, McKelly's Bar and Grill.

On March 26, 2010, Mr. Muir concealed his true motive of luring Maggie Foss to a secluded location, Keri Halberg's house, behind the subterfuge of a group get-together for drinks.

A pattern of behavior Mr. Muir demonstrated again in 2012 when he tried to lure Katie Oehlsen out on a so-called date under the subterfuge of a group get together for drinks after a day of training, IIU2016-146.

*The 48-minutes between 02:10 am and 02:58 am on March 27, 2010 is the entire extent Mr. Muir's so-called dating intimate relationship with Maggie Foss.*

Page one, line 25 – Mr. Muir wrote the following: *"In August 2014, Maggie Foss told her coworker Brandy Drake about our sexual encounter while the two were at a party" (mag004)*

This is not true.

Brandy Drake attended a party at Maggie Foss's house on July 30, 2014.

Maggie Foss talked to Mr. Muir at the party about March 27, 2010 but did not talk to Brandy Drake about it.

August 3, 2014, Maggie Foss told Brandy Drake a watered-down version of the 2010 incident on a 15-minute break in the Comm Center parking lot while both were at work.

It was a private conversation between the two women, no one else was present.

Maggie Foss asked Brandy Drake to keep the conversation private and Drake agreed she would.

During the conversation, Brandy Drake was the first person in the conversation to use the words, "date rape."

Maggie only agreed with Drake's description after Drake described the situation as sounding like a date rape to Drake.

Had the conversation occurred at a private party, Mr. Muir would have been unable to file a workplace harassment complaint in the form of an unknown dispatcher spreading rumors about him at the Comm Center on August 3, 2014.


Page two, line one – Mr. Muir wrote the following sentence: *"Afterwards Brandy Drake called me and explained the conversation to me. I immediately self-reported the conversation to Sgt. Wing Woo with the King County Sheriff's Office, who reported it to the Internal Affairs Unit (IIU)" (mag005)*

This is not true.

 On July 21, 2014, Mr. Muir had a Facebook conversation with Maggie Foss about what he had told Brandy Drake about the 2010 incident.

Maggie Foss asked Mr. Muir if he had told Brandy Drake about buying Maggie drinks and trying to have sex with her.

Maggie specifically asked if Mr. Muir had told Drake that Mr. Muir bought Maggie "SIX" drinks and "tried" to have sex with Maggie.

Maggie Foss capitalized the word "SIX" for emphasis.

Mr. Muir did not deny buying Maggie Foss "SIX" drinks or trying to have sex with Maggie.

Instead, Mr. Muir gave a deceptive response when he replied, "pretty much, and a lot of other dirt."

"Pretty much" means not quite, and "a lot of other dirt" was a deflection.

Even though Maggie Foss asked Mr. Muir what the other dirt was, Mr. Muir stopped talking to Maggie after the "pretty much" and a "lot of other dirt" message.

Mr. Muir did not self-report the 2010 incident to the King County Sheriff's Office following the July 21, 2014 conversation with Maggie Foss.


July 30, 2014 – Mr. Muir and Brandy Drake attended a party at Maggie Foss's house.

Maggie Foss and Mr. Muir spoke face to face about the 2010 incident.

It was a private conversation between the two.

The conversation occurred on the front porch of Maggie's house.

Maggie Foss was sitting on the right. Mr. Muir was sitting on the left.

Maggie Foss's husband, Jeremy Davy, witnessed the conversation through the window but could not hear what was being said.

However, Davy saw Maggie Foss leaning forward in an aggressive posture with an angry expression on her face and he saw Mr. Muir leaning away in a defensive posture with one leg crossed over the other in a position that put the crossed legs between Mr. Muir and Maggie.

Mr. Muir had an extremely uncomfortable facial expression and the foot that was crossed over the top was bouncing up and down in a nervous twitch.

Davy recognized the body language of both Maggie Foss and Mr. Muir from his years of experience being a cop.

Davy was able to correctly deduce the seriousness of the conversation and the general topic of the conversation from the body language.

During this conversation, Mr. Muir told Maggie Foss about Mr. Muir's second wife. Lindsay Johanson, accusing Mr. Muir of cheating on her with a coffee barista.

Although Mr. Muir did not identify the coffee barista by name, this coffee barista would later be identified as Katie Oehlsen.

Mr. Muir did not self-report the 2010 incident to the King County Sheriff's Office following the July 30, 2014 conversation with Maggie Foss.


August 3, 2014 – Maggie Foss told Brandy Drake the watered-down version of the 2010 incident while at work.

*The conversation occurred in the parking lot of the Comm Center.*

*The conversation occurred while both were on a 15-minute break.*

Per Brandy Drake's transcript for IIU2014-106, Drake was the first person in the conversation to use the term, "date rape" when she told Maggie it sounded like "date rape" to Drake.

Per Brandy Drake's transcript for IIU2014-106, Maggie Foss only agreed it was rape after Drake used the term first.

Later, when Maggie Foss and Brandy Drake were back at their computer terminals the women continued talking via CAD:

==Maggie asked Drake, on CAD, to keep the conversation private between the two of them:==

*"MSG ID **011408040534005598***
*Source Terminal **D153** Source Operator **66** Date Logged **8/3/2014** Time Logged **2234***
*MSG Type **2** Log Type **1** Destination **D153 179***
***NM NM***
*MSG_Length*
*Int Tran Ext Tran*
*Message **I'M SORRY IF WHAT I TOLD U UPSET U... THAT WAS DEF NOT THE INTENT... I'D REALLY APPRECIATE IT IF WHAT I TOLD U BE KEPT ON THE DL PLEASE... THAT IS NOT SOMETHING I WANT TO GET OUT."***

==Drake agreed to keep the conversation private:==

*"MSG ID **011408040536005642***
*Source Terminal **D153** Source Operator **66** Date Logged **8/3/2014** Time Logged **2236***
*MSG Type **2** Log Type **2** Destination **C104 460***
***FWD -FWD***
*MSG_Length*
*Int Tran Ext Tran*
*Message **DONT BE SORRY, ITS UPSETTING INFORMATION & BLINDSIDED BY IT...AND I DONT HAVE PLANS TO SPRED IT, NO WORRIES ABOUT THAT:)"***

==Maggie replied:==

MSG ID **011408040537005662**
Source Terminal **D153** Source Operator **66** Date Logged **8/3/2014** Time Logged **2238**
MSG Type **2** Log Type **1** Destination **D153 759**
**NM NM**
MSG_Length
Int Tran Ext Tran
*Message **U CAN DEF TELL HIM I SAID THAT.. I WAS EXPECTNG U TOO... AND WHO KNOWS, IT'S BEEN 4 AND A HALF YEARS... MAYBE HE HAS TURNED A NEW LEAF...***

==Drake replied:==

*"MSG ID **011408040539005725***

*Source Terminal **D153** Source Operator **66** Date Logged **8/3/2014** Time Logged **2239***
*MSG Type **2** Log Type **2** Destination **C104 69***
**MSG MSG**
*MSG_Length*
*Int Tran Ext Tran*
*Message YA WELL NO EXCUSE FOR THAT SO I SURE AS HELL AM GOING TO CONFRONT HIM."*

**Maggie then wrote:**

*"MSG ID **011408040540005736***
*MSG ID **011408040540005755***
*Source Terminal **D153** Source Operator **66** Date Logged **8/3/2014** Time Logged **2241***
*MSG Type **2** Log Type **1** Destination **D153 373***
**NM NM**
*MSG_Length*
*Int Tran Ext Tran*
*Message IN HIS DEFENSE I THINK I JUST GOT TIRED OF SAYING NO SO WAS JUST LIKE FINE TO GET HIM TO SHUT UP... IT WAS VERY GRY... DEF NOT BLK OR WHITE..."*

**A few minutes later, Drake asked another dispatcher sitting at C112 if she was there:**

*"MSG ID **011408040542005779***
*Source Terminal **D153** Source Operator **66** Date Logged **8/3/2014** Time Logged **2242***
*MSG Type **2** Log Type **2** Destination **C112 8***
**MSG MSG**
*MSG_Length*
*Int Tran Ext Tran*
*Message U THERE?"*

**The dispatcher sitting at C112 replied:**

*"MSG ID **011408040542005786***
*Source Terminal **D153** Source Operator **66** Date Logged **8/3/2014** Time Logged **2242***
*MSG Type **2** Log Type **1** Destination **D153 174***
**NM NM**
*MSG_Length*
*Int Tran Ext Tran*
*Message I AM."*

**At 22:42, Drake sent the dispatcher at C112 the following message:**

**"MSG ID 011408040542005787**
**Source Terminal D153 Source Operator 66 Date Logged 8/3/2014 Time Logged 2242**
**MSG Type 2 Log Type 2 Destination C112 12**
**MSG MSG**
**MSG_Length**
**Int Tran Ext Tran**
**Message DELETE THIS:**
**MSG ID 011408040542005789**

*Source Terminal D153 Source Operator 66 Date Logged 8/3/2014 Time Logged 2242*
*MSG Type 2 Log Type 2 Destination C112 551*
*-FWD -FWD*
*MSG_Length*
*Int Tran Ext Tran*
*Message Forwarded Message*
*Original message, forwarded:*
*Message From Terminal/Unit: C104 Operator: 45(FOSS, MAGGIE)*
*Originally Sent To: D153*
*Date/Time Sent: 03-AUG-2014 22:40:57*
*IN HIS DEFENSE I THINK I JUST GOT TIRED OF SAYING NO SO WAS JUST LIKE FINE TO GET HIM TO SHUT UP...IT WAS VERY GRY... DEF NOT BLK OR WHITE..."*

*At 22:43, Drake sent another message to the dispatcher at C112:*

*"MSG ID 011408040543005800*
*Source Terminal D153 Source Operator 66 Date Logged 8/3/2014 Time Logged 2243*
*MSG Type 2 Log Type 2 Destination C112 18*
*MSP MSP*
*MSG_Length*
*Int Tran Ext Tran*
*Message AND DELETE DELETE!"*

*Drake used an exclamation point to emphasis the need to delete.*

*The dispatcher at C112 replied at 22:44:*

*"MSG ID 011408040543005807*
*Source Terminal D153 Source Operator 66 Date Logged 8/3/2014 Time Logged 2244*
*MSG Type 2 Log Type 1 Destination D153 5*
*NM NM*
*MSG_Length*
*Int Tran Ext Tran*
*Message I DID."*

*The dispatcher sitting at C112 then sent this message which ended the conversation on CAD:*

*"MSG ID 011408040543005808*
*Source Terminal D153 Source Operator 66 Date Logged 8/3/2014 Time Logged 2244*
*MSG Type 2 Log Type 1 Destination D153 3*
*NM NM*
*MSG_Length*
*Int Tran Ext Tran*
*Message PAD"*

It is believed the dispatcher sitting at C112 was Allison Sierra.

What this evidence proves is Maggie Foss asked Brandy Drake to keep their conversation private at 10:34 pm and Drake agreed to keep it private at 10:36 pm.

Six-minutes later, Brandy Drake broke her agreement with Maggie Foss to keep the conversation private by forwarding Maggie's message to the dispatcher sitting at C112.

On August 3, 2014 @ 10:42 pm, Brandy Drake was the unknown dispatcher who spread the rumor of Mr. Muir raping Maggie Foss to the dispatcher sitting at C112.

Mr. Muir did not self-report the 2010 incident to the King County Sheriff's Office after his August 3, 2014 conversation with Brandy Drake.


August 3, 2014 – Brandy Drake contacted Sheree Good.

Brandy Drake and Mr. Muir were worried Maggie Foss was going to report the 2010 incident to the King County Sheriff's Office.

> *Mr. Muir being worried Maggie Foss was going to report the 2010 incident to the King County Sheriff's Office contradicts the self-righteous reporting of the sexual intercourse Mr. Muir tries to portray today.*

Brandy Drake and Mr. Muir asked Sheree Good to act as an intermediate.

The couple asked Sheree Good to contact Maggie Foss and determine whether Maggie intended to report the sexual assault to the King County Sheriff's Office.

Sheree Good reached out to Maggie Foss the night of August 3, 2014, and informed Maggie, Drake and Mr. Muir were worried Maggie was going to report Mr. Muir to the King County Sheriff's Office.

Sheree Good asked what Maggie intended to do.

Maggie Foss told Sheree Good to inform Brandy Drake and Mr. Muir that she did not report the sexual assault to the sheriff's office in 2010 and had no intention of reporting the sexual assault to the sheriff's office in 2014.

> *It was embarrassing to Maggie.*

Sheree Good passed Maggie Foss's message to Brandy Drake and Mr. Muir that evening.

By the time the sun rose on August 4, 2014, Mr. Muir knew Maggie Foss was not going to report the 2010 sexual assault to the Sheriff's Office.

Mr. Muir did not self-report the 2010 incident to the King County Sheriff's Office after this August 3, 2014 conversation between Brandy Drake, Mr. Muir, Sheree Good, and Maggie Foss.


August 18, 2014 – Mr. Muir sat down with his patrol sergeant, Sergeant Wing Woo.

It is not known exactly what Mr. Muir said to Sergeant Woo during the meeting.

Sergeant Woo did not take a taped or written statement from Mr. Muir and Sergeant Woo did not document what Mr. Muir said.

However, what is known is Sergeant Woo immediately contacted the Internal Investigations Unit (IIU) Sergeant Frances Carlson for advice.

Sergeant Carlson's first dated entry in the IIU2014-106 investigation reads as follows:

> *"08/26/14 – 1540 hrs. Assigned case for follow-up by Captain Anderson. I had been aware of this case as I had received a phone call from Sgt. Wing Woo around 08/18/14 (approximate date) about his conversation with Deputy Muir. Apparently, Deputy Muir had sexual relations with a comm. center employee (female friend), whose name Sgt. Woo did not know. Deputy Muir came forward and self reported the sex; however, he was concerned because the female now as alluding that the sexual relations was not consensual. The information Deputy Muir received came from his girlfriend, Brandy Burns (who also works in the comm. center and with the unknown female).*
>
> *After my phone conversation with Sgt. Woo, I brought the information forward to Captain Anderson, IIU Commander. Captain Anderson said he would contact Captain Butschli to get the information regarding Brandy Burns's new name (recently divorced and using a different last name). He would also discuss with Captain Butschli about contacting Brandy Burns to find out the name of the female who gave her the information about Deputy Muir."*

August 18, 2014 was 27-days after the July 21, 2014 Facebook conversation between Maggie Foss and Mr. Muir wherein Maggie Foss asked Mr. Muir if he had told Brandy Drake, he bought Maggie "SIX" drinks and tried to have sex with Maggie.

August 18, 2014 was 19-days after the July 30, 2014 conversation Mr. Muir had with Maggie Foss on her front porch.

August 18, 2014 was 15-days after the August 3, 2014 parking lot conversation between Maggie Foss and Brandy Drake.

August 18, 2014 was 15-days after Sheree Good told Brandy Drake and Mr. Muir, Maggie Foss was not going to report the 2010 incident to the King County Sheriff's Office.

Mr. Muir had Maggie Foss's July 21 Facebook conversation in his possession on August 18, 2014.

Mr. Muir omitting Maggie Foss's name and Mr. Muir's failure to turn over the July 21, 2014 Facebook conversation to Sergeant Woo contradicts Mr. Muir's self-righteous reporting of the sexual intercourse Mr. Muir tries to portray today.

Mr. Muir would not turn over the July 21 Facebook conversation until October 10, 2014, a full 81-days later.

In Mr. Muir's interview for IIU2014-106, Mr. Muir identified his motive for reporting the unknown dispatcher spreading rumors as an attempt to "stop Comm Center drama."

In Mr. Muir's letter to Chief Ledford that initiated IIU2016-070, Mr. Muir clearly stated his motive for reporting the unknown dispatcher spreading rumors about him at the Comm Center on August 3, 2014, when he wrote the following:

> "*I went to my Sergeant (Sgt Woo) to report Foss making these false accusations, yet the report ended up turning into an investigation on me.*"

> *This is a perfect example of how Mr. Muir omits facts to spin his narrative that Maggie Foss is the offender.*

> *Maggie Foss did not make any accusation against Mr. Muir to any official of the King County Sheriff's Office. She told a friend, Brandy Drake, in a private conversation, an opinion of Mr. Muir's character based on her own experiences with Mr. Muir as a warning to her friend.*

> *It was a private conversation Maggie Foss asked Brandy Drake to keep private.*

> *Had Drake kept her promise to keep the conversation private between Drake, Maggie Foss, and Mr. Muir, no one would have been the wiser.*

> *Maggie Foss even went so far as to tell Mr. Muir, through the intermediate Sheree Good, that Maggie Foss was not going to make an official complaint about 2010 incident to the King County Sheriff's Office.*

> *The irony is the official rape accusation Mr. Muir accuses Maggie Foss of making today was because Mr. Muir went to Sergeant Woo and made the rape accusation himself in a botched attempt to report Maggie Foss for making a false rape accusation.*

Mr. Muir would not start portraying his motive for reporting the unknown dispatcher as a self-righteous reporting of his sexual relationship with Maggie Foss until sometime after IIU2016-070.

Mr. Muir's originally stated motive of stopping Comm Center drama on October 9, 2014 and Mr. Muir's specifically stated motive of reporting Maggie Foss for making false accusations which got turned around on Mr. Muir in his complaint for IIU2016-070, contradicts the self-righteous motive he portrays today.

Mr. Muir's failure to report the 2010 incident on July 21, 2014; July 30, 2014; August 3, 2014; or August 4, 2010; and Mr. Muir's failure to identify Maggie Foss by name on August 18, 2014; coupled with Mr. Muir's failure to turn over the July 21 Facebook conversation on August 18, 2014; directly contradicts Mr. Muir's narrative that he self-righteously and immediately reported the 2010 incident to the King County Sheriff's Office.

Page two, line 12 – Mr. Muir wrote the following sentence: *"As part of the IIU investigation, Maggie Foss was contacted by Sgt. Carlson. Although Maggie Foss claimed I had taken advantage of her, she told Sgt. Carlson she never said it was rape. Maggie Foss also said didn't want to be involved in the investigation and did not want to give a recorded statement to IIU at that time" (mag006)*

This is partially true.

But Mr. Muir is omitting a significant amount of information to use this statement to substantiate his accusation Maggie Foss filed a false rape accusation against him in IIU014-106.

When you compare this statement with the facts Mr. Muir is omitting, the facts do not substantiate Mr. Muir's narrative that Maggie Foss falsely accused him of sexual assault.


August 3, 2014 – Maggie Foss and Brandy Drake had a private conversation in the Comm Center parking lot while both were on a 15-minute break.

Brandy Drake was the first person in the conversation to use the term date-rape when she told Maggie Foss what Maggie was telling her sounded like date-rape to Drake.

Maggie Foss only agreed with Drake's analogy, she did not actually call it rape herself.

Both women went back into the Comm Center where they continued talking on Computer Aided Dispatch message system or CAD. This is when Maggie Foss sent Brandy Drake the CAD message saying:

> *"Message IN HIS DEFENSE I THINK I JUST GOT TIRED OF SAYING NO SO WAS JUST LIKE FINE TO GET HIM TO SHUT UP... IT WAS VERY GRY... DEF NOT BLK OR WHITE..."*

This is the message Mr. Muir is using to prove Maggie Foss never said it was rape.

But Maggie Foss was not obligated to tell Brandy Drake the truth. Maggie was not making an official complaint to Brandy Drake; she was telling a friend an opinion in a private conversation.

Maggie had wanted to warn her friend about Mr. Muir.

When Maggie and Drake went back in the Comm Center, Maggie saw that Drake had been crying. Maggie believed Drake was a friend and while she had wanted to warn Drake, Maggie also wanted to help Drake's emotional crisis when she saw it.


August 18, 2014, Mr. Muir sat down with a King County patrol sergeant, Wing Woo, and reported an "unknown dispatcher" was spreading rumors of him having non-consensual sex with her at the King County Communication Center.

Mr. Muir identified he had gotten his information from his girlfriend, Brandy Drake.

Mr. Muir did not identify Maggie Foss by name although the evidence clearly proves Mr. Muir knew Maggie Foss was the dispatcher in question when he sat down with Sergeant Woo to make the complaint.

August 21, 2014, the King County Communication Center Commander, Captain Butschli interviewed Brandy Drake and identified the other dispatcher involved as Maggie Foss.

August 22, 2014, Captain Butschli interviewed Maggie Foss.

Maggie told Captain Butschli she did not want to give a statement, get Mr. Muir in trouble, or have the Sheriff's Office investigate the 2010 incident.

Maggie was extremely embarrassed and uncomfortable talking to Captain Butschli.

> *It should be noted that Maggie's future therapist would identify her as a type eight on the Enneagram scale and it is difficult for type eights to admit to being called a victim.*

> *Maggie would later be in therapy for approximately five years for the post-traumatic stress from the rape and botched IIU2014-106 investigation.*

August 25, 2014, Captain Butschli sent the IIU investigator, Sergeant Frances Carlson a memo documenting Maggie Foss did not want the sheriff's office investigating the 2010 incident.

Sergeant Carlson had gathered no other information in the IIU2014-106 investigation to substantiate any other finding other than "undetermined."

Undetermined, by King County Sheriff's Office policy, means the complainant is unavailable or not cooperative.

By policy, Sergeant Carlson could have and should have, permanently closed the IIU2014-106 investigation on August 25, 2014 with an undetermined finding, meaning the complainant (Maggie Foss) was uncooperative and/or not available.

Sergeant Carlson should have then opened a new investigation under a new case number for Mr. Muir's original complaint of an unknown dispatcher spreading rumors about him at the Communication Center on August 3, 2014.

As of October 20, 2020, the King County Sheriff's Internal Investigative Unit (IIU) has still not investigated Mr. Muir's original complaint of the spreading of rumors at the Communication Center on August 3, 2014.

In a subsequent investigation, IIU2015-083, the IIU commander, Captain Jesse Anderson, repeatedly told Kristin Anger of Summit Law Group throughout his interview, it did not matter to him whether Maggie Foss was going to cooperate with the IIU2014-106 investigation or not, the King County Sheriff's Office IIU was going to investigate Mr. Muir for rape regardless of Maggie's wishes.

This substantiates that Captain Anderson, as the IIU commander, was the person responsible for pushing the rape investigation forward against Maggie Foss's wishes.

This substantiates Captain Jesse Anderson was the complainant for IIU2014-106, not Maggie Foss.

This specific error was made again in 2015 when Mr. Muir tried to file a work-place harassment complaint against Jeremy Davy for the IIU2015-150 complaint.

Mr. Muir went to Chief Ledford with a specific complaint naming Jeremy Davy as the suspect but when SAL2015-145 was complete, Maggie Foss and Mr. Muir were the only listed principals, not Jeremy Davy. Mr. Muir was listed as the reporting principle. Maggie Foss was listed as the target principal. Even though Maggie Foss had nothing to do with the IIU2015-150 investigation, was not interviewed for the IIU2015-150 investigation, and provided the IIU zero information relevant to the IIU2015-150 investigation, she was inappropriately labeled as the target principal of SAL2015-145.

This specific error would be made a third time in 2019 where an unnamed administrative member of the Sheriff's Office went through Maggie Foss's October 20, 2019 Facebook post and identified possible policy violations.

This person subsequently made a mistake and inappropriately initiated an internal investigation against Mr. Muir, case # IIU2019-541, about a complaint that had already been investigated.

Maggie Foss was inappropriately listed as the complainant even though Maggie Foss did not have contact with any member of the King County Sheriff's Office, did not provided any member of the sheriff's office information on Mr. Muir, and was not contacted by any member of the King County Sheriff's Office administration or IIU.

Had the unnamed King County administrative person or IIU contacted Maggie Foss, she would have told them all of the information in her public letter on Facebook had been obtained through public record release and the complaint they attributed to her had already been investigation. She could have even given them the case number.


August 26, 2014, Sergeant France Carlson initiated a rape investigation into the March 27, 2010 incident.

Maggie Foss was inappropriately listed as the complainant, IIU2014-106.

Maggie Foss's interview with Captain Butschli occurred on August 22, 2014.

During the interview, Maggie Foss told Captain Butschli she did not want the King County Sheriff's Office to investigate the 2010 incident as it was humiliating to her and she had never dealt with the rape other than try and ignore it.

Between August 22, 2014 and September 3, 2014, Maggie Foss did not have contact with any member of the King County Sheriff's Office administration or IIU.

Maggie Foss did not provide the sheriff's office any information on Mr. Muir during this period.

September 3, 2014, Sergeant Carlson emailed Maggie Foss asking to set up an interview.

Maggie Foss was unaware an investigation had been initiated on August 26, 2014.

Sergeant Carlson reaching out to Maggie Foss to obtain a statement substantiates it was the King County Sheriff's Office reaching out to Maggie Foss to get a statement, not Maggie Foss reaching out to the sheriff's office to make a complaint.

Sergeant Carlson wrote Maggie Foss and offered to meet Maggie in person versus the phone if Maggie would be more comfortable.

Sergeant Carlson wrote she would meet Maggie Foss away from work if that made Maggie more comfortable.

Sergeant Carlson rough drafted this email at least once.

Sergeant Carlson did not include a copy of this email in her case package documentation for IIU2014-106.

It was found a in a public record request for Sergeant Carlson's emails after the complaint against Sergeant Carlson, IIU2015-083.


September 5, 2014 – Sergeant Carlson interviewed Maggie Foss by phone.

The interview occurred in Maggie Foss and Jeremy Davy's bedroom.

Maggie's husband, Jeremy Davy, witnessed the interview in person from Maggie's side.

Detective Sergeant Katy Larson witnessed the interview from Sergeant Carlson's side.


Maggie asked to do the interview in person.

Sergeant Carlson declined, citing she was too busy.


Maggie asked if the interview was going to be recorded.

Davy heard Maggie Foss ask Sergeant Carlson the following specific questions: "Is this a recorded line?" "So, this is going to be recorded?" "Good!"

To be fair, Davy could only hear Maggie's side of the conversation.

According to Maggie Foss, Sergeant Carlson's language gave Maggie the impression the interview was going to be recorded.

Davy also had the impression the conversation was going to be recorded.

Maggie's interview lasted approximately 50 minutes.

It was later revealed that Sergeant Carlson took field notes during the interview but did not record the interview.

Up until the moment Maggie Foss decided to start talking to Sergeant Carlson, Maggie Foss had been calling the incident a gray area. She had been saying Mr. Muir had gotten her drunk and taken advantage of her but she had not actually used the word rape or described the situation in detail.

She had always said, "Muir got me drunk and tried to have sex with me."

When Maggie Foss described being pushed off the couch, having her pants pulled down, trying to pull her pants back up, and having Mr. Muir knock her hand away to Sergeant Carlson, that was the first time Maggie Foss described the incident in detail to anyone, including her husband Jeremy Davy.

This was the destruction of Maggie Foss's defensive mechanisms and she has from this moment forward, called her sexual intercourse with Mr. Muir a rape.

Maggie Foss's husband, Jeremy Davy, wrote a detailed description about what he saw and heard during Maggie's interview in his written statement for IIU2015-083.

Davy's description in his IIU2015-083 statement is the only written documentation of Maggie Foss's IIU2014-106 interview.


Sergeant Carlson's partner, Detective Sergeant Katy Larson, had first-hand knowledge of Muir's sexually motivated misconduct in Shoreline from 2012 thru 2013.

Detective Sergeant Larson was the first Shoreline supervisor who raised an issue about the Amanda Sasnett investigation, case # 13-025258.

Detective Sergeant Larson learned from Sergeant Carlson; Mr. Muir was the suspect of a rape.

Detective Sergeant Larson told Carlson that Mr. Muir had a history in Shoreline.

Detective Sergeant Larson told Carlson, Sergeant Diana Neff, had been keeping a file on Mr. Muir and advised Carlson to contact Sergeant Neff for an interview.

Detective Sergeant Larson called Sergeant Neff and asked if Sergeant Neff still had the file.

When Sergeant Neff said yes, Detective Sergeant Larson told Sergeant Neff, Carlson would be contacting her.

Sergeant Neff dug the file out and waited, but Carlson never contacted Neff and never asked to see Sergeant Neff's potentially incriminating evidence.


September 5, 2014 – Maggie Foss took the initiative and called Sergeant Carlson to provide additional information.

Several hours after Maggie's initial interview, Maggie Foss remembered more information Maggie thought was important.

Maggie Foss called Sergeant Carlson and told Sergeant Carlson about meeting Mr. Muir at the Giants Causeway Bar after Maggie's shift on March 27, 2010.

Maggie Foss told Sergeant Carlson about the conversation to include Mr. Muir's statement to Maggie he thought Maggie was "big enough to push him off" if Maggie didn't want to have sex and Maggie told Sergeant Carlson about Mr. Muir apologizing.

Sergeant Carlson documented the phone call in her IIU report, and she paraphrased what Maggie Foss told her, but did not document the context or content of Maggie's statements accurately.


September 6, 2014 – Maggie Foss, again took the initiative and provided Sergeant Carlson a written statement.

Maggie sent Sergeant Carlson a 947-word statement via email.

Maggie provided additional information to include a potential witness, Krystal Rivera.

Sergeant Carlson entered this email into the IIU report documentation under section D) Written Statement.

Mr. Muir would provide the same name, Krystal Rivera, as a potential witness in an email after his interview for IIU2014-106 on October 9, 2014.

Both Maggie Foss and Mr. Muir providing the same name as a witness proved Maggie was providing good information and was cooperating with the investigation by the end of the day, September 6, 2014.

Within 24 hours of Maggie Foss's initial interview, Maggie had given a 50-minute phone interview, provided additional information in a self-initiated phone call to the investigator and provided a 947-word statement via email to the investigator.

Despite the evidence proving otherwise, Sergeant Carlson labeled Maggie Foss uncooperative after Maggie Foss's September 5 interview and had no further contact with her.

A label that Mr. Muir, Chief Ledford, and the Shoreline police continue to use to this day, as the primary means of discrediting Maggie Foss.

Page two, line 16 – Mr. Muir wrote the following sentence: *"In 2015, after the IIU investigation closed, Maggie Foss made a criminal complaint based on the same events that had been investigated and cleared by IIU (mag007)*

This is not true.

During the IIU2014-106 investigation, a Sexual Assault Unit supervisor, Sergeant Jessica Sullivan was in touch with Maggie Foss about filing a criminal complaint against Mr. Muir.

December 1, 2014, Maggie made the final decision not to pursue a criminal investigation.

Sergeant Sullivan had been discouraging Maggie Foss from making a criminal complaint using the statute of limitations and telling Maggie if an administrative investigation were conducted, Mr. Muir would be required to give a statement.

In a criminal investigation, Mr. Muir could invoke his Constitutional right to remain silence.

The statute of limitations for sexual assault was three years. Maggie's rape had occurred four years prior.

Sergeant Sullivan would do no further investigative work on the case and have no further contact with Maggie Foss until March 10, 2015.

For all intents and purposes, the criminal investigation was over on December 1. 2014.


January 16, 2015, Sergeant Carlson closed the IIU2014-106 investigation.

The investigation was forwarded to the IIU commander, Captain Anderson, for review.

Captain Anderson forwarded the investigation to Mr. Muir's precinct commander, Chief Ledford, for a final disposition.

Chief Ledford was the person responsible for making the "unfounded finding."

February 25, 2015, Mr. Muir was notified in writing the sexual assault allegation was unfounded.

This was the second most favorable finding for Mr. Muir other than exonerated.

Sergeant Carlson intentionally and deliberately failed to tell Maggie Foss the investigation was complete, and the finding was unfounded.

Although Sergeant Carlson had labeled Maggie Foss as uncooperative, Sergeant Carlson did not tell Maggie the investigation was closed, and the finding was unfounded because Sergeant Carlson thought Maggie would be mad at the finding.

An unfounded finding meant the incident did not occur as Maggie portrayed it.

The finding implies Maggie Foss lied about the incident.

Captain Anderson would subsequently deny unfounded meant the sheriff's office was calling Maggie a liar, but Mr. Muir would, in future complaints and interviews, point to the unfounded finding as proof Maggie Foss was a, "liar" and filed a false rape allegation against him.

March 8, 2015, Mr. Muir made a radio transmission.

Maggie Foss was the dispatcher.

For the last six months Mr. Muir had been very professional on the radio.

The radio message itself was innocuous. It was Mr. Muir's tone and inflection that passed the message.

Maggie asked Mr. Muir if he copied his vehicle return.

Mr. Muir replied, "I did … Thank You!"

Mr. Muir's tone and inflection were sarcastic, mocking, taunting, and different than the tone he had been using for the last six months.

Mr. Muir's tone and inflection passed the message to Maggie Foss the investigation was closed and had come back in favor of Mr. Muir and that he knew of it whereas Maggie did not.

Maggie had an emotional break down on the spot and went home sick. Maggie was deeply affected.

Maggie Foss's intuition as to the status of the case was correct.

March 8, 2015, Maggie Foss sent Sergeant Carlson an email asking for the status of the investigation.

March 8, 2015, Maggie Foss sent a text message to Mr. Muir's girlfriend, Brandy Drake.

Maggie was amid an emotional crisis and the text message reflected the crisis.

However, the text message between the women was sent and received on their personal cell phones while both were off duty, substantiating this message was a private message between two private citizens, not work place harassment.

March 8, 2014, Mr. Muir emailed his precinct commander, Chief Ledford, the text message between Maggie Foss and Brandy Drake, labeling it workplace harassment.

> *Mr. Muir wanted Chief Ledford and the sheriff's office to make Maggie Foss stop talking about him and quit bothering his girlfriend.*

Chief Ledford forwarded the text message to Captain Anderson who gave it to Sergeant Carlson.

Sergeant Carlson added it to the IIU2014-106 case package although this investigation was closed and unrelated to the March 8, 2014 text message between the two women.

The March 8, 2015 text message should have been a new incident.


March 9, 2015, Sergeant Carlson contacted the IIU commander, Captain Anderson, about Maggie Foss's email requesting status of the investigation.

Sergeant Carlson believed the IIU "should not" respond to Maggie Foss's request for case status because Sergeant Carlson knew Maggie was going to be upset.

This contradicted Sergeant Carlson's later narrative that Sergeant Carlson believed Maggie was uncooperative throughout the investigation.

Captain Anderson directed Sergeant Carlson to respond.

Sergeant Carlson sent Maggie Foss an email telling Maggie her allegation was unfounded; and if Maggie had any questions, Maggie could make a public record request for the case.

Maggie responded by asking when the decision was made and whether Sergeant Carlson or the IIU were ever going to tell her about the findings.

Sergeant Carlson turned the conversation over Captain Anderson, who responded to Maggie via email and told her a memo was on its way.

When Maggie received the memo, the memo did not say the allegations were unfounded. The memo read there was insufficient evidence to sustain the allegations.

Insufficient evidence to sustain an allegation is a non-sustained finding, meaning the sheriff's office cannot prove misconduct occurred and the sheriff's office cannot prove misconduct did not occur.

> A non-sustained finding is a neutral finding and as of October 20. 2020, is the correct finding for IIU2014-106.

> The King County Sheriff's Office cannot prove Mr. Muir raped Maggie Foss and the King County Sheriff's Office cannot prove Mr. Muir did not rape Maggie Foss.

> But what Maggie Foss can prove is Mr. Muir's timeline and version of events are not accurate. Mr. Muir is testifying to the first day he met Maggie Foss, March 17, 2010, not the day of the rape, March 27, 2010.

An unfounded finding meant the incident did not occur like Maggie Foss said it did.

> The unfounded finding for IIU2014-106 is the core basis of Mr. Muir's false rape accusation complaint against Maggie Foss.

The contradiction and Sergeant Carlson's advice to make a public record request seemed taunting in its nature to Maggie's husband, Jeremy Davy, and was the catalyst which prompted Davy to start making public record requests.

March 10, 2015, the Sexual Assault Unit supervisor, Sergeant Sullivan had a meeting with Captain Hodges, Captain Anderson, and Sergeant Carlson.

According to Sergeant Sullivan's report, Captain Hodges, Captain Anderson, and Sergeant Carlson felt because Maggie Foss had reached out to Brandy Drake to discuss the 2010 incident on March 8, 2015, Maggie might now be willing to provide a statement, although the evidence clearly proves Maggie Foss had been a cooperating victim since September 5, 2014 and would have provided a taped statement to both Sergeant Carlson or Sergeant Sullivan at any time had they asked for one.

At the end of the meeting, Sergeant Sullivan was "directed" to reach out to Maggie Foss to determine if Maggie Foss wanted to provide a statement in the criminal investigation.

Sergeant Sullivan's report simply says she was "directed" to reach back out to Maggie Foss. Sergeant Sullivan did not identify who made the decision to direct Sergeant Sullivan to reach back out to Maggie.

But Sergeant Carlson added information to the IAPro for IIU2014-106 which clearly showed who in the chain of command made the decision to direct Sergeant Sullivan to reach back out to Maggie Foss reference re-initiating the criminal investigation.

According to Sergeant Carlson's IAPro documentation, at the end of the March 10, 2014 meeting, Captain Anderson went and briefed Chief Fenton who directed Captain Anderson to direct Sergeant Sullivan to reach back out to Maggie Foss about giving a statement in case # 15-0077590.

Sergeant Sullivan started calling Maggie Foss and trying to make contact with her on March 10, 2014.


March 25, 2015, Sergeant Sullivan contacted Deputy Prosecuting Attorney Carla Carlstrom to discuss the statute of limitations.

DPA Carlstrom made the decision because the accusation of rape involved a possible violation of Mr. Muir's law enforcement oath of office, the statute of limitations was 10-years, substantiating a criminal prosecution was still viable.

When Sergeant Sullivan relayed this information to Maggie Foss, Maggie immediately agreed to assist in prosecution and cooperate with the investigation. This included providing an in-person interview with Sergeant Sullivan and DPA Sturgis.

Maggie Foss was by this point, extremely angry at the way Sergeant Carlson and Captain Anderson had treated her.

Maggie Foss was angry at being labeled uncooperative when she had been fully cooperative since Sergeant Carlson had coerced her into giving a statement on September 5, 2014.

Maggie was angry at Sergeant Carlson for not telling her up front the investigation was closed, unfounded and she was angry at Mr. Muir taunting her on the radio and causing her to have an emotional break-down on the dispatch floor.

Maggie Foss changing her mind and being willing to cooperate in the criminal investigation was completely understandable considering the totality of the circumstance.

However, Maggie Foss changing her mind about pressing charges once she learned the statute of limitations was 10-years, does not change the fact Sergeant Sullivan was directed by Chief Fenton and Captain Jesse Anderson to reach out to Maggie Foss on March 10, 2014 to see if Maggie was willing to cooperate in a criminal investigation.

Sergeant Sullivan and Sergeant Carlson writing in their reports that Sergeant Sullivan was directed to reach out to Maggie Foss, by Chief Fenton and Captain Anderson, substantiates it was the King County Sheriff's Office re-initiating the criminal investigation against Mr. Muir, not Maggie Foss.

Actions that were a direct result of Mr. Muir taking the private text message between Maggie Foss and Brandy Drake on March 8, 2014 to Chief Ledford and claiming the text message was work-place harassment.


Page two, line 24 – Mr. Muir wrote the following: *"In 2014, Maggie Foss and her husband, Jeremy Davy (also a deputy with the King County Sheriff's Office) began filing Public Disclosure Requests (PDRS) for complaints made against me in my role as a deputy sheriff. The two had married in 2013. I later learned from the Public Disclosure Unit that between August 1, 2014, and September 13, 2016, Maggie Foss and Jeremy Davy had made over 150 Public Disclosure Requests about me"* **(mag008)**

This is not true.

On September 8, 2017, Sergeant Gillette printed out Maggie Foss and Jeremy Davy's public record requests as a spread sheet which Sergeant Gillette put in the IIU2017-154 case package documentation.

As of September 8, 2017, Maggie Foss had 135 public record requests, 27 of which were directly about Mr. Muir or had Mr. Muir's name in the narrative of the request.

As of September 8, 2017, Jeremy Davy had 130 public record requests, 25 of which were directly about Mr. Muir or had Mr. Muir's name in the narrative of the request.

On October 4, 2018, as part of a hostile work-place settlement between Maggie Foss and the King County Sheriff's Office, Maggie Foss and Jeremy Davy agreed to withdraw all open public record requests on file and make no further public record request for events or documents that happened before October 4, 2018.

Mr. Muir did not challenge any of Maggie Foss or Jeremy Davy's public record requests in Court as was his right by law as described to Mr. Muir by the King County legal advisor, Patty Shelledy, in an email dated May 5, 2016.

Instead, Mr. Muir filed a bogus EEOC complaint of indirect harassment citing Maggie Foss and Jeremy Davy's public record requests as the basis of the indirect harassment, IIU2016-070.

Mr. Muir's tried to classify his complaint as an EEOC complaint on the premise Maggie Foss and Jeremy Davy were indirectly harassing him using public record requests because Mr. Muir was a man, IIU2016-070.

Mr. Muir tried to use his complaint of harassment in IIU2016-070 as justification to suspend or cancel Maggie Foss and Jeremy Davy's public records requests against him.

In the letter Mr. Muir sent to his precinct commander, Chief Ledford, to initiate IIU2016-070, Mr. Muir admitted that Maggie Foss and Jeremy Davy's public record requests were legal, Mr. Muir just didn't feel like Maggie Foss and Jeremy Davy were entitled to look at the information requested.

In Mr. Muir's interview for IIU2016-070, Mr. Muir again identified Maggie Foss and Jeremy Davy's public record requests were legal, he just did not feel like they were entitled to the information they were requesting.

Maggie Foss and Jeremy Davy made multiple public record requests concerning Frances Carlson, Jesse Anderson, Shawn Ledford, Jessica Sullivan, Brandy Drake, Bridget Sutherland, Lindsey Laktasich, Allison Sierra, Nick Baisch, IIU2014-106, 15-0077590, SAL2015-154, IIU2016-070, and IIU2016-146 just to name a few. A vast majority of Maggie Foss and Jeremy Davy's public record requests had nothing to do with Mr. Muir and everything to do with the hostile work environment Maggie Foss was experiencing at the Comm Center.

All of Maggie Foss and Jeremy Davy's public record requests were a direct result of Sergeant Frances Carlson's snarky email telling Maggie and Davy if they had questions, they could make a public record request.

Mr. Muir could have challenged any or all of Maggie Foss and Jeremy Davy's public record requests in Court as was his right by law, had he chosen to do so.


Page two, line 26 – Mr. Muir wrote the following sentence: *"Maggie Foss and her husband began using complaints from the results of these PDRS to make reports against me to IIU* **(mag009)**

This is not true.

Maggie Foss has not discovered information of misconduct in public record requests and brought it to the attention of the King County Sheriff's Office as an independent complaint.

Maggie Foss has not independently provided the King County Sheriff's Office any information about Mr. Muir.


IIU2014-106 was initiated by Mr. Muir's complaint of an unknown dispatcher spreading rumors of him at the Comm Center.

Maggie Foss asked the Sheriff's Office to not investigate the 2010 incident. Captain Jesse Anderson ignored Maggie Foss's request and ordered Sergeant Carlson to investigate the 2010 incident anyway.

As part of that investigation, Sergeant Carlson reached out to Maggie Foss on September 3, 2014, and again on September 5, 2014 to obtain some type of statement from Maggie Foss because Carlson intended to interview Mr. Muir sometime in the future.


Case # 15-077590 was initiated by Mr. Muir's turning over Maggie Foss's March 8, 2015 private text message to Brandy Drake and claiming it was workplace harassment.

As a direct result of Mr. Muir's work place harassment complaint on March 8, 2015, Chief Fenton directed Captain Jesse Anderson to direct Sergeant Jessica Sullivan to reach out to Maggie Foss for the purpose of seeing whether Maggie Foss was willing to provide a statement for 15-077590.

This was the re-initiation of the criminal investigation that had been closed on December 1, 2014.


IIU2016-070 was initiated by Mr. Muir's learning of Maggie Foss and Jeremy Davy's public record requests and their reaching out to third parties seeking information.

Mr. Muir's complaint was that Maggie Foss and Jeremy Davy were indirectly harassing him using public record requests because he was a man.

As part of this investigation, Maggie Foss was compelled by the investigator, Detective Sergeant Marenco, to answer his questions truthful under penalty of termination.

As part of Maggie Foss's interview for this investigation, Maggie disclosed what Rena Muir, Lindsey Johanson, Katie Oehlsen, and Amanda Sasnett had told her. Maggie's disclosure of the Rena Muir story was prompted by Detective Sergeant Marenco's question asking Maggie if she had any reason to fear Mr. Muir.

Maggie answered that question truthfully and then proceeded to disclose what the other women had told her.

At the end of Maggie's interview, Detective Sergeant Marenco compelled Maggie Foss to give him a written statement documenting what these women had said.

Maggie Foss's compelled written statement from IIU2016-070 was what Detective Sergeant Marenco used as the basis to open an additional investigation against Mr. Muir, IIU2016-146.

Maggie Foss could have been fired if it were determined she was not answering Detective Sergeant Marenco's questions truthfully or if she had refused to provide the written statement as directed.

Mr. Muir cannot hold Maggie Foss giving truthful answers in IIU2016-070 or providing the written statement for IIU2016-146 as harassment because she was not acting on her own initiative.

Maggie Foss was directed to give compelled statements in both investigations by Detective Sergeant Marenco and did not have a choice if she wanted to continue being employed by the King County Sheriff's Office.

Mr. Muir can also not classify Maggie Foss providing information to Detective Sergeant Marenco in her interview for IIU2016-070 or her written statement for IIU2016-146 as harassment because Maggie's interview and written statement were both precipitated by Mr. Muir's original indirect harassment complaint which was why Detective Sergeant Marenco was interviewing Maggie Foss in the first place.

Maggie Foss has not provided any further information about Mr. Muir to the King County Sheriff's Office since her interview for IIU2016-070.

Page two, line 28 – Mr. Muir wrote the following sentence: *"In 2015, Jeremy Davy made a complaint to IIU falsely claiming that after responding to a domestic violence call, I had gone back to the victim's house to have sex with her" (mag010)*

This is partially true but is being portrayed out of context.

In early 2015 while preparing a complaint against Sergeant Frances Carlson, Jeremy Davy picked up on a rumor that came out of Precinct 4.

Precinct 4 was where Mr. Muir had gone through field training at the start of his career with the sheriff's office.

The rumor was at the start of Mr. Muir's career, he had gone back to a DV victim's house for what the rumor mill called "care and comfort." The rumor mill implication, eyewinks and air quotes, was care and comfort was a euphemism for sexual intercourse.

The rumor came from deputies who had worked in Precinct 4 at the time. There was no other information about this rumor other than what was described above.

On March 16, 2015, Jeremy Davy had a private conversation with a deputy named Tom Calabrese about an unrelated matter.

Davy knew Calabrese had worked in Precinct 4, so on a whim, Davy asked Calabrese if Calabrese had heard about the care and comfort rumor story.

It would turn out that Tom Calabrese was one of three deputies involved in the original incident: Mr. Muir; Mr. Muir's training officer (Dave Mendez); and Mr. Calabrese.

Davy did not know Calabrese was involved when he asked the question.

Davy wrote a memo detailing what Calabrese told him and turned it over to Captain Jesse Anderson during Davy's interview for his complaint against Sergeant Carlson, IIU2015-083.

Davy was not making a complaint in as much as he was trying to point out that sexually motivated predatory grooming behavior at the start of Mr. Muir's law enforcement career was a huge red flag, especially considering Mr. Muir had just named himself as a rape suspect against Maggie Foss in August of 2014.

Maggie Foss was not present for the conversation between Davy and Calabrese. Maggie Foss did not write the memo and Maggie Foss did not turn the memo over to Captain Anderson.

Captain Anderson took Davy's memo and initiated an investigation, IIU2015-150.

The victim confirmed Mr. Muir did not have sex with her but Davy's complaint was not entirely without merit.

Mr. Muir, in his interview for IIU2015-150, admitted to driving by the "good looking" DV victim's house once or twice off-duty to make sure her boyfriend had not returned.

Mr. Muir excused the behavior as not knowing it was inappropriate behavior because he was a rookie.

What Mr. Muir did not understand, in admitting to driving by the DV victim's house once or twice off-duty to make sure the DV victim's boyfriend had not returned home, he was admitting to having placed the good-looking DV victim under surveillance, off duty.

Mr. Muir, as a deputy-trainee, did not have authority or authorization to exercise the duties of a sworn law enforcement officer in the State of Washington, off duty, without a field training officer present.

There was also no legal justification for placing the victim under surveillance of any type. The investigation had not established probable cause of a crime.

Mr. Muir and Mr. Mendez conducted at least five domestic violence investigations that week.

The good-looking victim was the only victim Mr. Muir placed under surveillance during the week. Mr. Muir did not place any of the other four DV victims under surveillance, off-duty, to make sure their boyfriends did not return home.

Conducting off-duty surveillance on the one good-looking DV victim of the week in your first week of training, without any legal authorization, authority, or justification, to make sure that good-looking victim's boyfriend did **NOT** return home, is sexually motivated predatory grooming behavior.


Page three, line 1 – Mr. Muir wrote the following: *"In 2016, Maggie Foss filed a complaint with King County IIU making multiple allegations that were investigated under case number IIU2016-146. Maggie Foss had contacted a woman I arrested in 2013 named Amanda Sasnet, to obtain information to use in her complaint. Maggie Foss claimed I had falsified to arrest report. The claim was investigated and determined to be unfounded. Maggie Foss also contacted (redacted) Rena Muir and Lindsay Johnson, and made false accusations I had been abusive. These claims were also investigated and determined to be unfounded. Finally, Maggie Foss contacted Katherine Oehlsen, and claimed I*

*had unlawfully used my authority to initiate a traffic stop of Ms. Oehlsen. This was the only part of the complaint that was sustained, after it was determined I hadn't had a valid reason to pull over Mr. Oehlsen. All of Maggie Foss's other accusations were determined to be unfounded.*

*None of the people Maggie Foss contacted initiated contact with the Sheriff's Office to complain. Maggie Foss contacted them and made the complaints to IIU herself" (mag011)*

This is not true.

July 30, 2014, Mr. Muir told Maggie Foss about Katie Oehlsen in a private conversation they had on the front porch of Maggie's house during the July 30 party for Mr. Muir's girlfriend, Brandy Drake.

Although Mr. Muir did not identify Katie Oehlsen by name, he provided enough information for Maggie Foss to associate what he told her on July 30, 2014 with what Mr. Muir's ex-wife, Lindsay Johanson, told her two-years later.

Maggie Foss did not report what Mr. Muir told her to the King County Sheriff's Office.

February 7, 2016, Maggie Foss reached out to Mr. Muir's ex-wife, Lindsay Johanson, on Facebook. Ms. Johanson confirmed Mr. Muir's story about Katie Oehlsen but provided more details and provide Maggie Foss with Ms. Oehlsen's phone number which Ms. Johanson had taken from Mr. Muir's cell phone while she was married to him. Ms. Johanson included the information Katie Oehlsen had been afraid of Mr. Muir.

Maggie Foss did not report what Lindsay Johanson told her to the King County Sheriff's Office.

February 19, 2016, Maggie Foss reached out to Mr. Muir's ex-wife, Rena Muir, because of information Lindsay Johanson provided her and to apologize for not reporting the rape in 2010.

> *Maggie Foss felt guilty because if she had reported the rape to law enforcement in 2010, Rena Muir might not have lost custody of her kids.*

Maggie Foss did not report what Rena Muir told her to the King County Sheriff's Office.

February 23, 2016, Maggie Foss reached out to Katie Oehlsen, the coffee barista whom Mr. Muir was stalking and harassing per Lindsay Johanson, to get Ms. Oehlsen's side of the story.

> *Lindsay Johanson gave Maggie Foss, Katie Oehlsen's phone, which Lindsay Johanson had taken off Mr. Muir's phone in 2012 and which Lindsay Johanson had kept over the years.*

> *The phone number would turn out to be a good phone number for Katie Oehlsen.*

Maggie Foss did not report what Katie Oehlsen told her to the King County Sheriff's Office.

March 20, 2016, Maggie Foss reached out to Amanda Sasnett via Facebook to get her side of the story.

Ms. Sasnett did not respond until May 29, 2016, but once Ms. Sasnett made contact, Ms. Sasnett was willing to provide Maggie Foss with Ms. Sasnett's side of the 2013 arrest.

Maggie Foss did not report what Amanda Sasnett told her to the King County Sheriff's Office.


April 4, 2016, Mr. Muir learned from Keri Halberg, Maggie Foss was contacting third parties and asking questions. Maggie Foss had reached out to a former tenant of Keri Halberg's, Shannon O'Conner, on Facebook. Maggie had gotten Shannon O'Conner's name from a public disclosure request for all police reports with the location of occurrence being 311 SW 146 ST in Burien, Halberg's address.

O'Conner rented a room from Halberg in 2011.

Although O'Connor had no direct knowledge of the 2010 incident, there was a legitimate reason for wanting to talk to her.

Keri Halberg's house is zoned for single-family occupancy only. It is not zoned for multiple-family occupancy and is not up to Burien City code for a multiple-family occupancy business.

It is highly unlikely that Halberg has a Burien City business license or a Burien City multiple-occupancy license due to the fact her residence is not zoned, or up to code, for a multiple-family occupancy.

O'Conner was contacted in the hopes that she could shed some light on the rental practices of the business and the interior layout of the residence, specifically the downstairs.

The property report for 311 SW 146 ST address shows the upper floor layout but does not show the basement layout. This is an important point because Mr. Muir, Keri Halberg, and a witness, Nick Baisch, all contradict each other as to whether the sex occurred upstairs on the living room floor or downstairs in the basement.

Shannon O'Conner, having lived in the house, could have shed light on the interior layout, specifically downstairs.

As soon as O'Conner received Maggie Foss's Facebook message, O'Conner contacted Keri Halberg and asked about Maggie Foss.

Halberg told O'Conner not to talk to Maggie Foss and asked for a copy of the Facebook message.

Halberg immediately turned around and sent the Facebook message to Mr. Muir.

Mr. Muir immediately contacted Rena Muir to see if Maggie Foss had contacted her.

Rena Muir lied to Mr. Muir and told him no.

Mr. Muir had also just learned about Maggie Foss and Jeremy Davy's public record requests through a public records request.

April 4, 2016, Mr. Muir filed an indirect harassment complaint against Maggie Foss and Jeremy Davy for making too many public record requests about him because he was a man, IIU2016-070.

June 23, 2016, Maggie Foss, and Jeremy Davy were interviewed for Mr. Muir's indirect harassment complaint, IIU2016-070.

Maggie Foss was compelled to give truthful answers in her interview for IIU2016-070.

During Maggie Foss's interview, she provided the information she had received from Lindsay Johanson, Rena Muir, Katie Oehlsen, and Amanda Sasnett to the investigator, Detective Sergeant Marenco.

At the end of Maggie's interview, Detective Sergeant Marenco compelled Maggie to give a written statement documenting the information she had received from these women.

Maggie's compelled written statement was the basis of the IIU2016-146 investigation.

Rena Muir declined to provide a statement concerning the domestic violence incident in Portland, citing a fear of retaliation from Mr. Muir. But Rena told Detective Sergeant Marenco that she talked to Maggie Foss as described and that Maggie Foss accurately relayed the information Rena told her.

Lindsay Johanson gave a reluctant statement. Chief Ledford determined nothing Lindsay said in her statement amounted to a criminal violation or a violation of policy.

Katie Oehlsen provided a statement and Mr. Muir subsequently admitted in his interview for IIU202016-146 that he had conducted an illegal traffic stop on Katie Oehlsen over as a joke.

The totality of the circumstances surrounding Mr. Muir's harassment of Katie Oehlsen substantiated that Mr. Muir's harassment of Ms. Oehlsen was because he was physically attracted to her and wanted to ask her out, substantiating that his behavior, to include the illegal traffic stop, was sexually motivated predatory grooming behavior.

One of the predatory grooming behaviors Mr. Muir admitted to, was asking Katie Oehlsen to go out with him and his friends for drinks in a group get together after training.

This was the same subterfuge Mr. Muir used to lure Maggie Foss out for drinks with a group of friends on March 26, 2010.

This made Mr. Muir's interaction with Katie Oehlsen in 2012 related to Mr. Muir's interaction with Maggie Foss on the day of the rape, March 27, 2010.

The allegation Mr. Muir made an illegal traffic stop against Katie Oehlsen was sustained, only because Mr. Muir admitted to it.

The illegal traffic stop was a serious enough matter to justify a day of suspension.

All other allegations of wrongdoing in this investigation were found to be non-sustained.

Non-sustained means the sheriff's office could not prove or disprove the allegation. It is a neutral finding.

Unfounded means the incident did not happen as the complainant said it happened.

Mr. Muir portraying the findings in the IIU2016-146 investigation as unfounded instead of non-sustained is a deliberate, intentional, omission of truthful fact on Mr. Muir's part.

Mr. Muir is trying to imply Maggie Foss was a liar and filed false accusations against him when in fact, Chief Ledford made neutral findings, essentially saying Chief Ledford could not prove or disprove the alleged wrongdoing.

Mr. Muir claiming Maggie Foss contacted Rena Muir, Lindsay Johanson, Amanda Sasnett, Katie Oehlsen, and filed complaints with the IIU on their behalf is also a deliberate, intentional, omission of truthful fact.

Mr. Muir is deliberately leaving out the fact the reason Maggie Foss told Detective Sergeant Marenco what these women had said to her was because Mr. Muir had filed a bogus indirect harassment complaint against Maggie Foss for her public record requests and Detective Sergeant Marenco had compelled Maggie Foss to provide truthful answers in her interview for his investigation into Mr. Muir's complaint.

Every time Maggie Foss provided the King County Sheriff's Office information on Mr. Muir was because Mr. Muir had filed some type of harassment complaint against Maggie Foss.

What Mr. Muir has done over the last six years is file harassment complaints against Maggie Foss and then cried harassment when the information Maggie Foss used to defend herself blew on him.

Mr. Muir's main lie of omission to Detective Henderson is that Mr. Muir is the complainant in every single accusation that he accuses Maggie Foss of making:

***IIU2014-106*** – initiated by Mr. Muir's complaint of an unknown dispatcher spreading rumors of him at the Comm Center.

***15-0077590*** – initiated by Mr. Muir giving the March 8, 2015 private text message between Maggie Foss and Brandy Drake to Chief Ledford as work place harassment and Chief Ledford forwarding that message to the investigator for IIU2014-106, Sergeant Carlson, which prompted a meeting between Captain Hodges, Captain Anderson, Sergeant Sullivan, Sergeant Carlson. A meeting which resulted in Chief Fenton directing Captain Anderson and Sergeant Sullivan to reach out to Maggie Foss to see if she was willing to provide a statement in the criminal investigation.

***SAL2015-145*** – initiated by Mr. Muir as a workplace harassment complaint against Jeremy Davy for making a complaint of sexually motivated predatory grooming behavior against Mr. Muir, IIU2015-150.

SAL2015-145 was supposed to be against Jeremy Davy but ended up being an attack on Maggie Foss.

When the SAL was complete, Maggie Foss and Mr. Muir were the only involved parties listed in the documentation. What makes this so egregious was the fact that Maggie Foss had nothing to do with Davy's complaint in IIU2015-150. Maggie Foss was not listed as a witness in the investigation, she was not interviewed in the investigation, and she did not provide the King County Sheriff's Office IIU any information on Mr. Muir as part of this investigation.

***IIU2016-070*** – initiated by Mr. Muir when he learned that Maggie Foss was reaching out to third parties and making public record requests. Mr. Muir's primary complaint in this investigation was that Maggie Foss was indirectly harassing him using public record requests because Mr. Muir was a man.

***IIU2016-146*** – initiated because of the written statement Maggie Foss was ordered to write at the end of her interview by Detective Sergeant Marenco when he interviewed her for IIU2016-070.

An interview in which Maggie Foss was compelled by Detective Sergeant Marenco to give truthful answers in his investigation of Mr. Muir's indirect harassment complaint against Maggie Foss.

***IIU2017-154*** – initiated by Mr. Muir as a workplace harassment complaint against Maggie Foss and Jeremy Davy for an excessive force complaint that was unrelated to Maggie Foss or Davy.

This complaint was the most egregious of Mr. Muir's complaints because this complaint was completely staged by Mr. Muir.

Mr. Muir, immediately after the traffic stop, notified Sergeant Parks of the possibility of the complaint and the fact the complainant was following him. This made it a memorable event.

Mr. Muir's notice of investigation (A-150) gave the date of the complaint, CAD number of the incident, citation number, and complainant's name, location of incident, date of the incident and a brief synapsis of the complaint itself.

Mr. Muir knew beyond all reasonable doubt, a month later, when he filed this complaint of harassment against Maggie Foss and Jeremy Davy that they both had absolutely nothing to do with this complaint.

This complaint would initiate a criminal cyber-stalking investigation and an administrative investigation against Maggie Foss. Although Mr. Muir brought this complaint forward as a legitimate complaint, he refused to identify who he was complaining on. The King County Sheriff's Office IIU investigator had to order Mr. Muir to provide a written statement and identify the person he was complaining on. Once Mr. Muir provided a written statement, it was determined that Mr. Muir was just re-hashing his old complaints from IIU2014-106, SAL2015-145, and IIU2016-070. He had provided no new allegation of harassment. The criminal investigation would be closed within 24-hours of being initiated. The administrative investigation would be closed as a non-investigative matter or NIM, several months later.

Page three, line 11 – Mr. Muir wrote the following sentence: *"In August 2016, an IIU investigation under case number 2016-070 sustained a misconduct allegation against Maggie Foss for conducting personal business while on duty for submitting PDRs related to me while at work" (mag012)*

This is not true.

But it is important to note that Mr. Muir is not intentionally lying here. Mr. Muir believes and has documentation to support his assertion but what Mr. Muir does not know is the sustained finding was proven to be incorrect and the finding was changed after Mr. Muir's public record release for IIU2016-070.

September 13, 2016, Mr. Muir received written notification that one of his allegations of misconduct against Maggie Foss in IIU2016-070, had been sustained but the notification did not actually specify which allegation was sustained.

It simply read one of Mr. Muir's allegations had resulted in a sustained complaint.

September 13, 2016, Mr. Muir made a public record request for IIU2016-070, P010102-091316.

September 14, 2016, Mr. Muir received a public disclosure release for record request P010102-091316.

Contained within this record release was Maggie Foss's sustained finding. P010102-091316 was classified as a full disclosure and closed.

September 21, 2016, Maggie Foss made a public records request for her CAD logs for the date of the sustained complaint in preparation of contesting the sustained finding. Maggie was adamant she had been off duty at the time she made the identified public record request.

September 24, 2016, the IIU2016-070 investigator, Detective Sergeant Marenco, contacted Maggie Foss by email and informed her that he had made a mistake. He apologized for not verifying the information the Comm Center supervisor provided him and he acknowledged Maggie's sustained complaint for IIU2016-070 was in error.

> *The fact that Detective Sergeant Marenco was made aware of the error through Maggie Foss's September 21, 2016 public record request substantiates that someone in the King County Sheriff's Office administration was actively monitoring Maggie Foss's public record requests.*

September 24, 2016, a revised memo of finding was entered into the IIU2016-070 case package. The new finding as to the complaint that Maggie Foss made a public record request against Mr. Muir while on-duty was unfounded.

But, because Mr. Muir had received a full disclosure for his public record request for IIU2016-070 10-days before the revised memo of finding was entered into the case package, he did not receive a copy of the revised memo of finding and does not know the sustained finding was reversed.

Page three, line 13 – Mr. Muir wrote the following: *"IIU investigated Maggie Foss again in 2017, under case number IIU2017-137, for statements she made about me while taking a 911 call. In July 2017, while taking a 911 call in her job as a dispatcher, Maggie Foss took a call from a man named Brandon Vandemeer. During the call Brandon Vandemeer mentioned an earlier incident in which I had issued him a traffic citation for driving without a seatbelt, which he admitted. Maggie Foss began questioning Brandon Vandemeer about me while on the 911 call, suggesting to him that I had lied about the citation, and telling Vandemeer that she believed him over me because I had a 'history.' She encouraged him to file a complaint against me with IIU, and provided him with IIU's number. The IIU investigation against Maggie Foss sustained findings of willful violations of the Sheriff's Office code of conduct, ridicule of a member of the department, and conduct unbecoming" (mag013)*

This is partially true.

Maggie Foss made a public record request for the 911 tape of Mr. Vandemeer's phone call when she got off-duty.

The Comm Center employee responsible for making the copy of the 911 tape, listened to the phone call and reported the conversation to a Comm Center supervisor. The Comm Center supervisor initiated the complaint, IIU2017-137.

Where Mr. Muir's statement is not true is in the description of the call.

The 911 recording clearly shows Mr. Vandemeer had a personal axe to grind against Mr. Muir for things unrelated to Maggie Foss.

Mr. Vandemeer was the one who, unsolicited, told Maggie Foss that Mr. Muir was a "piece of shit" and had issued him a ticket for not wearing his seatbelt.

Mr. Vandemeer identified Mr. Muir by name in his tirade against the Shoreline police.

Mr. Vandemeer admitted that he had been driving "illegally" but was adamant that he was wearing his seatbelt. He did not admit to the violation of not wearing his seatbelt like Mr. Muir claims in this statement.

Equally important, Mr. Vandemeer told Maggie Foss that Mr. Muir made up the fact that Mr. Vandemeer was not wearing his seatbelt to cite him for not wearing his seatbelt.

Maggie Foss did not suggest to Mr. Vandemeer that Mr. Muir lied about the seatbelt citation. It was Mr. Vandemeer telling Maggie, Mr. Muir made up the fact Mr. Vandemeer was not wearing a seatbelt to cite him.

All Maggie Foss said was that she believed Mr. Vandemeer, offered to transfer Mr. Vandemeer to a supervisor or provide him the phone number for IIU, and suggested he make a complaint on Mr. Muir to the IIU because Mr. Muir had a "history."

What is clear from the 911 recording is Mr. Vandemeer was clearly upset at what he viewed to be deliberate deception, abuse of authority, and an unjust citation by Mr. Muir.

Page four, line 10 – Mr. Muir wrote the following: *"On October 27, 2019, I was at my house in Monroe when I had my neighbor Tamara Haberlack and her husband come to the house. When I opened the door they asked me if everything was okay. Tamara Haberlack had received a blue envelope addressed to her, and with my name and address as the return address. The envelope contained a thank you card with a handwritten message that said, "(Redacted) IS A SEXUAL PREDATOR". I kept the letter, called Monroe PD, and filed a police report (MPD 19-21441). I later learned two or three other neighbors had gotten similar letters.*

*On November 7, 2019, I learned Chief Ledford and the Shoreline City Manager Debbie Tarry had each received envelops with my return address , and containing card with accusations similar to those received by my neighbors. Based on her previous accusations against me, I am certain these cards were sent by Maggie Foss" (mag014).*

This is partially true.

Chief Ledford, Debbie Tarry, and Tamara Haberlack each received an envelope with a thank you card inside.

Each thank you card had a generic, one-sentence accusation where the author accused Mr. Muir of being a sexual predator.

The Monroe police sent the card mailed to Chief Ledford to the Washington State Patrol lab and tested the card for latent fingerprints using several methods.

There were no latent prints found on the envelope, on the card, or behind the stamp.

What is not true is Mr. Muir's assertion that Maggie Foss is responsible for the sending of the cards.

Mr. Muir has no evidence Maggie Foss was responsible.

Maggie Foss did not send the cards and knew nothing about them until the public disclosure request for case # 2020-00003313.

Maggie Foss's fingerprints were not found on the Ledford card sent to the Washington State Patrol lab. This includes behind the stamp.

Maggie Foss's handwriting, when compared side by side with that of the suspect author, is clearly not the same handwriting.

Between August 3, 2014 and October 20, 2019 nothing like the cards had ever occurred.

September 22, 2019, Maggie Foss, reacting to having watched the Netflix series "Unbelievable," condemned Mr. Muir's behavior and was critical of the King County Sheriff's Office Internal Investigations Unit on her public Twitter feed.

September 23, 2019, an unidentified friend sent Mr. Muir a text message with a link to Maggie Foss's Twitter post and the September 22 comments.

Mr. Muir immediately reported the September 22 Twitter post to Sergeant Heather Volpe.

It is unknown what Sergeant Volpe did about Mr. Muir's complaint.

Maggie Foss as a private citizen and no longer employed by the King County Sheriff's Office was not subject to King County workplace authority.

> *A public record request for all records pertaining to Maggie Foss during this period returned with no record of this complaint.*

October 4, 2019, Mr. Muir reported the September 22 Twitter post to his precinct commander, Chief Ledford.

It is unknown what Chief Ledford did about Mr. Muir's complaint.

Maggie Foss as a private citizen and no longer employed by the King County Sheriff's Office was not subject to King County workplace authority.

> *A public record request for all records pertaining to Maggie Foss during this period returned with no record of this complaint.*


October 20, 2019, Maggie Foss, reacting to a public disclosure release of Kanwal Yusef's stalking complaint against Mr. Muir and the shooting of an unarmed person by police, posted a lengthy, detailed, public letter to Facebook wherein she used her name, Mr. Muir's name, Mr. Muir's photograph, and publicly voiced her opinion, condemning Mr. Muir's behavior and criticizing the Shoreline police.

Given the fact Maggie Foss had just publicly called out the Shoreline police and Mr. Muir, she had no motive to send an anonymous thank you card with a single, generic sentence, "Jeremy Muir is a sexual predator" to Chief Ledford after her Facebook post

Mr. Muir gave Chief Ledford a copy of Maggie Foss's Facebook post on October 22, 2019 and comments on the post showed Chief Ledford was aware of Maggie's post.

Maggie Foss had also received private messages from members of the Shoreline police department and was aware that her Facebook post was circulating throughout the Shoreline police department to include Chief Ledford.

Detective Henderson's last follow-up entry in the 2020-00003313 investigation was dated June 30, 2020.

As of June 30, 2020, no more cards had been sent.

Even after George Floyd's death and the subsequent Black Lives Matter protests in Shoreline where Mr. Muir's named appeared on signs in the crowd and Antifah posted Maggie's public letter to their Facebook page, no more cards were sent.

The three cards were a single focused attack, addressed to specific people.

The author of the cards wrote the cards under the presumption that the reader would know who Jeremy Muir was. The author did not identify Mr. Muir as a King County Deputy or cop. They used his name, Jeremy Muir.

This is an important point when it comes to Tamara Haberlack's card.

Tamara Haberlack is not listed on the property report of her residence as an owner, only her husband's name is on the property report.

Open source information would not have readily identified Tamara Haberlack as Mr. Muir's neighbor.

But Tamara Haberlack has a significant social media footprint.

Tamara Haberlack is a science teacher at the Hidden River Middle School, Monroe School District 103.

Tamara Haberlack's social media footprint revolves around the Hidden River Middle School and the Monroe School District, not her home address.

Tamara Haberlack's address appears to be within Monroe School District 103.

If Tamara Haberlack is Mr. Muir's neighbor like Mr. Muir wrote in his written statement to Detective Henderson, and like what is documented in the narrative of police report # 19-00021441, and what Mr. Muir wrote in his written statement for 19-00021441, then Mr. Muir lives in Monroe School District 103 too.

This substantiates Mr. Muir's two younger children most likely attended Hidden River Middle School and were taught science by Tamara Haberlack.

Tamara Haberlack is, or was, one of their teachers.

This is a direct link between Mr. Muir and Tamara Haberlack.

The author of the Tamara Haberlack card knew Tamara Haberlack lived in Mr. Muir's neighborhood and assumed Tamara Haberlack knew Jeremy Muir by name.

Tamara Haberlack receiving a card was not a coincidence.

Mr. Muir asserts that the motive for the cards was harassment but with Mr. Muir's assertion to Detective Alspach that multiple neighbors received cards, then the cards were a spectacular failure because only one card in the neighborhood, the Haberlack card, came back to Mr. Muir.

No one else in the neighborhood cared enough to bring the cards to Mr. Muir's attention.

Mr. Muir, himself, did not think the other cards were important.

On December 04, 2019, Mr. Muir told Detective Alspach that he had learned of the existence of at least three other cards sent to his neighbors.

The key question here is why Mr. Muir immediately reported the Haberlack card to Monroe Police when he received it but did not immediately report the existence of the additional three cards to the Monroe police when he learned of them?

Mr. Muir never reported the existence of the three additional pieces of evidence to the Monroe police.

Three additional pieces of evidence related to the original report of the extremely libelous Haberlack card that so offended Mr. Muir in the first place.

The Monroe police, themselves, did not think the Haberlack card was a crime.

Mr. Muir's initial report about Tamara Haberlack's card was closed as a non-crime, information report only and was written upon request by the reporting party, Mr. Muir.


But, sending a card to the Shoreline precinct commander, Chief Ledford, was guaranteed to draw Shoreline police attention.

A motive Mr. Muir substantiates in his written statement to Detective Henderson when he wrote the following sentence: *"On November 4, 2019, I started to see a psychiatrist to learn coping mechanisms to be able to cope with the constant onslaught of attacks from Maggie, as well as my frustration that my department, a law enforcement agency, had done nothing to assist me" – page five, line 14 (mag015).*

This card was very effective in drawing Chief Ledford's attention, considering this was the card that initiated both the King County criminal investigation and the Monroe police felony investigation against Maggie Foss and was the only card sent to the Washington State Patrol lab for processing.

When the question is asked, who benefited the most from the Ledford card, Mr. Muir or Maggie Foss, the answer is Mr. Muir.

The Ledford card jumped started a felony dv harassment investigation against Maggie Foss.

Mr. Muir benefited the most from the cards.

What Mr. Muir is admitting in his sentence is being so frustrated and angry with the King County Sheriff's Office by what he perceived as a lack of assistance from the King County Sheriff's Office in regards to his complaints against Maggie Foss's social media posts, that he had to start seeing a psychiatrist eight-days after the cards were sent in order to learn how to cope.

When this sentence is compared to Mr. Muir's complaints against Maggie Foss's Twitter posts on September 23, 2019; and October 4, 2019; along with Mr. Muir's complaints about Maggie Foss's Facebook posts on October 22, 2019, it becomes clear that Mr. Muir spent the months of September and October 2019 becoming more and more frustrated at the King County Sheriff's

Office failure to take action in response to his complaints about Maggie Foss's social media posts.

Mr. Muir's frustration became so acute, he had to seek professional medical assistance to learn how to cope.

This level of frustration and lack of coping skill is often the catalyst for all kinds of irrational criminal behavior and substantiates Mr. Muir had as much, or more, motive to be involved with the sending of the cards as Maggie Foss.

It is strongly suspected there were only three cards total, addressed to specific individuals for the specific intent of staging a harassment crime.


Page five, line 1 – Mr. Muir wrote the following statement: *"On December 17, 2019, Deputy Gaffin informed me he overheard a conversation in the King County Jail where a male claimed his friend "Amanda" was contacted and offered $100.00 to meet at a Starbucks and talk about Shoreline Deputy (redacted). I believe this may have been when Maggie Foss contacted Amanda Sasnett to obtain information, she included in her complaint against me under case number IIU2016-146" (mag016)*

This is not true.

According to the field notes Detective Alspach gave Detective Henderson, on December 17, 2019, Deputy Gaffin was outside a holding cell at the King County Jail when he heard a male inside the holding cell make this statement.

When Deputy Gaffin walked into the holding cell to identify the source of this comment, everyone in the holding cell shut up and Deputy Gaffin was unable to identify the source.

Deputy Gaffin cannot even put a face to the comment, let alone a name.

Equally important, Deputy Gaffin cannot provide context to the comment or conversation. This is just a random, out of the blue comment, overheard by Deputy Gaffin.

Mr. Muir knows exactly how and when Maggie Foss contacted Amanda Sasnett to get the information Maggie provided Detective Sergeant Marenco in IIU2016-146.

Maggie wrote it in her written statement for IIU2016-146 as follows:

> *"Amanda Sasnett, 206-931-4306 (alleged prostitute arrested by Muir)*
>
> *I reached out to Amanda via Facebook on March 20, 2016. She responded on May 29, 2016.*
>
> *I introduced myself via Facebook and told her I've had problems with a King County deputy named Jeremy Muir. I explained I was aware she was arrested by him in February of 2013 and I wanted to get her side of the story. I continued that I asked for Muir's disciplinary file and learned he got in trouble for his contact with her but I wanted to get her side of the story because apparently nobody ever did (and because I know what type of person Muir is and because I didn't and don't believe it is even*

*possible for a woman to reach her vagina while her hands are cuffed behind her back let alone rip a hole in the crotch of her leggings and masturbate).*

*She responded May 29, 2016*

*"I don't even know what to say right now. I hope I'm not too late in responding to you, I just came across your message in my filtered inbox. I know exactly what you are talking about, I am relieved that someone has contacted me about this, I would love to share with you what happened that night. If you don't mind me asking what is your interest in him? I would be happy to talk more over the phone please give me a call or message at 206-931-4306 at any time. Thank you so much, hope to talk to you soon."*

*I replied that he raped me March 27, 2010. She responded with he tried to get her to have sex with him and told her that he would pay her. I advised her I believed her and would contact her via phone later. She said she couldn't believe that I made contact with her and she thought nobody would ever believe her.*

*When we spoke on the phone she said, "it was crazy." She then seemed hesitant to talk. I sensed she feared I would judge her. I told her I am not one to judge and that I grew up in the projects of White Center and have been around all walks of life. I said, "everyone has a past but more importantly, everyone has a future." She replied, "Amen," and told me the following:*

*He pulled her over at gunpoint. After he detained her he asked her if she wanted him to take her around the corner. She was "high" at the time. He drove her "a little way" away, not even out of the parking lot but away from his partners. He got in the back seat with her and was "all up on her" and shone the mag-light "all up in her pussy." She knew she had felony warrants and knew she was going to jail. Muir told her as he shone the light on her vagina, "let's see if we can make these warrants go away."*

*Amanda said Muir offered if she could direct him to another stolen car he would let her go and they could go have sex and he would pay her $50. She stated she did not rip a hole in her leggings as the hole was already there and she didn't touch herself. She stated when she told Muir she didn't know of any stolen cars he then questioned her where "so and so" were. She believes he was talking about prostitutes. She told him she didn't know them. She said Muir expressed he still wanted to have sex with her and he left a business card with her belongings.*

*She said she was booked into jail, she recognized a Corrections Officer named Jefferson. She says she ran to Officer Jefferson and said, "Jefferson, Jefferson, a cop just tried to fuck me." She replied that Jefferson told her she had a lawsuit.*

*Amanda says when she got out of jail she told "so many people" of what happened that night but she never reported it to the authorities because she never thought anyone would believe her. I told her I believed her.*

*She thanked me."*

Mr. Muir has a copy of IIU2016-146 which he obtained via public disclosure.

Maggie Foss's written statement, including this information about Maggie Foss's contact with Amanda Sasnett, is in Mr. Muir's copy of IIU2016-146.

Mr. Muir knows exactly when, how, and why Maggie Foss contacted Amanda Sasnett to obtain the information she provided Detective Sergeant Marenco in IIU2016-146.

Mr. Muir does not have to say, "*I believe this may have been* *when Maggie Foss contacted Amanda Sasnett to obtain information, she included in her complaint against me under case number IIU2016-146*."

Mr. Muir is simply taking a random, out of the blue comment and trying to spin it into a smoking gun.

Mr. Muir has a history of doing this.

In IIU2016-070, Mr. Muir reported random comments made to him in conversations with deputies and supervisors from Precinct 3, as fact of wrong-doing on the part of Maggie Foss's husband, Jeremy Davy.

When Detective Sergeant Marenco contacted the source of the comments, every single one of them set context for the comments and substantiated Mr. Muir was using the comments out of context. Not a single witness Mr. Muir named, substantiated Mr. Muir's accusations of wrongdoing on the part of Jeremy Davy (***mag017***).


Mr. Muir's omissions of fact to Detective Henderson are intentional and deliberate.


Mr. Muir has a copy of IIU2014-106 which he obtained through public record release.

He could have reviewed the documentation in IIU2014-106 and provided accurate facts if he had wanted to.


Mr. Muir has a copy of 15-0077590 which he obtained through public record release.

He could have reviewed the documentation in 15-0077590 and provided accurate facts if he had wanted to.

Mr. Muir could have provided the part of Detective Sullivan's report which showed she was directed to reach back out to Maggie Foss on March 10, 2015 to re-initiate the criminal investigation.

Mr. Muir could have provided the part of Sergeant Carlson's IAPro for IIU2014-106 which showed it was Chief Fenton who directed Captain Anderson to direct Sergeant Sullivan to reach back out to Maggie Foss to determine if she would be willing to provide a statement in the criminal investigation.



Instead, Mr. Muir cherry picked the decline out of the documentation to make it look like Maggie Foss had filed a false accusation against him.

Mr. Muir has a copy of IIU2016-070 and IIU2016-146 which he obtained via public record.

Mr. Muir could have reviewed the documents in both IIU2016-070 and IIU20146 and provided a copy of Detective Sergeant Marenco's follow-up reports which showed Detective Sergeant Marenco compelled Maggie Foss to provide truthful answers in her interview for IIU2016-070, and compelled Maggie Foss to provide a written statement documenting what Rena Muir, Lindsay Johanson, Amanda Sasnett, and Katie Oehlsen had told her in IIU2016-146.

But if Mr. Muir accurately reported the facts and provided a copy of these documents, Mr. Muir would be unable to spin the story Maggie Foss filed false accusations against him on behalf of these women.

Mr. Muir would have to admit that Mr. Muir has been the primary instigator of every single complaint against Maggie Foss.

What Mr. Muir is doing is filing harassment complaints against Maggie Foss and then crying harassment when the information Maggie Foss uses to defend herself blows back on him.

When the investigator for IIU2017-154 met with Mr. Muir to explain the results of the investigation, Mr. Muir listened intently and then made a classic DARVO statement, saying he just, *"wanted to put this all behind him."*

It is exceptionally hard for Mr. Muir to put this all behind him when he was the one who made the complaint.

It is hard for Mr. Muir to claim to be the victim of harassment complaints when Mr. Muir is the one filing the harassment complaints (*mag018*).

Detective Alspach's investigation and police report must also be examined alongside Mr. Muir's written statement.

Detective Alspach provided Detective Henderson five pages of typed documentation and two pages of handwritten documentation which will hereafter be referred to as Detective Alspach's field notes.

In addition to the field notes, Detective Alspach provided Detective Henderson with a thumb drive of the information Detective Alspach had developed during her two-month investigation.

Detective Alspach also turned over the Ledford card to Detective Henderson.

The timeline of Detective Alspach's investigation is as follows:

November 20, 2019, Detective Alspach was briefed by Chief Ledford and Captain Konoske of the possibility of a criminal cyber-stalking case wherein Mr. Muir was the victim and Maggie Foss was the suspect.

According to Detective Alspach's field notes, Chief Ledford, and Captain Konoske told Detective Alspach that Maggie Foss had accused Mr. Muir of "rape, harassment, and other serious crimes."

Detective Alspach's field notes do not document the exact nature of Chief Ledford and Captain Konoske's allegations, but the totality of circumstances substantiates that what Chief Ledford and Captain Konoske were referring to when they alleged Maggie Foss falsely accused Mr. Muir of rape, harassment, and other serious crimes was IIU2014-106, SAL2015-145, IIU2016-070, IIU2016-146, and IIU2017-154.

In addition to accusing Maggie Foss of making false accusations, Chief Ledford turned over "paperwork," "photocopies," and the Ledford card.

Detective Alspach did not identify or describe her terms "paperwork" and "photocopies."

According to Detective Alspach's field notes, she took possession of the Ledford card on November 20, 2019.

According to Detective Alspach's field notes, Mr. Muir wished to make a police report so Chief Ledford and Captain Konoske "asked" Detective Alspach to take the police report.

December 4, 2019, Detective Alspach met with Mr. Muir to discuss the "details of his report."

Detective Alspach's field notes document that she called the Communication Center to "obtain a case number," and Mr. Muir then relayed the basis of his complaints.

The basis of Mr. Muir's primary complaint was that Maggie Foss had falsely accused him of rape (IIU2014-106).

When the allegation was unfounded, Maggie Foss filed criminal charges against Mr. Muir (15-077590).

In 2015, Maggie Foss's husband falsely accused Mr. Muir of having gone back to a DV victim's house and having sex with her (IIU2015-150).

In 2016, Maggie Foss and her husband harassed Mr. Muir by making over 150 public record requests against him (IIU2016-070).

In 2016, Maggie Foss falsely accused Mr. Muir of domestic violence, verbal abuse, falsifying a police report, and abuse of authority (IIU2016-146).

These were the same complaints Mr. Muir made in IIU2016-070 and IIU2017-154.

Mr. Muir included the information about Maggie Foss's Twitter post and the Facebook public letter but each of these secondary complaints were made within a single paragraph.

Mr. Muir's primary complaint took up a page and half of typed, single space.

When Mr. Muir was telling Detective Alspach about receiving the Haberlack card, Mr. Muir told Detective Alspach that an unnamed neighbor had informed him at least three other neighbors had received cards like the Haberlack card

Mr. Muir immediately reported the Haberlack card to the Monroe police when Tamara Haberlack brought the card to his attention on October 27, 2019.

Mr. Muir immediately named Maggie Foss as the suspect to the Monroe police on October 27, 2019.

Mr. Muir wrote in his statement for the Haberlack card report that he was extremely offended by the fact that someone sent his neighbor something so "libelous and slanderous."

Yet here he was telling Detective Alspach a month later, that he was aware of at least three additional cards.

Cards that were equally libelous and slanderous.

Cards that were additional evidence in Mr. Muir's original harassment complaint to the Monroe police on October 27, 2019.

Cards that Mr. Muir did not immediately report to the Monroe police upon learning of their existence.

Cards that Mr. Muir never reported to the Monroe police. Cards that if sent to Mr. Muir's neighbors, would have been the sole purview of the Monroe police to investigate.

The failure to report the additional cards prevented the Monroe police doing a timely canvass to determine if the cards were still available.

Mr. Muir's failure to immediately report the three other cards to the Monroe police when he learned of their existence substantiates the Haberlack and Ledford cards were a secondary complaint and Mr. Muir's primary complaint was the re-hashing of the complaints he filed with the King County Sheriff's Office in IIU2014-106, SAL2015-145, IIU2016-070 and IIU2017-154.

According to Detective Alspach's field notes, at the end of her interview with Mr. Muir, Detective Alspach let Mr. Muir read her field notes to ensure the accuracy of events.

Detective Alspach then gave Mr. Muir a copy of her field notes.

Detective Alspach did not ask Mr. Muir to write a sworn, written statement for her investigation.

Detective Alspach did not complete a dv supplemental form which would have required Mr. Muir provide specific facts to support his assertion of a domestic relationship with Maggie Foss.

A form Mr. Muir would have had to swear and affix his signature to, attesting to the truthfulness of his statements.

Detective Alspach did not swear and affix her signature to her field notes, attesting to the truthfulness of the information contained within.


December 17, 2019, Detective Alspach identified Maggie Foss by name and date of birth.

Detective Alspach added Maggie Foss's information to her police report in Mark 43.

This substantiates Detective Alspach was entering data into the Mark 43 report system on December 17, 2019.

Detective Alspach's field notes document that Detective Alspach used Mr. Muir's home address as the incident of location.

Detective Alspach decided because Mr. Muir had been at home off-duty when he learned of Maggie Foss's Twitter post and Facebook public letter, the address of occurrence was Mr. Muir's home address and the Monroe police would be the proper agency to investigate Mr. Muir's complaint.

Detective Alspach's decision that Mr. Muir was off-duty and at home when he learned of the Twitter post and Facebook letter substantiates that Mr. Muir was filing a criminal complaint as a private citizen, not a King County Sheriff's Office employee.

While Mr. Muir's primary complaints against Maggie Foss were about actions that had occurred while Maggie Foss was a King County Sheriff's Office employee and subject to King County workplace authority, Mr. Muir's primary complaints had already been investigated and adjudicated by the King County Sheriff's Office.

The only real things Mr. Muir had to complain on was Maggie Foss's social media posts and the three thank you cards.

Maggie Foss's employment with the King County Sheriff's Office ended on October 4, 2018. She had not been employed by the King County Sheriff's Office for over a year. She was no longer subject to King County workplace authority.

Mr. Muir was a private citizen complaining about Twitter messages and a Facebook post which he had become aware of while he was off duty at home in Monroe.

Mr. Muir should have been directed to take his complaint to the Monroe police and Detective Alspach should have done no further investigative work on the c19046254 investigation subsequent to her decision on December 16, 2019, that the Monroe police were the proper authority to investigate Mr. Muir's complaint.

January 7, 2020, even though Detective Alspach had decided the crime occurred at Mr. Muir's home address and the Monroe police department was the proper agency to investigate Mr. Muir's complaint on December 17, 2019, she continued investigating Maggie Foss, conducting cyber-surveillance of Maggie Foss's social media posts, and gathering evidence in the form of screenshots of Kanwal Yousef's Instagram account.

Detective Alspach identifying Mr. Muir was a private citizen and the proper agency to investigate his complaint was the Monroe police substantiates Detective Alspach's continued involvement in the c19046254 investigation was a personal favor to Mr. Muir.

Detective Alspach's field notes document on January 7, she was looking for Kanwal Yousef's Instagram account.

Detective Alspach was looking for a post on Kanwal Yousef's Instagram account that had been brought to her attention by Mr. Muir.

When Detective Alspach could not find the Instagram post, she contacted Mr. Muir who agreed to print her out a copy.

This substantiates that Mr. Muir himself was also conducting cyber-surveillance on Maggie Foss and Kanwal Yousef.

Detective Alspach's field notes document that she copied all the posts she had to a thumb drive and gathered up the paperwork and documentation she had developed during her two-month investigation.

Detective Alspach's field notes document that as she gathered up the paperwork, she noticed the Ledford card had been damaged.

Specifically, it had been torn.

Detective Alspach's field notes document that she must have inadvertently torn the Ledford card while it was "stored in her desk."

Detective Alspach drew a circle around the tear, initialed the damage, and notified Chief Ledford and Captain Konoske about damaged envelope.

According to Detective Alspach's field notes, she took custody of the Ledford card on November 20, 2019.

According to Detective Alspach's field notes, she noticed the card was damaged on January 7, 2020 when she gathered it from her desk where she had been storing it.

November 20, 2019 to January 7, 2020 is 48-days.

January 16, 2020, Detective Alspach received a call from Detective Henderson who asked her for additional information and a copy of the information Detective Alspach had gathered.

They scheduled a time to meet for Detective Alspach handed off her field notes, thumb drive, and the Ledford card to Detective Henderson.

January 21, 2020, Detective Henderson met with Detective Alspach to exchange information and take over the investigation.

Detective Henderson wrote the following in his police report:

> Detective Alspach gave me a copy of her report which detailed her interview with Muir, as well as a detailed list of events pertaining to social media posts and other events directly related to this case."

Detective Henderson was referring to Detective Alspach's typed field notes.

Detective Henderson continued, writing the following in his police report:

> "Detective Alspach provided other documents to include her handwritten notes, a summary of the internal investigation reference the rape allegation made by Maggie Foss, and copies of social media posts made by Maggie Foss to include Facebook, Instagram, and Twitter."

Detective Henderson separating Detective Alspach's typed notes from her handwritten notes in his police report and labeling the typed notes as Detective Alspach's report substantiates that Detective Henderson was duped into erroneously believing the typed notes were Detective Alspach's official police report.

Detective Henderson subsequently sent the Ledford card to the Washington State Patrol lab for fingerprint analysis and included a copy of all of Detective Alspach's documentation in his case package as part of his investigation against Maggie Foss.

Detective Henderson used the information contained in Detective Alspach's typed field notes and Mr. Muir's written statement as the basis for his probable cause to arrest Maggie Foss, still believing that the field notes Detective Alspach had provided him were her sworn police report.

January 27, 2020, Detective Alspach completed her police report in Mark 43.

As part of the submission process, Detective Alspach affixed her digital signature to the Mark 43 police report, certifying that her Mark 43 police report was true and accurate under penalty of perjury by the laws of Washington State.

Detective Alspach's Mark 43 police report documenting her two-month investigation reads as follows:

"*Allegation of DV cyber stalking and/or DV harassment. I discussed the elements of the allegation with Muir. Case referred to Monroe Police Dept.*"

This is the total extent of Detective Alspach's police report.

The Mark 43 report does not include a copy of the field notes Detective Alspach provided Detective Henderson.

The Mark 43 report does not document Detective Alspach's interview with Mr. Muir.

The Mark 43 report does not include copies of any of the documentation, photocopies, paperwork, screen shots, or other information developed by Detective Alspach in her investigation which she turned over to Detective Henderson on January 21, 2020.

The Mark 43 report does not contain a dv supplemental form substantiating a domestic relationship between Mr. Muir and Maggie Foss. A document that is required by King County Sheriff's Office policy in all domestic violence criminal investigations.

The Mark 43 report does not substantiate a dv relationship between Mr. Muir and Maggie Foss.

The Mark 43 report does not substantiate probable cause or reasonable suspicion of any crime, let alone a felony dv crime.

The Mark 43 report does not substantiate the damage to the Ledford card as documented in Detective Alspach's field notes.

The Mark 43 report does not substantiate that Detective Alspach stored the Ledford card in her desk for 48-days in violation of the King County Sheriff's Office evidence handling policies.

A gross mishandling of evidence that is clearly substantiated by Detective Henderson's handling of the Ledford card.

Detective Henderson submitted the Ledford card to the Washington State Patrol lab on February 21, 2020.

The Washington State Patrol lab processed the card and returned both the card and the results of the fingerprint analysis on March 3, 2020. A total of ten-days.

Detective Alspach stored the Ledford card in her desk, unsecured as substantiated by the inadvertent damage, four times longer than it took Detective Henderson to send the card to the lab, have it processed, and get back the results.

There is another problem with the Ledford card.

In the lower right corner of the envelope is a handwritten phone number with a Denver Colorado area code (720).

Did Detective Alspach accidentally use the Ledford card as a piece of scratch paper while it was stored in her desk during the 48-days, or is this phone number and its relationship to the card a lead to the author's identity?

There is no documentation in Detective Alspach's field notes or Mark 43 report that mentions this phone number or any attempt to investigate this phone number.

There is also no documentation in Detective Henderson's report that mentions this phone number or any attempt to investigate this phone number.

Whose phone number is it and how is that phone number related to the envelope is the question?

If Detective Alspach and Detective Henderson cannot answer this question, the card's value as evidence has been further contaminated.

The fact of the matter is, there is a strong probability that this phone number's relationship to the Ledford card is the suspect author's identity and neither Detective Alspach nor Detective Henderson made any attempt to investigate this lead.


The most serious damage to Detective Henderson's investigation against Maggie Foss, other than Mr. Muir's omission of facts, is found in the discrepancy between Detective Alspach's field notes and Detective Alspach's Mark 43 police report

Detective Alspach did not swear and affix her signature to her field notes testifying to their accuracy and truthfulness.

Detective Alspach allowed Mr. Muir to read her field notes to verify their accuracy. She then provided Mr. Muir a copy of her field notes before she had done any real investigative work on the complaint.

Detective Alspach would eventually determine that Mr. Muir was off-duty and the location of occurrence of the crime was Mr. Muir's private residence in Monroe. Detective Alspach subsequently decided the Monroe police were the proper authority to investigate Mr. Muir's complaints.

Mr. Muir, as a private citizen, was not entitled to any access of Detective Alspach's criminal investigation identified by case # c19046254 outside of the public records request process.

Detective Alspach allowing Mr. Muir access to her field notes to verify their accuracy and providing him a copy was a personal favor to Mr. Muir. A favor Mr. Muir was not entitled to as a private citizen.

This is also the reason why Detective Alspach's field notes contain the same inaccurate and untruthful statements of fact as Mr. Muir's written statement to Detective Henderson.

Mr. Muir dictated Detective Alspach's field notes to her and then verified the information himself, rather than Detective Alspach independently verifying Mr. Muir's information, a core tenant of basic investigations 101.

Detective Alspach allowing Mr. Muir internal access to her field notes and then providing him a copy before she turned those field notes over to Detective Henderson, allowed Mr. Muir to coordinate his sworn, written statement to Detective Henderson with Detective Alspach's field notes.

This, on the surface, would have given Mr. Muir's sworn, written statement more credibility because it would have appeared to Detective Henderson that Mr. Muir's sworn, written statement had been independently verified by Detective Alspach's investigation.

This is especially crucial when it is understood that Detective Henderson did not independently verify Detective Alspach's field notes or Mr. Muir's sworn written statement himself.

Detective Henderson simply copied what Detective Alspach and Mr. Muir told him into a probable cause statement against Maggie Foss which he then presented to the Snohomish County prosecutor's office with a recommendation for charges.

Detective Alspach fixing her signature to her Mark 43 police report, swearing to its truthfulness and accuracy, puts Detective Alspach and Detective Henderson in a catch-22.

Detective Alspach will be the first witness called in Maggie Foss's criminal defense and will be asked two questions.

Is this Detective Alspach's digital signature on the bottom of the Mark 43 police report identified by case # c19046254? Yes or no!

Does the Mark 43 police report identified by case # c19046254 accurately describe the information Detective Alspach developed in her two-month investigation against Maggie Foss which she turned over to Detective Henderson. Yes or no!

If Detective Alspach answers yes, she will be impeached by the five pages of unsworn field notes she provided Detective Henderson and which Detective Henderson erroneously believed was Detective Alspach's sworn police report which he relied on to substantiate his probable cause against Maggie Foss.

If Detective Alspach answers no, she will be admitting to a violation of RCW 9a.72.040, false swearing.

Regardless of whether she answers yes or no, Detective Alspach deals a fatal blow to her personal credibility, the credibility of her investigation, the credibility of Detective Henderson's investigation, and Detective Henderson's personal credibility (*mag019*).

Mr. Muir has two primary witnesses which he continually uses to discredit Maggie Foss's version of events and to substantiate his accusations that Maggie Foss has falsely accused him rape.

These two witnesses are Keri Halberg and Nick Baisch.

Mr. Muir attended the law enforcement academy in 2008 and rented a room from Keri Halberg while he was attending the police academy.

Mr. Muir graduated the police academy sometime around the beginning of October 2008.

It is unknown exactly when Mr. Muir moved out of Keri Halberg's house but another tenant, Kyle Yates, substantiates Mr. Muir, John Rausch, Kyle Yates, and Keri Halberg were living in the house in July of 2009 and that Kyle Yates moved out before Mr. Muir in September of 2009.

Keri Halberg was Mr. Muir's live-in landlord for an extended period.

Keri Halberg would eventually identify that she had two tenants at the time of Maggie Foss's sexual assault, John Rausch, and Nick Baisch.

Mr. Muir was not a tenant.

Nick Baisch denied knowing Maggie Foss or Mr. Muir.

Nick Baisch was an independent eyewitness who was alleged to have walked in on the sexual intercourse between Mr. Muir and Maggie Foss while they were at Keri Halberg's house.

Nick Baisch was the most important witness in the case because he was an independent witness who was alleged to have been at the scene.

Nick Baisch's story was simple:

> "He came home, walked downstairs, found a man and woman under a blanket near his room, heard them giggling, did not hear any sounds of distress, did not see their faces, and did not know who they were."

This was a simple story, easily remembered.

Even though Nick Baisch was the most important witness in the case, Sergeant Carlson never spoke to him in person.


September 6, 2014, Mr. Muir provided Sergeant Carlson a witness list. This witness list included Brandy Drake, Keri Halberg, and Allison Sierra but did not include Nick Baisch or the fact a roommate walked in on Mr. Muir and Maggie Foss.

> *This witness listed was alleged to have been created after Mr. Muir contacted Keri Halberg to ensure he was remembering things correctly.*

October 9, 2014, Sergeant Carlson interviewed Mr. Muir.

During the interview, Mr. Muir brought up the fact a roommate had walked in on Mr. Muir and Maggie Foss.

*Mr. Muir did not know the roommate's name.*

October 16, 2014, Sergeant Carlson called Keri Halberg looking to conduct a phone interview.

*Keri Halberg told Carlson she was out of town and would contact Carlson for an interview when she got back into town.*

Keri Halberg told Sergeant Carlson, Halberg needed a few days to refresh her memory. Sergeant Carlson asked Keri Halberg for the name of her tenant.

Keri Halberg did not know the tenant's name off the top of her head but agreed to check her records.

Approximately three hours later, Keri Halberg left Sergeant Carlson a voicemail identifying Nick Baisch as the roommate who walked in on Mr. Muir and Maggie Foss.

Even though Keri Halberg had just checked her records, Halberg did not tell Sergeant Carlson that she had two tenants: John Rausch and Nick Baisch.

*It is important to note that although Keri Halberg checked her records on October 16, 2014 and identified Nick Baisch as the roommate who walked in, Keri Halberg would not identify that she had two roommates until April 2015 in her interview for 15-0077590 wherein she thought maybe she had two roommates at the time but wasn't sure. She ended up having to check her records a second time to confirm John Rausch and Nick Baisch were the tenants.*

*It is also important to note Keri Halberg was not present in the room when the roommate walked in and did not have any first-hand knowledge of which roommate walked in.*

*Mr. Muir did not know the roommate's name.*

*Sergeant Carlson did not know the roommate's name and did not know there were multiple roommates in the house.*

*Keri Halberg did not know the names of her tenants off the top of her head and had to check her records.*

*Keri Halberg's record check on October 16, 2014, should have showed at least two roommates: John Rausch and Nick Baisch.*

*On paper, Keri Halberg did not have enough information available to her on October 16, 2014 @ 7:00 am, to positively identify Nick Baisch as the roommate who walked in from a simple records check.*

*Keri Halberg was not asked by either investigator for a copy of her records nor was Halberg asked how she was able to determine which roommate walked in on Mr. Muir and Maggie Foss, John Rausch, or Nick Baisch.*

On November 13, 2014, Sergeant Carlson called Nick Baisch's phone number and left a voicemail which include Sergeant Carlson's email address.

Sergeant Carlson received the following email statement from Nick Baisch in response to her voicemail:

"*From: Nick Baisch [mailto:nbaiscM40@yahoo.com]*

*Sent: Friday, November 14, 2014 12:48 PM*

*To: carlson, Frances*

*subject: Returning voicemail*

*Hello,*

*My name is Nick Baisch and I received a voicemail from you on 11/13/2014. Keri Halberg gave you my name regarding a deputy you are investigating. The only thing I remember that night is when I came home and walked downstairs, there was one male and one female on the floor under a blanket. I had absolutely no idea who they were. I could not see their faces. As I walked by they giggled. I went to bed in my room next to where I last saw them and they were gone in the morning.*

*I hope this helps,*"

Sergeant Carlson asked Nick Baisch three follow-up questions via email.

Sergeant Carlson received the following answers to her questions from Nick Baisch via email:

"*From: Nick Baisch [mailto:nbaisch440@yahoo.com]*

*Sent: Monday, November 17, 2014 5:33 PM*

*To: Carlson, Frances*

*Subject: Re: Returning voicemail - additional questions!*

*Hello,*

*1. I don't remember hearing any conversation.*

*2. There was no indication of any problem between the two when I saw them.*

*3. I don't really remember seeing any movement under the covers.*

*I hope this helps,*

*Nick*"



81

This was the entire extent of Sergeant Carlson's contact and interview with the most important witness in the investigation.

Sergeant Carlson did not substantiate how Nick Baisch was associating Friday March 12, 2010; Wednesday March 17, 2010; or Saturday March 27, 2010 with the man and woman under the blanket.

Sergeant Carlson did not substantiate how Nick Baisch was associating Mr. Muir and Maggie Foss with the man and woman under the blanket; a King County deputy sheriff; a man and woman whose faces Nick Baisch did not see; or a man and a woman Nick Baisch did not know.

> *It is important to note that Maggie Foss has only been to Keri Halberg's house one time, March 27, 2010.*

> *Maggie has always said she was sitting on a living room couch just to the left of the front door and was pushed off the couch onto the living room floor.*

> Maggie has always said she did not go downstairs and that no one walked in on them.

> *Maggie Foss can accurately describe the main floor of Keri Halberg's house as compared to the property report and Facebook photos of the interior of Keri Halberg's main floor but cannot describe the downstairs layout at all.*

In Mr. Muir's interview with Sergeant Carlson, Mr. Muir contradicted himself by claiming the sex happened on the living room floor and downstairs.

In Mr. Muir's written statement to Detective Henderson, Mr. Muir again contradicted himself by claiming the sex happened on the living room floor.

Keri Halberg substantiated that the sex occurred on the living room floor but contradicted herself when she described hearing Mr. Muir and Maggie Foss getting ready to have sex on the couch and coming out of her room to tell them not on the couch, "take it to the floor."

Nick Baisch and Keri Halberg were living downstairs in March of 2010.

The assertion that Keri Halberg heard Mr. Muir and Maggie Foss getting ready to have sex on the living room couch from downstairs defies credible belief.

Nick Baisch contradicted both Mr. Muir and Keri Halberg when Nick Baisch testified to coming home, walking downstairs, and finding the man and woman under a blanket near his room.

Sergeant Carlson now made a critically important error.

Sergeant Carlson copied a portion of Nick Baisch's original email statement and the answers to her questions into her follow-up report for IIU2014-106 but she did not copy the original email statement verbatim.

Sergeant Carlson cut off the first two sentences of Nick Baisch's original email statement.

Sergeant Carlson's version of Nick Baisch's statement read as follows:

> *"11/14/14 – 1248 hrs. Received email from Nick Baisch. He told me the following*:
>
> *"The only thing I remember that night is when I came home and walked downstairs, there was one male and one female on the floor under a blanket. I had absolutely no idea who they were. I could not see their faces. As I walked by, they giggled. I went to bed in my room next to where I last saw them and they were gone in the morning. I hope this helps, - Nick"*
>
> *11/17/14 – 0828 hrs. I sent email to Baisch, thanking him for the information, but told him I had several more questions. I asked him the following*:
>
> *1. You mentioned the pair were giggling at the time you walked by – was there any conversation you heard between them before your presence was known? If so, what?*
>
> *2. Was there any indication to you that there might be a problem between the two at the time? Either verbally or physically?*
>
> *3. Was there physical movement beneath the covers at the time you came by to indicate there was consensual sexual intercourse between the two?*
>
> *11/17/14 – 1733 hrs. Baisch answered my questions via email with the following*:
>
> *"1. I don't remember hearing any conversation.*
>
> *2. There was no indication of any problem between the two when I saw them.*
>
> *3. I don't really remember seeing any movement under the covers."*

Sergeant Carlson included a copy of the three answers in her case documentation but did not include a copy of the original email statement.

At the time, the original email statement could only be obtained via a public record request for Sergeant Carlson's emails.

Five months later, Sergeant Sullivan reached out to Nick Baisch about the criminal investigation, 15-0077590.

Sergeant Sullivan was looking to set up an interview. She spoke to Nick Baisch by phone for approximately three minutes.

Nick Baisch did not want to give an interview. He told Sergeant Sullivan that he had already provided another investigator a written statement and he asked if he could send the "same statement" to Sergeant Sullivan.

Sergeant Sullivan agreed and Nick Baisch emailed a copy of his original email statement to Sergeant Carlson a few minutes later.

Sergeant Sullivan copied Nick Baisch's original email statement into her report verbatim and included a copy of the original email statement in the case documentation.

The statement Nick Baisch sent Sergeant Sullivan read as follows:

> **"The only thing I remember that night is when I came home and walked downstairs, there was one male and one female on the floor under a blanket. I had absolutely no idea who they were. I could not see their faces. As I walked by they giggled. I went to bed in my room next to where I last saw them and they were gone in the morning.**
>
> **Additional information:**
>
> **1. I don't remember hearing any conversation.**
> **2. There was no indication of any problem between the two when I saw them.**
> **3. I don't really remember seeing any movement under the covers.**
>
> **I hope this helps,**
>
> **-Nick Baisch"**

The problem is that Nick Baisch's original email statement to Sergeant Sullivan was not a copy his original email statements to Sergeant Carlson.

The statement to Sergeant Sullivan was a new statement.

Nick Baisch's new statement copied Sergeant Carlson in that Nick Baisch's new statement cut-off the first two sentences of his original statement.

Nick Baisch could not have anticipated five months later that Sergeant Carlson had cut-off the first two sentences of his original statement without prior knowledge.

If Nick Baisch had copied his original email statements to Sergeant Sullivan, they should have looked like this:

"*Hello,*

*My name is Nick Baisch and I received a voicemail from you on 11/13/2014. Keri Halberg gave you my name regarding a deputy you are investigating. The only thing I remember that night is when I came home and walked downstairs, there was one male and one female on the floor under a blanket. I had absolutely no idea who they were. I could not see their faces. As I walked by they giggled. I went to bed in my room next to where I last saw them and they were gone in the morning.*

*I hope this helps,*


*Hello,*

*1. I don't remember hearing any conversation.*

*2. There was no indication of any problem between the two when I saw them.*

*3. I don't really remember seeing any movement under the covers.*

*I hope this helps,*

*Nick*"


Nick Baisch did not make a public record request for IIU2014-106. On paper, he did not have a copy of it.

Keri Halberg did not make a public record request for IIU2014-106. On paper, she did not have a copy of it.

Nick Baisch does not know Mr. Muir, or so he said.

The only person in this triangle who had a copy of Sergeant Carlson's IIU report was Mr. Muir.

But Mr. Muir did not make a public record request for Sergeant Carlson's emails and did not know Sergeant Carlson did not copy Nick Baisch's email statement into the IIU report verbatim.

Mr. Muir did not know the first two sentences of Nick Baisch's original email statement had been cut-off.

Sergeant Sullivan's investigation was a criminal felony rape investigation, not a minor, unimportant internal administrative investigation.

Nick Baisch plagiarizing Sergeant Carlson's IIU report instead of providing a copy of his original email was witness tampering.

Mr. Muir must be a suspect in that witness tampering because he was the only one of the three who had a copy of Sergeant Carlson's IIU report.


Mr. Muir committed two other acts of witness tampering right in front of Sergeant Carlson and Detective Sergeant Marenco.

During his interview with Sergeant Carlson, Mr. Muir admitted to contacting Keri Halberg prior to the receipt of his notice of investigation (A-150) to make sure he was "remembering" things correctly.

Mr. Muir was very subtle when he told Sergeant Carlson about contacting Keri Halberg to ensure he was remembering events correctly. He buried it deep within the interview.

Sergeant Carlson was not a competent enough investigator to catch it.

Equally disturbing was the fact that Keri Halberg contradicted Mr. Muir when she denied she had any "recent conversations" with Mr. Muir about the 2010 incident in her interview for IIU2014-106.

But again, Sergeant Carlson's incompetence prevented her from catching this serious discrepancy between Mr. Muir and his primary witness.

> *When Kristin Anger questioned Sergeant Carlson about this discrepancy in Carlson's interview for IIU2015-083, Carlson knew that Halberg had denied having any recent conversations with Mr. Muir but she admitted that she had no idea whether Mr. Muir had contacted Halberg or not because she had not reviewed Mr. Muir's transcript prior to interviewing Halberg.*


When Mr. Muir received his public records disclosure for IIU2016-070, he immediately contacted an eyewitness to the Rena Muir incident that happened in Portland, Jason Fischer.

Mr. Muir covered his contacting Jason Fischer under the guise of asking Jason Fischer if Jason Fischer would be willing to talk to Detective Sergeant Marenco and then provided Detective Sergeant Marenco, Jason Fischer's phone number as a witness.

> *It is important to note this was how Sergeant Carlson justified Mr. Muir's contacting Keri Halberg in the IIU2014-106 investigation, when Sergeant Carlson was asked about the discrepancy between Mr. Muir saying he contacted Halberg and Halberg denying any recent conversations with Mr. Miur.*

Detective Sergeant Marenco was not an incompetent investigator. Detective Sergeant Marenco was sharp as a tack and caught the fact that Mr. Muir tampered with Jason Fischer's testimony, but Mr. Muir had squeaked through a loophole in the King County Sheriff's Office policies.

Mr. Muir had received a full disclosure for his public record request for IIU2016-070 on September 14, 2016. He quickly deduced Jason Fisher was a threat from the information contained within Maggie Foss's transcript and Mr. Muir contacted Jason Fisher on September 14, 2014, the very same day he got his hands on Maggie Foss's statement transcript.

Detective Sergeant Marenco caught the tampering and investigated but because Mr. Muir had done it before the receipt of his notice of investigation (A-150) for IIU2016-146, there was no violation of policy and there was nothing Detective Sergeant Marenco could do about it.

November 1, 2016, Detective Sergeant Marenco attempted to contact Jason Fischer and left a voicemail.

November 3, 2016, Detective Sergeant Marenco interviewed Mr. Muir.

Mr. Muir said the following at the beginning of his interview with Detective Sergeant Marenco:

> "*MARENCO: Other than a labor representative or attorney have you spoken to anyone regarding this matter since being served the A-150?*
>
> *MUIR: I let my girlfriend Brandy Drake know I had received an A-150, cannot talk about it. Um, I spoke with Sergeant Lurry...*
>
> *MARENCO: Ok.*
>
> *MUIR:...sergeant, or I'm sorry Deputy Mansanarez, another guild rep.*
> *MARENCO: Ok.*
>
> *MUIR: Um, two days ago about three o'clock in the afternoon I received a phone call from Jason Fisher. I had referred you to call him. Um, he told me he had received two phone calls from you and that he was gonna call you back.*
>
> *MARENCO: Ok.*
>
> *MUIR: And I told him I couldn't talk about the case and he needed to deal directly with you.*
>
> *MARENCO: Ok.*
>
> *MUIR: And that's all I've spoken to.*"

November 4, 2016, Detective Sergeant Marenco interviewed Jason Fischer.

What makes Jason Fischer's interview with Detective Sergeant Marenco suspect is Jason Fischer told Detective Sergeant Marenco that Jason Fisher thought it likely he "would remember" if a gun had been involved in the Portland incident.

This was the exact same phrasing Mr. Muir used a year prior in his interview for IIU2015-150 when Mr. Muir told the IIU investigator that Mr. Muir "believed" he "would remember" going back to a DV victim's house.

> *Jason Fischer using the same phrasing Mr. Muir did a year prior in Mr. Muir's interview for IIU2015-150, two days after Fischer talked to Mr. Muir about Jason Fischer's upcoming interview in IIU2016-146, looks too coincidental to be natural.*

Another fact that makes Jason Fischer's denial of a gun being involved suspicious is the fact that Jason Fisher provided Detective Sergeant Marenco the text message conversation he had with Rena Muir about the 2010 incident before Mr. Muir found out Rena Muir had told Maggie Foss.

In the text message conversation Rena Muir straight up asked Jason Fisher if he remembered the incident in the barn when Muir was armed with a gun.

Jason's Fisher's reply to Rena Muir was "Oh My God I do remember" directly contradicting his assertion to Detective Sergeant Marenco he didn't remember a gun being involved.

When Mr. Muir admitted to talking to Jason Fischer on November 1, 2016, he was once again admitting to witness tampering in plain sight.


Maggie Foss does not have to prove Mr. Muir's witness tampering was intentional.

Proving whether Mr. Muir's witness tampering was inadvertent or done with malicious intent is the job of the investigators.

All Maggie Foss must do to substantiate witness tampering is prove Mr. Muir's memory of events is not accurate:

> *When Mr. Muir says he met Maggie Foss for drinks sometime prior to March 12, 2010 after her swing shift, this is not true.*

> *Maggie Foss's CAD log and the March 16, 2010 Facebook post prove Maggie Foss was working the graveyard shift until March 16, 2020.*

> *Mr. Muir's comment on Maggie Foss's March 16, 2010 Facebook post proves Mr. Muir knew Maggie Foss was working the graveyard shift on March 16, 2010.*

> *When Mr. Muir says he had consensual sex with Maggie Foss on Friday, March 12, 2010, Maggie Foss's CAD log proves this is not true, Maggie Foss was at the Comm Center answering 911 calls.*

*When Mr. Muir says he was on a date with Maggie Foss on March 17, 2010, this is not true. Maggie Foss's phone records and Facebook messages with Marcy Smith prove Maggie Foss and Marcy Smith were out doing their own thing in their own social circle to which Mr. Muir was not included or invited.*

*When Mr. Muir says he met Maggie Foss at Swannies Underground Comedy Club on the night of the sexual intercourse, March 26, 2010, and then drove back to Keri Halberg's house, this is not true.*

*Maggie Foss's CAD log proves Maggie Foss was at the Comm Center, working the swing shift, dispatching the Metro radio.*

*When Mr. Muir says he had consensual sex with Maggie Foss on Friday March 17, 2010, St. Patrick's Day, and Keri Halberg says Mr. Muir and Maggie Foss had consensual sex on St. Paddy's Day, this is not true.*

*Maggie Foss's CAD log, phone records, credit card statements, bank statements, and Facebook messages proves the sexual intercourse occurred on Saturday, March 27, 2010 between 2:10 am and 2:58 am.*

*Mr. Muir and Keri Halberg are testifying about the wrong day. They are testifying to the day they first met Maggie Foss, March 17, 2010; not the day of the sexual assault, March 27, 2010.*

*Mr. Muir and Keri Halberg testifying to the same wrong day in the same wrong fashion is symptomatic of witness tampering.*

The only question left to ask is did Mr. Muir contact Keri Halberg before the receipt of his A-150 to intentionally change her memories or did he inadvertently change her memories when he refreshed their memories with his own faulty memory?

What makes Keri Halberg witness tampering suspicious is the fact that Keri Halberg on October 16, 2014, declined to give Sergeant Carlson a statement citing she needed to refresh her memory. Keri Halberg then denied having any recent conversations with Mr. Muir about the 2010 incident five days later, during her interview with Sergeant Carlson.

*If Mr. Muir contacted Keri Halberg to refresh their memories before the receipt of his A-150 on September 6, 2014, then why did Keri Halberg have to refresh her memory again on October 16, 2014?*

*How did Keri Halberg refresh her memory about the 2010 incident, if she did not talk to Mr. Muir about the 2010 incident subsequent to Sergeant Carlson's request for an interview on October 16, 2014?*

*It is important to note that if Mr. Muir talked to Keri Halberg about the 2010 incident after September 6, 2014, it would have been clear witness tampering.*

*Whether it was a violation of King County Sheriff's Office policies is debatable because Mr. Muir's notice of investigation (A-150) does not restrict Mr. Muir from talking about the investigation with anyone. There was no language in the A150 directing Mr. Muir not to talk about the investigation.*

Maggie Foss's husband, Jeremy Davy, immediately recognized Nick Baisch's statement had severe discrepancies and was extremely weak.

Davy also immediately recognized Mr. Muir, Keri Halberg, and Nick Baisch were all contradicting themselves on where the sex had occurred, upstairs or downstairs.

Nick Baisch needed to substantiate his written statement in person and he needed to answer questions as to how he was associating his story of a man and woman under a blanket, whose faces he did not see and whose names he did not know, to Mr. Muir and Maggie Foss.

So, Jeremy Davy hired Rain City Investigations, a private investigative company, to go out and interview Nick Baisch and his wife in person.


Nick Baisch did enormous damage to his credibility in the Rain City interview.

Nick Baisch refused to substantiate his written statement in person, and he refused to answer questions about how he was associating the man and woman under the blanket to Mr. Muir and Maggie Foss.

Nick Baisch refused to answer whether the phone number Sergeant Carlson and Sergeant Sullivan used to call him was his phone number.

Nick Baisch could not remember his simple story and could not tell it to the Rain City Investigator in person.

Nick Baisch could not remember where Keri Halberg lived, even though Nick Baisch lived on the same street, approximately nine blocks to the west.

> *Nick Baisch drove by Keri Halberg's house every day on his way to work at Valley Medical Center.*

Nick Baisch would eventually end the Rain City interview by telling the investigator he was so angry, he had told the King County Sheriff's Office what little he knew and he thought he had put all of that behind him.

This was an extremely odd statement for an independent witness to make.

Nick Baisch had no reason to be angry. He was just a guy telling a simple story with nothing to gain or lose, so why the anger and what exactly did he mean when he thought he had put all that behind him?

But the most telling part of the whole interview was the fact that Nick Baisch did not tell Keri Halberg or Mr. Muir that a private investigator had approached both him and his wife for separate interviews.

Nick Baisch not telling Mr. Muir or Keri Halberg about the private investigator substantiated Nick Baisch was not an ally of Mr. Muir or Keri Halberg.

This made Nick Baisch's involvement in the investigations all the more suspicious.

On September 6, 2014, Mr. Muir provided a witness list to Sergeant Carlson when he received his notification of investigation (A-150) for IIU2014-106.

This witness listed was supposedly created after Mr. Muir contacted Keri Halberg and refreshed their memories.

This witness list did not contain Nick Baisch's name or the fact that a roommate had walked in on Mr. Muir and Maggie Foss.

Mr. Muir would not bring Nick Baisch up until the middle of his interview with Sergeant Carlson on October 9, 2014 and even that was strange because when Mr. Muir introduced Nick Baisch into the equation, he did so by asking Sergeant Carlson, "*didn't a roommate walk in on us*" like Sergeant Carlson had some prior knowledge of the roommate walking in on Mr. Muir and Maggie Foss.

Maggie Foss's phone records, Facebook messages, CAD-log, credit cards, and bank statements which prove Mr. Muir and Keri Halberg are remembering the wrong day now makes Nick Baisch's testimony and involvement in the two investigations even more suspect.

If Nick Baisch did not see the man or woman's face, does not know who they were, and cannot provide a landmark reference for when he found the man and woman under the blanket, then how did Mr. Muir, Keri Halberg, and Nick Baisch figure out that Nick Baisch witnessed Mr. Muir and Maggie Foss under the blanket.

> *It is important to note that Rena Muir, Lindsay Johanson, Hannah McCabe, and Maggie Foss are all believed to have been to Keri Halberg's house and all four women are known to have had sexual intercourse with Mr. Muir.*

> *If Mr. Muir and Keri Halberg are remembering the wrong day, it is just as likely that Nick Baisch is remembering the wrong day and the two people under the blanket were Mr. Muir and Rena Muir, Mr. Muir and Lindsay Johanson, or Mr. Muir and Hannah McCabe.*

> *There is another plausible scenario given Nick Baisch's statement that he was so pissed off and thought he had left all that behind him, coupled with Nick Baisch's plagiarizing Sergeant Carlson's IIU report when on paper, Nick Baisch had no legitimate way of copying the IIU2014-106 report.*

> *It is equally plausible that no one walked in and Nick Baisch was illegally coerced into giving false testimony.*

Nick Baisch and Keri Halberg have some profoundly serious questions to answer, in person, eye to eye with an interrogator, without Mr. Muir having the ability to interfere.

They are not the witnesses Mr. Muir thinks them to be (***mag020***).

I swear this Memorandum of Facts is true and accurate to the best of my ability under penalty of perjury by the Laws of Washington State

(signature)_____*Jeremy C Davy*_____          (date)_Oct 19, 2020_          (location)___Kent, Washington___

**RCWS**

## RCW 9A.46.110

### Stalking.

(1) A person commits the crime of stalking if, without lawful authority and under circumstances not amounting to a felony attempt of another crime:

(a) He or she intentionally and repeatedly harasses or repeatedly follows another person; and

(b) The person being harassed or followed is placed in fear that the stalker intends to injure the person, another person, or property of the person or of another person. The feeling of fear must be one that a reasonable person in the same situation would experience under all the circumstances; and

(c) The stalker either:

(i) Intends to frighten, intimidate, or harass the person; or

(ii) Knows or reasonably should know that the person is afraid, intimidated, or harassed even if the stalker did not intend to place the person in fear or intimidate or harass the person.

(2)(a) It is not a defense to the crime of stalking under subsection (1)(c)(i) of this section that the stalker was not given actual notice that the person did not want the stalker to contact or follow the person; and

(b) It is not a defense to the crime of stalking under subsection (1)(c)(ii) of this section that the stalker did not intend to frighten, intimidate, or harass the person.

(3) It shall be a defense to the crime of stalking that the defendant is a licensed private investigator acting within the capacity of his or her license as provided by chapter 18.165 RCW.

(4) Attempts to contact or follow the person after being given actual notice that the person does not want to be contacted or followed constitutes prima facie evidence that the stalker intends to intimidate or harass the person. "Contact" includes, in addition to any other form of contact or communication, the sending of an electronic communication to the person.

(5)(a) Except as provided in (b) of this subsection, a person who stalks another person is guilty of a gross misdemeanor.

(b) A person who stalks another is guilty of a class B felony if any of the following applies: (i) The stalker has previously been convicted in this state or any other state of any crime of harassment, as defined in RCW 9A.46.060, of the same victim or members of the victim's family or household or any person specifically named in a protective order; (ii) the stalking violates any protective order protecting the person being stalked; (iii) the stalker has previously been convicted of a gross misdemeanor or felony stalking offense under this section for stalking another person; (iv) the stalker was armed with a deadly weapon, as defined in RCW 9.94A.825, while stalking the person; (v)(A) the stalker's victim is or was a law enforcement officer; judge; juror; attorney; victim advocate; legislator; community corrections' officer; an employee, contract staff person, or volunteer of a correctional agency; court employee, court clerk, or courthouse facilitator; or an employee of the child protective, child welfare, or adult protective services division within the department of social and health services; and (B) the stalker stalked the victim to retaliate against the victim for an act the victim performed during the course of official duties or to influence the victim's performance of official duties; or (vi) the stalker's victim is a current, former, or prospective witness in an adjudicative proceeding, and the stalker stalked the victim to retaliate against the victim as a result of the victim's testimony or potential testimony.

(6) As used in this section:

(a) "Correctional agency" means a person working for the department of natural resources in a correctional setting or any state, county, or municipally operated agency with the authority to direct the release of a person serving a sentence or term of confinement and

includes but is not limited to the department of corrections, the indeterminate sentence review board, and the department of social and health services.

(b) "Follows" means deliberately maintaining visual or physical proximity to a specific person over a period of time. A finding that the alleged stalker repeatedly and deliberately appears at the person's home, school, place of employment, business, or any other location to maintain visual or physical proximity to the person is sufficient to find that the alleged stalker follows the person. It is not necessary to establish that the alleged stalker follows the person while in transit from one location to another.

(c) "Harasses" means unlawful harassment as defined in RCW 10.14.020.

(d) "Protective order" means any temporary or permanent court order prohibiting or limiting violence against, harassment of, contact or communication with, or physical proximity to another person.

(e) "Repeatedly" means on two or more separate occasions.

[ 2013 c 84 § 29; 2007 c 201 § 1; 2006 c 95 § 3; 2003 c 53 § 70. Prior: 1999 c 143 § 35; 1999 c 27 § 3; 1994 c 271 § 801; 1992 c 186 § 1.]

**NOTES:**

**Findings—Intent—2006 c 95:** See note following RCW 74.04.790.

**Intent—Effective date—2003 c 53:** See notes following RCW 2.48.180.

**Intent—1999 c 27:** See note following RCW 9A.46.020.

**Purpose—Severability—1994 c 271:** See notes following RCW 9A.28.020.

**Severability—1992 c 186:** "If any provision of this act or its application to any person or circumstance is held invalid, the remainder of the act or the application of the provision to other persons or circumstances is not affected." [ 1992 c 186 § 10.]

**RCW 9A.46.020**

**Definition—Penalties.**

(1) A person is guilty of harassment if:

(a) Without lawful authority, the person knowingly threatens:

(i) To cause bodily injury immediately or in the future to the person threatened or to any other person; or

(ii) To cause physical damage to the property of a person other than the actor; or

(iii) To subject the person threatened or any other person to physical confinement or restraint; or

(iv) Maliciously to do any other act which is intended to substantially harm the person threatened or another with respect to his or her physical or mental health or safety; and

(b) The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out. "Words or conduct" includes, in addition to any other form of communication or conduct, the sending of an electronic communication.

(2)(a) Except as provided in (b) of this subsection, a person who harasses another is guilty of a gross misdemeanor.

(b) A person who harasses another is guilty of a class C felony if any of the following apply: (i) The person has previously been convicted in this or any other state of any crime of harassment, as defined in RCW 9A.46.060, of the same victim or members of the victim's family or household or any person specifically named in a no-contact or no-harassment order; (ii) the person harasses another person under subsection (1)(a)(i) of this section by threatening to kill the person threatened or any other person; (iii) the person harasses a criminal justice participant who is performing his or her official duties at the time the threat is made; or (iv) the person harasses a criminal justice participant because of an action taken or decision made by the criminal justice participant during the performance of his or her official duties. For the purposes of (b)(iii) and (iv) of this subsection, the fear from the threat must be a fear that a reasonable criminal justice participant would have under all the circumstances. Threatening words do not constitute harassment if it is apparent to the criminal justice participant that the person does not have the present and future ability to carry out the threat.

(3) Any criminal justice participant who is a target for threats or harassment prohibited under subsection (2)(b)(iii) or (iv) of this section, and any family members residing with him or her, shall be eligible for the address confidentiality program created under RCW 40.24.030.

(4) For purposes of this section, a criminal justice participant includes any (a) federal, state, or local law enforcement agency employee; (b) federal, state, or local prosecuting attorney or deputy prosecuting attorney; (c) staff member of any adult corrections institution or local adult detention facility; (d) staff member of any juvenile corrections institution or local juvenile detention facility; (e) community corrections officer, probation, or parole officer; (f) member of the indeterminate sentence review board; (g) advocate from a crime victim/witness program; or (h) defense attorney.

(5) The penalties provided in this section for harassment do not preclude the victim from seeking any other remedy otherwise available under law.

[ 2011 c 64 § 1; 2003 c 53 § 69; 1999 c 27 § 2; 1997 c 105 § 1; 1992 c 186 § 2; 1985 c 288 § 2.]

## RCW 9A.46.030

## Place where committed.

Any harassment offense committed as set forth in RCW **9A.46.020** or **9A.46.110** may be deemed to have been committed where the conduct occurred or at the place from which the threat or threats were made or at the place where the threats were received.

[ **1992 c 186 § 3; 1985 c 288 § 3.**]

## NOTES:

**Severability—1992 c 186:** See note following RCW **9A.46.110**.

## RCW 9.61.260

### Cyberstalking.

(1) A person is guilty of cyberstalking if he or she, with intent to harass, intimidate, torment, or embarrass any other person, and under circumstances not constituting telephone harassment, makes an electronic communication to such other person or a third party:

(a) Using any lewd, lascivious, indecent, or obscene words, images, or language, or suggesting the commission of any lewd or lascivious act;

(b) Anonymously or repeatedly whether or not conversation occurs; or

(c) Threatening to inflict injury on the person or property of the person called or any member of his or her family or household.

(2) Cyberstalking is a gross misdemeanor, except as provided in subsection (3) of this section.

(3) Cyberstalking is a class C felony if either of the following applies:

(a) The perpetrator has previously been convicted of the crime of harassment, as defined in RCW 9A.46.060, with the same victim or a member of the victim's family or household or any person specifically named in a no-contact order or no-harassment order in this or any other state; or

(b) The perpetrator engages in the behavior prohibited under subsection (1)(c) of this section by threatening to kill the person threatened or any other person.

(4) Any offense committed under this section may be deemed to have been committed either at the place from which the communication was made or at the place where the communication was received.

(5) For purposes of this section, "electronic communication" means the transmission of information by wire, radio, optical cable, electromagnetic, or other similar means. "Electronic communication" includes, but is not limited to, electronic mail, internet-based communications, pager service, and electronic text messaging.

[ 2004 c 94 § 1.]

## NOTES:

**Severability—2004 c 94:** "If any provision of this act or its application to any person or circumstance is held invalid, the remainder of the act or the application of the provision to other persons or circumstances is not affected." [ 2004 c 94 § 6.]

**Effective dates—2004 c 94:** "This act is necessary for the immediate preservation of the public peace, health, or safety, or support of the state government and its existing public institutions, and takes effect immediately [March 24, 2004], except for section 3 of this act, which takes effect July 1, 2004." [ 2004 c 94 § 7.]

# Det. Alspach's report

**C19046254**

On 11/20/19, I was briefed by Shoreline Police Chief Ledford and Shoreline Police Captain Konoske about a possible stalking/harassment case between Deputy Jeremy Muir and a woman he had a prior sexual relationship with, Maggie Foss. Foss is a former dispatcher who worked at the King County Sheriff's Office Communications Center. According to Chief Ledford and Captain Konoske, Foss has accused Muir of rape, harassment, and other serious crimes. Her accusations have been posted all over social media, and Muir's neighbors and co-workers have also received mysterious letters in the mail accusing Muir of being a sexual predator. Muir has requested a police report to document what is happening. I was asked to take the report. Chief Ledford turned over paperwork, photo copies, and a letter he said he received through the mail. Chief Ledford said he did not open the letter since he knew the City Manager Debby Tarry had received the same letter. The City Manager's letter was photocopied, and a Chief Ledford presented me with that copy.

**12/4/19**

Based on workload, vacation, and holiday schedules, I wasn't able to meet with Muir until 12/4/19. We met at the Shoreline Police station at 0800 hours to discuss the details of his report. I called the Communications Center to obtain a case number. Muir then relayed the following information:

In March 2010, Muir met Keri Halberg (a friend of his) and Maggie Foss at a bar in Seattle. After visiting for a while, the three went to another bar in Burien and had some drinks. After that, they went to Halberg's house in Burien. Muir said he and Foss were kissing and making out in the living room. They ended up having sex on the living room floor. Halberg's roommate, Nick Baisch, walked in on them, so Muir and Foss ended up leaving together. Muir drove Foss to her house in Seattle. While there, they had a few drinks and went to her bedroom. Foss pulled out a magnum condom and said "I guess you don't need this since you're white." She got another condom and they briefly had sex again, but stopped. They agreed it wasn't working and the chemistry wasn't there. According to Muir, the next morning they went out for coffee and Muir drove Foss back to her car at Halberg's house.

Muir said after that night, he saw Foss a few times. They met for drinks in April 2010, and saw each other at mutual parties about two or three times. The only sexual encounter between Muir and Foss was that night in March 2010.

Then, in April of 2014, Muir and Brandy Drake, also a communications specialist at the King County Sheriff's Office Communications Center, began dating. In August 2014, Foss asked to speak with Drake about Muir. Foss told Drake that after a night at a bar, Muir went back to her house and made about 8 drinks. Foss said they were flirtatious and kissing on the couch when she started to black out, or pass out. She said she awoke to Muir on top of her having sex. Drake asked Foss if she was alleging it wasn't consensual. Foss apparently replied, "Well not really." Foss said she got tired of saying no, she pushed him off and told him to leave.

Drake told Muir what Foss had said. Because of the seriousness of the allegation, Muir self-reported to his Shoreline Police supervisor, Sgt Wing Woo. Sgt Woo reported it to KCSO Internal Investigations Unit (IIU), who initiated an investigation (IIU 2014-106).



1

While investigating for the IIU, Sgt Francis Carlson contacted Foss. Foss said she didn't want to be involved and never said it was rape, but said Muir took advantage of her. She said she didn't want to get Muir in trouble. Foss refused to give a recorded statement to IIU at that time.

Muir, however, provided a recorded statement to IIU regarding the events with Foss. Keri Halberg also provided a recorded statement. Halberg said she didn't notice anyone drunk, but did believe they were buzzed. She said Muir and Foss were being flirtatious throughout the night. She saw them on the couch at her house and told them not to have sex on her couch. She gave them a blanket. Halberg said she spoke with Foss a few weeks later and Foss told her she and Muir were just going to be friends, and it was a mistake. Halberg said Foss was making fun of Muir and their sexual encounter.

The IIU investigation was completed and all allegations against Muir were deemed to be unfounded.

Foss then re-contacted the King County Sheriff's Office and wanted to file a rape case against Muir for the above events. Special Assault Unit (SAU) Sergeant Jessica Sullivan spoke with Foss to investigate the criminal allegation. The case was compiled and sent to the King County Prosecuting Attorney's Office (KCPAO) for review (15-077590).

On 8/11/15, the case was declined by KCPAO DPA Charles Sergis for three reasons: delay in reporting, contradictory eye-witness testimony, and apparent consensual sex later in the evening after the alleged rape.

Sometime in 2013, Maggie Foss married Jeremy Davy, who is also a Deputy with the King County Sheriff's Office.

In 2015, Davy made a report to KCSO IIU that Muir had gone back to a DV victim's house after responding to a call there (IIU 2015-150). The allegation was that Muir had sex with her. Sgt Pat Rafits, who was assigned to IIU, investigated the allegation. He contacted the DV victim and discovered the allegations against Muir were unfounded.

In 2016, Muir asked the King County Sheriff's Office Public Disclosure Unit for all public disclosure requests (PDR) where someone requested public information pertaining to Jeremy Muir between 8/1/14 – 9/13/16. The response from the Public Disclosure Unit showed that Jeremy Davy and/or Maggie Foss had made over 150 PDR's involving Jeremy Muir.

In 2016, Foss filed a report with KCSO IIU making several allegations (IIU 2016-146). First, Foss said she contacted Muir's ex-wife, Rena Muir, and according to Foss, Rena Muir was the victim of a crime. Foss' allegation was investigated and non-sustained. Second, Foss said she contacted Muir's other ex-wife, Lindsay Johanson, and according to Foss, Johanson was verbally abused. That allegation was also investigated and non-sustained. Third, Foss said she contacted a woman named Amanda Sasnett, who was arrested by Muir in 2013. According to Foss, Muir falsified the police report in that case. That allegation was investigated and non-sustained. Lastly, Foss said she contacted Katherine Oehlsen, a victim who worked at a barista stand in Shoreline. Foss accused Muir of unlawful use of authority. The allegation was investigated and sustained for Muir initiating a traffic stop to talk to Oehlsen when he had no valid reason or law violation.

In 2018, Maggie Foss resigned from the King County Sheriff's Office.

NON-DISCLOSURE

2

On September 23, 2019, Muir received an unsolicited text message from a friend that contained a link to Foss' Twitter page. Her page contained pictures of Muir and accusations against him. The pictures contained a caption, "This is the rapist cop Jeremy Muir." Muir saw several tweets from Foss where she referenced the non-sustained IIU investigations. The posts were dated 9/22/19.

Muir immediately notified his supervisor, Sgt Heather Volpe about the post. On 10/4/19, Muir also notified Shoreline Police Chief Ledford about the post.

On 10/20/19, Muir was at his home in Monroe when he was notified by a friend about more social media posts by Foss. This time, it was on her Facebook page. The Facebook post contained the same pictures, plus one additional picture, as well as a lengthy explanation of her allegations of rape, misconduct, abuse, racism, stalking, and other claims against Jeremy Muir. She also stated the King County Sheriff's Office had covered up the crimes and referred to KCSO as the "good ol' boys' club." At the end of the post she wrote, "Feel free to share this if you'd like. Knowledge is power."

I checked Foss' Facebook page and the post is still there as of today, 12/4/19. According to Facebook, the post has been shared 2.9K times.

Muir again notified his supervisor, Sgt Volpe of the Facebook post. On 10/22/19, Muir left copies of the Facebook post with Chief Ledford.

On 10/27/19, Muir was at his home in Monroe when he received a visit from his neighbor, Tamara Haberlack, and her husband. They asked Muir if everything was okay. Muir responded that everything was fine and asked why they were inquiring. They handed him a blue envelope addressed to Tamara Haberlack. The return address was listed as J. Muir with Muir's home address. Inside the envelope was a thank you card. Inside the card was a handwritten message stating, "JEREMY MUIR IS A SEXUAL PREDATOR." Muir learned from other neighbors that at least 3 other neighbors received letters. Muir kept the envelope and called Monroe PD. He provided a statement to Monroe PD and gave the card to Monroe PD for evidence. The incident was documented under their case number 19-21441.

On 11/6/19, Muir met with Shoreline Captain Tony Garza. Captain Garza was concerned about Muir's safety after learning about the Facebook posts and the cards being mailed to his neighbors. Captain Garza was concerned that a citizen could retaliate against Muir after viewing the Facebook post.

On 11/7/19, Muir learned that Chief Ledford and Shoreline City Manager Debby Tarry received the same letters as Muir's neighbors.

On 11/7/19, Chief Ledford and others in the Shoreline Police Dept received an email from a concerned Shoreline citizen, Corinna Sullivan. Sullivan wrote: "It has been widely spread that one of your male Deputies has been accused of rape, sexual assault, abuse, racism and bigotry, harassment, and stalking." Sullivan went on to state how deeply concerned she was for her own safety and the safety of her children because of these allegations.

On 11/8/19, Kanwal Yousuf apparently posted Maggie Foss' post about Muir onto her Instagram account. Yousuf is a City of Shoreline employee who worked at the Shoreline Teen Recreation Center with Muir. She had previously complained about Muir to Sgt Volpe on 12/6/18 (IIU 2018-17645). At the time of that complaint, Sgt Volpe took a recorded interview with Yousuf and discovered there were no valid complaints and no policy violations to report. In Yousuf's recent Instagram post, she apparently

NON-DISCLOSURE   3

stated she was contacted by Maggie Foss and Yousuf proceeded to make additional allegations against Muir.

On 11/9/19, Muir learned that Maggie Foss' derogatory Facebook post was shared on a private Facebook page entitled "Shoreline Living." The post was allegedly shared by Foss. Shoreline Living is a private Facebook group for Shoreline residents. According to Facebook, Shoreline Living has about 5.2K members.

On 11/12/19, as a result of the social media posts and widespread viewing, Muir began riding with another KCSO Deputy for his own safety and to prevent any acts of retaliation against him.

On 12/2/19, Muir learned that Maggie Foss' derogatory Facebook post was also shared on "Take back Burien," a public Facebook group. I checked the public "Take back Burien" page, and saw that Maggie Foss posted:

> "FYI, since I posted this on my page, numerous people have posted their own complaints on him or have sent me private messages about how he has abused them... I've heard he sometimes works OT in Burien... Protected Predator! Please be aware!"

The post contained the pictures of Muir and her same lengthy diatribe against Muir.

Muir has not had any contact with Foss or Davy since 2014. He is extremely frustrated with the recent events and has decided to file a police report of stalking and/or harassment. I went over the above sequence of events with Muir. He read through it to confirm the accuracy and I gave him a copy.

I pulled screenshots of Foss' Facebook posts as well as comments from community members. I also pulled screenshots of Foss' tweets currently posted on her Twitter account. She linked her Facebook post about Muir to her Twitter account. These posts were public, meaning they were viewable to anyone with a Facebook account. I regularly use Facebook for my investigations, so I used that account to look up her posts. I was not "friends" with Foss' Facebook or Twitter account.

**12/17/19**

I entered the basic victim and alleged suspect information into Mark43. Muir had previously told me Foss was about 40 years old, lives in Kent, and was tall. Using those descriptors, I located Magdalena K. Foss (DOB: 1/11/1981). I used Muir's home address as the incident location. As I read the RCW for cyberstalking and harassment, I saw that both crimes are deemed committed where the conduct occurred or the place from which the threat/communication was received. Muir mentioned to me that he learned about the Facebook and Twitter posts (from friends) while he was at his home in Monroe. I believed Monroe PD would be the proper agency to investigate this case.

Deputy Gaffin contacted me this afternoon and told me about an incident that happened at the King County Jail this morning. Around 0730 hours, Deputy Gaffin went into the Jail to transport a prisoner to Shoreline Court. As Deputy Gaffin placed the prisoner in handcuffs, Deputy Gaffin overheard an inmate talking in the holding area. The inmate noticed Deputy Gaffin was from the City of Shoreline, and the inmate said a girl named Amanda spoke to a woman who offered her $100 to meet at a Starbucks to talk about Shoreline Deputy Muir. Deputy Gaffin attempted to see who made those statements, but when he walked into the holding area everyone was silent. Deputy Gaffin suspected the inmate's comments



NON-DISCLOSURE 4

could have involved the Facebook posts made by Foss. Deputy Gaffin told Muir what he heard, and Muir asked Gaffin to talk to me.

**1/7/20**

I checked on Foss' Twitter page for anything new. Nothing new and it doesn't appear anything has been removed. The posts about Muir on 9/22/19 are still visible. I checked on Foss' Facebook page for anything new. Nothing new and it doesn't appear anything has been removed. The post about Muir from 10/20/19 is still visible.

I attempted to locate the Instagram (IG) post made by Kanwal Yousuf about Muir. I was able to locate Yousuf's IG account by first looking at Maggie Foss' Instagram account. Maggie Foss follows Kanwal, who uses the Instagram handle "higher.living.lotus." I was unable to locate the IG post about Muir on Kanwal's account. I contacted Muir about it. He said a friend had sent him a screenshot of the post. Muir agreed to print out a copy of the IG post from Kanwal's IG account.

I copied all the posts I had to a thumb drive. As I gathered all the paperwork/documents in this case, I noticed a corner of the envelope addressed to Chief Ledford was ripped. I must have inadvertently ripped the envelope while it was being stored at my desk. I drew a line around the tear and initialed next to it. I notified Chief Ledford and Captain Konoske about the tear in the envelope.

**1/16/20**

I received a call from Detective Paul Henderson with Monroe Police Department. He asked for additional information and requested a copy of the information I had gathered. We scheduled a time to meet and hand off the paperwork and thumb drive.

 NON-DISCLOSURE

**Documents provided by Det. Alspach**

1-9-19   1700

2010 DIVORCE MAGGIE
          MAGNUSON        42      COUPLE DATES
TONE
2014   2014 DIFF COMM CENTER - DIDNT GET PLUG
          UNOFFICIAL SEX - SGT SELF REPORT  CLEANS
          SPU - ANOTHER 3 POMPEO DECLINE
          CURRENT DEPTY HUSBAND GUNSTON
          2014-2017 HUNDREDS OF PDR'S. IA COMPLAINTS
              CONTACTED ARESTEES
              4 TO 3RD - DEPT REFUSES TO OPEN
       * LIGHTS BEHIND BACKUP
          CHRONIC HARASSMENT COMPLAINT — 0
2018  EVOC = WSB BF.
          SEPT 23 2019  TWITTER POST ROBE MAGGIE FOSS - HER TWITTER
       SE SETTLEMENT AGREEMENT #.
       10-27-19  LETTERS (3)  NONTO JBAND PUNNA.   THOMAS & PUNNA
       11-7-19  CHEF SHORELINE & CITY ADMIN  GOT LETTERS W/ HIS RETURN ADDR
       (MOVED TO MONROE 2014)
       11-8-19  KONYA YOSEPH TEFIN ENVEG CENTER — SHE COMPLAINED DOING
       RADIO BY HER HOME. MENTOR ROLE. UPSET SOMEONE DIDNT GET DEPT
       W/ HER DURING PLAIN CLOTHES SECURITY. MAGGIE FOSS CONTACTED KONYA.
       POSTED MAGGIES POST FACEBOOK
       11-13-19 ?  MAGGIE POSTED SHORELINE GROUP 5500 PEOPLE SEXUAL
       PREDATOR.
       11-13-19  EMAIL PDR GT3, KIRO, KOMA
       10-22-19  REPORTER JOEL MONICO

11-13-19   DEP BPTS ANGRY CITIZEN EMAIL

CAPT PSKED SCHEDULE TEEN REC CENTER

11-16-19  MAGGIE TO TESTIFY CITY COUNCIL

11-19-19  MARK KONOSKI CAPT & CHIEF

16-21 YEO KIDS. NO GO              LEFT 2

OPTED TO NOT CALL THEM ON DUTY OVERTIME 16-20 PM MO $800

CHIEF - ADMIN SHORELINE LIVING. CONTRASTED TO KICKED OUT MAGGIE

MALICIOUS IN NATURE.

11-20  1400  SHARES

12-1-19  SENT TO BURIEN POLICE, SOMETIMES BURIEN          2017

TWITTER    9-23-19                              DEC JPN

RING @ URSE DECLINE

FACEBOOK  10-20-19

INSTAGRAM  KONOSKI  OCT 20-19

12-17-19?  PRISONER TRANSPORTS C/ PARTNER. HOLDING CELL.

MY FRIEND AMANDA  RECORD 873 $100 TO TOUR TO REC MAN - STANDARDS

EMAIL.   SPSNETT.  DOR PROTEST.  MAGGIE COVERED  30'S

CIVIL LAWP ALSPPOD.

KEPT CHIEF INFORMED.

6 CLKS ROPE C/ PARTNER TILL END OF 2019.

KCSO WONT MAKE A STATEMENT.

RCU BURIEN, SHORELINE (NOT SINCE 202)


MAGGIE WSB    JEREMY DRVY            LEFT IN 2018 COM CENTER

**Ledford, Shawn**

| | |
|---|---|
| **From:** | Heidi Costello <hcostello@shorelinewa.gov> |
| **Sent:** | Tuesday, January 21, 2020 8:29 AM |
| **To:** | Tarry, Debbie; Norris, John; Ledford, Shawn |
| **Cc:** | McCloskey, Pollie-Shoreline |
| **Subject:** | Shoreline Living Posts by Maggie Foss re: Officer Muir |
| **Attachments:** | Maggie Foss 1.docx; Maggie Foss 2.docx |

[EXTERNAL Email Notice! ] External communication is important to us. Be cautious of phishing attempts. Do not click or open suspicious links or attachments.

Attached

Heidi C.

**Maggie Foss**
13 hrs
It's been three months to the day since I shared my post about the corrupt King County Sheriff's Office's complete botched and biased handling of my rape by KCSO Officer Jeremy Muir, which HE reported, (not me). To those of you who've shared my post from October 20, 2019 or have even read it, THANK YOU! It has been shared over 3,000 times! I am extremely grateful for the awareness it has and is creating.

It has since been brought to my attention that the King County Sheriff's Office has once again spread false information about this, informing the public that Muir has been investigated. A concerned citizen contacted KCSO regarding their "investigation" (i.e., cover up) and this is what KCSO responded about me to her:

"As previously stated, her allegations have been investigated both by an internal investigations team, as well as an independent outside investigator, determine (sic) the allegation was unfounded. so yes, he was investigated."

This above statement was likely written by the KCSO Public Information Officer, Ryan Abbott, whom I can pretty much guarantee has not read all of the cases but was told how to respond and he did, like a well-paid, talking puppet. First of all, there was no internal investigations team who investigated my rape—there was only Frances Carlson, a former sergeant and friend of the rapist Jeremy Muir. She failed to interview any of my witnesses nor gather any of my evidence because she had an agenda to clear her boy Jeremy Muir.

She interviewed three of his witnesses. The first one, Keri Halberg, is Muir's former roommate/landlord and close friend. Keri lied to Carlson saying she saw Muir making out with me. Carlson asked Keri Halberg if she had discussed this rape case with Muir and she flat out said "no." However, when Carlson officially interviewed Muir, (I say officially because she had at least five undocumented, off the record, private phone conversations with him during her "investigation"), Muir rambled on and on about how he and Keri talked about the "consensual sex" with me and my rape allegation. Carlson could have and should have cross referenced this with Halberg and caught her in a lie. But she didn't. If Carlson had done her due diligence and requested my phone records, it would have been proven to her that I was non-stop drunk-texting an ex immediately before the rape. But she didn't because she was too biased to look for anything but exculpatory evidence for Muir.

The next witness Carlson interviewed is a man supposedly named Nick Baisch. I say "supposedly" because he was never identified by Carlson or the KCSO. Instead he was interviewed via email. Yes, an alleged witness of a rape committed by a police officer was interviewed via EMAIL! I couldn't even make this up. This is even too stupid and ridiculous for a Reno 911 skit! Here was the email response from supposedly Nick Baisch:
"Hello, My name is Nick Baisch and I received a voicemail from you on 11/13/2014. Keri Halberg gave you my name regarding a deputy you are investigating. The only thing I remember that night is when I came home and walked downstairs, there was one male and one female on the floor under a blanket. I had absolutely no idea who they were. I could not see their faces. As I

walked by, they giggled. I went to bed in my room next to where I last saw them and they were gone in the morning. I hope this helps. – Nick"

Carlson should have immediately known the above statement was not written by a civilian because civilians don't talk or write like that. The above statement's diction and syntax is that of a police officer, likely Jeremy Muir's writing. A civilian would never use the terms, "one male and one female." A civilian would instead say something like, "a guy and a girl." Also, a civilian would never say "I went to bed in my room next to where I last saw them." Where else would his bed be—on the outdoor patio? Of course his bed would be in his room so it's pointless to even add that. Carlson sent this so-called Baisch a follow up email asking for his date of birth and full middle name. Baisch, (or whoever was impersonating Basich), never responded. He didn't need to because Carlson is incompetent and failed to verify anything. And how did Baisch even get her email address? Baisch use to live in Halberg's house as well. Carlson should have asked him whether he knew Muir and what his relationship with Muir was.

The third witness of Muir's who was interviewed was his then-girlfriend, someone I once considered a friend, whom I briefly told what happened in a 15-minute break to try to protect her from this damaged narcissist. Muir told Carlson she should be interviewed so she was. None of my witnesses were interviewed by Carlson or by any "internal investigations team." In fact, a member of the internal investigations team wrote an email saying they admitted they failed to supervise Carlson during Carlon's botched "investigation." Why does an IIU (Internal Investigations Unit) detective sergeant have to supervise another IIU detective sergeant? They knew Carlson was a complete idiot and yet they allowed her to have carte blanche to do whatever damage she wanted to do to protect her boy, rapist Shoreline cop Muir.

The one who should've been supervising Carlson was Captain Jesse Anderson, then commander of IIU. Anderson accepted Carlson's report without thoroughly reviewing it. My husband and I filed a complaint against Carlson for her complete and utter negligence and mishandling of the case. The "independent investigator" was Attorney Kristin Anger with Summit Law. She was hired by KCSO to mitigate the damages caused by Carlson. Anger did not investigate the rape; she investigated my husband's and my complaint of the botched investigation of the rape. And even though the county paid her as their lawyer, Anger found fault in Carlson's "investigation." She stated Carlson could have and should have interviewed witnesses in-person including Nick Basich and me—Carlson refused to interview me in person, (she only took my statement via phone), and she lied about recording me—she didn't record me and watered down what I told her. Anger also opined Carlson should have "paid more attention to detail." Anger did not find our complaint unfounded. She opined that Carlson should have been more thorough and detailed. However, Anger, at the time, did not know of Carlson's off the record, private phone conversations with Muir on her personal cell phone during her "investigation" and prior to Muir's official interview. Anger was also not privy to a substantial amount of other evidence of the rape accusation because again, she did not investigate the rape.

Anderson, who accepted the original botched and biased report by Carlson arbitrarily deemed our complaint against Carlson's incompetence and negligence as unfounded. This was after he refused to look me in the eye when I met with him and Anger to be interviewed. This was also after Anderson told my husband, "Maggie can't let Muir get away with this!"

I didn't let Muir get away with anything. Jesse Anderson did. But instead of taking any responsibility, like the weak man he is, he projected blame onto Muir's commander, Shoreline Chief of Police Shawn Ledford. He stated to Anger that Ledford is the one who reviewed the case and could have ordered further investigation. Anderson also sent me an email informing me nothing could be done with our complaint because investigating Muir again "would be Double Jeopardy" and the police guild would vehemently fight a second investigation since Muir was already cleared previously. Jesse Anderson should not have even been a part of the investigation against Carlson because it was a conflict of interest since he accepted the original report. What would he have done—find himself at fault for accepting the original botched report?

I made an official complaint against Anderson for also being incompetent in not reviewing the report he accepted. Wait, I attempted to make a complaint against Anderson because Anderson never even took my complaint; instead he arbitrarily deemed my complaint against him unfounded, even though I was never interviewed or questioned about what my complaint against Anderson was. KCSO could not and still cannot admit to any kind of fault.

Kristin Anger also did not know that another IIU detective sergeant told Carlson to contact a specific member of the department who had damning evidence against Muir. Reportedly Muir was terrorizing sex workers and setting up his own "undercover prostitution stings" by meeting sex workers in Shoreline hotels off the record. Apparently Muir would put himself on these "stings" by himself, without any backup or without even advising Dispatch of his whereabouts or what he was doing. He would then trespass these sex workers not just from the hotels where he met them, but from ALL hotels in Shoreline, which is completely illegal. What else Muir was doing to these sex workers? We may never know because sex workers tend to know not to trust police. I was one of them—a KCSO employee, a college educated, white, blond woman with no criminal history who worked for them as a dispatcher and I saw how they treated me. How do you think they would treat a drug addicted sex worker? Voiceless victims!

Shoreline undercover cops reportedly learned of Muir's misconduct with sex workers and voiced their concerns. It was all covered up. Kristin Anger never learned of this and Jesse Anderson failed to have this former IIU detective sergeant interviewed. Instead, he summarized "she doesn't remember." How convenient for him. Except she did remember.

Anderson also hid evidence. My husband submitted a thumb drive, which had approximately 1,500 pages of documentation to support our allegation against Carlson's malfeasance. None of these documents were released in our complaint, IIU2015-083. Instead, Anderson, in retaliation, opened an investigation against both my husband and me to determine whether we used county resources for personal use. I was given a sustained complaint because I admitted to printing out my work history for the night Muir reported he had what he deemed "consensual sex" with me, Friday, March 12, 2010. He reported he drove me home on Saturday morning, March 13, 2010. I worked the graveyard shift that night—started at approximately 2255 (10:55pm) and drove myself home from the Communications Center shortly after 0700 (7am). I told KCSO if their IIU "investigator" had done her f***ing job, I wouldn't have had to print out the Computer Aided Dispatch (CAD) history.

I was told it was understandable that Muir had the wrong day as the case had been four years old at that point. Well, Muir reported used receipts and checked his bank statements to verify his so-called timeline. The benefits of being a police officer—they're protected! And again, KCSO could not admit to fault so they had to defend it.

When my husband publicly requested his thumb drive back, since once again, his evidence was not included in the report, he saw that thumb drive was used on an iMac computer on Monday, 5/25/15, from approximately 1800-2030, three days before Carlson's official interview with Kristin Anger, the outside investigator hired by the county. IIU doesn't work after 1600 (4pm). Who used this thumb drive three days before Carlson's interview after hours? The thumb drive had been given to another IIU investigator, Mike Mullinax, (a close, personal friend of Carlson) on 5/21/15, to investigate us, my husband and me. My husband later submitted a public disclosure request for the iMac computer that was used. KCSO Records responded KCSO doesn't issue or use Apple products. Hmm… that wasn't his question. So KCSO couldn't answer who the owner of the iMac is or who illegally used his thumb drive on an Apple product. What's interesting is that eight days after my husband submitted this public disclosure request, IIU Detective Sergeant Mike Mullinax turned in his retirement papers and gave a one-day notice to separate from the county. Why would the Golden Boy of IIU do this? Especially when he reportedly had a sick wife who needed his health benefits? My theory is Mullinax allowed Carlson to borrow that thumb drive so she could inappropriately look at the evidence against her to better prepare herself in Anger's interview with her. So much for integrity! Who investigates corrupt internal affairs officers?!

After Anderson deemed our complaint against Carlson unfounded, Carlson was kicked out of IIU and moved to an administrative sergeant position in Sammamish, where she was in command of nobody. This is no coincidence. KCSO knew she was a moron and acted accordingly but they still could not admit fault. Carlson had told coworkers she planned to stay in IIU and retire from IIU. Another IIU investigator even went to bat for her saying Carlson did not want to leave IIU. Carlson was nevertheless removed from IIU. Because she screwed up epically and was too much of a liability to remain in IIU.

I submitted a formal complaint with the King County Ombudsman's Office detailing all of my grievances on 10/29/17. The KCSO Ombudsman stalled as much as they could. They waited until 4/6/2018 to submit my complain to then-IIU Captain Chinnick. Captain Chinnick is a smart man; he knew not to communicate via email because he knew I'd eventually submit a public request for those emails. Shortly after Chinnick started his investigation, Carlson suddenly "retired" just like Mullinax "retired."

Good riddance to both corrupt, immoral, unscrupulous cops, or shall I say FORMER COPS! But again, KCSO cannot and will not admit to any of this because then every case either of these two "officers of the law" were involved in could be reopened. It would be a PR nightmare. Quite frankly, any "investigation" either Mullinax or Carlson was ever involved in should be re-opened and reinvestigated. But that cannot happen due to Double Jeopardy!

Captain Jesse Anderson, who admitted to Kristin Anger that he knew about issues with particular

IIU investigators but didn't want to micro-manage because he learned in college that micro-managing was detrimental, has been moved out of IIU. He reportedly now is the captain of managing contract cities. He now commands a staff of paper clips and staplers. Careful, Mr. Anderson, the paper shredder can be extremely dangerous! I hope you wear your Kevlar vest in dealing with that! But if it really triggers you, there's EAP, (Employee Assistance Program)! Speaking of EAP, when I was still working as a police dispatcher, my captain, one of the most highly intelligent people working with KCSO, who actually has integrity and a legit moral compass, suggested to me I see a counselor to help me deal with the fall-out. I contacted the number on the pamphlet and agreed to meet with a woman whose husband is a retired Auburn police officer. After conversing with her several times, I brought the botched report, IIU2014-106 and asked her to have her husband look at it and get his opinion. I assured I would sign anything to allow her husband to read it. She told me she would White-Out my name. A day later she called me saying I would not believe this—her husband had actually been in the same police academy as Frances Carlson in 1981 and said she was "dumb as a box of rocks" and only passed the academy because he and others had helped her! Coincidence? No. I don't believe in coincidences. Synchronicity.

What happened to my Ombudsman complaint? It was cancelled because I had suffered enough retaliation and hired a lawyer to fight a hostile work environment claim. KC Ombudsman office happily told me my complaint was canceled because even though my lawsuit had nothing to do with the claim, it all stemmed from the same complaint and KC Ombudsman could not go against the county.

I quit KCSO. They don't deserve me.

So why am I writing this? To set the record straight. Am I over this? No. I will never be over this. I was raped by a KCSO officer who has reportedly abused his power galore and has since allegedly victimized many with impunity. After my last post, numerous people reached out to me detailing their own stories of Muir's abuse. I shared their stories but not their names. Has KSCO reached out to me asking to identify these potential victims? No. Of course not. Because this doesn't fit KCSO's agenda. If it was information on a murder, you can be assured they would have knocked on my door demanding answers. But it's expensive to replace a cop, especially a cop who writes a plethora of tickets and generates a lucrative income for the city of Shoreline. As I've said before, Muir is a PROTECTED PREDATOR! Please film him if you ever have the misfortune to encounter him. For your protection.

(And I made this post public, so share if you care.)

Comments:

- **Maggie Foss**

  Hide or report this



- Like
- · 13h



•

**Stephanie J. Deckard Henry**  I read it all and believe you. With your permission, I may forward to our local representatives to see if they can do anything about any of this. How else can we support you?

2

Hide or report this

- Like
- · 13h

○

**Maggie Foss** Stephanie J. Deckard Henry of course.

2                                    .

Hide or report this

▪ Like
▪ · 13h

○

**Melinda O'Malley** Stephanie J. Deckard Henry who will you contact? I had planned to try and do something when Maggie first posted about this rapist. Unfortunately I've been caught up in quite a few issues in my personal life. Let me know who you will contact and I will also contact them.

1

Hide or report this

- Like
- · 12h



○

**Cheryl Lee Gunwall-Davis**  Why not take it to the media

2

Hide or report this

- Like
- · 12h



○

**Maggie Foss** Cheryl Lee Gunwall-Davis I've tried. The media believes what the police tell them. Kind of like how children believe how their parents tell them Santa is real.

Hide or report this

- Like
- · 12h



○

**Cheryl Lee Gunwall-Davis**  Maggie Foss that is not true. Plenty of news investigations where the media does not believe the police. Consider discussing with an attorney then.

Hide or report this

- Like
- · 12h



○

**Maggie Foss** Cheryl Lee Gunwall-Davis maybe I haven't tried enough then. But every time I try, it takes a lot from me... and I'm only so strong. I can only be disappointed so many times before I quit. And I've pretty much given up.

1

Hide or report this

- Like

- · 11h



- **Cheryl Lee Gunwall-Davis**  Maggie Foss

  I am sorry..

  Hide or report this

  - Like
  - · 11h



- **Vanessa Anne Grenier** I believe you and hope this all comes to an end as soon as possible. ♡ ♡

  2

  Hide or report this

  - Like
  - · 13h



- **Kealani Lynn Simpson** I believe you. I also made it a point to go into the teen center and voice my concerns over Muir having contact with the teens there, (my son), and they said he wasn't allowed to be there. Idk what that means, but they knew exactly who Muir is...

  6

  Hide or report this

  - Like
  - · 12h



- **Maggie Foss** Kealani Lynn Simpson OMG, that IS progress! If nothing else happens, at least he cannot victimize underage kids at the teen center! I'm ecstatic to hear this!! Thank you SO much! 🙏

  1

Hide or report this

- Like
- · 12h

○

**Kealani Lynn Simpson** Maggie Foss, no, thank you for speaking up!!

1

Hide or report this

- Like
- · 12h

●



**Corinna Sullivan** I spoke at length with sheriff Ledford about Muir and he assured me that he and the city manager Debbie Terry would be hosting a meeting that I could attend. I never heard back about it (but I also didn't follow up, so...)

2

Hide or report this

○ Like
○ · 12h

○

**Stephanie J. Deckard Henry** Corinna, if you follow up (and I hope you do), please let us know what they say.

1

Hide or report this

- Like
- · 11h

○

**Corinna Sullivan** Stephanie J. Deckard Henry I plan to and I will.

1

Hide or report this

- Like
- · 11h



o

**Stephanie J. Deckard Henry**  Corinna, thank you!

Hide or report this

- Like
- · 11h



•

**Karie P. Schneider** ⭐ You are really setting yourself up to lose credibility in the eyes of a jury. Talk to your LAWYER instead of posting on Facebook.

9

Hide or report this

o Like
o · 12h

•

**Tiffany Doody Blood** ✅ This post is being reported. Admins are keeping an eye on everything here and Admins will be turning off commenting for the time being.

8

Hide or report this

o Like
o · 10h

After comments were turned off by Shoreline Living administrators, she posted this:

**Maggie Foss**
10 hrs
Good luck trying to silence me... or trying to stop me! I will forever protect those who have no voices.
**Comments**



- **Maggie Foss** Nobody will silence me... admins can try, but I will forever speak the truth.

1

Hide or report this

- ○ Like
- ○ · 10h



- **Tiffany Doody Blood** ✅ I don't know why I'm even taking the time to address this post. Here is photographic evidence of you liking my post. 🦸 ♂️

Admins are in agreement that your diatribe doesn't necessarily belong there, but as a courtesy we've left it up and turned off commenting rather than deleting.

This is a serious legal matter and you're doing yourself a disservice by posting publicly. There are obviously members that support what you're saying so I'd suggest you make a group message and discuss it there.

Hide or report this



- ○ Like
- ○ · 10h

A moderator turned off

**Muir, Jeremy A**

| | |
|---|---|
| **From:** | Petty, Kimberly |
| **Sent:** | Tuesday, November 12, 2019 1:25 PM |
| **To:** | Muir, Jeremy A |
| **Cc:** | Petty, Kimberly |
| **Subject:** | PRA Request P041043 (KOMO News) |
| **Attachments:** | Full Release _ 11-15-2019.zip |
| | |
| **Importance:** | High |

Good afternoon, Deputy Muir!

The KCSO Public Disclosure Unit has received the following request from KOMO News:

> I am requesting the disciplinary records of Deputy Jeremy A. Muir, DOB 1/10/80, who currently works as a police officer in Shoreline. I am requesting the publicly available complaints on file throughout Jeremy Muir's employment, which would include any complaints that were not sustained, as well as any complaints that were sustained. I am also requesting any commendations Jeremy Muir received during his employment with the King Co. Sheriff's Office and/or Shoreline Police Dept.
> I am a reporter at KOMO-TV and can be reached at 206-795-9952

We have worked with KOMO to narrow the scope of their request to IAPro summaries only, however, I expect they may request full files for those events they're interested in at some point. We have prepared the attached summaries for release to KOMO on Friday morning, November 15, 2019.

*This notice is for your information only, as a courtesy, and requires no response from you.*

Let me know if you have questions.

Thank you!


Kimberly Petty | Public Disclosure Program Manager | Sheriff's Administration – Legal Unit



☎ 206.263.2630 | www.kingcounty.gov/sheriff

To make a request for records, please visit the King County Sheriff's Office website at:
http://www.kingcounty.gov/safety/sheriff/Services/PublicDisclosure/Online%20Requests.aspx


Kimberly Petty | Public Disclosure Program Manager | Sheriff's Administration – Legal Unit



☎ 206.263.2630 | www.kingcounty.gov/sheriff

To make a request for records, please visit the King County Sheriff's Office website at:
http://www.kingcounty.gov/safety/sheriff/Services/PublicDisclosure/Online%20Requests.aspx

and os how courageous you are!!! Please stay safe 

3d    Like



**Joseph Aulaumea-Fisaga**
Amazingly BRAVE Maggie,  I salute you my old friend. For that Muir dude hope he never walks the mainline...he'll diffently come up missing!!

3d    Like    



**Amy Lemafa**
LOVE YOU Mags! 

3d    Like    

"LIKED" BY
MAGGIE
FOSS



**Jesse Ballentine**
I'll share your story

3d    Like    



**Carmen Gonzalez**
I'm so sorry this happened to you Maggie but I sincerely thank you for posting it. We need to be aware.

3d    Like    



and os how courageous you are!!! Please stay safe 💕 💕 👍

3d    Like                                            👍❤️ 5

**Joseph Aulaumea-Fisaga**
Amazingly BRAVE Maggie,  I salute you my old friend. For that Muir dude hope he never walks the mainline...he'll diffently come up missing!!

3d    Like                                            👍 3

 3

    Bonnie Sagiao

    Arne Foss

    Maggie Foss

## Ledford, Shawn

**From:** Corinna Sullivan <corinnaasullivan@gmail.com>
**Sent:** Thursday, November 07, 2019 9:47 PM
**To:** Ledford, Shawn; Corona, Dahlia; Kieland, Paula
**Subject:** Community Concerns about officer

[EXTERNAL Email Notice! ] External communication is important to us. Be cautious of phishing attempts. Do not click or open suspicious links or attachments.

Hi all,

Forgive the multiple recipients, I am not sure where this e-mail is best addressed. I am a mom of three and I live in Ridgecrest. I've had a lot of great interactions with police officers, but I am concerned about news I heard recently.

It has been widely spread that one of your male Deputies has been accused of rape, sexual assault, abuse, racism and bigotry, harassment, stalking.  He has allegedly threatened to plant a gun on someone if he shot them, so it would seem like the shots are warranted. He has allegedly stopped citizens without reason and joked about it. He has allegedly injured a driver during a traffic stop. There are many additional complaints, and since the story was first shared, others have come forward and said that they have also had dangerous encounters with this Deputy although they are not willing to press charges. It has also been said that very little administrative action has come from this.

I wanted to let you know that this deeply concerns me. As a citizen (and someone who is home all day and has reported and stopped crimes before), I do not trust calling the Shoreline PD at the risk that this Deputy might be the one to respond to my call. I am concerned that if I was home alone with my kids and needed emergency assistance, or if I was pulled over by this man, I would be at risk. My children might be at risk. My children have always deeply loved high fiving and getting stickers from officers, but I don't want them to come across this man. How can I keep my children safe from him at public events? I am also less inclined to report any suspicious activity, in case this officer hurts someone or plants a gun on them.

I am curious how I can keep myself safe from this man? What advice do you have for vulnerable people who feel that there is an officer in our city who is predatory?

Best,
Corinna Sullivan
206-295-7962



JEREMY MUIR
IS A SEXUAL PREDATOR



J. MUIR
15591 168TH S.E
MONROE WA
98272

TAMARA HABERLACK
15557 168TH AVE S.E.
MONROE WA
98272 - 2887



american greetings

**Letter booked in evidence**







720-0120 <sup>03</sup>
3/4/20

STAMP removed
From envelope

( item 3 )




JEREMY MUIR
IS A SEXUAL PREDATOR

**Internal Investigation provided by Victim**

### Detailed History for Police Event #K15077590 As of 6/02/2015 09:17:08

Output for: 91614

**Priority:**3 **Type:**RAPE - Rape
**Location:**311 SW 146TH ST,BUR
**LocCross:**btwn 3RD AVE SW and 4TH AVE SW

| Created: | 03/19/2015 09:20:47 | RJC17 | 71162 |
|---|---|---|---|
| Entered: | 03/19/2015 09:21:01 | RJC17 | 71162 |
| Closed: | 03/19/2015 09:21:01 | RJC17 | 71162 |

**IC: PrimeUnit: FCR:**146E0 **Type:**RAPE - Rape
**Agency:**KCS **Group:**SW **District:**N5 **RA:**N05050      ☐ **Detail**

| | | |
|---|---|---|
| 09:20:47  CREATE | **Location:**311 SW 146TH ST,BUR **Type:**RAPE **FCR:**146E0 **Group:**SW **PDist:**N05050 |
| | **TypeDesc:**Rape **LocCross:**btwn 3RD AVE SW and 4TH AVE SW **Priority:**3 **Response:**1P |
| | **Agency:**KCS **LocType:**S **Contact:**No |
| 09:21:01  ADVSED | **FCR:**146E0 **DispoLevel:**6 |
| 09:21:01 -NPREMS | **Comment:**(none) |

**CONTACT INFO:**

| Name | Phone | RPaddr | Contact | Fire/Aid | Rt/Coach | Box4 |
|---|---|---|---|---|---|---|
| | | | No | | | |

| DO NOT DISCLOSE! ☐ | | **SHERIFF** **KING COUNTY** | **INCIDENT REPORT** | **15-077590** | Page 1 |
|---|---|---|---|---|---|
| Domestic Violence ☐ | | | | **146-E-0** | **District: N-5** |

| Reported: 9/8/2014 | DOW Mon | Time: 9:00 | Incident Type: **RAPE** | | | Initial FCR **146-E-0** | | Court | | Juvenile ☐ |
|---|---|---|---|---|---|---|---|---|---|---|
| Occ Between: 1/1/2010 | DOW Fri | Time: | And: 12/31/2010 | DOW Fri | Time: | LocationName: | | | | |
| Incident Location: 311 SW 146 ST | | | | City: BURIEN | | | State: WA | Zip 98166 | | |

**MO**

Suspect Trademarks:

Instrument:

Entry Point:

Entry Method:

| PremisesType | Locked ☐ | Occupied ☐ | Total Property Cost: |
|---|---|---|---|

| ☐ Aid Req | ☐ Weapons | ☐ Injury | ☐ Alcohol | ☐ Computer | ☐ Dom Viol | ☐ Drug | ☐ Juvenile | ☐ Gang |
|---|---|---|---|---|---|---|---|---|

**Narrative:**

Rape allegation occurred 4 years ago.  See handwritten attachment.

Certification

I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Date and Place: _____    Signature/Agency: _____

## END OF REPORT

**REVIEW**

| DateSubmitted: 3/19/2015 | Reporting Officer: **18548   Sullivan, Jessica L** | Disposition: **INCIDENT REPORT ON SCENE - NO ARREST/NO BOOKING** | |
|---|---|---|---|
| DateTimeReviewed: 3/19/2015 10:02 | ReviewedBy: **18548   Sullivan, Jessica L** | CIDScreener: | Event Processing Status: **Filed** |
| DateAssigned 3/19/2015 | InvestigatorAssigned **18548   Sullivan, Jessica** | | Date Status Last Changed: 6/2/2015 10:08:03 A |

| ☐ Aid Req | ☐ Weapons | ☐ Injury | ☐ Alcohol | ☐ Computer | ☐ Dom Viol | ☐ Drug | ☐ Juvenile | ☐ Gang |
|---|---|---|---|---|---|---|---|---|

Printed by: Schuetze, Jeremiah L   On:  Tuesday  06/02/15  10:08

| DO NOT DISCLOSE!: ☐ | **SHERIFF** KING COUNTY | **FOLLOW-UP REPORT** | **15-077590** | Page 1 |
|---|---|---|---|---|
| DomesticViolence ☐ | | | **146-M-0** | **District: N-5** |

| Reported: | DOW | Time: | Incident Type: | | Initial FCR | Court | | Juvenile |
|---|---|---|---|---|---|---|---|---|
| 9/8/2014 | Mon | 9:00 | **RAPE** | | **146-E-0** | | | ☐ |

| Occ Between: | DOW | Time: | And: | DOW | Time: | LocationName: |
|---|---|---|---|---|---|---|
| 3/17/2010 | Wed | | 3/31/2010 | Wed | | |

| Incident Location: | City: | | State: | Zip |
|---|---|---|---|---|
| 311 SW 146 ST | BURIEN | | WA | 98166 |

## PROPERTY SECTION

| Status | Article | Brand | Model | Serial # |
|---|---|---|---|---|
| EVIDENCE | CD | | | |

| Qty | Unit of Meas: | Description | Value |
|---|---|---|---|
| 1 | | **CONTAINING STATEMENTS OF VICTIM AND WITNESSES** | |

## MO

Suspect Trademarks:

Instrument:

Entry Point:

Entry Method:

| PremisesType | Locked | Occupied | Total Property Cost: |
|---|---|---|---|
| | ☐ | ☐ | $0.00 |

☐ Aid Req   ☐ Weapons   ☐ Injury   ☐ Alcohol   ☐ Computer   ☐ Dom Viol   ☐ Drug   ☐ Juvenile   ☐ Gang

## Summary/Conclusion:

Case open/inactive. Referred to KCPAO for review,  See handwritten attachments.

## Additional Attachments/Reports Associated with this Incident/Follow-up Report:

| A-102 Master Evidence Report | Tuesday  05/05/15 | Active |
|---|---|---|
| HW - Follow-up | Tuesday  05/05/15 | Active |
| HW emails | Tuesday  05/05/15 | Active |
| CD containing statements of victim and witness | Tuesday  05/05/15 | Active |

Certification

I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Date and Place:_____     Signature/Agency:_____

## END OF REPORT

## REVIEW

| DateSubmitted: | Reporting Officer: | | Event Processing Status: |
|---|---|---|---|
| 5/5/2015 | 18548   Sullivan, Jessica L | | **Filed** |
| DateTimeReviewed: | Reviewing Officer: | | Date Status Last Changed: |
| 05/05/15 14:26 | 03391   Marenco, Jose E | | 6/2/2015 10:16:44 A |

☐ Aid Req   ☐ Weapons   ☐ Injury   ☐ Alcohol   ☐ Computer   ☐ Dom Viol   ☐ Drug   ☐ Juvenile   ☐ Gang

CASE FOLLOW-UP  REPORT                                                     96-340483-A

**Printed by: Schuetze, Jeremiah L   On:  Tuesday  06/02/15  10:16**                    -1883585536

| DO NOT DISCLOSE!: ☐ | | SHERIFF KING COUNTY | | **FOLLOW-UP SUPPLEMENTAL REPORT** | 15-077590 | Page 1 |
|---|---|---|---|---|---|---|
| DomesticViolence ☐ | | | | | 146-M-0 | District: N-5 |

| Reported: 9/8/2014 | DOW Mon | Time: 9:00 | Incident Type: **RAPE** | | | Initial FCR 146-E-0 | Court | | Juvenile ☐ |
|---|---|---|---|---|---|---|---|---|---|
| Occ Between: 3/17/2010 | DOW Wed | Time: | And: 3/31/2010 | DOW Wed | Time: | LocationName: | | | |

| Incident Location: 311 SW 146 ST | City: BURIEN | State: WA | Zip 98166 |
|---|---|---|---|

**MO**

| Suspect Trademarks: | |
|---|---|
| Instrument: | |
| Entry Point: | |
| Entry Method: | |

| PremisesType | Locked ☐ | Occupied ☐ | Total Property Cost: |
|---|---|---|---|

☐ Aid Req   ☐ Weapons   ☐ Injury   ☐ Alcohol   ☐ Computer   ☐ Dom Viol   ☐ Drug   ☐ Juvenile   ☐ Gang

### Reporting Officers Entries Associated with this Case Follow-up Report:

**Tuesday  05/05/15**                              **12:46**

I received an email from David Allen.  He stated the suspect's date of birth is 01/10/80, in response to my previous email.  He also provided me with a transcript of the statement the suspect gave to IIU on 10/09/14.  The statement was also copied to DPA Sergis.  I spoke with Sergis briefly about the email and he stated he would forward the statement to the Filing Unit to be included with the case.

**Tuesday  05/05/15**                              **15:12**

After reviewing the statement provided by Allen, I sent Captain Butschli an email requesting CAD messages between the victim and another dispatcher in July of 2014 that were specifically referenced in the statement as being relevant to the case.

**Wednesday  05/06/15**                            **9:38**

I received an email from Captain Butschli containing the CAD messages I requested.

### Summary/Conclusion:

Additional information for case - forwarded to DPA Sergis for review.

| REVIEW | | | |
|---|---|---|---|
| DateSubmitted: 5/6/2015 | Reporting Officer: 18548    Sullivan, Jessica L | | Event Processing Status: **Filed** |
| DateTimeReviewed: 05/06/15 12:39 | Reviewing Officer: 03391    Marenco, Jose E | | Date Status Last Changed: 6/2/2015 10:21:09 A |

☐ Aid Req   ☐ Weapons   ☐ Injury   ☐ Alcohol   ☐ Computer   ☐ Dom Viol   ☐ Drug   ☐ Juvenile   ☐ Gang

CASE FOLLOW-UP  REPORT                                                96-340483-A

Printed by: Schuetze, Jeremiah L   On:  Tuesday  06/02/15  10:21                    -1988555776

| DO NOT DISCLOSE!: ☐ | **SHERIFF** **KING COUNTY** | **FOLLOW-UP SUPPLEMENTAL REPORT** | 15-077590 | Page 2 |
|---|---|---|---|---|
| DomesticViolence ☐ | | | 146-M-0 | District: N-5 |

**Additional Attachments/Reports Associated with this Incident/Follow-up Report:**

| HW - Email from Allen and attached statement | Tuesday  05/05/15 | Active |
|---|---|---|
| HW CAD Audit Log from 08/03/14 | Wednesday  05/06/15 | Active |
| HW - Word document narrative | Wednesday  05/06/15 | Active |

Certification

I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Date and Place:_____    Signature/Agency:_____

**END OF REPORT**

# CONFIDENTIAL - FOR POLICE AGENCY USE ONLY
## DECLINE

Suspect(s): <u>Jeremy A Muir, AKA Jeremy Muir, Deputy Jeremy Muir</u>

Crime: <u>Rape In The Second Degree</u>

Case No: <u>15-077590</u>

Investigator: <u>Detective Sergeant Jessica L Sullivan</u>
Agency: <u>KCSO/Sammamish Police Department</u>      Unit: <u>Unit???</u>

We are declining to file this case in Superior Court for the following reasons:
- ☐ A. Case is being returned for filing in municipal or city court.
- ☐ B. Case is being sent to our District Court Unit for review.
- ☐ C. Case is being declined for non-evidentiary reasons.
- ☒ D. Case is being returned because it is legally insufficient.
- ☐ E. Case has been used as part of a plea package. (Cause# <u>CAUSE NUMBER???</u>)
- ☐ F. Case is being declined at this time because we have not received the materials requested on <u>REQUEST DATE???</u>.  If you resubmit the case with the requested materials, please be sure to include copies of any CDs, DVDs or thumb drives.

- ☐ **Please submit the sexual assault kit to the WSPCL for analysis.**
- ☐ **DO NOT DESTROY EVIDENCE**, filing on co-defendant(s).

Facts:

The suspect is a deputy with KCSO. MF is a dispatcher with KCSO. The suspect self-reported to his superior that he and MF had a sexual relationship in the past. They met in 2009 and communicated some over the dispatch system and in person. In March 2010, the suspect invited MF out with some other people to have some drinks. He expressed interest in dating MF, but she told him she wasn't interested. At the end of the evening, the suspect expressed concern about MF driving herself home, so offered to drive her. Once at MF's home, the suspect said he felt tipsy and asked if he could spend the night. MF said he could sleep on the couch and she went to bed. The suspect crawled into bed with MF a short time later and tried to touch her breasts. MF told him she wasn't interested and the two slept in the bed together the rest of the night. The next morning things were awkward, and MF again told the suspect she wasn't interested in a relationship with him.
A week or two later, the suspect invited MF out again with a group of people. The suspect bought MF 6 drinks, which she drank over the course of the evening. She was feeling drunk by the time she was going to leave the bar. The suspect offered to drive her to his friend Keri Halberg's house a few blocks away. Once there, they sat on the couch. The suspect kissed MF and she tried to lean away from him. The suspect then pulled MF onto the floor and started pulling off her jeans. MF told the suspect to stop, but did not want others in the house to hear and come out. MF said that when the suspect did not stop, she just laid there and stared at the bedroom doors

to see if anyone was coming out. The suspect had penile/vaginal intercourse with MF. After a short time, MF said she wasn't comfortable doing this here and that if they were going to have sex to take her to her house. They got dressed and he drove them to her house. Once there, they got into bed, the suspect put on a condom and they had penile/vaginal intercourse. MF did not tell the suspect "no" this time. At some point, MF told the suspect to get off of her, which he did. They slept in the bed together the rest of the night. The next morning, the suspect drove her to her car, and they didn't speak. Later, the suspect kept texting and calling MF, so she agreed to meet with him. When they met, they both agreed that they would not tell anyone about what happened and they would just put it behind them.

The suspect and MF went out again with a group of people a few weeks later. Over the next four plus years, the suspect and MF remained in contact through texts and Facebook.

In July 2014, MF found out that the suspect was dating a good friend of hers, Brandy. She was throwing a party for Brandy and Brandy brought the suspect to MF's house. After several drinks, MF called the suspect "a little bitch" and told Brandy that she and the suspect had history. Brandy said she knew about their history. This angered MF. The next day, she told her husband, Jeremy Davy, that in 2010, the suspect had forced himself on her. MF said this was the first person she had told. She later told several co-workers. MF expressed anger that it appeared that the suspect was telling people "his side" of their sexual encounter.

When contacted by investigators, MF initially said that she did not want to provide a statement and proceed with criminal prosecution against the suspect. MF struggled with the decision of whether to participate in a criminal investigation (changing her mind several times), but finally indicated that she wanted to assist in a criminal investigation against the suspect.

Other witnesses were interviewed.

Kerri Halberg indicated that she recalled the night when MF came to her house with the suspect after the bar. She said that MF and the suspect were flirtatious with each other at the bar. At her house, she gave them blankets and then went into her room. She heard them giggling and went back into the living and told them not to "hook up" on her couch. They giggled and she told them she was serious and to go on the floor if they were going to do that. The next morning, Kerri came out and found the blankets folded on the couch and MF and the suspect gone. A few weeks later, she went out with MF and the suspect. MF told Kerri that she and the suspect had sex, he was bad at it, and they promised not to have sex ever again. Kerri remembers this because she thought it was funny that MF had said the suspect was bad in bed.

Nick Baisch, who rented a room at Kerri Halberg's house, provided a statement. He said that he recalls coming home and there were two people under a blanket on the floor. As he walked by, they giggled. He went into his room and did not see them in the morning. He did not hear any conversation, there was no movement under the blanket and he did not have any indication that there was a problem between the two.

A friend of MF's, Amy, who was present at the bar that night, was interviewed. She indicated that she left before MF. She said MF and the suspect were very flirtatious that night.

The suspect provided a statement to a sergeant with KCSO who was conducting an

|  |  |
|---|---|
|  | internal investigation into this matter. In that statement, he indicated that he and MF engaged in consensual sex on the floor in Kerri Halberg's house after being at a bar together. They then went to MF's home, where they had a few more drinks, and had consensual sex again in her bed. The suspect said neither of them was into sex the second time and they stopped. They both agreed, and joked about, the lack of sexual chemistry between them. However, they remained friendly over the next few years and socialized on occasion. The suspect self-reported the sexual encounter to his superiors because he heard that MF was telling people at work about it. |
| Discussion: | To prove Rape in the Third Degree, the State must prove beyond a reasonable doubt that the suspect had sexual intercourse with MF after she had clearly expressed her lack of consent to that act. There is insufficient evidence to prove that crime here. |
|  | The only evidence of this crime available to the State comes from MF. Her testimony would be compromised by a number of factors. |
|  | First, there is a significant delay in the reporting of this crime. While that fact by itself is not fatal to the case, the fact that MF and the suspect remained in contact and appeared to be on friendly terms over the four years after the alleged rape, would be extremely difficult to explain to a jury. |
|  | Second, there are two witnesses, besides the suspect, who will contradict MF's version of what happened at Kerri Halberg's home during the alleged rape. Both Kerri Halberg and Nick Baisch told the detective that they heard giggling under the blanket. While Nick did not know who was under there, Kerri did and even had a conversation with them about not having sex on her couch. These statements directly contradict MF's version of how events tool place at Kerri's residence. |
|  | Finally, the fact that MF engaged in consensual sex later in the evening with the suspect after she alleged that he raped her, would be an insurmountable obstacle for the State to prove this crime. |
|  | Based on all of these issues with this case, a jury would not be justified in finding the defendant guilty beyond a reasonable doubt. |
|  | Therefore, the State will not be filing charges in this case. |

Deputy: Charles K. Sergis    Date: 08/11/2015 _____

Telephone Number: (206) 477-1199 _____

Supervisor: _____    Date:_____

Detective contacted: Yes ☒    Left message ☐    No ☐

Criminal Division, King County Prosecuting Attorney's Office, (206) 477-3757

**Latent Labe request 20-3313**

## WSP
WASHINGTON STATE PATROL
### CRIME LABORATORY
### REQUEST FOR LABORATORY EXAMINATION

CRIME LAB BARCODE HERE
FOR LAB USE ONLY

**For evidence submission guidelines, refer to the Forensic Services Guide**

| PRIMARY AGENCY CASE NUMBER | RELATED AGENCY CASE NUMBER(S) |
|---|---|
| 2020-3313 | |

| HAS OTHER EVIDENCE IN THIS CASE BEEN PREVIOUSLY SUBMITTED TO A WSP CRIME LAB? | ☐ YES ☐ NO | OFFENSE Other Criminal | OFFENSE DATE 02/19/2020 |
|---|---|---|---|

| SUSPECT(S) – LAST, FIRST, MI | SID # | DOB | VICTIM(S) – LAST, FIRST, MI | DOB |
|---|---|---|---|---|
| 1 FOSS, MAGDALENA K | | ▉▉▉ | 1 MUR, JEREMY A | ▉▉▉ |
| 2 | | | 2 | |
| 3 | | | 3 | |
| 4 | | | 4 | |

| INVESTIGATING OFFICER/DETECTIVE | ☐ RUSH | TRIAL DATE |
|---|---|---|

| NAME (LAST, FIRST) HENDERSON, PAUL | RANK/POS DET | BADGE # 2055 | E-MAIL ADDRESSES PHENDERSON@CI.MONROE.WA.US | PHONE 360-794-6300 |
|---|---|---|---|---|
| AGENCY MONROE PD | STREET ADDRESS 818 W MAIN ST | | CITY MONROE | ZIP CODE 98272 |

| Evidence Item # (Prioritized) | Item Description | Exam Codes | | Special Instructions/Requested Exam Explained |
|---|---|---|---|---|
| #3 | LETTER SENT TO CHIEF OF POLICE | LAT | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**For DNA:** First submissions will normally be limited to 5 items (not including reference samples). Please submit <u>Supplemental form</u> on initial submission and <u>Consumption form</u> as needed. For Sexual Assault Submissions with no charged individual and Property Crimes, written consumption permission must be submitted with the RFLE.

<u>Sexual Assault Submissions</u>: Indicate the priority level:
☐ High priority (active/court)
☐ Low priority (non-active)
☐ Previously Unreported & In Storage (HB 1166)
___ SAK Tracking System Barcode Number

| SUBMITTED BY (LAST, FIRST, MI) ACREE, RENEE | SIGNATURE (/S/ Electronic Signature) *Kimi Acree* | DATE 02/20/2020 | TIME |
|---|---|---|---|
| SUBMITTAL METHOD: IN PERSON | TRACKING NUMBER: | | |
| | TRACKING NUMBER: | | |

**FOR LAB USE ONLY**

| RECEIVED BY (PRINT NAME—LAST , FIRST) | SIGNATURE | DATE | TIME |
|---|---|---|---|

Item(s) being released/returned:

| RELEASED BY (LAST, FIRST, MI) | SIGNATURE | DATE | TIME |
|---|---|---|---|
| RELEASED TO: (LAST, FIRST, MI) | SIGNATURE or TRACKING NUMBER | DATE | TIME |

**NOTE:** Signing the Request for Laboratory Examination constitutes written agreement between the Washington State Patrol Crime Laboratory Division (CLD) and the submitting agency, subject to, but not limited to, the Terms and Conditions above.
3000-210-005 (R 12/19)

**Crime Lab Report**



JAY INSLEE
Governor

JOHN R. BATISTE
Chief

STATE OF WASHINGTON
## WASHINGTON STATE PATROL
PO Box 42608 • Olympia, WA 98504-2608 • (360) 596-4525  Fax (360) 596-4470 • www.wsp.wa.gov

**CRIME LABORATORY REPORT**

| | |
|---|---|
| **Agency:** Monroe Police Department | **Laboratory Number:** 720-000120 |
| **Agency Case Number:** 202000003313 | **Request Number:** 0001 |
| **Agency Rep:** Paul Henderson | |
| **Suspect:** FOSS, MAGDALENA K. | |
| **Victim:** MUR, JEREMY A. | |

Results and Conclusions

No friction ridge impressions were developed on the envelope, 'Thank You' card, or stamp.

Evidence

The following item was received by the scientist in a sealed container:

3:  An envelope (with attached stamp) containing a 'Thank You' card

Methods and Observations

The envelope and card were examined and processed using the following methods: visual examination, diazafluorenone in conjunction with an alternate light source, and ninhydrin.

The stamp was removed from the envelope, examined, and processed using the following methods: visual examination, magnetic fingerprint powder, and a suspended powder.

At each process step the envelope, card, and stamp were examined for friction ridge impressions.

Remarks

The submitted item will be returned to the requesting agency with this report.

Donald W. Brannan, Forensic Scientist

3/3/2020
Date




**WSP**

**CRIME LABORATORY**
**REQUEST FOR LABORATORY EXAMINATION**

LAT –PROCESSING
**CASE #720-000120**
REQ.    #0001 -02/21/2020-LAT

| PRIMARY AGENCY CASE NUMBER | RELATED AGENCY CASE NUMBER(S) |
|---|---|
| 2020-3313 | |

| HAS OTHER EVIDENCE IN THIS CASE BEEN PREVIOUSLY SUBMITTED TO A WSP CRIME LAB? | ☐ YES ☐ NO | OFFENSE Other Criminal | OFFENSE DATE 02/19/2020 |
|---|---|---|---|

| SUSPECT(S) – LAST, FIRST, MI | SID # | DOB | VICTIM(S) – LAST, FIRST, MI | DOB |
|---|---|---|---|---|
| 1 FOSS, MAGDALENA K | | | 1 MUR, JEREMY A | |
| 2 | | | 2 | |
| 3 | | | 3 | |
| 4 | | | 4 | |

INVESTIGATING OFFICER/DETECTIVE     ☐ RUSH     TRIAL DATE

| NAME (LAST, FIRST) HENDERSON, PAUL | RANK/POS DET | BADGE # 2055 | E-MAIL ADDRESSES PHENDERSON@CI.MONROE.WA.US | PHONE 360-794-6300 |
|---|---|---|---|---|
| AGENCY MONROE PD | STREET ADDRESS 818 W MAIN ST | | CITY MONROE | ZIP CODE 98272 |

| Evidence Item # (Prioritized) | Item Description | Exam Codes | Special Instructions/Requested Exam Explained |
|---|---|---|---|
| #3 | LETTER SENT TO CHIEF OF POLICE | LAT | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

For DNA: First submissions will normally be limited to 5 items (not including reference samples).
Please submit Supplemental form on initial submission and Consumption form as needed. For Sexual Assault Submissions with no charged individual and Property Crimes, written consumption permission must be submitted with the RFLE.

Sexual Assault Submissions:  Indicate the priority level:
☐ High priority (active/court)
☐ Low priority (non-active)
☐ Previously Unreported & In Storage (HB 1166)
SAK Tracking System Barcode Number

| SUBMITTED BY (LAST, FIRST, MI) ACREE, RENEE | SIGNATURE (/S/ Electronic Signature) | DATE 02/20/2020 | TIME |
|---|---|---|---|

SUBMITTAL METHOD: IN PERSON     (FedEx)     TRACKING NUMBER: M8210526SU
TRACKING NUMBER:

FOR LAB USE ONLY

| RECEIVED BY (PRINT NAME –LAST , FIRST) | SIGNATURE | DATE 2/21/2020 | TIME 1405 |
|---|---|---|---|

Item(s) being released/returned:

| RELEASED BY (LAST, FIRST, MI) | SIGNATURE | DATE 03/03/2020 | TIME 1045 |
|---|---|---|---|

RELEASED TO: (LAST, FIRST, MI)     SIGNATURE or TRACKING NUMBER 1260051903MA50940     DATE     TIME

NOTE: Signing the Request for Laboratory Examination constitutes written agreement between the Washington State Patrol Crime Laboratory Division (CLD) and the submitting agency, subject to, but not limited to, the Terms and Conditions above.

3000-210-005 (R 12/19)

**Monroe PD Incident 19-21441**



# Monroe Police Department
## Detail



Monroe Police Department
ORI Number:  WA0311200

Print Date/Time:  01/07/2020 17:01
Login ID:  mm2005
Case Number:  2019-00021441

## Case Details:

| | | | | |
|---|---|---|---|---|
| Case Number: | 2019-00021441 | Incident Type: | Harassment | |
| Location: | 15591 168TH AVE SE | Occurred From: | 10/27/2019 19:15 | |
| | MONROE,WA 98272 | Occurred Thru: | 10/27/2019 19:15 | |
| | | Reported Date: | 10/27/2019 19:15 Sunday | |
| Reporting Officer ID: | MM2101-Nelson | Status: | Inactive | Status Date: 11/03/2019 |
| | | Disposition: | No Crime Occurred | Disposition Date: 11/03/2019 |
| Assigned Bureau: | Records Div | | | |

### Case Assignments:

| Assigned Officer | Assignment Date/Time | Assignment Type | Assigned By Officer | Due Date/Time |
|---|---|---|---|---|

| Associated Cases | Status | Assisting ORIs | Role | |
|---|---|---|---|---|

| Modus Operandi | | Solvability Factors | Weight | |
|---|---|---|---|---|
| | | | Total: | |

## Offenses

| No. | Group/ORI | Crime Code | Statute | Description | Counts |
|---|---|---|---|---|---|

## Subjects

| Type | No. | Name | Address | Phone | Race | Sex | DOB/Age |
|---|---|---|---|---|---|---|---|
| Contact | 1 | MUIR, JEREMY ALFRED | 15591 168TH AVE SE MONROE,WA 98272 | ███████ | White | Male | ███████ |
| Other Involved | 1 | foss, maggie | | | Unknown | Female | |



# Monroe Police Department
## Detail



| | | | Monroe Police Department |
|---|---|---|---|
| **Print Date/Time:** | 01/07/2020 17:01 | | **ORI Number:** WA0311200 |
| **Login ID:** | mm2005 | | |
| **Case Number:** | 2019-00021441 | | |

| <u>Subject #</u> | <u>1-Contact</u> | | | | |
|---|---|---|---|---|---|
| **Primary:** | No | | | | |
| **Name:** | MUIR, JEREMY ALFRED | **Race:** White | **Sex:** Male | **DOB:** ▮▮▮▮ |
| **Address:** | 15591 168TH AVE SE | **Height:** 5ft 10 in | **Weight:** 190.0 lbs. | **Build:** |
| | MONROE WA 98272 | **Eyes:** BLU | **Hair:** BRO | **Age:** ▮▮ |
| **Primary Phone:** | (360) 991-4596 | **SSN:** | **DVL #:** ▮▮▮▮ | **State:** |

| Resident Type: | Resident Status: | Statement Type: |
|---|---|---|
| Disposition: | Date: | Custody Status: |

<u>Related Offenses</u>

<u>Related Weapons</u>

<u>Victim/Offender Relationship</u>

| Transported By: | Extent of Injury: | Hospital: |
|---|---|---|
| Domestic Violence: | Domestic Violence Referrals: | Federal Agencies Involved: |
| Condition: | Medical Treatment: | |

<u>Missing Person Information</u>

| <u>Subject #</u> | <u>1-Other Involved</u> | | | | |
|---|---|---|---|---|---|
| **Primary:** | No | | | | |
| **Name:** | foss, maggie | **Race:** Unknown | **Sex:** Female | |
| **Address:** | | **Height:** | **Weight:** | **Build:** |
| | | **Eyes:** | **Hair:** | **Age:** |
| **Primary Phone:** | | **SSN:** | **DVL #:** | **State:** |
| Resident Type: | Resident Status: | | Statement Type: |
| Disposition: | Date: | | Custody Status: |

<u>Related Offenses</u>

<u>Related Weapons</u>

<u>Victim/Offender Relationship</u>

| Transported By: | Extent of Injury: | Hospital: |
|---|---|---|
| Domestic Violence: | Domestic Violence Referrals: | Federal Agencies Involved: |
| Condition: | Medical Treatment: | |

<u>Missing Person Information</u>

## Arrests

| Arrest No. | Name | Address | Date/Time | Type | Age |
|---|---|---|---|---|---|

## Property

| Date | Code | Type | Make | Model | Description | Tag No. | Item No. |
|---|---|---|---|---|---|---|---|
| 10/28/2019 | Evidence | Other | | | letter possibly from Maggie Foss to neighbor | 2019-00021441 | 1 |

 

# Monroe Police Department
## Detail

**Print Date/Time:** 01/07/2020 17:01
**Login ID:** mm2005
**Case Number:** 2019-00021441

Monroe Police Department
**ORI Number:** WA0311200

**Seq #** 1

**Tag Number:** 2019-00021441    **Item Number:** 1

| Property Codes: | Property Type: | Other | Property Class: | | Date Received: | 10/28/2019 |
|---|---|---|---|---|---|---|
| Evidence | UCR Value: | | Initial Value: | | Stolen Location: | |
| Quantity: | Unit of Measure: | | Measurement Source: | | | |

**Description:** letter possibly from Maggie Foss to neighbor    **Officer Remarks:** letter

| Make: | Model: | Style: | Style Desc: |
|---|---|---|---|
| Year: | OAN: | Serial #: | Color: |
| Condition: | Reg. Type: | Reg. ORI: | Reg. Number: |
| Reg. State: | Reg. Year: | Reg. Date: | Reg. Expiration: |

**Recovery Information**

| Location: | Date: | Code: | Value: |
|---|---|---|---|
| RFOJ?: | ORI: | Recovered Address: | |

**Associated Subjects**

| Type | Name | Address | Phone | Notified How | Date |
|---|---|---|---|---|---|
| Owner | | | | | |

| Insurance Company: | Policy Number: | Lein Holder: |
|---|---|---|

**Chain of Custody**

| Date | Transaction | From | From Role | To | To Role |
|---|---|---|---|---|---|
| 10/28/2019 01:45 | **Type:** Intake<br>**Code:** Initial<br>**Remarks:** | MM2101-Alexander Nelson | | MM2090-Renee' Acree | |

## Vehicles

| No. | Role | Vehicle Type | Year | Make | Model | Color | License Plate | State |
|---|---|---|---|---|---|---|---|---|

**Supervisor**                                          **Date:**

**Routing:**

☐  Liquor Board
☐  Dawson Place
☐  Juvenile Court
☐  Juvenile Prosecutor
☐  Mental Health
☐  APS
☐  CPS
☐  Other_____
☐  County Prosecutor
☐  Domestic Violence Unit
☐  City Prosecutor
☐  Detectives

## MM Case, Officer: mm2101, Supervisor: mm2034, Merged By: mm2051

| MONROE POLICE DEPARTMENT<br>818 W Main St<br>Monroe, WA 98272<br>(360) 794-6300 | Initial Case Report |
|---|---|
| | Case Report # **2019-00021441** |

### EVENT

| OCCURRED INCIDENT TYPE **Harassment** | DATE/TIME REPORTED **10/27/2019   19:15** | ASSOCIATED CASES |
|---|---|---|
| LOCATION OF OCCURRENCE **15591 168TH AVE SE MONROE, WA 98272** | OCCURRED DATE/TIME **10/27/2019   19:15**<br>OCCURRED THROUGH **10/27/2019   19:15** | |

### OFFENSES

| STATUTE / DESCRIPTION | Counts | Attempt/Commit |
|---|---|---|
| | | |

### SUBJECT

☐ NON-DISCLOSURE

| SUBJECT TYPE **Contact** | NAME **Adult / MUIR, JEREMY ALFRED** | DOB / AGE RANGE |
|---|---|---|
| ADDRESS **15591 168TH AVE SE MONROE, WA 98272** | | PRIMARY PHONE<br>SECONDARY PHONE |

| RACE **White** | SEX **Male** | HEIGHT **5' 10** | WEIGHT **190** | HAIR | EYE **BLU** |
|---|---|---|---|---|---|
| DL NUMBER | | DL STATE | EMPLOYER | | |

### SUBJECT

☐ NON-DISCLOSURE

| SUBJECT TYPE **Other Involved** | NAME **Adult / foss, maggie** | DOB / AGE RANGE |
|---|---|---|
| ADDRESS | | PRIMARY PHONE<br>SECONDARY PHONE |

| RACE **Unknown** | SEX **Female** | HEIGHT | WEIGHT | HAIR | EYE |
|---|---|---|---|---|---|
| DL NUMBER | | DL STATE | EMPLOYER | | |

### VEHICLE

| PROPERTY CODE | | YEAR | COLOR |
|---|---|---|---|
| TYPE / MAKE / | MODEL / | | |
| PLATE | STATE | VIN | VALUE |
| DESCRIPTION | | | |

### PROPERTY

| PROPERTY CODE | | | |
|---|---|---|---|
| SERIAL NUMBER | QTY/UNIT OF MEASURE | VALUE | COLOR |
| TYPE / MAKE / | MODEL / | | |
| DESCRIPTION | | | |

| REPORTING OFFICER / ID # **NELSON, ALEXANDER    2101** | APPROVING SUPERVISOR **Fuller, Chuck** |
|---|---|

Complete report details do not print in this format.



| MONROE POLICE DEPARTMENT<br>818 W Main St<br>Monroe, WA 98272<br>(360) 794-6300 | Initial Case Report |
|---|---|
| | Case Report #  **2019-00021441** |

---

### NARRATIVE

| AGENCY NAME<br>**Monroe Police Department** | Officer/Number<br>Officer A.Nelson #1230 |
|---|---|

On 10/27/2019 at approximately 1915 hours, I was on uniformed patrol, in a marked patrol vehicle in the city of Monroe in Snohomish County.  I am a commissioned Officer of the City of Monroe.

I was dispatched to a harassment complaint at 15591 168th Ave NE.

I arrived on scene and made contact with the home owner, Jeremy A Muir.  Jeremy stated that on 10/27/19 at about 1835 hours, he was at his residence when his neighbors, the Haberleck's, came over.  The Haberleck's gave Jeremy an envelope addressed to Tamara Haberlack with Jeremy's name and address as the sender.  Inside the blue envelope was a thank you card with a message inside stating "Jeremy Muir is a Sexual Predator".  Jeremy stated that he was shocked that someone had sent the card to his neighbor with libelous/harassing statements. Jeremy stated that he did not send the card and had never seen it before tonight.  Jeremy stated he is not a sexual predator and the accusation of being one could destroy his personal and professional career.

Jeremy stated that the only person he can think of that would send such a message is Maggie Foss.  Maggie is an ex-girlfriend and has previously accused Jeremy of raping her. Jeremy was cleared by the King County Sheriff's Office and later the King County Prosecutor's Office of the rape accusation. Jeremy said there has been on going issues with Maggie over the years.

Maggie Foss is only a possible suspect at this time.  This is an informational report requested by Jeremy Muir.

No further information.

---

This report was submitted from an electronic device owned, issued, or maintained by a law enforcement agency using my user ID and password. I certify or declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

| REPORTING OFFICER / ID #<br>NELSON, ALEXANDER        2101 | APPROVING SUPERVISOR<br>Fuller, Chuck | |
|---|---|---|
| LOCATION SIGNED  Snohomish County, WA | DATE SIGNED | 10/27/2019 |

This officer's narrative is complete when an approving supervisor's name is attached.  Complete report details do not print in this format.

MM Case 2019-00021441 Page 2 OF 2

**Statement.**

Case #: _19 - 21441_
_NELSON_

## MONROE POLICE DEPARTMENT
[ ] Suspect [X] Victim [ ] Witness  Statement

Statement of: _MUIR, Jeremy A_ _____ Date of Birth: ████████
                   (Last name, First & Middle Initial)
Home Address: _15591 168 AV 8E_ _____ City/State/Zip _Monroe, WA 98272_

Business Address: _____

Email Address: _Jeremymuir30@gmail.com_ _____

Home Phone # ( ) _____ - _____  Business Phone # ( ) _____ - _____

Cellular Phone # ████████ Driver's License Number _WDL 7N9|G73B_ State _WA_

If you have property/items that have been: __Lost __Found __Stolen __Damaged/Vandalized __Graffiti __Forged
__Counterfeited. **Please provide the estimated dollar amount of loss $_____.**

_Jm_ Initial here if you would like to request non-disclosure as allowed by RCW 42.56.240. See back of this form
for explanation.

1  Today 10/27/19 at about 1835 hours I was at my home at
2  15591 168 Av 8E Monroe.  My Neighbors the Haberlachs came
3  over and gave me an envelope addressed to Tamara Haberlach
4  with my name - J. Muir and address as the sender.
5  Inside the blue envelope there was a thankyou card.
6  Inside the thankyou card was the message "Jeremy Muir
7  is a Sexual Predator".  I was shocked and alarmed that
8  someone had sent this card to my neighbor with libelous/
9  harassing statements.  I did not send this card and had
10  not seen it before tonight.  I am not a sexual predator and
11  the accusation of being one could destroy my personal and
12  professional career.  The only person who I can think of
13  who would send such a message/letter is Maggie Foss,
14  who had previously accused me of raping her.  I was cleared
15  by the King County Sheriff's office and later the King County
16  Prosecutor's Office of this accusation.  I am offended by this
17  letter and feel this is harassment.  Should prosecution be
18  an option I am willing to assist in prosecution. Jm
19  _____
20  _____

I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.
Date: _10/27/19_ Time: _2025_ Place Statement Taken: _Monroe, WA_

Signed: _Jeremy Muir_ _____ Witnessed by: _A. Nelson #2101_

(DO NOT WRITE ON THE BACK.  PLEASE ASK FOR ADDITIONAL STATEMENT FORMS)

Page _1_ of _1_

2013

**Maggie Foss' Facebook Posts**



19:13

Write a comment...

**Maggie Foss**
21 mins · 🌐

I will probably lose a lot of so-called friends by posting this, but I cannot and will not be silent anymore, especially in the wake of the recent unjustified shooting/murder of Atatiana Jefferson in Fort Worth, TX by a police officer.
This is King County Sheriff's Office Deputy Jeremy Muir. He currently works for the King County Sheriff's Office assigned to the Shoreline police department just North of Seattle. According to his second ex-wife, he's racist and told her he wanted to earn his "street cred" by shooting someone and getting "paid vacation" i.e., paid administrative leave for it. According to her, he told her he would shoot someone claiming they had a gun but "if they didn't have a gun, he would leave a 'drop gun' on them."
I was confused and asked what a 'drop gun' is. She told me a gun he would drop on the subject and claim it as the subject's gun. A planted gun. I recoiled at how evil this man is that he could even fathom doing something so heinous. But I wasn't entirely surprised because of my own history with him.
Years prior, I worked with Muir as a police dispatcher. One night I agreed to meet up with him and his friends after swing shift for a drink or two. I arrived with a female friend. She got bored and left early while I stayed and regrettably drank the six vodka drinks he ordered for me while I was in the restroom. He was only legally able to order six vodka drinks because everyone at the table was drinking beer except for me and he ordered these vodka drinks on the guise that everyone at the table would be having one. Later that night Muir acquaintance-raped me in the living room of his former residence. I never reported it because I was embarrassed, and I didn't want the inevitable attention and gossip from members/coworkers in the department, which I no doubt would've received had I reported it. Also, he took me to his former roommate's house, which was in the city he patrolled, Burien to commit his crime. Even if I had reported it, his partners/friends would've responded, and they of course would've taken his word over mine. That's



19:14

me to his former roommate's house, which was in the city he patrolled, Burien to commit his crime. Even if I had reported it, his partners/friends would've responded, and they of course would've taken his word over mine. That's just the way of the Good Ol' Boys Club. I knew it then. I most definitely know it now.

The only reason the rape was ever brought up is because four years later, a co-worker and someone I believed to be a friend was going through her second divorce from another cop, who eventually got fired for sending racist and homophobic text messages. My husband, friends and I decided to throw her a divorce party. She asked if she could bring this "nice guy" she was dating. I said of course. The "nice guy" she brought turned out to be Muir. He had told her that he and I dated but I only had "consensual sex" with him only once because I was still in love with my ex at the time. And she believed that.  Doesn't this sound like a bad Lifetime movie?

Of course, I had to warn her. But I didn't want to make a scene, so I waited until after the party.

I explained to her how Muir had bragged to me (in a group outing) that he had created fake social media accounts to cheat and have an affair on his then-wife/mother of his three kids, and when she learned of the blatant deception and infidelity, she slit her wrist in a suicide attempt. Muir was happy this occurred. He boasted, "No judge alive will give a crazy, suicidal BITCH custody of my kids!"

I then explained to my "friend" what Muir did to me. She said, "Oh my God, that sounds like rape." I hurriedly tried to change the subject as I don't like to be a victim. She, of course, told Muir. Muir went to his sergeant, Wing Woo, and told him likely to get out ahead of it. KCSO's Internal Investigations Unit (IIU) got word of this and even though I didn't want to make a report, I was pressured to give a statement. The "investigator," a detective sergeant named Mary Francis Carlson, refused to meet me in person and coerced me into giving a statement via phone. I later learned she never even recorded my statement and completely changed what I told her.  The "investigation" came back UNFOUNDED. After I received a public disclosure request for the report, I saw there was never an investigation but a botched, and biased cover-up. The "investigator," Carlson, I later learned was a former sergeant/supervisor of Muir.

    

19:14

later learned was a former sergeant/supervisor of Muir. According to a former KCSO deputy, "Muir was always her favorite." Conflict of interest? Not for the Good Ol' Boys' Club where a female "investigator" felt the need to "protect her boy."

My husband, an actual good, honest and fair man and police officer, saw this report was appalled at how incompetent and biased Carlson was. He and I voiced concern over the atrocious report, (summary didn't match his statement and a plethora of other flaws including none of my witnesses were ever contacted let alone interviewed and so much more). An outside investigator was hired. KCSO disregarded the mistakes noted by this lawyer and they arbitrarily deemed our complaint UNFOUNDED. I then requested the phone records of Carlson and learned she had at least five off the record, personal calls with Muir, the same deputy whom she was "investigating" but she never recorded any of these statements, took notes or had Muir's attorney or union representative present. She never needed to because she made sure he would be found not guilty. KCSO covered it all up and blamed me.

It was implied that I was not a "normal" rape victim because I wasn't scared of him and I had confronted him after the rape. I flat out told the IIU detectives that this rape wasn't what I believed to be a "normal rape"—I always thought rape was supposed to hurt— I've had tampons bigger than Muir. I'm not afraid of cowards and that is exactly what rapists and cops who abuse their power are. COWARDS. Regardless, I was retaliated against by higher-ups at KCSO, so I eventually quit. They don't deserve me.

I reached out to Muir's first ex-wife/mother of his three kids to apologize for not initially reporting the rape. She apologized to me for not reporting her own abuse of his— she told me he took her to their barn, pointed a gun at her head and demanded she tell the truth about having an affair with their house guest. When she didn't admit to it (because there was no affair) he put the gun to his own head threatening suicide. He then moved the gun away from his head and fired off a round, which could've ricocheted and hit her. She told me via FB messenger, "He is the most manipulative snake I've ever met in my life, he was a tough and controlling personality but not like what he became once he became a cop. It completely changed him into the

     

19:14 

most arrogant, egotistical, twisted, lying and manipulative monster."

I have since then requested Muir's disciplinary file as it's public record. There are NUMEROUS complaints against him. He's been accused of harassment, bigotry, conduct unbecoming, incivility, rape (a second rape by a sex worker), sexual misconduct, dishonesty, stalking etc. Most of these complaints have come back either Unfounded or Non-Sustained.

The only SUSTAINED complaint Muir received was for illegally pulling over a barista. She reported he was stalking her and even though she told him she had a boyfriend, he demanded her phone number and asked her out for drinks "with a group of friends," (same MO of what he did to me before he acquaintance-raped me. Except I never gave him my phone number—he likely got that from work personnel records). Muir admitted he stopped her without a valid reason just "as a joke." He received only a one-day suspension for violating this woman's civil rights. She stated she was terrified, he creeped her out and even her customers expressed their concern of her due to his stalking behavior.

There have been numerous other complaints against Muir. But they've all been swept under the rug.

I believe the man of color who was pulled over with his adult son. He reported to IIU that Muir seemingly stopped him for no reason. When he asked Muir why he was pulled over, Muir became so angry and irate and reached inside the vehicle and violently scratched his neck breaking the skin. Even though a picture of the wound was taken, medical treatment was received and there was a witness, (the man's adult son), IIU still sided with Muir.

A male citizen reported Muir wrote him a false ticket for not wearing a seatbelt. IIU never even took this complaint. The citizen tried to fight the ticket in court. The judge told him, "I have to believe the word of a police officer."

Muir wrote a false police report claiming a sex worker, whom he had placed in his custody, had ripped a hole in the crotch of her leggings, masturbated in front of him and offered him sex for free "because he was so cute." How does a woman with her hands cuffed BEHIND her back do this? When Muir was later questioned, he admitted he never actually saw this. But nothing happened. He's STILL a cop.

    

**19:14**

............... .... ............ .......... ... . . . ... . .....

A young Muslim woman of color working at the Shoreline teen center reported she was highly uncomfortable around Muir because he would stare at her and try to get her alone and stalk her. Shoreline brass decided this should be an NIM (Non-Investigative Matter) even though they know he's been accused of rape. After seeing her name and number in a public disclosure, I reached out to her and told her my story. She cried saying she thought she was crazy but knew in her heart Muir was a bad guy. She told me she was sorry that he raped me, but she thanked me for sharing my experience with her because now she knew she was right. I told her to never doubt her instincts.

I wonder how many other victims of Muir have been gaslighted.

A young male reported Muir lied to him by telling him his tow would be free. When this man got home, the tow truck driver asked for payment. The young man told him he was told the tow was free and asked him to call the police officer, Muir, and Muir would explain. The tow driver called Muir and Muir reportedly denied ever saying the tow was free and said if the young man didn't pay, he would come and arrest him. The young man became indignant and demanded his body camera be reviewed to prove Muir had lied. Muir wasn't wearing a body camera. Muir's word again was believed over this young man's word.

There are too many complainants to list here. Again, his disciplinary file is public disclosure. I am posting this because I do not want to wake up to news that a man or woman of color was shot and killed by this corrupt cop. Fort Worth, Texas police officers wear body cameras so we all can see what happened when Atatiana Jefferson was murdered. KCSO deputies neither wear body cameras nor have cameras on their dash cameras. And as a woman who use to work for police and is married to a police officer, because of what I witnessed, I don't trust police. I urge anyone and everyone who may encounter Jeremy Muir to IMMEDIATELY film him because unfortunately your word means NOTHING against the word of a cop, even a cop who has been caught in lies. Unless you have concrete evidence, i.e., video recording, the King County Sheriff's Office will always take the word of one of their cop's over yours. And their "investigations" will ALWAYS be biased and inadequate to favor their police

     





**3**



 Bonnie Sagiao

 Arne Foss

 Maggie Foss

05:57                                    ⏱ LTE 🔋

< 🔍   Joseph Aulaumea-Fisaga

 **Joseph Aulaumea-Fisaga**                      •••
Sunday at 21:03 · 🌐

Amazingly brave friend of mines....Knowledge is Power!!!

 **Maggie Foss**                          
Sunday at 18:52 · 🌐

I will probably lose a lot of so-called friends by posting
this, but I cannot and will not be silent anymore,
especially in the wake of the recent unjustifi... See More



  

 5                                     1 Share

 Like             Share

            



05:56 · ll LTE

**Maggie Foss**
Sunday at 18:52 · 🌐

3d   Like

**Seattle T. Cornforth**
I've read this 4 times. I'm so proud of you, and os how courageous you are!!! Please stay safe 💕💕👍

3d   Like   5

**Joseph Aulaumea-Fisaga**
Amazingly BRAVE Maggie, I salute you my old friend. For that Muir dude hope he never walks the mainline...he'll diffently come up missing!!

3d   Like   3

**Amy Lemafa**
LOVE YOU Mags! ❤️

3d   Like   5

**Jesse Ballentine**
I'll share your story

3d   Like   4

**Carmen Gonzalez**
I'm so sorry this happened to you Maggie but I sincerely thank you for posting it. We need to be aware.

3d   Like   3

**Robert Donahue**
Thanks for sharing Maggie.

3d   Like   2

**Paula Parks LaPlante**








**kanwallyousuf**
Shoreline, Washington

...




Maggie Foss
October 20 at 6:52 PM · 🌐


1/9

I will probably lose a lot of so-called friends by posting this, but I cannot and will not be silent anymore, especially in the wake of the recent unjustified shooting/murder of Atatiana Jefferson in Fort Worth, TX by a police officer.
This is King County Sheriff's Office Deputy Jeremy Muir. He currently works for the King Coun... See More













## Instagram

 

about him but Maggies post says it all.

Be aware of this man, it is true...these things are happening and it's scary.

How can they let a guy like that work at a teen center? How can they just let him go into his car on the streets?

May Allah protect us all and bring justice to those affected by him.

If you comment, I'm not going to respond because I don't want to look at this post again. But I'm posting because I've been encouraged to share this. There have been many others reaching out to Maggie about their experience with this guy.

 Add a comment...            

3 hours ago

    



**••ll AT&T 🗇**　　　**4:10 PM**　　　**🖈 92% ▇**

 **Instagram** 

you over". When he pulled over a relative of mine (for the second time), he said "I guess I'm meeting your whole family". He told everyone that he my family members tickets and I had to tell him "don't bring up my family". There's just a lot more to say about him but Maggies post says it all.

Be aware of this man, it is true...these things are happening and it's scary.

How can they let a guy like that work at a teen center? How can they just let him go into his car on the streets?

May Allah protect us all and bring justice to those affected by him.

If you comment, I'm not going to respond because I don't want to look at this post again. But I'm

    



## Instagram

 

**ᵼᵢᵼᵢ AT&T 🤖**　　　**4:10 PM**　　　**🧭 92% 🔋**

This guy worked with me at the teen center and there's just so much to say about his actions towards me. He used to stalk me and park in front of my street and every time I would ignore him. he would call it out infront of everyone when I saw him at the teen center. Maggie found my report a few months later and got in contact with me to tell me about everything she knows (she used to be a deputy). He's pulled over People of color I know for no reason. He used to make inappropriate comments towards me in front of the middle school kids I worked with and sometimes the other male staff (who wouldn't say anything).
Sometimes he'd say something like "I should just randomly pull

    



.ıl AT&T 🛜          4:10 PM          ↗ 92% 🔋

# Instagram

 

others

**kanwallyousuf** This is really hard for me to post but I have been in contact with Maggie, because I am the girl from the teen center. I reported him to the city of shoreline, twice and talked to king county sheriff department. Everything I reported was recorded. I was interviewed and asked questions when I met with a lady sheriff who was in charge of the affairs. We met at third place books and she recorded the whole interview. It took me a while to report and I had to wait after I quit the job and my family moved out from Shoreline (which he noticed and asked me if I moved the last few times I worked there). Even then I was so scared to report it. They didn't take me seriously.

    



 **Maggie Foss** shared a **post** to the group: **Take back Burien**.   •••
Yesterday at 5:27 PM · 🌐

FYI, since I posted this on my page, numerous people have posted their own complaints on him or have sent me private messages about how he has abused them... I've heard he sometimes works OT in Burien... Protected Predator! Please be aware!







**Maggie Foss** October 20 at 5:52 PM · 🌐

I will probably lose a lot of so-called friends by posting



AT&T 08:09 100%

mobile.twitter.com

Search Twitter

Log in

Sign up

Follow

**Maggie Foss**

@MaggieFoss

Former police dispatcher, yes FORMER, because I refuse to work for dishonest police departments that protect corrupt cops.

Kent, WA Joined October 2010

**366** Following **45** Followers

Tweets Tweets & replies Media Likes

**Maggie Foss** @MaggieFoss · 16h

So disappointed in this game.... Come on Hawks! #Seahawks 12

📶 AT&T 🛜                08:09                100% 🔋

🔒 mobile.twitter.com

🐦        🔍 Search Twitter                    ○○○

( **Log in** )          ( **Sign up** )

 **Maggie Foss** @MaggieFoss · Sep 22          ⌄
This is the rapist cop Jeremy Muir

💬          🔁          ♡ 1          ⬆️

**Show this thread**

 **Maggie Foss** @MaggieFoss · Sep 22          ⌄
This is the rapist Jeremy Muir





**Maggie Foss** @MaggieFoss · Sep 22

This is the rapist cop Jeremy Muir



Show this thread



**Maggie Foss** @MaggieFoss · Sep 22

This is the rapist Jeremy Muir







**Maggie Foss** @MaggieFoss · Sep 22

They didn't believe any of the other plethora of complaints against him because DIRTY COPS PROTECT OTHER DIRTY COPS. And sadly, this is not #Unbelievable

♡ 2

Show this thread

## Who to follow



**Miranda**
@ReadrsLibrarian



Readers Librarian for Topeka Library. Bookworm, writer, mom, & dog-mom.



**Joanne Ryan**
@Jocullenryan



Full time working Mam of 3, trying to stay sane while keeping everyone alive 🤪



**REDbeardwrites**
@REDbeardwrite



Nobleman of the notebook. Not very good at it yet. Series in the works. Work in progress.



all AT&T 🛜                    08:09                    100% 🔋
                        🔒 mobile.twitter.com

🐦        🔍 Search Twitter                          000

[ Log in ]        [ Sign up ]

**Maggie Foss** @MaggieFoss · Sep 22      ⌄
They didn't believe the barista who accused
him of stalking and harassing her....

💬          ⟲          ♡ 2          ⬆

Show this thread

**Maggie Foss** @MaggieFoss · Sep 22      ⌄
They didn't believe the teenaged boy who
accused him of lying and demanded they
review the police body cam.... KCSO
deputies don't wear body cams nor have car
cameras....

💬          ⟲          ♡ 2          ⬆

Show this thread

**Maggie Foss** @MaggieFoss · Sep 22      ⌄
They didn't believe the sex worker who he
wrote a false police report about...he
arrested a hooker & wrote she ripped a hole
in the crotch of her leggings (while hands
cuffed BEHIND her) and masturbated in front
of him & offered him sex for free because he
was "so cute."

💬          ⟲          ♡ 1          ⬆

Show this thread



**Maggie Foss** @MaggieFoss · Sep 22

They didn't believe them who accused Jeremy Muir of discrimination, harassment, incivility and bigotry....

Show this thread

**Maggie Foss** @MaggieFoss · Sep 22

They didn't believe his second ex-wife who said he told her he fantasized about earning "street cred" by shooting someone and would leave a drop-gun on his victim if they didn't have a gun....

Show this thread

**Maggie Foss** @MaggieFoss · Sep 22

But I wasn't the only one...they didn't believe his 1st ex-wife when she told them he took her to their barn, pointed a gun at her and demanded she admit to cheating on. They didn't believe her when she told them he put the gun to his head and shot at the barn wall...



**ıll** AT&T 🛜      08:10      100% 🔋
🔒 mobile.twitter.com

←    🔍 Search Twitter    ○○○

Log in      **Sign up**

**Maggie Foss** @MaggieFoss · Sep 22 ∨
Replying to @MaggieFoss
They didn't believe his second ex-wife who
said he told her he fantasized about earning
"street cred" by shooting someone and
would leave a drop-gun on his victim if they
didn't have a gun....

💬    🔁    ♡ 1    ↑

**Maggie Foss** @MaggieFoss · Sep 22 ∨
Replying to @MaggieFoss
They didn't believe them who accused
Jeremy Muir of discrimination, harassment,
incivility and bigotry....

💬    🔁    ♡ 2    ↑

**Maggie Foss** @MaggieFoss · Sep 22 ∨
Replying to @MaggieFoss
They didn't believe the sex worker who he
wrote a false police report about...he
arrested a hooker & wrote she ripped a hole
in the crotch of her leggings (while hands
cuffed BEHIND her) and masturbated in front
of him & offered him sex for free because he
was "so cute."

💬    🔁    ♡ 1    ↑



**Maggie Foss** @MaggieFoss · Sep 22

Watching #Unbelievable Not at all surprised about the incompetent police. I was raped by a cop, King County Sheriff's Officer Jeremy Muir. The "detectives" completely covered it up to clear him...Just like they mitigated all the other accusations against him. I hate corrupt cops!

♡ 9          ♡          ♡ 2          ↑

Show this thread

**Maggie Foss** @MaggieFoss · Sep 9

I am not a fan of the so-called trendy thick eye brows... ugh, they look like fat, furry slugs camped out above the eyes.

♡          ♡          ♡          ↑

**Maggie Foss** @MaggieFoss · Aug 19

You have to love yourself before u can even think of loving someone else... and you're not capable of loving another until you know and love yourself.

♡          ♡          ♡          ↑

**Maggie Foss** @MaggieFoss · Aug 18

3 furry ass dogs— 1 would think they'd all



of him & offered him sex for free because he was "so cute."

♡ 1

**Maggie Foss** @MaggieFoss · Sep 22

Replying to @MaggieFoss

They didn't believe the teenaged boy who accused him of lying and demanded they review the police body cam.... KCSO deputies don't wear body cams nor have car cameras....

♡ 2

**Maggie Foss** @MaggieFoss · Sep 22

Replying to @MaggieFoss

They didn't believe the barista who accused him of stalking and harassing her....

♡ 2

**Maggie Foss** @MaggieFoss · Sep 22

Replying to @MaggieFoss

They didn't believe any of the other plethora of complaints against him because DIRTY COPS PROTECT OTHER DIRTY COPS. And sadly, this is not #Unbelievable

♡ 2







Log in        Sign up

Replying to @MaggieFoss

# Shame him on all social media

1:02 AM · Sep 22, 2019 · Twitter Web Client

**1** Like



**Maggie Foss** @MaggieFoss · Sep 22
Replying to @KC7WGB


I just want people to be aware of him so they can protect themselves by filming him... he's STILL a cop with a badge and unlimited power.

♡ 1

**Maggie Foss** @MaggieFoss · Sep 22
Replying to @KC7WGB


They also didn't believe the man of color who had his neck scratched by Muir during a traffic stop... nor did they believe the victim's son who witnessed the assault

♡ 1



**Maggie Foss**
@MaggieFoss

Replying to @komonews

That makes about as much sense as King County Sheriff's Office Deputy Jeremy Muir writing a police report that a hooker (w/her hands cuffed behind her back) ripped a hole in the crotch of her leggings and masturbated. But KCSO covered that up just like this department will too

10:30 PM · Mar 23, 2019 · Twitter for iPhone

**1** Retweet   **10** Likes

This Tweet is unavailable.

 **Maggie Foss** @MaggieFoss · Mar 24
Thanks. Deputy Muir also admitted to illegally pulling over a cute barista on a traffic stop "as a joke" since he had no cause to stop her. He was only given a one day suspension for that. All public record.

**Tape Recorded Witness Statment Form**

Case # _2020 - 3313_

### MONROE POLICE DEPARTMENT
### TAPE RECORDED WITNESS STATEMENT

Statement of _GAYLE D. HANKS_    Date of Birth _9-26-1948_

The date is _MAY 21, 2020_ The time now is _5:12 PM_.
I am _PAUL HENDERSON_ of the Monroe Police Department. This statement
is being recorded at _1231 NE 184TH PL, SHORELINE_ There are _2_ persons
present in the room. For the purpose of voice identification, would each person present besides
Mr., Ms., Mrs., _____ who is giving a statement, state your name
and occupation one at a time.

Q.    _____ GAYLE _____, do you understand that this statement is being recorded?
Q.    Do I / we have your consent to record this interview?
Q.    Would you give your full name and spell it please?
Q.    Would you give your date of birth please?
Q.    Would you give your address please?
Q.    Would you give your home telephone number please? _206 - 363 - 9050_
Q.    Would you give your work telephone number please?

**QUESTIONS FOR WITNESS AT END OF STATEMENT:**
Q.    Do you have anything else you would like to add to this statement?
Q.    Do you certify or declare under penalty of perjury under the laws of the State of
       Washington the facts stated on this tape are true and correct to the best of your
       knowledge?
Q.    Has your statement been made freely, voluntarily, and without threats or promises of any
       kind?
Q.    Would you please sign this document?

_Gayle D. Hanks_                          _P_ #2055
Witness' Signature                        Officer's Signature

The time is now _5:32 PM_, and this concludes this statement.

Updated 7/18/11

# Transcription, Voicemail

(Unintelligible), Monday 2:47pm.

Hi Gayle, my name is Maggie Foss and I used to work for the King County Sheriff's Office. I'm calling because I found your name in a complaint against the Shoreline Deputy Jeremy Muir.  Um, Shoreline Police are corrupt and dirty and they have been protecting Jeremy Muir for years.  Jeremy Muir raped me on March 27th, 2010 and the Shoreline Police completely covered it up and they tried to say that I was crazy just like they are claiming in this public records uh, request that I just got back, that you are crazy.  Um, I have a lot of information about Jeremy Muir and Shoreline Police, so if you ever wanna talk about it my number is 206-351-6956.  He has numerous complaints against him and they have all been unfounded, non-sustained, exonerated, except for one. Um, and that's because he admitted to stalking this barista and yeah.  It's just, it's, it's disgusting.  Um, anyways I just wanna let you know that I believe you and I'm sorry you have to live in Shoreline and deal with that piece of shit, excuse my language, but that's what he is.  Have a good day, bye, bye.

 (END OF RECORDING)

MONICA SANDOVAL, INVESTIGATIVE SUPPORT OF THE MONROE POLICE DEPARTMENT, ON 06/09/2020, TRANSCRIBED THIS RECORDED STATEMENT.

Monica Sandoval 06/09/2020
_____ _____
MONICA SANDOVAL     DATE

 Detective Paul Henderson
REVIEWED BY:  _____

 06-18-2020
DATE REVIEWED:  _____

# Transcription, Hanks, Gayle

Detective Henderson: Alright, this is the statement of Gayle Hanks, date of birth 09/26/1948.  The date is May 21st, 2020.  The time is now 5:12pm.  I am Paul Henderson of the Monroe Police Department.  This statement is being recorded at Gayle's home, which is 1231 Northeast 184th Place in Shoreline Washington.  There are two persons present in the room.  Gayle do you understand that this statement is being recorded?

Gayle Hanks: Yes I do.

Detective Henderson: And do I have your consent to record this interview?

Gayle Hanks: Yes.

Detective Henderson: Would you give your full name and spell it please?

Gayle Hanks: Gayle Dianne Hanks, G-A-Y-L-E, D-I-A-N-N-E, H-A-N-K-S.

Detective Henderson: And would you—would you give your date of birth please?

Gayle Hanks: ███

Detective Henderson: And can you give uh, your—oh we already went over your address, I'm just confirming it is the 1231 Northeast 184th Place?

Gayle Hanks: Yes.

Detective Henderson: In Shoreline?

Gayle Hanks: Yes.

**Detective Henderson:** Okay.  And can you give your telephone number please?

**Gayle Hanks:** 206-363-9050

**Detective Henderson:** Okay.  And obviously I explained to you earlier that I'm here uh with an investigation that you had uh, come up with, because there was information I was told you were given regarding uh, sexual allegations against Jeremy Muir…

**Gayle Hanks:** Mm-hmm

**Detective Henderson:** …who's a deputy for King County who works in Shoreline.

**Gayle Hanks:** Yes.

**Detective Henderson:** So if, if you can briefly describe how you uh, know Jeremy Muir.

**Gayle Hanks:** I have to say it was clo—very close after January 16th.  It was my grandson's birthday that's why I remembered it, of 2015, and I have been attacked by five full grown Pitbulls 100 feet from my door in my back yard. I heard the car door open and somebody shout an order and the dogs started coming at me, broke my fence and I got to the back door and slammed it just as they were bouncing off of it.  So I called the police and I got a very angry officer. I don't know who it was. It could've been him, but I've never—cuz I was shocked, just shocked.  And um, yeah because there was two guys from that house trying to get their Pitbulls out of my yard when the police off—so that had to take at least ten minutes for him to get here.  And I had a cup of old cold (unintelligible) like a cup of coffee and I threw it down off my deck while I was watching these people and their dogs trampling my garden and this police officer wanted to cite me for throwing my coffee down at them.  And I said 'That's just…' and then he just said 'This is Animal Control.' and left.  And it had to be like a week, maybe two, after that incident that somebody knocked on my door and I answered it and it was a Shoreline Police Officer and I thought it was going to be somebody saying 'Oh hey we found in the book…' something about the dog attack or whatever, but he was, he had a clenched fist and a gritted teeth and just was threatening and um, shouting things at me that he could hardly wait to grab me and throw me and cuff me and arrest me and blah, blah and I'm going 'For what?' you know.  I mean I didn't say anything, but in my head I was saying 'You must have the wrong house.' You know that kind of thing.

**Detective Henderson:** Mm-hmm

**Gayle Hanks:** And um, he did—and he went uh, 'When we get the prints back…' and blah, and I knew I didn't do anything so…

**Detective Henderson:** And that was only a couple of weeks after the first…

**Gayle Hanks:** After the…

**Detective Henderson:** …the dog incident?

**Gayle Hanks:** After the dog Pitbull thing.

**Detective Henderson:** Okay.

**Gayle Hanks:** And then um, I'm not sure if I complained about him then or if I called the police and asked them why they would do that.  I don't think I did. I think it was last year um, in May when Susie Kroll came with Jeremy Muir and I was talking to her and I was trying not to look at him, because somehow he looked familiar to me in a bad way.  And then when he started to speak to me in a threatening (unintelligible) tone and he said 'You're going to court next week and after that court thing you're gonna leave those nice people over there...' that are poisoning me in my yard '…alone and let them live their life.' So I just said, 'you know what you need to leave now.' And I went in my door and slammed it and then he stayed out there in front of my house for a long enough time that I decided it was a good time to take out the garbage and I did and slammed that lid and then just stared at him until they left.

**Detective Henderson:** Okay. And it, and uh, it sounds like from what you were saying earlier that after that interaction…

**Gayle Hanks:** Mm-hmm

**Detective Henderson:** …you filed a complaint?

**Gayle Hanks:** I did.

**Detective Henderson:** With the Shoreline Police Department?

**Gayle Hanks:** Yep, because I realized that the reason no one was paying any attention to me, the victim, is because there was some crud in the Shoreline Police Department called Jeremy Muir and spreading all kinds of gossip, I kill dogs.  People move away because of me.  Um whatever those complaints with, again—they're against me, they're lies.

**Detective Henderson:** And so the complaint against Jeremy Muir was probably around May of last year, 2019?

**Gayle Hanks:** It had to be, cuz I was so sick.  I couldn't walk and I had to get Adult Protective Services to help me.

**Detective Henderson:** Okay.

**Gayle Hanks:** From chemical exposure.

**Detective Henderson:** And then stemming from that complaint, lets fast-forward a little bit, uh just recently or in the last few months you received a phone call.

**Gayle Hanks:** Mm-hmm

**Detective Henderson:** Uh, in regards to allegations uh, more allegations against Jeremy Muir.

**Gayle Hanks:** Right.

**Detective Henderson:** Specifically sexual allegations.

**Gayle Hanks:** Well that may—they make total sense to me.

**Detective Henderson:** Okay, so can you…

**Gayle Hanks:** Cuz I mean I'm too old for him to hit me.

**Detective Henderson:** So how did you…

**Gayle Hanks:** (Unintelligible) on me.

**Detective Henderson:** Can you explain how you found out about that and when that was?

**Gayle Hanks:** Um, well it had to be when I got that phone message, whatever date was on there was the day.

**Detective Henderson:** Okay, do you remember what month was that?

**Gayle Hanks:** I think it was February.

**Detective Henderson:** In February, okay.

**Gayle Hanks:** Yeah.

**Detective Henderson:** Okay so you got a, a phone message in February…

**Gayle Hanks:** Mm-hmm

**Detective Henderson:** …and who was that from?

**Gayle Hanks:** From Maggie Foss.

**Detective Henderson:** Okay.  And do you remember—can you recall what she said on the recording? I mean just a…

**Gayle Hanks:** Well…

**Detective Henderson:** …general observation?

**Gayle Hanks:** …it made me feel like oh boy at least there's somebody that does believe me and isn't going to try and slander and libel and lie about me and say I'm crazy and all of that. I've been through a lot.

**Detective Henderson:** It sounds like that.

**Gayle Hanks:** I had a really good case against the City of Shoreline, the Shoreline Police Department and City Hall.

**Detective Henderson: So did you call Maggie back?**

**Gayle Hanks: Mm-hmm**

**Detective Henderson: And what was that like?  Would—did she…?**

**Gayle Hanks: She um, I, I said well I'm seventy-one, so you know obviously he wouldn't be sexually interested in me and but he is uh, uh, I—my first husband was horrible. He would grab my hair and beat my head against the wall so there wouldn't be bruises.  But he broke my neck, punctured my eardrums, smashed my, that bone, broke my nose and I've been battered. I know what those kind of people are like.  And that's him. And he has lied about me. He's lied to the other, other police officers there and no one paid attention to my case, because of him.  And I believe that firmly.**

**Detective Henderson: Okay.  And what kind of things did Maggie talk to you about from her experience?**

**Gayle Hanks: Well that um, she worked there uh, the Shoreline Police Department, which was in 2010 was a much smaller police department then, then it is now and in fact I ever uh, lifelong friend that volunteers her time there that I found out, volunteers her time there at the front desk, when I got my concealed weapon license, even though I don't have a weapon.  Um, so I was FBI background checked in 2015 and if I had had anything on my record I would've not have gotten that permit.  So I guess that's why allegations of 'Oh you're crazy. You're not a good person.' and that, they…it's hard to…**

**Detective Henderson: Yeah, but what—what did Maggie talk about?  I mean were there specific allegations she made against Muir?**

**Gayle Hanks: Well yeah that he, that, that um, date rape they called it.**

**Detective Henderson: Was she the victim or somebody else?**

**Gayle Hanks: No she was the victim.**

**Detective Henderson: Okay.  And did she talk about when that happened or anything about that?**

**Gayle Hanks: Um, probably, but I'm—maybe not—I mean it was be—she—they—King County paid her ninety some thousand dollars.**

**Detective Henderson: Did she tell you that?**

**Gayle Hanks: Yes.**

**Detective Henderson: Okay.  And did she say what the…**

**Gayle Hanks: And that she was…**

**Detective Henderson: …payment was for?**

**Gayle Hanks: For, just your date raped and you can, you can, they both get to keep their jobs, but she could not continually work around that atmosphere anymore, because—would you be able to?  You wouldn't, not when him and then all of his friends are against you also.**

**Detective Henderson: Because you mentioned that at the time she was working for the Shoreline Police Department and…**

**Gayle Hanks: Mm-hmm**

**Detective Henderson: …and is she still a police officer now?**

**Gayle Hanks: Mm-hmm**

**Detective Henderson: Okay.  Do you know where she works?**

**Gayle Hanks: No I didn't ask her, but…**

**Detective Henderson: Okay.  But she told you that she's still a police officer?**

**Gayle Hanks: Yeah.**

**Detective Henderson: Just for a different agency?**

**Gayle Hanks: Different city.**

**Detective Henderson: And she told you she got married as well?**

**Gayle Hanks: Uh-huh**

**Detective Henderson: Okay.  Did she say who to?**

**Gayle Hanks: A police officer.**

**Detective Henderson: Okay.  Uh…**

**Gayle Hanks: So that they're not all bad.  And I already know that.**

**Detective Henderson: Yeah.**

**Gayle Hanks: I do.  People are people. I worked for the Post Office and most of them are men.  And almost all of them were nice.  They really are, but some weren't.**

**Detective Henderson: Yeah.  Not everybody can be good.**

**Gayle Hanks: No.**

**Detective Henderson: Um, now did Maggie talk to you about other victims or possible victims?**

**Gayle Hanks: Mm-hmm**

**Detective Henderson: Uh…**

**Gayle Hanks: The sex worker in the back of the uh, squad car.**

**Detective Henderson: Can you talk about that?  What did she tell you about that?**

**Gayle Hanks: That, that there, that she, this sex worker was raped by him in the back of his squad car.**

**Detective Henderson: And when you say him you mean…**

**Gayle Hanks: Jeremy Muir.**

**Detective Henderson: Okay.**

**Gayle Hanks: But I would even have to say without camera video he said she said. You don't have a good case there.**

**Detective Henderson: Mm-hmm**

**Gayle Hanks: If you're the sex worker, what are you doing being a sex worker?  You know?  I mean that's kind of low life anyway. So I'm sure that went nowhere.  And um, oh his wife.  But that was in the um, ex-wife.  That was in the um, Facebook thing.**

**Detective Henderson: So did…**

**Gayle Hanks: She didn't tell me that.  Some of the stuff I read.**

**Detective Henderson: Oh okay.**

**Gayle Hanks: In that, in that.**

**Detective Henderson: So do you remember what she told you about over the phone?**

**Gayle Hanks: Not as much as what I read in the, so there again I'm not being—I have a lot going on.**

**Detective Henderson: Oh I totally understand it. If you don't remember which…**

**Gayle Hanks:** I mean I'm just…

**Detective Henderson:** …that's fine.  So maybe we'll just talk about um you said online, right?

**Gayle Hanks:** Mm-hmm

**Detective Henderson:** So uh, what did Maggie talk to you about or show you or tell you about on the phone in regards to online?

**Gayle Hanks:** She said that um, that there's a Facebook thing uh, that I could get and I did.  And I put it on my page so it wouldn't get erased.  And in case he ever came back.

**Detective Henderson:** Okay.  And that's um, so it was a post that she made on her page?

**Gayle Hanks:** Mm-hmm

**Detective Henderson:** And you reposted it on your page?

**Gayle Hanks:** Mm-hmm

**Detective Henderson:** Got it.  Uh, and that was the one that you showed me earlier that I took pictures of?

**Gayle Hanks:** Mm-hmm

**Detective Henderson:** Alright. Um, have you reposted anything else of hers?

**Gayle Hanks:** No I don't even, no.

**Detective Henderson:** Okay.

**Gayle Hanks:** I don't have…

**Detective Henderson:** I don't know if there was other things about Jeremy that she had posted.

**Gayle Hanks:** No, she gave me her phone number and she, she had to go to work so she couldn't talk long and she said I could call her any time.

**Detective Henderson:** And you mentioned you called her earlier today.

**Gayle Hanks:** I did.

**Detective Henderson:** After I contacted you.

**Gayle Hanks:** After you called me I called her.

**Detective Henderson:** Okay.

**Gayle Hanks:** Because I thought that would be fair.

**Detective Henderson:** Yeah.  Um, and how did Maggie say that she got like your phone number or, or found out about you?

**Gayle Hanks:** She uh, because I made a formal complaint to IUU I believe it is.

**Detective Henderson:** At Shoreline?

**Gayle Hanks:** No, at King County.

**Detective Henderson:** Oh the Sheriff's Department?

**Gayle Hanks:** Yes.

**Detective Henderson:** Okay.  The IIU Department?

**Gayle Hanks:** Uh, yes. And they did an investigation and found no wrongdoing and I went well that's just typical. That's what happens when you file a complaint against a lawyer or a doctor too. You have to do it more than once and you have to have evidence.

**Detective Henderson:** So she found out that you made a complaint?

**Gayle Hanks:** Mm-hmm

**Detective Henderson:** And that's how she got your information?

**Gayle Hanks:** Mm-hmm

**Detective Henderson:** Okay.

**Gayle Hanks:** And I was grateful, because what I had wasn't much either.

**Detective Henderson:** Hmm

**Gayle Hanks:** But he's a creep and he should not be a wearing a uniform. At least not that uniform. The garbage truck uniform, that's the one he should be wearing.

**Detective Henderson:** And you mentioned earlier that…

**Gayle Hanks:** I found out about him online myself.

**Detective Henderson:** Oh okay.

**Gayle Hanks:** I did. I just knew he was tied to these creeps over here that are trying to kill me.

**Detective Henderson:** So in regards to…

**Gayle Hanks:** Cuz he stook up—he stood out for them twice.

**Detective Henderson:** Yeah. So in regards to the allegations that Maggie was bringing forward…

**Gayle Hanks:** Mm-hmm

**Detective Henderson:** Is there anything else that you think would help in regards to like information you know or information you found out from Maggie?

**Gayle Hanks:** No, most of it I found out myself.

**Detective Henderson:** Okay.

**Gayle Hanks:** I mean I just looked him up and found out he was a um, um, previous National Guard um…

**Detective Henderson:** You're talking about Jeremy?

**Gayle Hanks:** Yeah.

**Detective Henderson:** Okay.

**Gayle Hanks:** Maybe it's National—I think it was National Guard and I can't remember exactly what I thought he did there, but maybe it was—wasn't garbage, but it was some—something and then he um, had his own garbage truck or, or route, whatever, in Oregon.

**Detective Henderson:** Oh okay.

**Gayle Hanks:** And then he moved up here the same time these creeps did in 2008.

**Detective Henderson:** Your neighbors over here?

**Gayle Hanks:** Yeah.

**Detective Henderson:** Okay.

**Gayle Hanks:** Yeah.  And, and, and after that nobody, no police would ever listen to me.

**Detective Henderson:** Um…

**Gayle Hanks:** I mean…

**Detective Henderson:** Oh I was gonna ask about the recording.  So we recorded the voicemail that Maggie left.

**Gayle Hanks:** Yes.

**Detective Henderson:** And that was back in I think February.

**Gayle Hanks:** I think so.

**Detective Henderson:** Um, and is it normal for you to keep the recordings that long?

**Gayle Hanks:** Well I kept ones that are important to me.

**Detective Henderson:** Okay.

**Gayle Hanks:** So um, Walter from PS Clean Air that left the message that they finally gave those creeps their first violation….

**Detective Henderson:** Yeah.

**Gayle Hanks:** …they finally caught them.

**Detective Henderson:** And I noticed you had a few messages on there.  So basically you…

**Gayle Hanks:** So, and one was from Britney from (unintelligible) Blue Cross that I'm reporting a fraud…

**Detective Henderson:** Okay.

**Gayle Hanks:** …(unintelligible) doctor.

**Detective Henderson:** I don't need to know all the messages.

**Gayle Hanks:** But I mean those are important, cuz they have a phone number.

**Detective Henderson:** Yeah. I just wanted to find out why you kept them and that's because you knew Maggie's was important to you?

**Gayle Hanks:** Yes.

**Detective Henderson:** Okay.

**Gayle Hanks:** Because it backed up what a creep Jeremy Muir is.

**Detective Henderson:** Okay.

**Gayle Hanks:** And what I had wasn't sexual, but it certainly is scary.

**Detective Henderson:** Absolutely, absolutely.

**Gayle Hanks:** You know I mean I—if he could do what he wanted to do, that—he shouldn't be a police officer.

**Detective Henderson:** Yeah. Now…

**Gayle Hanks:** Cuz he doesn't have any…

**Detective Henderson:** When you were talking with Maggie did she talk about ever reaching out to other people or other victims or…?

**Gayle Hanks:** Yes.

**Detective Henderson:** Yeah?

**Gayle Hanks:** That she had—that there were other victims that reported Jeremy Muir.

**Detective Henderson:** Reported on him?

**Gayle Hanks:** Mm-hmm

**Detective Henderson:** Okay.  Did she reach out—do you know if she ever reached out to his ex-wife?  Cuz she talked about problems with the ex-wife.

**Gayle Hanks:** I think that I—I just—I read that mostly on that Facebook thing.

**Detective Henderson:** Oh okay.  So, but she—she did talk to you on the phone in regards to um, the sex worker?

**Gayle Hanks:** Mm-hmm, well I think so yes.

**Detective Henderson:** Okay.  Uh, I'm just curios if she's…

**Gayle Hanks:** Well…

**Detective Henderson:** …actually talking to this sex worker.

**Gayle Hanks:** She worked there.

**Detective Henderson:** At the police department?

**Gayle Hanks:** Yeah

**Detective Henderson:** So she probably had access to that kind of stuff?

**Gayle Hanks:** I would think so.

**Detective Henderson:** And you're—and she told you she works as a police officer now, but you're not sure what…?

**Gayle Hanks:** She doesn't work in Shoreline and she doesn't work in Snohomish.

**Detective Henderson:** Okay.

**Gayle Hanks:** I mean uh, Monroe.

**Detective Henderson:** But somewhere around here?

**Gayle Hanks:** Somewhere.

**Detective Henderson:** As a police officer?  And, and her husband is a police officer?

**Gayle Hanks:** I believe so.

**Detective Henderson:** Okay, alright.

**Gayle Hanks:** I mean as far as I know. I—I—I can't say for sure, but that's what I was told.

**Detective Henderson:** By her?

**Gayle Hanks:** Yes.

**Detective Henderson:** Okay. Uh, I think that's it so I'm just gonna have some really quick statements at the bottom here.

**Gayle Hanks:** Okay.

**Detective Henderson:** It just says, do you certify or declare under penalty of perjury under the laws of the State of Washington the

**facts stated on this tape are true and correct to the best of your knowledge?**

**Gayle Hanks: Yes.**

**Detective Henderson: And has your statement been made freely, voluntarily and without threats or promises of any kind?**

**Gayle Hanks: Absolutely.**

**Detective Henderson: And I'm gonna have—ask you here, would you please sign this document…**

**Gayle Hanks: Okay.**

**Detective Henderson: …under the witness signature?**

**Gayle Hanks: Maybe I'll do that.  Okay.**

**Detective Henderson: Thank you and I'm gonna sign next to your name here.  So the time is now 5:32pm and this concludes this statement.**


**(END OF RECORDING)**

**MONICA SANDOVAL, INVESTIGATIVE SUPPORT OF THE MONROE POLICE DEPARTMENT, ON 06/11/2020, TRANSCRIBED THIS RECORDED STATEMENT.**

**Monica Sandoval 06/11/2020**

**_____   _____**
**MONICA SANDOVAL     DATE**

**Detective Henderson**
**REVIEWED BY:  _____**

**06-18-2020**
**DATE REVIEWED:  _____**

**Request for Investigation**

SNOHOMISH COUNTY PROSECUTING ATTORNEY'S OFFICE
**REQUEST FOR INVESTIGATION**
Dated: June 23, 2020

| | |
|---|---|
| **Police Agency:** | **MONROE PD** |
| **Agency #:** | **20003313** |
| **Contact:** | RECORDS |
| **Agency email** | pdrecords@ci.monroe.wa.us |
| **Lead LEO:** | PAUL HENDERSON |
| **Suspect:** | MAGDALENA KRISTIN FOSS |
| **Crime(s):** | 1.   STALKING DOMESTIC VIOLENCE (DV)(RCW 10.99.020 HOUSEHOLD OR FAMILY MEMBER RELATIONSHIP) |
| **DOV:** | January 15, 2015 |
| **PA #:** | 20-5245 |
| **Court/Division:** | |

I.      **Case status**
[X] B.  We need additional reports or information in order to file a violent/sex felony charge.  Due to the sensitive nature of this case, we will keep our file open until 7/17/2020, awaiting receipt of the requested items below.

II.     **Requested items**
[ ]  1.  Officer's report: Detective Henderson called about a month ago stating he had received more documentation regarding allegations in this case.  He had mentioned forwarding them on for review.  To date our office has not received anything additional, please forward on anything else received in this case.

Return requested items **WITH A COPY OF THIS FORM** via SharePoint.

If you have any questions regarding this request please contact:

| | |
|---|---|
| **DPA:** | JAIME V TAFT, WSBA #: 39642 |
| **Phone number:** | (425) 388-3853 |
| **E-mail address:** | jtaft@co.snohomish.wa.us |

****ATTENTION ****
- RETURN THIS REQUEST WITH ITEMS LISTED ABOVE via SHAREPOINT – IF YOUR AGENCY HAS ACCESS
- SEND COPIES ONLY, DO NOT SEND ORIGINALS.
- DO NOT SEND DUPLICATES OF THE INITIAL REFERRAL.
- DO NOT SEND FOLLOW-UP VIA E-MAIL
   ONLY E-MAIL DPA'S WITH QUESTIONS / CLARIFICATION.

**Sno911 Fax confirmation**

```
                                                                    P. 1

        x   x   x   Communication Result Report ( Jun. 30. 2020  5:53PM ) x x x
                                                        1) Monroe Police Department
                                                        2)
```

Date/Time: Jun.30. 2020  5:52PM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|---|
| 4009 | Memory TX | Snopac | P. 1 | OK | |

```
----------------------------------------------------------------------
Reason for error
    E. 1) Hang up or line fail          E. 2) Busy
    E. 3) No answer                     E. 4) No facsimile connection
    E. 5) Exceeded max. E-mail size     E. 6) Destination does not support IP-Fax
```

## SNOHOMISH COUNTY 911 PREMISE HISTORY DATA FORM
1121 SE EVERETT MALL WAY #200, EVERETT 98208

THIS FORM MUST BE COMPLETED FOR ANY PREMISE ENTRY REQUEST
IF UNABLE TO SUBMIT VIA EMAIL PLEASE FAX TO SNO911 425-407-3960
FOR ANY QUESTIONS CONTACT THE SNO911 SUPERVISOR 425-407-3930

1. Type  ☒ New Entry  PREMISE INFO    ☐ Update Existing  ☐ Delete Existing

2. Address  15991 168 AVE SE    Qual/City    City  Monroe

3. Subject Information (if applicable)

Last Name  Muir    First Name  Jeremy    Initial

Date of Birth    Sex  M - MALE    Race  W - White

Height    Weight    Eye Color    Hair Color

4. Weapons Information

5. Jamie Phone Number  +1 (360) 991-4106    360-348-6099
                                            360-348-7251
                                            360-348-6118

6. Associated Vehicle (if applicable)

Color    Year    Make    Model

License Plate    State or Province    Country

7. Reason for Request  Please be aware, this is the home to a KCSO deputy who is the victim of ongoing threats. Please contact KCSO Detective Batt at 2063919931 or Detective Sgt Devore at 3064331643 of any calls to this address.

8. Associated Case Number (if applicable)  Monroe PD #202000003313

Submitting FDLE Agency  LB - KCSO    Purge Date  01/01/2099 (Non-expiring by default)

Official/Officer Requesting Entry  Batt, King County SO    Badge/ID Number  78517    Date  06/30/2020

Supervisor Authorization    Badge/ID Number    Date

** SNO HOMISH COUNTY 911 USE ONLY **    VALIDATION HISTORY

ENTERED BY    ENTRY DATE

REVIEWED BY    REVIEWED DATE

PURGED BY    PURGED DATE



# Quick Property Receipt



**Print Date/Time:** 02/19/2020 17:45
**Login ID:** mm2055

Monroe Police Department
**ORI Number:** WA0311200

| Entry Date/Time | Officer | Case Number | Property Code(s) | Property Type | Description | Facility | Location/Other | Tag/Item Number | BarcodeID |
|---|---|---|---|---|---|---|---|---|---|
| 02/19/2020 17:43 | MM2055 - Henderson | 2020-00003313 | Evidence | Digital Media | Facebook posts provided by Nan Skinner | Evidence Server | Evidence Server | 2020-00003313/1 | |

Submitted By

Date    2 - 19 - 2020

Property Officer

Date    2 - 20 - 2020

Page: 1 of 1

Case Number: 2020-00003313. ORI: WA0311200.



# Quick Property Receipt



**Print Date/Time:** 02/19/2020 18:01
**Login ID:** mm2055

Monroe Police Department
**ORI Number:** WA0311200

| Entry Date/Time | Officer | Case Number | Property Code(s) | Property Type | Description | Facility | Location/Other | Tag/Item Number | BarcodeID |
|---|---|---|---|---|---|---|---|---|---|
| 02/19/2020 17:58 | MM2055 - Henderson | 2020-00003313 | Evidence | Digital Media | Documents (on USB drive) provided by Det. Alspach | Temp Evidence | Drop Box | 2020-00003313/2 | 26462 |
| 02/19/2020 17:58 | MM2055 - Henderson | 2020-00003313 | Evidence | Other | Letter mailed to Shoreline Police Chief Ledford | Temp Evidence | Drop Box | 2020-00003313/3 | 26463 |

Submitted By     Date  2-19-2020

Property Officer     Date  2.20.2020

Page: 1 of 1

Case Number: 2020-00003313. ORI: WA0311200.

**2020-3313 Property Receipt**




# Quick Property Receipt

| | |
|---|---|
| **Print Date/Time:** 05/26/2020 08:37 | Monroe Police Department |
| **Login ID:** mm2055 | **ORI Number:** WA0311200 |

| Entry Date/Time | Officer | Case Number | Property Code(s) | Property Type | Description | Facility | Location/Other | Tag/Item Number | BarcodeID |
|---|---|---|---|---|---|---|---|---|---|
| 05/26/2020 08:35 | MM2055 - Henderson | 2020-00003313 | Evidence | Photographs | Screenshots of emails (provided by Jeremy Muir) | *PHOTOS PENDING | *PHOTO TEMP I-DRIVE | 2020-00003313/6 | |
| 05/26/2020 08:35 | MM2055 - Henderson | 2020-00003313 | Evidence | Photographs | Pictures at home of Gayle Hanks (Facebook posts and answering machine) | *PHOTOS PENDING | *PHOTO TEMP I-DRIVE | 2020-00003313/7 | |

_____
**Submitted By**

_____
**Property Officer**

5 - 26 - 2020
_____
**Date**

5/26/2os
_____
**Date**

Page: 1 of 1




# Quick Property Receipt

**Print Date/Time:** 05/25/2020 09:57
**Login ID:** mm2055

Monroe Police Department
**ORI Number:** WA0311200

| Entry Date/Time | Officer | Case Number | Property Code(s) | Property Type | Description | Facility | Location/Other | Tag/Item Number | BarcodeID |
|---|---|---|---|---|---|---|---|---|---|
| 05/25/2020 09:55 | MM2055 - Henderson | 2020-00003313 | Evidence | Recordings | Audio recorded interview of Gayle Hanks | AUDIO TEMPORARY | Audio :I Drive | 2020-00003313/4 | |
| 05/25/2020 09:55 | MM2055 - Henderson | 2020-00003313 | Evidence | Recordings | Voicemail left on Gayle Hanks' phone | AUDIO TEMPORARY | Audio :I Drive | 2020-00003313/5 | |

_____

**Submitted By**

5-25-2020
_____

**Date**

_____

**Property Officer**

6/1/20
_____

**Date**

Page: 1 of 1

**2020-3313 Property Receipt**





# Quick Property Receipt

**Print Date/Time:** 06/03/2020 12:43
**Login ID:** mm2055

Monroe Police Department
**ORI Number:** WA0311200

| Entry Date/Time | Officer | Case Number | Property Code(s) | Property Type | Description | Facility | Location/Other | Tag/Item Number | BarcodeID |
|---|---|---|---|---|---|---|---|---|---|
| 06/03/2020 12:41 | MM2055 - Henderson | 2020-00003313 | Evidence | Digital Media | Screenshot of Shoreline PD Facebook post and comments | *PHOTOS PENDING | *PHOTO TEMP I-DRIVE | 2020-00003313/8 | |

_____
Submitted By

_____
6 - 03 - 2020
Date

_____
Property Officer

_____
6/4/20
Date

Page: 1 of 1

---

Page: 238 of 239

Case Number: 2020-00003313. ORI: WA0311200.

**2020-3313 Property Receipt**



# Quick Property Receipt



| **Print Date/Time:** | 06/30/2020 09:06 | | | | | Monroe Police Department |
|---|---|---|---|---|---|---|
| **Login ID:** | mm2055 | | | | | **ORI Number:** WA0311200 |

| Entry Date/Time | Officer | Case Number | Property Code(s) | Property Type | Description | Facility | Location/Other | Tag/Item Number | BarcodeID |
|---|---|---|---|---|---|---|---|---|---|
| 06/30/2020 09:05 | MM2055 - Henderson | 2020-00003313 | Evidence | Photographs | Facebook post made by Shoreline PD | *PHOTOS PENDING | *PHOTO TEMP I-DRIVE | 2020-00003313/10 | |

_____     6 - 30 - 2020
Submitted By                  Date

_____     7/2/20
Property Officer              Date

Page: 1 of 1



# Quick Property Receipt



**Print Date/Time:** 10/28/2020 13:33
**Login ID:** mm2055

Monroe Police Department
**ORI Number:** WA0311200

| Entry Date/Time | Officer | Case Number | Property Code(s) | Property Type | Description | Facility | Location/Other | Tag/Item Number | BarcodeID |
|---|---|---|---|---|---|---|---|---|---|
| 10/28/2020 13:32 | MM2055 - Henderson | 2020-00003313 | Evidence | Digital Media | Documents provided Maggie Foss | Temp Evidence | Drop Box | 2020-00003313/11 | |

**Submitted By**

10 - 28 - 2020
**Date**

**Property Officer**

10/28/2020
**Date**

Page: 1 of 1

EXHIBIT 2

EXHIBIT 2



Person/Business Activity - Combined [Rows returned: 5]

Open   Review   Help

| Activity Date/Time | Activity Type | Activity Reference | ORI/FDID | Description | Name | Global Subject Nu |
|---|---|---|---|---|---|---|
| 03/26/2020 12:0... | Arrest | 4328 | WA0311200 | Arrest, Charge: STALKING FELONY DV | FOSS, MAGDALENA KRIS... | 37677 |
| 10/27/2019 19:1... | Case | 2019-00021441 | WA0311200 | Subject Type: Other Involved, Incident Type: Harassment | FOSS, MAGDALENA KRIS... | 37677 |
| 02/19/2020 11:1... | Case | 2020-00003313 | WA0311200 | Subject Type: Arrestee, Incident Type: Stalking | FOSS, MAGDALENA KRIS... | 37677 |
| 10/27/2019 19:1... | Incident | 2019-00021441 | WA0311200 | Incident Type : Harassment, Role : Other Involved | FOSS, MAGDALENA KRIS... | 37677 |
| 02/19/2020 11:1... | Incident | 2020-00003313 | WA0311200 | Incident Type : Harassment, Role : Suspect | FOSS, MAGDALENA KRIS... | 37677 |

EXHIBIT 3

## EXHIBIT 3

December 18, 2020

Provided by Detective Paul Henderson
Monroe Police Department

**Did Chief Shawn Ledford, Captain Mark Konoske or anyone from the King County Sheriff's Office abuse/ mis-use their authority to influence the Monroe Police Department to take this investigation?**

No.  The only person from the King County Sheriff's Office that I spoke to regarding this investigation (other than Jeremy Muir) was Detective Laura Alspach.  She only shared information that had been gathered during a preliminary search of social media and other items that may have been evidence (i.e. cards received by City employees.  At no time did Detective Alspach abuse her authority or attempt to influence the investigation.  I found the information she gave me to be relative and appropriate based on the allegations made by Jeremy Muir.

**What Statements, if any, did Chief Ledford provide to you and did you find any of these statements to be false or mis-leading?**

I did not receive any statements from Chief Ledford.

**What statements, if any, did Captain Konoske provide to you and did you find any of these statements to be false or mis-leading?**

I did not receive any statements from Captain Konoske.

**Did Detective Laura Alspach provide you with any statements that you found to be false or mis-leading?**

My investigation began with a signed written statement from Jeremy Muir which was submitted to the Monroe Police Department.  This was supplemented by materials provided by Detective Laura Alspach.  Much of the information she provided was actual copies of other reports (i.e. KCSO Internal Affairs), social media posts, or information provided to her from Jeremy Muir.  I did not find any of these materials to be false or misleading.

**Did Jeremy Muir provide you with any statements that you found to be false or mis-leading?**
**Did you put the DV indicator associated to Magdalena Foss charges based on your investigation or statements Jeremy Muir made to you?**

My assessment of the information provided by Jeremy Muir during the investigation does not lead me to believe it was false or misleading.  There was information in his lengthy statements which were not entirely accurate (i.e. specific dates, locations, or persons who may have been present) but to be fair, the allegations stem from an event which occurred approximately 10 years ago.  Maggie Foss provided evidence that was very specific relating to dates, times, locations, and people who were present during certain events.  However, a person's personal opinion cannot be held to the same evidentiary standard.  Even if Maggie Foss declines she ever had a dating relationship with Jeremy Muir, this would not

December 18, 2020

preclude Jeremy from believing that he and Maggie were in a dating relationship.  At the conclusion of my investigation, I forwarded criminal charges against Maggie Foss to the Snohomish County Prosecutor's Office for review.  These charges included the Domestic Violence indicator based on the statements provided by Jeremy Muir.  In his statement, Jeremy indicated that he had ██████ **18** ██████ on two separate occasions with Maggie Foss and prior to this, the two of them had been on a few dates while continuing to see each other socially afterwards.  Based on this information, I found it appropriate to add the DV designator as having been in a prior dating relationship.

After charges had been filed, I received a statement from Maggie Foss where she refutes this information.  Maggie explains the two of them had never been on a date but rather attended the same events with others present.  Maggie also asserts that both accounts of ████████ **18** ████████ ████ **18** ████

My investigation was not into the ██████ **18** ██████ allegations, as it was my understanding this had already been accomplished by the King County Sheriff's Office.  Instead I was focused on the allegations of Maggie Foss mailing letters, posting to social media websites, and contacting citizens who Jeremy Muir had previously engaged with during the performance of his official duties; all of which could possibly have endangered his life or affected his career in law enforcement.  During my investigation, it was obvious everything between these two parties stems directly from the events of a decade before.  Therefore it was decided the DV designator would be added based on Jeremy Muir's opinion of the two of them having been in a previous dating relationship.

EXHIBIT 4

<u>EXHIBIT 4</u>

## MAGDALENA FOSS EMPLOYMENT CLAIM
## SETTLEMENT AGREEMENT AND
## RELEASE OF ALL CLAIMS

This Settlement Agreement and Release ("Agreement") is entered into by and between Magdalena Foss, Jeremy Davy, ("Claimants") and King County ("Defendant").

### RECITALS

A.     Claimants are current employees of the King County Sheriff's Office. Ms. Foss has filed a civil Claim for Damages with King County, Claim #61180.

B.     Claimants and King County hereby execute this Agreement in order to resolve fully and finally all claims against King County that are related to, or arising out of, Claimants' employment with King County and the above-referenced claim, including any claims for attorneys' fees and costs incurred.

### AGREEMENT

In consideration for the mutual covenants set forth below, the sufficiency of which is acknowledged, the parties agree as follows:

1.     King County will pay to Claimants, the sum of $90,000 dollars and no cents ("Settlement Sum"), due ten business days after this Agreement is signed by all parties. For tax purposes, the Settlement Sum is allocated as follows:  $90,000 for emotional distress and attorneys' fees. The parties agree that this allocation is reasonable and supported by the claims in the Claim for Damages and the evidence in this case.

2.     The parties understand and agree that this Agreement is in full compromise of all disputed and potential claims by Claimants against Defendant. Defendant expressly denies the validity of Claimants' claims and potential claims. This Agreement will not be construed as an admission of any liability.

3.     The check for the Settlement Sum will be delivered to the Law Offices of Alex J. Higgins, LLC, within 10 business days of this Agreement being signed by all parties. The check will be made payable to Magdalena Foss.

4.     This Agreement constitutes a full release by Claimants for all legal claims against King County. Claimants promises not to sue, make any claim, or initiate any legal action against King County, its current or former agents, elected officials, assigns and employees in any forum, and releases and discharges King County, its current or former agents, elected officials, assigns and employees (including any employees of the King County Sheriff's Office) from any and all claims, causes of action, damages, attorneys' fees, costs, or consequential damages arising out of Claimants' employment with the King County Sheriff's Office based upon circumstances or events on or before the date that Claimant signs this Agreement. This release includes all claims for direct and indirect damages, expenses, attorneys' fees, and all claims in law and in equity. It is understood that this release also includes, without limitation, all claims under any theory of negligence or common law torts, any deprivation of civil rights (including federal or state constitutional rights), all statutory claims including, but not limited to, 42 U.S.C. Section 1983, Title VII of the Civil Rights Act, as amended, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Washington Law Against Discrimination, (RCW 49.60), and the Public Records Act (RCW 42.56).

5.     Ms. Foss will not return to the KCSO workplace after October 4, 2018. She may elect to use accrued vacation, sick, and compensatory leave to extend her official separation date, but agrees to resign her employment with King County, at latest, by November 22, 2018. At that time, any remaining accrued leave shall be cashed out.

6.     Ms. Foss agrees to neither seek nor accept future employment with King County. In the event claimant does accept county employment, this agreement shall serve as immediate grounds for termination, regardless of any just-cause provisions that would normally apply to a termination decision or any rights of appeal that might otherwise be available to a County employee in such a job.

7.      Regarding public disclosure requests, claimants agree as follows:

    a.  Claimants withdraw all open public disclosure requests they have made to date;

    b.  Claimants agree that previously closed public disclosure requests to KCSO have been fully satisfied;

    c.  Claimants agree not to repeat public disclosure requests for information that have previously been requested.

8.      Claimant acknowledges the following:

    a.  This Agreement is written in a manner calculated to be understood by an average individual;

    b.  Claimant is waiving her rights or claims only in exchange for consideration that is in addition to anything to which Claimant is already entitled;

    c.  Claimant has consulted with legal counsel of her choice before signing this Agreement;

    d.  Claimant has had a reasonable period of time to consider this Agreement before signing it.

9.      In response to future employment inquiries from outside agencies, defendants agree that HR manager Jessica Klein will provide a summary of any sustained IIU findings and the contents of Ms. Foss' personnel file, provided the prospective employer provides a release signed by Ms. Foss.

10.     Claimant will be solely liable for any income tax liability due on any portion of the Settlement Sum and will indemnify and hold King County harmless for any future tax payments related to the Settlement Sum. King County will file tax reporting forms in accordance with the applicable federal regulations.

11.     Defendant agrees to the following regarding Ms. Foss' personnel and IIU files:

    a.  Regarding, SAL 2016-236, defendants agree to remove it from the personnel file;

    b. Regarding IIU 2018-448, defendants agree to convert it to a SAL with no written memo to the personnel file;

    c. Regarding IIU 2018-285, defendants agree to convert it to a SAL with no written memo to the personnel file.

12.    Claimant acknowledges and assumes all risk that further injuries may become known after the signing of this agreement. Claimant also assumes all risk that her known injuries may be or may become more extensive than is now known or anticipated. In signing this Agreement, Claimant does not rely upon any representation made by King County, its officers, agents or employees, concerning the extent of her injuries or concerning King County's legal liability. The term "injuries" as used in this paragraph refers to any basis for a claim of damages, including, without limitation, physical injury or emotional distress.

13.    Claimant represents and warrants that there are no lien holders or other persons or entities having an interest in the proceeds being paid in accordance with the settlement of these claims and the conditions of this Agreement. If such liens or claims exist, Claimant will satisfy all claims, liens, subrogation interests, or conditional payments associated with this lawsuit from the Settlement Sum. This obligation includes any liens arising from this lawsuit, any governmental or Medicaid/Medicare liens, conditional payments, future set-asides, and any other amounts owing now, or in the future, that are related to Claimant's injuries claimed in this lawsuit. Claimant will hold Defendant harmless from any future lien claims. If Claimant is Medicare benefits eligible, Claimant agrees to disclose this Agreement to Medicare or its agent and cooperate in any resolution of claims for reimbursement by Medicare or its agent. Claimant also waives any right of action against Defendant under 42 U.S.C. 1395(b)(3)(A).

14.    The provisions of this Agreement will not be construed against either party. If any of the provisions of this agreement are held to be invalid or unenforceable, the

remaining provisions will nevertheless continue to be valid and enforceable. This Agreement constitutes the entire agreement and understanding between the parties.

15.     Any dispute relating to this Agreement, or relating to Claimant's employment with King County after she signs this Agreement, will be resolved through arbitration under the WAMS arbitration rules in Seattle. If the parties cannot agree to a mediator, the parties will ask WAMS to assign an arbitrator at WAM's sole discretion. The arbitrator will have no authority to add to, subtract from, or modify in any manner the terms of this Agreement. With regard to disputes relating to this Agreement, the arbitrator will only interpret this Agreement. Washington law, unless federal law governs the issue, will govern all substantive aspects of any dispute between the parties. Each side will bear their own attorneys' fees and the non-prevailing party will bear the fees of the arbitrator and court reporter, unless otherwise provided by law. Judgment on any award may be entered in a court of competent jurisdiction. This provision will be specifically enforceable under the laws of the State of Washington. The decision of the arbitrator will be final and binding to the extent permitted by law.

16.     Claimant acknowledges that she is competent and of lawful age. Claimant has had ample opportunity to review the facts and law relevant to this dispute; has consulted fully and freely with counsel of her choice; has carefully read and understands all of the provisions of this agreement; and has entered this Agreement knowingly and intelligently, without duress or coercion.

17.     The parties agree that scanned PDF or faxed signatures will suffice to legally bind either party to the terms of this Agreement.


FOR KING COUNTY:

*Christine Oh*                                    10-4-18

Christine Oh, Risk Manager Deputy Director          Date


CLAIMANT:

Magdalena Foss

10 - 4 - 18

Date

Jeremy Davy

10-4-18

Date

Approved as to form only:

Allyson Zerba
Attorney for Defendant

10/4/18

Date

Alex J. Higgins
Attorney for Claimant

In capacity as counsel, not a party.

10/4/18

Date

EXHIBIT 5

<u>EXHIBIT 5</u>

**Ogletree Deakins**

**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.**

*Attorneys at Law*

**Brenda L. Bannon**

brenda.bannon@ogletree.com

1201 Third Avenue, Suite 5150
Seattle, WA 98101
Telephone: 206-693-7057
Facsimile: 206-693-7058
www.ogletreedeakins.com

---

## CONFIDENTIAL MEMORANDUM

| | |
|---|---|
| **To:** | Erin Overbey, Chief Legal Advisor, KCSO |
| **From:** | Brenda L. Bannon, Investigator |
| **Date:** | July 2, 2021 |
| **Subject:** | *Workplace Investigation Summary Report;*<br>*King County Sheriff's Office* ██ ██ *IIU2021-172* |

---

### I.    SCOPE OF INVESTIGATION AND SUMMARY

On or around April 16, 2021, I was retained to conduct an independent, outside workplace investigation for the King County Sheriff's Office ("KCSO"). The need for an investigation was prompted by the KCSO's receipt of December 22, 2020 responsive information from Deputy ██ ██ during the course of IIU2020-419. ██ alleged Domestic Violence ("DV") stalking and harassment, and asserted that historically the KCSO had failed to protect him or stop the harassment. On January 28, 2021, Captain Ryan Abbott and a KCSO Legal Advisor met with ██ attorney was present telephonically. An intake interview was conducted at that time for IIU2021-172 documenting issues dating back to spring 2010. ██ alleged that since 2014 he has been harassed by former KCSO dispatcher Maggie Foss[1] and her husband, Deputy Jeremy Davy, and he had a 2010 "dating relationship" with Foss. He alleged that due to his gender, the KCSO has not protected or intervened as it would have if he were a female employee. Independent witnesses were interviewed to evaluate the circumstances surrounding the expansive Complaint.

I have interviewed the following persons:

1. ██ (5/4/21);
2. Dan Pingrey* (5/11/21);
3. Patrick Butschli* (5/11/21);
4. ██ (5/11/21);
5. ██ (5/11/21);
6. ██ (5/11/21);

12. ██ (5/20/21);
13. ██ (5/25/21)
14. ██ (6/1/21);
15. ██ (6/1/21);
16. ██ (6/2/21);
17. ██ (6/2/21);

---

[1] While the Investigator might anonymize a rape complainant's name in specific cases, here Foss has recounted her version of events multiple times on social media starting in March 2019.

*Brenda L. Bannon (206) 693-7057*

Atlanta • Austin • Berlin (Germany) • Birmingham • Boston • Charleston • Charlotte • Chicago • Cleveland • Columbia • Dallas • Denver • Detroit Metro • Greenville • Houston
Indianapolis • Jackson • Kansas City • Las Vegas • London (England) • Los Angeles • Memphis • Mexico City (Mexico) • Miami • Milwaukee • Minneapolis • Morristown
Nashville • New Orleans • New York City • Oklahoma City • Orange County • Paris (France) • Philadelphia • Phoenix • Pittsburgh • Portland, ME • Portland, OR • Raleigh
Richmond • St. Louis • St. Thomas • Sacramento • San Antonio • San Diego • San Francisco • Seattle • Stamford • Tampa • Toronto (Canada) • Torrance • Tucson • Washington

Erin Overbey;
KSCO/█19B█  IIU2021-172 Summary Report
July 2, 2021
Page 2

|  |  |
|---|---|
| 7. Kimberly Petty* (5/11/21); | 18. Scott Somers# (6/2/21); |
| 8. Bryan Howard* (5/19/21); | 19. █19B█ █19B█ (6/2/21); |
| 9. █19B█ █19B█ (5/19/21); | 20. █19B█ █19B█ (6/10/21); |
| 10. Jessica Sullivan* (5/20/21); | 21. Lance King# (6/11/21).[2] |
| 11. Ryan Abbott (5/20/21); |  |

Detective Sergeant Erik Wolff was assigned by the KCSO to assist and facilitate this investigation. In an effort to protect the confidentiality of the investigation and to preserve the overall integrity of the general investigative process, I have only referenced participating witnesses' names in the narrative of the report where important to the overall context. The Investigator has also reviewed selected interview transcripts and documents pertaining to KSCO internal investigations, disciplinary memoranda, emails, relevant personnel evaluations, the KCSO Organizational Chart, miscellaneous memoranda, notes, spreadsheets, policy and protocol documents, extensive social media posts and tweets, key documents from the parallel Monroe Police Investigation, and relevant publicly available information. Significant investigation documents from the KCSO Internal Investigations Unit involving █19B█ and Foss were evaluated by the Investigator; portions but not all of key IIU investigation documents have been reviewed by the Investigator. The documents are too voluminous to individually list.

## II.    POLICY PROVISIONS AND LEGAL STANDARD

This report is a summary report and is not intended to be a comprehensive recitation of all the information that was collected, reviewed and considered as part of the investigation. The examples discussed in this report are intended to be illustrative and not exhaustive. If a description is a direct quote, it will be noted as such by quotations marks or block quotes. The findings and conclusions set forth in this report are based on the entirety of the record considered by the Investigator, and are not limited to the factual information contained in this report. As set forth in the Conclusion below, a preponderance of the evidence standard means that based on the credible evidence gathered during the investigation, it is "more likely than not" that an event occurred or did not occur as alleged. "Clear and convincing" is a more rigorous evidence standard where "the evidence is highly and substantially more likely to be true than untrue." Background information is presented as context for the current workplace dispute. Finally, this report is not intended to provide any legal conclusions or offer any legal advice and should not be construed as such.

/

---

[2] Due to the ongoing though improving worldwide pandemic, and the Washington Governor's March 2020 Stay Home–Stay Healthy proclamation and subsequent updates and guidelines, all interviews were conducted remotely using a video-conferencing platform. All witnesses were interviewed while the Investigator was in a remote office and the witness was in a private office. An asterisk [*] next to a name signifies that the individual was notified they were a subject of the investigation pursuant to labor contract issues. Various Guild representatives from the Sergeants' or Captains' Guild appeared with various witnesses/subjects. A hash [#] next to a name signifies a former KCSO employee. An OLEO representative was also frequently present.

Erin Overbey;
KSCO/IUB   IIU2021-172  Summary  Report
July 2, 2021
Page 3

The applicable  King County HR policy  on nondiscrimination  is as follows (2018-0001):

King County is committed to maintaining  a respectful, productive, inclusive  and equitable workplace. Therefore, all elected officials and employees are expected to act with fairness, civility,  integrity and to treat all coworkers equitably.  Discrimination, harassment, retaliation, and other inappropriate  conduct that undermines  the integrity of the employment  relationship  is prohibited.  All complaints of conduct inconsistent with these expectations, regardless of whether the conduct rises to the level of unlawful discrimination,  harassment  or retaliation  will  be  investigated  and substantiated complaints  will result in prompt, corrective action, up to and including  termination.

King County prohibits  discrimination  or harassment that is related to anyone's race, color, sex, age, creed, disability,  marital status, national origin,  religion, pregnancy,  gender,  gender identity  or expression,  genetic information,  sexual orientation,  veteran or military  status, use of a service animal,  and any other status protected by  federal, state and local law. Additionally,  King County  prohibits retaliation  of any kind against employees, who in good faith, report harassment, discrimination  or retaliation, or assist in the investigation  of such complaints.

DEFINITIONS
**Discrimination** occurs when an employer  takes a discrete adverse employment action against an employee and the employee's protected status was a substantial factor in the employer's decision.
        ***
**Discrete Adverse Employment Action**, in the case of discrimination, is an action that substantially  affects the terms, conditions,  or privileges  of employment.  It includes, but is not limited  to, discipline,  discharge, layoff and a failure to hire or promote.

**In the case of retaliation**, it is an action that would discourage a reasonable employee from making  a complaint  or participating  in a discrimination,  harassment or retaliation  investigation  or proceeding.

**Protected Status** includes an employee's sex, age, creed, disability,  marital status, national origin,  race, color, religion,  pregnancy,  gender,  gender identity  or expression, genetic information,  sexual orientation,  veteran or military  status, use of a service animal,  and any other status protected by federal, state and local law.
                                ***

/
/
/
/

Erin Overbey;
KSCO/IIB  IIU2021-172  Summary Report
July 2, 2021
Page 4

The KCSO General Order on non-discrimination  is set out below in pertinent part:

## 3.01.000 HARASSMENT, DISCRIMINATION AND RETALIATION

3.01.005
**POLICY:** 12/17
It is the policy of the King County Sheriff's Office to provide a work environment for its members that respects the diversity of our community, is free from discrimination, harassment and retaliation, and promotes equal employment opportunity and equitable treatment for all department members. The Sheriff's Office strongly encourages members to come forward with their concerns and complaints and will take immediate action to investigate complaints of violations of this policy. (See GOM 3.00.015(g)  and (h)). Employees who come forward with such complaints or concerns may be afforded whistleblower  protection under King County Code Chapter 3.42.

Discrimination, further defined below, may occur in different forms such as disparate treatment, harassment/hostile work environment, and quid pro quo sexual harassment. Retaliation related to complaints of discrimination is also prohibited by this policy. All of these forms of discrimination, and retaliation, are prohibited serious misconduct under GOM 3.00.015 and are further defined here. In order to better prevent conduct before it rises to the level prohibited by these policies, KCSO will investigate other applicable policy violations where the evidence may not support a violation of discrimination or retaliation, such as Courtesy, Ridicule, Conduct Unbecoming, etc.

3.01.010
**DEFINITIONS:** 09/14
For the purpose of this policy and GOM 3.00.015:

**"Discrimination"** means any act or failure to act (whether by itself or as a part of a practice), the effect of which is to adversely affect or adversely differentiate individuals or groups of individuals, on the basis of a protected class unless based upon a bona fide occupational qualification. Disparate treatment discrimination means treating similarly situated individuals differently based on a protected class.

**"Harassment" (also known as hostile work environment)** is a form of discrimination that is unwelcome, offensive based on a protected class. To constitute harassment, the conduct must be so severe or pervasive that it alters the terms or conditions of employment. Such conduct can take many forms and may include slurs, comments, jokes, innuendoes, unwelcome compliments, cartoons, pictures, or other similar conduct.

Erin Overbey;
KSCO/19B  IIU2021-172  Summary Report
July 2, 2021
Page 5

> **"Harassment or Discrimination Complaint"** means an oral or written complaint alleging an incident or a set or series of actions as defined above, made by any member to a supervisor.

> **"Protected class"** includes race, color, creed, age, sex or gender, sexual orientation, gender identity or expression, marital status, religion or religious affiliation, ancestry, national origin, honorably discharged veteran or military status and disability.

> **"Retaliation"** means to take adverse employment action against an individual because he/she has exercised his/her rights protected under the law by complaining in good faith about discrimination, harassment, and/or retaliation, or assisted or participated in an investigation of such allegations.

***

As to workplace domestic violence issues "regarding department members," GOM 3.02.005 provides as follows:

> **POLICY STATEMENT:** 06/05 A law enforcement agency must maintain the highest level of personal and official conduct if it is to receive and maintain the respect and confidence of the public it serves. Rules and regulations governing the conduct of members of the Sheriff's Office ensure the high standards of the law enforcement profession are maintained, especially in the area of domestic violence. Domestic violence committed by department members is unacceptable. It is the Sheriff's Office policy to promptly, thoroughly and fairly investigate alleged domestic violence incidents involving all members of law enforcement, giving primary consideration to the protection of and communication with victims of domestic violence committed by members of law enforcement. The Sheriff's Office will maintain ongoing and meaningful relationships with advocacy groups and other domestic violence professionals in the community.

The GOM provides further statements of expectations regarding supervisory personnel (rank of Sergeant or above) in the aftermath of a reported incident of domestic violence. GOM 3.02.035. **Appendix A** (GOM Chapter 3). The language refers to responding to "the scene of all domestic violence incidents involving department members…" GOM 3.02.035. Reading the GOM as a whole, it seems apparent that it was intended to prescribe response to the aftermath of a fresh crime that was newly reported. **App. A.** As outlined below, this opportunity for immediate official supervisory response in the aftermath of a crime was not available in the two primary circumstances presented by the earlier (2014 -- 2017) underlying conflict between 19B and Foss. GOM 3.02.045 speaks to how to respond when a department member is alleged to have committed a DV crime. The 2019 Foss social media posts would not have fit that provision. GOM 3.92.050 speaks to communications and interactions with an alleged DV victim who is a department member. Additional GOM reference may be provided in applicable sections below.

Erin Overbey;
KSCO/██ IIU2021-172 Summary Report
July 2, 2021
Page 6

### III.    SUMMARY OF INVESTIGATION FINDINGS

At the outset, it is noted that many factual disputes exist.  The parties generally acknowledged and/or referenced the same events, but perceived and relayed differing communications, intentions or motivations during the events.  Resolving factual discrepancies is one of the most challenging elements of any investigation and may be accomplished in part by assessing witness credibility. Credibility is not merely a determination of whether a witness is being truthful -- it involves consideration of a number of factors which include, but are not limited to: (i) ability to observe; (ii) ability to recall and consistency of recollection; (iii) reputation for truthfulness; (iv) statements by other witnesses that are consistent or inconsistent with those of the declaring witness; (v) self-contradiction; (vi) bias/unusual interest in the outcome of the case or a friendly or hostile relationship with one of the parties; (vii) contemporaneous documentation; and (viii) an individual's conduct during the investigation, including demeanor and body language during interviews and/or other tangible and intangible conduct that goes to a witness's sincerity.  Life and work experiences are also factored in as to a witness's perspective.  All of these factors were considered in assessing the credibility and the information provided for every individual who participated in the investigation.

It is the Investigator's normal practice to accept business records prepared in the ordinary course of business as conclusive regarding dates and events. Because of the volume of written statements already provided by former employee Foss, the Investigator did not interview her again in this investigation.  It is noteworthy that in response to the City of Monroe's recent DV harassment and cyberstalking investigation initiated by ██ alleging that Foss was the criminal suspect (MPD No. 2020-00003313), Foss provided a 92-page statement that was apparently prepared by her husband, current Deputy Jeremy Davy. This statement was considered by the Investigator.  ██ has previously provided two separate timelines (IIU 2015-776; MPD 2020-3313); these were considered by the Investigator. The Investigator has noted various conflicts highlighted in the recount of information separately provided by Foss and ██ without making factual determinations regarding historical background facts from the distant past.  It is sufficient to note that where Foss or Davy have highlighted factual disputes or outright alleged that a witness has lied or provided false information, this has been considered by the Investigator.  Other witnesses had also prepared timelines contemporaneously with their involvement in various events in 2014 – 2018; these timelines were evaluated by the Investigator and compared to the historical record.  Such provided assistance as to contextual background information.

Deputy ██ has been assigned to the Shoreline Police Department during the relevant time frame discussed here; he was hired by the KCSO in 2008.  He has primarily been assigned to the Traffic Unit. Foss worked as a Communications Specialist at the KCSO Communications Center from 2004 until she separated employment through a Settlement Agreement with the County in October 2018. In June 2018 while potential discipline was pending against her, Foss filed a Civil Claim for Damages against the County alleging discrimination, retaliation, emotional distress damages stemming from allegedly being sexually assaulted by a co-worker, and she specifically identified the IIU investigations that were initiated following her 2014 report of rape as actionable retaliation; this Claim

Erin Overbey;
KSCO 19B  IIU2021-172  Summary Report
July 2, 2021
Page 7

was resolved in the October 2018 settlement and Foss agreed to withdraw all pending public disclosure requests for records.

Since 2009, Deputy Davy has primarily been assigned to the Covington Police Department where he is still employed. In August 2016, months after receiving a counseling memorandum for using County time, equipment and software programs to explore/develop public disclosure requests (IIU2015-083; IIU2015-145), Davy filed a lawsuit against the County alleging violations of the Public Records Act (Case No. 16-2-19159-2). Davy settled that matter with the County in October 2018 and agreed to withdraw all pending public disclosure requests for documents. As of Foss' fall 2018 separation of employment, Foss and Davy had lodged a combined total of approximately 288 (two hundred eighty eight) public disclosure requests arguably related to or about 19B  *Between October 2018 and September 2019, the record reflects that* 19B *heard little if at all from Foss.*

This current Investigation evaluating 19B  newly minted harassment allegations involves policy based allegations and criminal allegations dating back to spring 2010. The primary impetus for the current DV harassment allegations by 19B  appear to be the fall 2019 social media "tweets" and posts by former employee Foss, and fall 2019 receipt of anonymous cards by 19B  neighbors, the Shoreline City Manager, and the Shoreline Police Chief. Foss' posts and tweets were subsequently supplemented by Foss in January 2020, and her posts and tweets were variously repeated, reposted, and commented upon in different forums and on different FB pages for months following the initial September 2019 posts. The initial cascade of Foss tweets on Twitter on September 22, 2019 recounted a dozen allegations against 19B  In combination, these above-described communications variously characterized 19B  as a rapist or sexual predator.

As discussed further below and to varying degrees, in late 2019 and afterwards, Sgt. 19B  Sgt. 19B  Sgt. 19B  Capt. 19B  Capt. Abbott, Det. 19B  and Chief Pingrey (and others) variously raised or discussed with 19B  his options regarding issues such as seeking a court order, initiating civil or criminal complaints, meeting with KCSO Detective 19B  meeting with Monroe Det. 19B  seeking resources with the Employee Assistance Program, allowing 19B  to work a 2-person patrol detail for a brief period, allowing 19B  to not work the OT detail at the June 2020 BLM rally, referring 19B  to Peer Support, and generally being a sounding board for 19B  concerns.

Notably, after (i) 19B  lodged criminal allegations against Foss in late 2019/early 2020 (MPD 2020-3313), and (ii) Foss later received notice that criminal charges were being referred to the Snohomish County Prosecutor's Office, in October 2020 Foss lodged an administrative complaint to the KCSO against 19B  19B  and KCSO Detective 19B  alleging false statements and other code of conduct violations (IIU2020-419). The findings that were entered following the ensuing administrative investigation were a combination of "unfounded" or "exonerated." 19B  current allegations forming the current investigation in IIU2021-172 followed 19B  receipt of notice of Foss's IIU2020-419 allegations against 19B

The Investigator notes that as of this writing, both of the underlying criminal aspects of the Foss/19B  historical allegations have been referred to a county prosecutor's office as a formal

Erin Overbey;
KSCO ▮19B▮ IIU2021-172 Summary Report
July 2, 2021
Page 8

criminal referral based on the respective criminal allegations and investigations. On August 28, 2015, the King County Prosecutor's Office formally issued a decline memo as to Foss' rape allegations. **App. B.** On January 20, 2021, the Snohomish County Prosecutor's Office formally issued a decline memo as to ▮19B▮ harassment, stalking and cyberstalking allegations. **Appendix C.**

By way of further background, Foss did not raise her allegations of a 2010 sexual assault by ▮19B▮ -- a person with whom she was in a brief dating relationship -- until August 2014. Foss raised the allegation in the workplace and to her then husband Deputy Davy after learning that co-worker and then-friend ▮19B▮ was dating Deputy ▮19B▮ In turn, ▮19B▮ did not in 2015 through 2016 frame his allegations of ongoing workplace harassment by Foss and Davy as "domestic violence" criminal behavior. He instead framed it as policy-based harassment and retaliation creating a hostile work environment. He also alleged that Foss and Davy were harassing him and treating him differently due to his gender; in October 2016, this allegation was evaluated by the KCSO Human Resources Director who concluded in a written report that Foss and Davy were tendering their voluminous public disclosure requests for personal gain to develop facts to support a potential lawsuit and *not* based on gender bias. **Appendix D.**

In an August 15, 2017 meeting with then Sgt. ▮19B▮ (while another IIU investigation was pending), ▮19B▮ reiterated that he felt he was being harassed; he also stated that due to the past dating relationship with one of the employees the harassment "could be considered a DV." A record review by the Investigator reveals that this complaint initiated NIM2017-154 (See **Appendix E,** 9/17/17 ▮19B▮ complaint statement to Sgt. Gillette). On 8/15/17 ▮19B▮ suggested to ▮19B▮ that obtaining a court order might be an option for ▮19B▮ (▮19B▮ Preliminary report, NIM2017-154). Various members of the KCSO command staff reviewed the allegations and determined that the facts as alleged did not warrant a criminal investigation; it appeared that most of the factual allegations had been previously reviewed by the IIU (NIM2017 -154 Detective follow up reports). In his May 4, 2021 interview with the Investigator, ▮19B▮ stated his perspective that as far back as 2016, his allegations should have been treated as DV harassment.

In the past, ▮19B▮ has similarly asserted his stated perspective that the KCSO would have responded to Foss and Davy differently if ▮19B▮ had been a female employee ("I feel if the roles were reversed and I was a female being targeted by a male the outcome would be different. Especially if I was a female falsely accused of a crime by the same male.") **Appendix E** (9/7/17 ▮19B▮ complaint statement to Sgt. Gillette). The primary focus of ▮19B▮ 2015 – 2017 allegations of workplace "harassment" was the serial Title 42 Public Records requests[3] by Foss and Davy, coupled with the serial allegations of misconduct stemming from third party report or other collateral sources. **Appendix E** (4/4/16 letter to ▮19B▮ and 9/17/17 ▮19B▮ complaint statement to Sgt. Gillette). The September 2017 complaint primarily focused on ▮19B▮ disagreement with the HR Director's assessment of whether or not the Foss and Davy actions constituted a protected class harassment policy violation; the HR Director focused on the PDRs as potential protected class harassment based

---

[3] Title 42.56 RCW.

Erin Overbey;
KSCO/19B  IIU2021-172  Summary Report
July 2, 2021
Page 9

on 19B  complaint.   The complained of public disclosure requests and later allegations led to a number of IIU investigations being lodged against 19B  With one exception regarding pulling over a citizen for no apparent reason (a "barista" that 19B  knew), all allegations were unfounded.  19B received a written reprimand for the single sustained finding (IIU2016-146).

In the current investigation, when 19B  spoke to Captain Abbott and the Legal Advisor on January 28, 2021, he stated his concerns as follows:

> 19B  alleges his complaints of harassment and retaliation would have been treated differently if he were female. 19B  alleges that "the conduct of which he complained was not adequately addressed because it was not recognized and treated as domestic violence harassment, consistent with KCSO policies (GOM 3.02.000) and state law." 19B  said he has been well supported by command staff at his precinct, Shoreline, Precinct 5, because they knew and understood the history of harassment by M. Foss. His complaint concerns KCSO command-level staff beyond his precinct.

IAPro Intake summary, 2021-172.

Of import to the current investigation, based on GOM 3.02.020, the 2014 allegations by Foss characterized her as a DV victim of rape.  The January 27, 2015 findings memo in IIU2014-106, authored by Chief 19B  acknowledged the past dating relationship between 19B  and Foss. The KCSO accordingly took steps to initiate a criminal investigation with the Sexual Assault Unit (Criminal Investigations Division) and provided her with victim resources such as a referral to a victim advocate.  In August 2014, 19B  raised with his Sergeant the issue of being accused of nonconsensual sex *after* Foss made that allegation to 19B  then girlfriend 19B  and the gossip mill in the Communications Center began to churn.  19B  reported he was a victim of false report.  The KCSO followed up by conducting both an administrative (IIU2014-106) and criminal (Case No. 15-077590) investigation into then-stale rape allegations and stale evidence in support.  The result of the administrative investigation was an "unfounded" finding, and the result of the criminal investigation was a subsequent decline memo from the King County Prosecuting Attorney's Office ("KCPAO"). **Appendix B.**

19B  July 1, 2015 workplace harassment email complaint against Foss and Davy (SAL2015-145) was lodged about 6-months after the Foss rape administrative investigation was concluded but before the KCSO had received the Prosecutor's August 11, 2015 decline memo.  Following a Blue Team entry[4] and Commanders Review by Chief 19B  designating the matter as an inquiry,[5] and an intervening July 10, 2015 Memo of Expectations ("MOE") issued by Captain Butschli to Foss,

---

[4] "Blue Team" is a web-based computer program used to input employee performance issues.  GOM 3.03.010.

[5] "Inquiry" is an entry into Blue Team that documents any communication directed to a member of the department which if true, alleges misconduct by any member of the Sheriff's Office.  GOM 3.03.010.

Erin Overbey;
KSCO/███ IIU2021-172 Summary Report
July 2, 2021
Page 10


███ workplace harassment complaint was closed as a Supervisor Action Log entry ("SAL").[6] Based on the contemporaneous documentation, this decision appears to have been made on Captain Anderson's recommendation after consulting with HR Manager King. (July 17, 2015 recommendation, SAL2015-145 IAPro Summary).[7] Chief ███ specifically denies making that recommendation. The following month, the August 11, 2015 KCPAO decline memo begins by outlining the facts of a dating relationship that existed before the night in question where Foss alleged she was raped – to include a previous night that they slept together.

The contemporaneous documentary record seems to support an inference that in spring 2015, Butschli was receiving communications (directly or indirectly) from Chief ███ ███ Sergeant, and the Guild, regarding Foss becoming a workplace problem for ███ and suggesting that additional steps should be taken to direct Foss to not discuss the sexual assault investigation(s) in the workplace. A notable March 9, 2015 email by Butschli reflects the apparent tension in the workplace over this issue: "...I will not be asking Maggie ["potential rape victim"] to stop talking about the incident without some legal consultation." Nonetheless, after consulting with HR and Legal, Captain Butschli counseled Foss several times against discussing the ongoing issues concerning ███ and ███ in the workplace inasmuch as it had become disruptive to operations and employees. In spring 2015, Command staff communicated to Butschli the importance of emphasizing to Foss the need to "remain professional" even when presented with a formal complaint.

In 2015, ███ lodged a harassment complaint against Foss that was investigated (IIUI2015-176, allegation 1 courtesy is non-sustained & allegation 2 insubordination is unfounded (findings memo by Butschli)), and ███ lodged a harassment complaint that resulted in a SAL (IIU2015-145, memoranda by ███ Subsequent ███ harassment complaints followed[8] as did serial complaints

---

[6] "SAL" is an entry into Blue Team used to document a supervisor action related to observed or reported minor policy infractions. GOM 3.03.010.

[7] Jul 17, 2015   Follow up-Capt. Anderson   Un-assigned

> I discussed this complaint with HR Director Lance King. I told him that I would like to handle this as a SAL by including Captain Butschli's MOE that he gave to CS Foss this week. The intent of the MOE is to stop this type of unbecoming conduct. If Foss violates the MOE she is facing an allegation of Insubordination. Lance agrees that this is not an EEO type matter as defined in GOM 3.01.000, which also reflects the law. There are no specific department policy violations that should be addressed via the IIU investigation process. Lance thought this is an appropriate resolution to this complaint. I will brief Deputy ███ on the disposition of this complaint.

NIM2017-154.

[8] The IAPro Intake Summary noted the following IIU matters document ███ previous allegations that the KCSO was failing to protect him from Foss/Davy: SAL2015-145; NIM2015-149 ("Non-Investigative Matter"); IIU2015-176 (filed by ███ then-girlfriend ███ IIU2016-070; and NIM2017-154.

Erin Overbey;
KSCO/19B IIU2021-172 Summary Report
July 2, 2021
Page 11

by Foss and Davy against 19B In June 2015, Davy received "Corrective Counseling" as a result of the KCSO learning that he had used County time and resources to research his public records requests and complaint allegations (IIU20150145; IIU2015-083). Foss eventually received the July 2015 MOE, a written reprimand (IIU2016-070), a 1-day suspension (IIU2016-240), and a recommendation for a 5-day suspension (IIU2017-137).[9] As highlighted above, this back and forth between 19B and Foss/Davy continued until late 2018 when Foss' employment was formally separated.

In fall 2019, about a year after Foss left her KCSO employment, a barrage of Foss Twitter posts and Facebook posts began to appear on the internet targeting 19B This barrage instigated renewed concern by 19B his immediate supervisory staff at the Shoreline Police Department, the Shoreline City management, and then by the Executive Command Staff at the KCSO. As referenced above, there were apparently related anonymous cards received by 19B neighbors in his City of Monroe neighborhood, by Shoreline Chief 19B and by the Shoreline City Manager. Questions arose within the KCSO as an employer as to the appropriate next steps in response to these extensive and troubling social media posts by a former employee -- now a private citizen -- who in 2014 had accused 19B of rape. Of relevance to the current workplace investigation, the January 20, 2021 Snohomish County decline memo highlighted the following observation:

> While the victim [19B] has reported significant financial and physiological harms from this alleged conduct, the available evidence is insufficient to prove Stalking or Cyberstalking beyond a reasonable doubt....*** [As to harassment] [t]aking the most generous view, we could prove public, disparaging statements are directed at the victim because his name and photograph is used, as well as other information about his employment and the areas where he works. However, the suspect [Foss] would still be able to allege she had a lawful purpose to warn the community about a predator. The truth of the underlying rape accusation would then be at issue, as would all the dueling complaints KCSO investigated against both parties. This battle is impossible to win beyond a reasonable doubt....
> ***

**Findings Summary:**

In an effort to avoid workplace drama, stress or issues connected to former employee Foss' 2019-2020 social media tweets and posts, Deputy 19B 19B voluntarily (1) worked patrol overtime on June 6, 2020 instead of the BLM rally overtime assignment; (2) rode patrol with another traffic deputy for approximately six weeks between November 12, 2019 and December 27, 2019; (3) opted to stop working overtime at the Shoreline Teen Rec Center in early November 2019; (4) broke up with his girlfriend for two weeks about a year after the Foss social media posts were originally circulated; (5) applied to transfer from Shoreline to Sammamish (July 2020) and later to Kenmore (early 2021); (6) lodged a criminal complaint of DV cyberstalking and harassment against Foss to the KCSO and the

---

[9] Captain Butschli was assigned to the Communications Center until spring 2016 when Captain Jessica Sullivan was assigned to the Comm. Center upon her promotion to the rank of Captain.

Erin Overbey;
KSCO/19B  IIU2021-172  Summary Report
July 2, 2021
Page 12

Monroe PD;  (7) stopped studying in fall 2019 to take the Sergeants exam; and (8) decided not to apply for a civil protection or anti-harassment order.  19B  also expressed to the Investigator that some of these decisions were prompted by his concerns for his personal safety.  These issues or actions were not directed by the Shoreline  KCSO command staff or the KCSO executive command staff.

Regarding the July 2020 request to transfer to dayshift patrol in Sammamish, according to Chief Pingrey, the transfer did not occur because (1) there was no vacant dayshift patrol position in 2020; (2) he did not want to wait unduly in 2021 when vacant positions became available – for Shoreline to release  19B  to Sammamish;  (3) the City was socially savvy and mindful of the difficulties the Foss posts were stirring up in Shoreline;  and (4)  19B  never responded to Pingrey's suggestion that he apply for and bring to the City a protection order or other court order addressing the issue.

In early December 2019, KCSO Detective  19B  prepared a KCSO report documenting allegations of domestic violence cyberstalking and domestic violence harassment by former employee Foss as outlined by Deputy  19B  19B  submitted  19B  DV complaint  and the preserved and compiled Foss social media posts to the City of Monroe Police Department ("Allegation  of DV cyber stalking and/or DV harassment. I discussed the elements of the allegation with  19B  Case referred to Monroe Police Dept." (KCSO Case # C19046254)).

Regarding the KCSO decision to have Monroe PD conduct the investigation into the  19B  2019 complaint of criminal DV cyberstalking and harassment, the weight of the evidence supports a finding that such decision was motivated by a desire to avoid an appearance of bias, undue influence, conflict of interest and potential civil liability  exposure and not due to gender bias against  19B

The weight of the evidence does not support a finding that gender bias played a role in any of the issues raised by  19B  in his intake meeting.

## IV.     SPECIFIC ALLEGATIONS

As summarized above, in  19B  12/22/20 A-150 written response in IIU2020-419,  19B  renewed old allegations of harassment by Foss and  19B  He also alleged that the KCSO has refused to recognize his previous relationship with Foss as a DV relationship.  He further alleged that Foss has "weaponized" the IIU to silence him as a DV victim.  19B  specifically alleged as follows:

> I have been being [sic] harassed by Foss since 2014.  Foss has harassed me by making false accusations against me, contacting my ex wives, people I have arrested and contacted on duty as a police officer.  Foss has gone after my job and effectively weaponized the King County Sheriff's Office Internal Investigations  Unit against me as a form of harassment.  When Foss did not get the desired results from the Internal Investigations  Unit she turned to the internet to continue to harass me and try to ruin my career.

Erin Overbey;
KSCO/<span style="background-color:black;color:red">19B</span>  IIU2021-172  Summary Report
July 2, 2021
Page 13

> I have come to the department for assistance based on being stalked and harassed but
> I have not received any assistance until late 2019 from Shoreline Police.

<div align="center">***</div>

Key events pertaining to <span style="background-color:black;color:red">19B</span>  allegations occurred as follows:

- 2010 brief dating relationship between <span style="background-color:black;color:red">19B</span> and Foss;
- 2014 Foss told coworker <span style="background-color:black;color:red">19B</span> that Foss and <span style="background-color:black;color:red">19B</span> had sex and implied it was not consensual;
- 2014 <span style="background-color:black;color:red">19B</span> told his Sergeant that Foss was falsely suggesting there had been a rape;
- IIU2014-106 initiated and resulted in unfounded finding (administrative investigation);
- 2015 SAU (CID) rape investigation initiated and resulted in a 8/2015 decline memo (KCPAO) (criminal investigation);
- July 10, 2015 Memo of Expectations issued to Foss (not discussing inv. in workplace);
- 2015 Foss expected to work graveyard shift and not work North radio;
- 2015 – 2017 <span style="background-color:black;color:red">19B</span> and <span style="background-color:black;color:red">19B</span> raised various harassment complaints; IIU investigated;
- 2016 IIU allegations against Foss: 1-day suspension (IIU2016-249);
- October 2016 HR evaluated gender based harassment allegation by <span style="background-color:black;color:red">19B</span> (not supported by evidence);
- 2015 – 2018 Foss and Davy initiated 288 PDRs;
- 2015 – 2018 Foss and Davy raised issues to KCSO; IIU investigated;
- Spring 2018 IIU 2017-137 allegations against Foss (resulted in no findings rather than 5-day suspension -- 180-day deadline was not met);
- October 2018 Foss and Davy entered a settlement agreement and withdrew all pending PDRs;
- November 2018 Foss separated employment with KCSO;
- *2018-2019 no further Foss/Davy adv.* <span style="background-color:black;color:red">19B</span> *PDRs or investigations*;
- September 2019 former employee Foss launched tweets alleging rape by <span style="background-color:black;color:red">19B</span> and alleging violations of misconduct in twelve detailed examples; IIU reviewed; all allegations previously investigated;
- November 2019 and January 2020 Foss FB posts realleged rape; multiple FB pages and locations;
- Fall 2019 receipt of anonymous cards by <span style="background-color:black;color:red">19B</span> neighbors, the Shoreline City Manager, and the Shoreline Police Chief (maligning <span style="background-color:black;color:red">19B</span>
- November 2019 Chief <span style="background-color:black;color:red">19B</span> and Capt. <span style="background-color:black;color:red">19B</span> met with KCSO Det. <span style="background-color:black;color:red">19B</span> to start DV cyberstalking and harassment fact gathering from <span style="background-color:black;color:red">19B</span> complaint; meeting with <span style="background-color:black;color:red">19B</span> occurred on 12/4/19;
- November 2019 <span style="background-color:black;color:red">19B</span> stopped working OT at Shoreline Teen Rec Center;
- November 12, 2019 through December 27, 2019 <span style="background-color:black;color:red">19B</span> reportedly rode patrol with another traffic deputy;[10]

---

[10] This time frame is taken from <span style="background-color:black;color:red">19B</span> statement provided to the Monroe PD.

Erin Overbey;
KSCO ▮19B▮   IIU2021-172  Summary Report
July 2, 2021
Page 14

- December 2019 KCSO Det. ▮19B▮ met with ▮19B▮ compiled information and submitted DV cyberstalking and harassment report to Monroe PD -- briefed Monroe PD;
- June 2020 Black Lives matter rally in Shoreline; protester signs maligning ▮19B▮
- June 2020, Chief ▮19B▮ posted a responsive factual post on the Shoreline PD FB page informing the public that the past Foss sexual assault (and other) allegations had been previously investigated;
- July 2020 ▮19B▮ applied to transfer to the City of Sammamish;
- October 2020 former employee Foss raised issues with KCSO, re ▮19B▮ ▮19B▮ ▮19B▮ and ▮19B▮ making false statements and abusing authority; IIU investigated (unfounded/exonerated);
- December 2020 ▮19B▮ met with Chief Pingrey, re, Sammamish transfer request;
- December 2020 ▮19B▮ alleged KCSO has failed to protect him historically from the Foss/▮19B▮ "harassment" and refused to recognize him as a victim of DV harassment; gender bias alleged (IIU2020-419 A-150 O.R.);
- January 20, 2021 DV cyberstalking and harassment charges against former employee Foss are declined (Sno. Co. Pros).

During ▮19B▮ January 28, 2021 intake meeting with Captain Abbott and the KCSO Legal Advisor, ▮19B▮ made the following general allegations.[11]

> **1. In July and August 2020, when working in connection with Black Lives Matter protests within the city of Shoreline, ▮19B▮ learned of a number of signs held by protesters, five or six, that said derogatory things about him, consistent with false information published by Maggie Foss (That he is a rapist, that he should be fired…).**

The evidence is uncontroverted that in advance of the June 6, 2020 Black Lives Matter rally that occurred in the City of Shoreline, ▮19B▮ raised issues with his supervisory staff that he was concerned about working an overtime assignment at the rally in light of all the attention he had received in the aftermath of former employee Foss' social media posts. These posts had been reposted on an "Emerald City Antifa" FB page. ▮19B▮ was allowed to work a patrol overtime detail on the other side of Shoreline so as to avoid the rally. After the rally, other deputies brought to ▮19B▮ attention the fact that specific members of the rally held signs with ▮19B▮ name on them and statements urging ▮19B▮ to be fired. ▮19B▮ collected photographic images of the signs from these deputies and presented them to ▮19B▮ in a June 9, 2020 email. ▮19B▮ expressed to ▮19B▮ concerns about his physical safety on and off the job, and he sought a specific threat assessment concerning his physical safety. ▮19B▮ opted out of working during the August 2020 rally. In late June 2020, Chief ▮19B▮ posted a responsive factual post on the Shoreline PD FB page informing the public that the past Foss sexual

---

[11] The language of these allegations comes from the IIU intake summary that was vetted with ▮19B▮ legal counsel.

Erin Overbey;
KSCO/**19B** IIU2021-172 Summary Report
July 2, 2021
Page 15

assault allegations had been previously investigated with the oversight of the Office of Law Enforcement Oversight ("OLEO").

**2. After Foss distributed false information about him, for at least two months in 2020, Shoreline PD felt that it was necessary to have 19B ride with another deputy for safety reasons.**

In **19B** 1/28/21 intake meeting, he noted that at the KCSO deputies typically ride one officer to a patrol vehicle. The evidence is undisputed that after third parties brought to **19B** attention former employee Foss' late 2019 tweets and posts about him on social media, **19B** raised his personal safety concerns to members of his command staff. **19B** specifically spoke to Traffic Sergeant **19B** **19B** **19B** requested to be able to ride in a 2-person patrol car. **19B** agreed to **19B** request on a temporary basis. There was already in place a routine protocol for two traffic officers to ride in the prisoner transport van. **19B** ended up working a 2-person traffic assignment riding with Deputy **19B** **19B** and others. According to **19B** this lasted for approximately 6-weeks between November 12, 2019 and December 27, 2019. According to compiled CAD reports, **19B** officially reported working a 2-person patrol on four days.[12] Ordinary Shoreline patrol assignments are one officer to a car.

**3. 19B lost overtime employment at a Shoreline Teen Center because after seeing the false information online about 19B they were uncomfortable hiring him for work there.**

In **19B** 1/28/21 intake meeting, he asserted that the Teen Center is only one example of lost overtime due to Foss's and Davy's harassment. The evidence is uncontroverted that after the Shoreline City Manager received (i) an anonymous card alleging the **19B** was a sexual predator, (ii) notice that the Foss social media allegations were showing up on various Shoreline area FB pages, and (iii) information that staff and clientele of the City Teen Rec Center had raised concerns about **19B** working the off-duty overtime ("OT") assignment at the Center after learning of the Foss social media posts, there was a meeting. City management had concerns about **19B** continued involvement at the Center. **19B** asserts that he had regularly worked OT at the Center on Friday and Sunday for the three years leading up to fall 2019. According to **19B** (5/4/21 interview), Chief **19B** and Captain **19B** **19B** relayed the City's concerns:

…they expressed to me that they wouldn't tell me that I couldn't work there, but they were telling me that if I did work there, it would probably not be in my best interest. So at that point in time, I removed myself from working at the Shoreline Center so that

---

[12] **19B** reported riding with Terry Ater on 10/18/19, **19B** **19B** on 11/13/19 & 11/18/19, and Delsin Thomas on 11/21/19 & 11/27/19.

Erin Overbey;
KSCO/19B   IIU2021-172  Summary Report
July 2, 2021
Page 16

I wouldn't do any significant damage to the reputation of the Sheriff's Office with these
false accusations against me, and so that my other partners can continue working there.

According to 19B   Chief 19B   had spoken with the Center employees, Parks Department
Employees and Teens. The issue was with the Teens:

The issue was with the teen volunteers that said they didn't want to work with me. One
jumped up and said, "I can't be in a room with a racist." Another one jumped up and
said, "I can't be in a room with someone who assaults women," and left the room
crying. So she left the room and that's when I said, "Well, if you don't think that I can
work around these kids without it being complex, I will bow out." My concern was
either some kid saying I did something I didn't do or having a conversation within the
rec center with the kids and therefore putting a tarnish on the Shoreline Police.

Both 19B   and 19B   stated to the Investigator that 19B   decided to not continue working
the off-duty OT assignment at the Teen Center. Neither one of them directed 19B   to stop applying
for OT work there. According to records and 19B   statement to the Investigator, 19B   began
working OT hours at the Teen Center in January 2017 and 19B   stopped working OT at the Teen
Center after November 9, 2019.

19B   told the Investigator that he generally avoided OT assignments where he might have contact
with Deputy Davy in Covington. He also described one incident "years ago" where a colleague of
Davy approached him as he arrived to participate in EVOC instruction, and 19B   became
uncomfortable when the other instructor raised the rape investigation (this likely occurred in
2015/2016). Between that incident and a frustrated desire to be able to claim EVOC as OT when he
provided instruction, 19B   decided to stop providing EVOC instruction.

4. **After 19B   filed a criminal complaint with Monroe PD for
   cyberstalking/harassment against Maggie Foss, Foss and Davy started
   targeting Shoreline Det. Alspach, who took the intake on 19B   criminal
   complaint against Foss.**

In 19B   1/28/21 intake meeting, 19B   further stated that Davy made a public disclosure request
about one of 19B   cases on which she had received a citizen complaint. The IAPro intake form
states that "Foss made a PDR P054916-110420 on 11/4/20 requesting records from a case 19B
had worked on, but only addressing 19B   involvement (not responding officers) including any
documents, video, etc, she had that were not included in the case file." In his intake meeting, 19B
said "Foss has also renewed her attacks on Chief 19B   due to his involvement in the criminal
complaint, by restating old complaints against the Chief."

It is undisputed that following receipt of knowledge that the Monroe Police Department had
referred criminal charges against Foss to the Snohomish Prosecutor's Office for review, former
employee Foss tendered a public records request about 19B   and lodged a complaint to the KCSO

Erin Overbey;
KSCO/⬛19B⬛  IIU2021-172  Summary Report
July 2, 2021
Page 17

against ⬛19B⬛  ⬛19B⬛  ⬛19B⬛ and ⬛19B⬛  (IIU2020-419, false complaints (unfounded), abuse of authority (exonerated), violation of performance standards (exonerated)). This continued a pattern of Foss/Davy urging IIU investigations or raising issues with the KCSO when they did not like a process occurring or did not like the outcome of a process or investigation.

**5.  ⬛19B⬛ girlfriend broke up with him in early 2021, after they dated for about a year.**

⬛19B⬛ asserted in his 1/28/21 intake meeting that the "woman's ex-husband had spoken with Maggie Foss about ⬛19B⬛ and had reviewed statements made by Foss about ⬛19B⬛ on the internet. The ex-husband had threatened to take her to court and seek custody of their children if she moved in with ⬛19B⬛

In his May 4, 2021 interview with the Investigator, ⬛19B⬛ clarified that due to child custody concerns raised by his girlfriend's former spouse, he and his girlfriend broke up for approximately two weeks. There were ongoing parenting plan issues, and ⬛19B⬛ had not wanted to be a reason why things did not work out for his girlfriend. ⬛19B⬛ broke off the relationship. This occurred approximately a year or more after the fall 2019 Foss FB posts were posted. This was temporary. ⬛19B⬛ retold to the investigator the girlfriend's recount of a text where the former spouse allegedly said that he had spoken with Maggie Foss about ⬛19B⬛ and what "he's done." As of the 5/4/21 interview, ⬛19B⬛ and his girlfriend were reconciled and back together.[13]

**6. ⬛19B⬛ has applied for other positions in order to escape the harassment by Foss/Davy, but other employers will not hire him due to the false allegations made by Foss.**

⬛19B⬛ told the Investigator about submitting a transfer request to work at the City of Sammamish Police Department in summer 2020 (see discussion below), and more recently submitting a transfer request to work at the City of Kenmore Police Department. ⬛19B⬛ told the Investigator he was looking to be in a less busy locale and not in the spotlight. ⬛19B⬛ also relayed to the Investigator that he was trying to remove himself from the "drama" he was experiencing in the City of Shoreline related to the Foss social media posts. ⬛19B⬛ also relayed his belief that a "change of venue" would help address his feelings of personal safety being impacted by the Foss posts. The chain of command signed off on both transfer requests, leaving it up to the contract City Chief(s) as to officially approving the request(s) or not. ⬛19B⬛ has also discussed with co-workers and supervisory staff about possibly getting out of police work and starting his own business or exploring other employment opportunities. In his earlier written investigation statements, ⬛19B⬛ has more than once expressed that in the past he had applied for a job outside of the KCSO but did not pursue the position due to concerns that Foss would be contacted or would make false statements against him.

---

[13] ⬛19B⬛ opted to not provide the name of his girlfriend to the Investigator.

Erin Overbey;
KSCO█19B█ IIU2021-172 Summary Report
July 2, 2021
Page 18


Furthermore, as paraphrased below by the Investigator, during the January 28, 2021 intake meeting, █19B█ made the following allegations related to KCSO action or inaction:

### A. Failure to Grant █19B█ Transfer Request to Sammamish Police Department in 2020 or 2021.

On August 28, 2020, █19B█ submitted a transfer request to work dayshift patrol at the City of Sammamish. █19B█ request stated: I have been in Shoreline for 8 years and it's time for a change. I am very proactive and would like to assist in training newer deputies." Three levels of command staff signed their approval of the request; on September 1, 2020, █19B█ received a confirming email that the signed request was forwarded to Human Resources. The cover email informed as follows: "Deputy █19B█ - your request was signed by Chief Anderson and the original forwarded to Human Resources. Please note this is a procedural email and does not indicate or confirm another work assignment." The City of Sammamish Chief Pingrey was one of many persons who were copied on this confirming email to █19B█ Of note, it is agreed that █19B█ request to transfer is for a change of venue or assignment and not a promotion; it would not have impacted his wages or benefits. A number of witnesses stated their perspective to the Investigator that █19B█ was likely looking to work in a less busy City and get away from the Foss social media attention.

In his 1/28/21 intake meeting, █19B█ elaborated as follows:

> In part, he applied for the transfer to get away from Shoreline where Foss had spread so much false information about him. He was told in about August 2020 that the job was his, and details were even discussed with him as to a special project (RADAR) he would work on with another deputy at Sammamish (Velie), and also the possibility of him conducting defensive tactics (DT) training. Having him work on dayshift was something that was discussed to help with these ancillary duties, and he was told, "I think we can make that happen." But that changed in December, when he was told by the chief at Sammamish, Capt. Pingrey, that he had to run his selection by the City Manager, and the Assistant Chief in Sammamish. █19B█ said this is not the normal process for a transfer. Soon thereafter █19B█ was told he would not be selected for the transfer to Sammamish. He believes this transfer was denied because of Maggie Foss's history of publicly posting false statements about him on social media, and other methods of publication.

IAPro Intake Summary. In his 5/4/21 interview, █19B█ told the Investigator that he unilaterally submitted his transfer request; he denied applying in response to an announcement or General Information Bulletin ("GIB").

According to GOM 2.00.080 - 085, the following is the protocol for applying for transfers and reviewing transfer requests:

2.00.080 TRANSFERS AND JOB REASSIGNMENTS: 06/92

Erin Overbey;
KSCO/IUB IIU2021-172 Summary Report
July 2, 2021
Page 19

1. Department members shall comply with the guidelines in their current Collective Bargaining Agreement regarding all transfers and job reassignments.
2. All transfer and reassignment orders shall identify the Division, Section, and Unit to and from which the department member is assigned.

2.00.085 TRANSFER POLICY: 01/19 The purpose of this policy is to establish procedures regarding the application process for openings in specialized units or assignments within the department for commissioned and civilian members. This policy is intended to give equal opportunity and information to all applicants, and ensure feedback is provided to interviewing applicants as a method for improving future potential for success.

1.   VACANCY ADVERTISEMENT:

 a.   All openings shall be advertised in the GIB.

  • There shall be fourteen (14) day minimum between the date the notice is issued and the closing date listed on the application announcement.

 b.  The announcement shall include the following information:

  • Open and closing dates.
  • Minimum and desired qualifications.
  • Job description.
  • Responsibilities and job conditions.
  • Days off and shift hours.
  • The selection process.

2.   TRANSFER PROCEDURES:

 a. Members requesting transfer are responsible for completing and submitting, via their chain of command, a transfer request form and any accompanying information to the Captain/Manager advertising the vacancy prior to the closing date.
 b. Candidates must agree to the job responsibilities and working conditions before being considered for filling the vacant position.
 c. In the event the advertising Captain/Manager does not receive a sufficient number of qualified applicants, the Captain/Manager may issue additional announcements for the vacancy.

3.   SELECTION PROCESS:

Erin Overbey;
KSCO/<mark>19B</mark>   IIU2021-172  Summary  Report
July 2, 2021
Page 20

    a.   The advertising  Captain/Manager  is responsible  for:

- Preparing the position  vacancy announcement.
- Accepting applications  for transfer.
- Screening applicants  for minimum  qualifications.
- Scheduling  candidates for an in-person interview  with selection committee.
- Reviewing  the work history  of the candidates which may include  but not limited  to:
  - IIU complaints.
  - Sick leave.
  - Performance evaluations.

- Providing  an alphabetical  list of all eligible  candidates and the name of the top candidate to the Precinct/Section Commander  for their approval.

  - The Precinct/Section Commander  is responsible  for selecting the candidate to fill  the vacancy.
  - Notifying  unqualified  applicants  and candidates that are not selected prior to announcing  the results.
  - Preparing transfer orders.
  - Debriefing  all unsuccessful  candidates upon completion  of the process.

b. The Division  Commander  or his/her designee  is responsible  for final approval of the candidate selection.

4.     EXCEPTIONS:
    a. Upon written  request due to special circumstances, the Undersheriff  may approve a waiver of this policy…...
                                            ***

In his May 4, 2021  interview, <mark>19B</mark>  further elaborated  as to the circumstances  of his  8/28/20 transfer application:

Q:      And tell me about that particular transfer process. Was there a bulletin  or a general order or something put out to everybody? If they were interested in this transfer opportunity  to put in?

A:      There was not. The city was understaffed and they needed bodies. I talked to, once again, Deputy Velie, who let me know that there was going to be a vacancy on day shift. I think  there already was a vacancy on day shift, so when I asked Chief Pingrey if I could come over, he said there was an absence on day shift and he said, "I believe I can make that happen." On the initial  phone call.  The thing is, the application

Erin Overbey;
KSCO/19B  IIU2021-172  Summary Report
July 2, 2021
Page 21

process is, I fill out a form. I provided that form to my Sergeant. My Sergeant sends it
to the Captain and then it goes to the division commander….

\*\*\*

In this case, 19B  Shoreline  Traffic  Unit  partner,  Deputy  19B  was already lined up to transfer to
the City of Sammamish as a Detective.  19B  was waiting to be released from Shoreline.  This had
been discussed with 19B [14]

According to Chief Pingrey's May 11, 2021 interview, in the summer 2020, he had no day shift
patrol positions available.

> We had put out a bulletin, a GIB bulletin, sometime I believe in May for just putting
> bodies out there.[15] We didn't have any vacancies. We ultimately got a transfer request
> from him in, last August 2020. Again, we didn't have any vacancies. We were just
> trying to get a list established, see if there was any interest. We already were at our
> fair share, which was three vacancies, and we already had selected 19B 19B  who
> was going to be one of our detectives, which those vacancies were included in that
> role.  He was at Shoreline, and we've been waiting for him for already I think four or
> five months because they were not able to release anybody from Shoreline.

\*\*\*

19B  told the Investigator that he called Pingrey in summer 2020 to let him know of his interest.
As referenced above, according to 19B  Pingrey provided positive feedback, they discussed that
19B  RADAR program skills could provide a good asset to the City, and they indicated they would
talk again.  19B  described to the Investigator his summer 2000 call with Pingrey as follows:  "On
the phone call he was very interested. He went as far as to get me put with Deputy Velie.  Told him
about the interest in me coming over and doing mental health that week and partnering with Deputy
Velie on defensive tactics training."

19B  told the Investigator that as of November 2020, he had not heard anything; 19B  new
Captain called Pingrey on 19B  behalf and to get a sense of staffing issues:[16]  "November came
along and Captain Abbott talked to Chief Pingrey and said, 'Hey, when's 19B  coming over?' And
[Pingrey] told Captain Abbott, '19B  not coming to Sammamish." And Captain Abbott said, 'What's
going on?' And [Pingrey] said, '19B  has issues he has to work through.' So Captain Abbott told him,
he's like, 'I understand what you're saying.'"

According to Cpt. Abbott:

---

[14] 19B  has since transferred to be a Detective in Sammamish.

[15] Chief Pingrey has not provided, and the Investigator has not been able to locate, a GIB for a patrol deputy
opening from May 2020.

[16] Captain Abbott was assigned to the City of Shoreline PD in mid-November 2020.

Erin Overbey;
KSCO/19B   IIU2021-172   Summary Report
July 2, 2021
Page 22

…So I came [to the City of Shoreline], like I said, I think it was November 15th is when I started here. And there's a board kind of behind me in my office here and it lists names of people that are either transferring in or transferring out of the city. And I took over for Captain 19B who was here before. 19B told me, "These are the people that are going out next. This is where they're going."   And so, there were multiple names on there. 19B was one of them and he was set to go to Sammamish, or at least that was my understanding.

And it was taking a while to move anybody.   Just, our staffing numbers are not good right now, so it takes a lot longer to get people moved around to different areas.   And so, at one point, and I don't remember exactly what it was.  It might have been 19B asking if I had any new info on a date of when he was going to go.   And so, I told him that, or I either told him or I told 19B I told somebody that I was going to call over to Sammamish to try to get an idea of when he was going to go there, and I ended up talking to Chief Pingrey, Dan Pingrey.

And I asked him what the plan is with 19B 19B and I realized it had been, I think, at this time, it had been maybe over six months, and maybe even longer than that, because the other guy [Deputy 19B that went to Sammamish, it had been a year before he actually got his transfer filled.   So, it might have been even more time than six months, but I asked him-…

And so anyway, I called Pingrey to try to find out a transfer date or something, and then he told me that he wasn't taking 19B and so I was confused, because I said, "Well, I had him on my list and I was told that he was coming over there, and he's under the impression that he was coming over there."   And he said, "I don't think I even saw a transfer request from 19B I'm like, "Well, that's weird. I swear he sent one over."   So we ended up find… I don't remember how the transfer request was found.  I don't remember if I called downtown to try to find it, if I emailed, or what, but we ended up getting the transfer request that had been signed off.   So, it was sent over to Pingrey.  And I'd have to find the date, I can probably find it on my emails, of when this occurred.

*** 

So, I ended up finding it and Pingrey said that he wasn't up to take him because of his quote, "baggage."   And he said, "I think I know what you're referring to," and I said, "I'm guessing the Maggie stuff," and he said, "Yeah."  Let me think if there was anything else. So, I asked him if he planned on telling 19B or if I need to tell him that he wasn't coming over and so he said, "Well, no, you can talk to him."   I said, "Okay." So I ended up talking to 19B about it and told him about our conversation and then he told me that he wanted to call Pingrey and asked if I had a problem with that, and I said, "No, of course not."   So he 19B ended up calling him [Pingrey] and

Erin Overbey;
KSCO/19B   IIU2021-172   Summary Report
July 2, 2021
Page 23

then he [19B] told me that he was going to go meet with him [Pingrey] if I was okay
with that, and I said, "Definitely, go for it," and that was kind of the end of my
conversations about the Sammamish thing, other than 19B telling me that he still
didn't know for sure if he even wanted to go there anymore but he wanted to talk to
Pingrey about it first.

***

According to 19B after learning about the results of Capt. Abbott's call to Chief Pingrey, he
called Pingrey to find out the status of his transfer request and try to make an appointment with him.

I actually emailed Chief Pingrey to ask him, or I told him, I said, "Hey. I'm not sure
understand what's going on here. And he said, "Well, I never interviewed you." So, I
went ahead and sent him an email with all the dates of my availability. I went over and
I interviewed with him. And it was him and an assistant chief. And we talked about
my work ethic, my reviews, everything under the sun. And then we get to what I refer
to as the elephant in the room, which is the Maggie Foss Facebook post. Chief Pingrey
advised me that it'd be hard to bring me over to the city of Sammamish due to how it
would look. And he said he would talk to the assistant chief and then talk to the City
Manager. That was in December. I asked him before I left if I should remove my name
from the task force application or if I needed to get an anti-harassment order or a case,
a court case against Maggie Foss, before I should apply. And he told me, "No.
Nothing's impossible. I'll talk to my assistant chief and I'll talk to the city manager." I
haven't heard from him since. Now, it's May, he's transferred two other people into
the city of Sammamish with less seniority than me, except for their qualifications.

***

Pingrey told the Investigator that he did not have a specific recollection of a preliminary outreach
phone call with 19B but he typically tries to be upbeat and positive when people reach out to him
about a possible transfer to his Department.[17] The following colloquy from his May 11, 2021
interview portrays Chief Pingrey's recollection of events:

Q:  Okay, so did you end up receiving a phone call, do you remember, from 19B
    19B maybe before he submitted the transfer request, possibly in July 2020?

---

[17]  At the time of his 5/11/21 interview, Chief Pingrey explained that he was currently "a Captain in the Patrol
Operations Division, currently serving as Chief of Police for the City of Sammamish in a contracted status."
He was assigned as the Chief of Sammamish beginning on December 1, 2019. He had been Chief of Shoreline
before 19B became the Chief in June 2012. Pingrey told the Investigator he did not recall ever meeting
19B In the past, Pingrey held the position of Chief of Patrol Operations Division ('12 – '17). In these earlier
roles, Pingrey would have signed off on 19B performance evaluations (Shoreline), and in some cases
reviewed/signed the findings memos in various IIU investigations involving Foss or 19B (Chief of Patrol
Operations).

Erin Overbey;
KSCO/19B IIU2021-172 Summary Report
July 2, 2021
Page 24

A: He may have, I don't know. I don't remember. I did talk to him once or twice but I don't know before or after, and ultimately we established a meeting the first of December to have a conversation. But I don't have any idea of when.

Q: Okay, do you recall ever having, during the course of the transfer process, a phone call with him where you expressed that it would be a positive thing for him to apply to transfer and you could see that working out for him?

A: No, I always encourage people to go ahead and transfer, and look at an opportunity. I don't tell anybody absolutely no. It's always going to be a conversation after. If we decide to go forward, then there'll always be an interview and a conversation.

Q: Okay, do you recall specifically having conversations with him about the RADAR program that you could see him working at Sammamish in that RADAR program?

A: Yeah, I think he brought up the fact that he was interested in that. I know he brought that up again in the conversation we had later, that might be something that would be a possibility in Sammamish. I think I may have even told him, but I'm not a big fan of the RADAR program, simply because of the amount of work that's put into it. There's not that many opportunities for it in Sammamish. That being said, in the political climate, there was opportunity based on, not concerns, but thoughts that were being put out there by our city council about different ways to work with MHP, social workers, different people. And so the RADAR program is just another option that might be considered.

Q: Okay, did you ever represent to him on the phone in advance of his interview that he likely would be considered as a successful candidate?

A: I can say I let everybody know that I'm interested and appreciate their interest, and would love to have them put in for it, and we'll see if an opportunity presents itself. And everybody gets that same spiel.

Q: Okay, so what was your process, then, once you sent out the GIB bulletin? How did you end up starting to have interviews? What was that process?

A: Well, we didn't have any positions so there wasn't any interview process.

<center>***</center>

The Investigator has evaluated available documentary information. On November 24, 2020, Pingrey issued GIB No. 2020-192 announcing "openings" for the position of patrol officer - night shift patrol. GIB 2020-192 stated that an interview was a part of the selection process. The GIB also highlighted that Sammamish patrol officers are on a rotating 4/10 schedule.

Erin Overbey;
KSCO/[19B]  IIU2021-172 Summary Report
July 2, 2021
Page 25

On December 1, 2020, Sergeant Timothy Gillette sent out a "Moves Proposal" email that included [19B] in the body of the email as someone to transfer from Shoreline to Sammamish.

> **From**: Gillette, Timothy S. <Timothv.Gillette@kinRcounty.Rov>
> **Sent**: Tuesday, December 1, 2020 7:42 AM
> **To**: Pingrey, Daniel <Daniel.Pingrev@kinRcounty.Rov>; Miller, Todd
> <Todd.Miller@kinRcountv.gov>; Herman, Clint
> <Clint.Herman@kinRCounty.Rov>; Thomas, Greg (KCSO)
> <GreR.Thomas@kinRcountv.gov>; Abbott, Ryan D.
> <Ryan.Abbott@kingcountv.ROv>; [19B]   [19B]
> <[19B] [19B]    kinRcountv.gov>
> Cc: McSwain, John <John.McSwain@kinRcounty.gov>; [19B]   [19B]
> <[19B]    [19B]    a)kinRCounty.gov>
> **Subject**: Moves Proposal
>
> Majors and Captains,
> Here's a proposal for some upcoming personnel moves:
>
> Hossner(DVIU) toPCTZ
> Carswell(PCT2)toARFF
> Hawley(CID) to Shoreline
> **[19B] (Shoreline) and [19B] (Shoreline) to Sammamish**
> Williams (Sammamish) to ARFF
> Please send me your thoughts

                                                    ***

(BOLD added). Both Chief Pingrey and Chief [19B] were included on this email, as was Shoreline Capt. [19B] and other persons. This email was treated as a draft.[18]

December 8, 2020 COB was the application deadline for GIB2020-192. As noted above, in his May 4, 2021 interview, [19B] stated that he did not reach out to Pingrey in response to a GIB announcement, but just to express his interest. After Abbott spoke to Pingrey in mid-November, [19B] reached out for an interview.

On December 2, [19B] emailed Pingrey directly to line up an interview:

> **From:** [19B] [19B]  [19B]
> **Sent:** Wednesday, December 2, 2020 1:41 PM
> **To:** Pingrey, Daniel < Daniel.Pingrey@kingcounty.gov >
> **Subject:** Interview Dates

---

[18] By this time, former employee Foss had already lodged her October 2020 complaint to IIU to initiate IIU2020-419 focusing on [19B] [19B] and [19B] as subjects.

Erin Overbey;
KSCO/19B  IIU2021-172  Summary Report
July 2, 2021
Page 26

Good Afternoon Captain Pingrey,
Per our conversation here are some dates and times for me to interview for the patrol
position in Sammamish:

12/04 – 0600-1500hrs
12/08 – 0600-1200hrs
12/10 – 0600-1200hrs
12/18 – 0600-1500hrs
12/22 – 0600-1500hrs
12/23 – 0600-1500hrs

I am okay with doing the meeting over Skype if we need to due to Covid.

Thanks,


***

The meeting was scheduled for December 8:

**From:** 19B 19B
**Sent:** Thursday, December 3, 2020 5:49 AM
**To:** Hall, Alana < Alana.Hall@kingcounty.gov >
**Subject:** RE: Interview with Chief Pingrey

I can do that.

Thanks,


**From:** Hall, Alana < Alana.Hall@kingcounty.gov >
**Sent:** Wednesday, December 2, 2020 4:20 PM
**To:** 19B 19B < 19B 19B kingcounty.gov >
**Subject:** Interview with Chief Pingrey

Hello,
Would Tuesday 12-8-20 at 1100hrs work for you? Here in Sammamish?
If it does work I can send a calendar invite to you and the Chief.
Thank you,

   *Alana*

***

Pingrey told the Investigator that they did not have an "interview," but they did have a meeting.
Per Pingrey, since he did not have an opening, there was no need for an interview. Pingrey's

Erin Overbey;
KSCO/`19B`  IIU2021-172  Summary Report
July 2, 2021
Page 27

Administrative  Sergeant sat in on the meeting but did not take any notes or have any formal role.  She did  not recall  discussing  `19B`  as a transfer candidate in the aftermath  of the meeting,  or discussing the outcome  of any subsequent  conversation with the City Manager.

   All three persons present at the meeting recall `19B` talking  extensively,  and largely  without prompting,  about his current  frustrations and issues stemming  from Foss' social media posts and historical allegations.   Pingrey recalls asking  `19B`  about whether he had a Protection  Order or Anti-harassment  Order;  upon  learning  that none existed,  Pingrey  suggested  to  `19B`  that he apply  for an Order.   In Pingrey's view,  it would  be helpful  to have a Judge enter an Order in order to have something  to discuss  with the City Management  as context  favorable  to  `19B`     In his 5/11/21 interview,  Pingrey described the December 8, 2020 meeting with `19B`  as follows:

> So we had a... again, I think  that he wanted to meet to talk about where he was at, what was going on, his situation.  So I said, "Sure, that'd be great." And myself and Sergeant `19B`   `19B`  met with him.  And I think that was on December 8. I asked him to give us a feel for what was going on, where he was at, why he wanted to transfer.
>
> So he did most of the talking.  It was a very good conversation.  He went through  a lot of the issues that he has had with a person.  Again, I don't know the investigation  or all of those things.  He gave us a lot of information  about the issues that he's had with, I think,  former employees  within the department  that was creating a problem  for him as far as moving  around and the going  to other agencies. He was frustrated. It sounded very... I appreciate how frustrated he was.
>
> We talked about some of the different options  on what he was doing.  I had asked him based on what he was telling  me whether or not he was doing  a defamation  case somehow,  in a defamation  lawsuit  or something.  And he had said, "No." He had brought  up a point  in the protest  during  the summer that there were, it sounds like, some terrible signs and comments that specifically  addressed him and accusations, and then that created a big issue for the city,  and the council,  and the chief. And that's when I talked to him about what he was doing  as far as defamation,  the lawsuit,  or anything. I didn't  know.  I was just wondering what he was doing.  At that point,  he said that he was trying to get a protection  order through  the city of Monroe, I believe, so that he could address these things  and prevent her from doing  that.
>
> So I said, "Okay," so I explained  to him that from a city perspective,  especially  the City of Sammamish,  which is social savvy, it's nonstop,  that before he came over I'd have to have a conversation  with the City Manager because we have to be careful about putting  him in a bad situation.  But I didn't want him to think  that we wouldn't bring him on. I think what he's gone through  sounds terrible from his perspective. I do not envy the man one bit.

Erin Overbey;
KSCO/19B  IIU2021-172  Summary Report
July 2, 2021
Page 28

And so we talked about him following through on that. He said that he was going to. I said that would be great because if we brought him over, then he would be able to... then we'd have documentation and a legal report from a judge stating that this was the best …and that he... which then we have a way to explain where he's at. And he agreed that that sounds like a good idea. And so I talked to the City Manager about this and the City Manager said he would be willing to bring him onboard if we had that paperwork because he agreed. And I believe I got back to him on that and hadn't heard anything more from him since then.

And he was never denied, told no, but we were just looking at trying to come up with a plan that made sense. Again, I have to look at the interests of 19B coming onboard, but also in the interest of, again, what he was telling us is what was occurring in Shoreline in the protest and just looking at the city as well, with our city council. We have one council member that looks at everything that gets posted, written, talked about, etc, with the police. So it's just being aware of that.

<div align="center">***</div>

Pingrey did not approve 19B transfer request to Sammamish. As set out above, in his May 12, 2021 interview, Pingrey stated that he discussed the matter with the City Manager. He emphasized that Sammamish is socially savvy and the City interests needed to be taken into account. He heard nothing further from 19B after the December 8, 2020 meeting.

Chief Pingrey further explained that 19B never brought him a court Order as they had discussed:

Well, like I said at the end, it was that not opposed to having him onboard, that he said he was going to be following through with that protection order. And to me, that would be great because then, like I said, regardless of what then was done, at least we have the ability from a legal perspective from a judge saying that this was all occurring via essentially harassment from another person, which would even if we had some social media issues, at least then we have the ability to say, "No, we got a solid officer that could come in, get the job, and this is a legal battle that's occurring." And he said, "That sounds like a good idea," and that's how we ended it. But again, we didn't have a position available, even at that time. It wasn't like…we didn't have positions. This was just a meeting, here we go.

<div align="center">***</div>

Pingrey additionally elaborated about the operational distinction between a vacancy versus an open position:

Q: Understood, did you express to him that particular fact, that at the time that you met with him on December 8, you did not have an opening for a patrol position?

A: I think we told him at different times. Like I said, I think he called and was interested a couple different times. We didn't have an opening. I mean we have vacancies, but they were fair share vacancies.

Erin Overbey;
KSCO█19B█ IIU2021-172 Summary Report
July 2, 2021
Page 29

\*\*\*

The Staffing worksheet Pingrey sent to Sgt. Gillette  in early January 2021 did not include █19B█ name as a potential Deputy to transfer into Sammamish.  On January 6, 2021, Chief Pingrey sent the following  staffing email:

**From:** Pingrey, Daniel <Daniel.Pingrey@kingcounty.gov>
**Sent:** Wednesday, January 6, 2021 1:35 PM
**To:** Gillette,  Timothy  S. <Timothy.Gillette@kingcounty.gov>
**Cc:** █19B█ █19B█  <█19B█       19B█ kingcounty.gov>;  McSwain, John <John.McSwain@kingcounty.gov>;  Miller,  Todd <Todd.Miller@kingcounty.gov>
**Subject:** RE: Patrol Operations  Quarterly Staffing Meeting  (in person)

Tim,

Here is my completed  form to date.

Currently,  we have 4 vacancies and one long  term DL.

As of January 16, 2021 I will be at 5 vacancies with the transfer of Williams  to ARFF but my long  term vacancy will  be returning.

By January 31, 2021 we will be at 6 vacancies with the resignation  of Hunter Marshall.

\*\*\*

In mid-January  2021, Chief Pingrey sent the following  staffing email:

**From:** Pingrey, Daniel <Daniel.Pingrey@kingcounty.gov>
**Sent:** Wednesday, January 13, 2021 2:35 PM
**To:** Curry, Ross A <Ross.Curry@kingcounty.gov>;  Hudson, Jason T <Jason.Hudson@kingcounty.gov>;  █19B█   19B█  <█19B█      19B█ kingcounty.gov>;  Hall, Edward <Edward.Hall@kingcounty.gov>
**Cc:** Hall,  Alana <Alana.Hall@kingcounty.gov>
**Subject:** Staffing
**Importance:** High

So the staff meeting  just finished  and we are looking  at getting  the following personnel…

Feb 1st          █19B█   for Detective  position
March 1st        Weisberg patrol
TBD              Hyatt to patrol as soon as Woodinville  gets their guys  back from Admin/Injury.  May be as soon as two weeks from today

Erin Overbey;
KSCO/ 19B   IIU2021-172  Summary Report
July 2, 2021
Page 30

TBD            Davis from Carnation if he wants to come.  I believe he is only looking
at second shift.

Current vacancies are….

1 swing shift patrol position
3 graveyard patrol positions
1 property crimes detective
1 SET detective
1 dayshift position  vacant for long term medical

Our 3 SRO's are still working patrol but that may change by Spring with the vaccine
distribution.   I have been willing  to hold two vacancies on graves…

                                          ***

   Pingrey also explained during his May 11, 2021 interview that in early 2021, he filled  two vacant
Sammamish patrol positions  with newly trained Deputies -- and without an interview  -- because he
did not want to wait for Shoreline  to release 19B

Q: Okay, and I think I've asked you this, but I just wanted to be clear. When you did
fill  the openings  or the vacancies that did come up this year, did  you interview either
of those two deputies before bringing  them into those openings?

A: I don't believe so. I mean I think they just expressed an interest and that came via
their training officers and things, saying they were doing a good job. Again, the easiest
way to get bodies if and when you do need them is usually  through the training
program at the precinct of your location.  And that's pretty standard throughout  the
department.

Q:  And were there any outside deputies  outside of Sammamish that also expressed
interest such as the way that 19B     19B   did with a transfer request?

A: I don't believe so. Like I said, usually  when you get a transfer request saying that,
if you decide to select someone from outside, it's very difficult  to get them because of
all of the vacancies within the Sheriff's Office.[19] So the training deputies, if you have
vacancies, if you get additional  vacancies or vacancies you can fill,  the easiest way we
do that is via the training  program at the precinct that you're at. So I didn't put out any
other GIBs or anything  like  that since that one way back in May I think  it was.

_____

[19] In addition to the two probationary Deputies who were assigned to the newly open Sammamish patrol
positions in early 2021, the Investigator is aware of one other outside Deputy who submitted a transfer request
to Sammamish patrol around the same time as 19B    transfer request. In 2020, Sammamish did post other
GIBs for Detective, Motorcycle Officer, Sergeant, SRO, MPO and SET.

Erin Overbey;
KSCO/19B IIU2021-172 Summary Report
July 2, 2021
Page 31

***

The following  colloquy  sets out Chief Pingrey's  thoughts about filling  his early 2021 open patrol
Deputy positions  with newly  trained Deputies rather than a seasoned traffic Deputy such as 19B

A:  We have added positions  in this year, yes, 2021.

Q:  And when did those positions  get filled?

A:  I think  February and March…we lost  some people  and we needed to fill  some
bodies.

Q:  Did you specifically  fill  the patrol deputy position?

A:  We filled  the SET position,  which  had been selected, again,  over almost  a year
ago. That was filled,  had already been selected and then the other two positions  were
patrol positions.  …And I believe that the SRO position  was filled  internally  by one of
our officers.

Q:  And so who did you fill  for the patrol positions?  …

A:  Officer Deputy Hyatt and Deputy Weisberg.  …

Q:  Thank you, and did you interview  both of those deputies?

A: No, they were phase three deputies, or people  from phase two that transitioned  into
phase three.

Q:  What does that mean?

A:  Within  a precinct, they were in training  in phase two, which  means they're riding
with  someone,  riding  with  a training  officer. Then they go into phase three, which
means they're still  in their first year probation  but they're out on their own. A lot of
times  that's what  happens  within  precincts  because it's easier to fill  those new
personnel  into positions  as opposed to being able to get them,  for example, the officer
from Shoreline  that took over here. Shoreline, I think  during this whole time, they've
been up at five, six, seven vacancies. So they've been unable to release personnel.

Q:  All right, with regard to Deputy 19B  he would've been released by Shoreline,  is
that correct? The transfer form was signed off by all of the command staff?

A: No, that's not how that works [crosstalk]…

Erin Overbey;
KSCO/`19B`  IIU2021-172  Summary Report
July 2, 2021
Page 32

Q:  So with regard to Deputy `19B` was it your understanding he would've been released from Shoreline to be able to transfer to the city of Sammamish?

A:  No.

Q:  And why is that?

A:  Well again, all the transfer request is expressing an interest in a position. Those occur throughout the department all the time to different locations, different positions, different divisions. They don't guarantee anything. It means nothing other than that there's an interest that's approved through the chain saying, "This person has an interest in coming to your shop, or to this location, or that location."

It literally means nothing more than that, other than it's been approved through the chain. That's a notification that I'm interested in going to a position. We have people often that put in for multiple positions. For example, `19B` `19B` could've put in for four positions. None of those are guaranteed. None of those are saying he will transfer. It just simply is notification of interest.

                              ***

When asked, Chief Pingrey was uncertain whether he had discussed the topic of Shoreline releasing `19B` with Chief `19B`

I don't know. I think I mentioned to him that he came. I always try to call and find out. I mean again, I didn't know `19B` so, "Hey, I've got this person interested." But not about being released because I knew they weren't releasing anybody because as I said, we still had now Detective `19B` who had been selected, and we had been waiting for him for quite a time. `19B` had put in for his. Like I said, it must've been at least four months and we didn't get him for a year…

Chief `19B` did not recall having a direct conversation with Pingrey concerning `19B` transfer request, but he agreed that at that time Shoreline deputies were not being released right away:

Q:  … Major `19B` did you ever have that conversation directly with Major Pingrey regarding the transfer request to Sammamish?

A:  Not that I recall.

Q:  Had you communicated up the chain of command, or directly to Pingrey, or to anybody at Sammamish, that if he were selected as a candidate to be transferred, that he would be released by Shoreline?

A:  I didn't have any conversation with anybody regarding that. I mean, if they're selected, we're going to release them at some point.

> Q: Okay. Can you speak to that issue in any more detail? So my understanding is that the transfer request was put in, in late August of 2020. And there was a meeting in December of 2020, between the folks at Sammamish and Deputy 19B Was there any reason that anyone would think that 19B would not be released by Shoreline at that point, if there were an opening and an opportunity to transfer to Sammamish?

> A: So I'd be speculating, but it's just typical that anytime we release somebody, it may not be right away, it may be a few months. I mean, we had a Deputy 19B 19B he was a patrol deputy of ours and he was selected for a detective position and I think that transfer took up to a year.

> Q: Did anybody reach out to ask you whether 19B would be released by Shoreline?

> A: No.

***

## B. Failure to Stop Providing Public Records to Foss and Davy in Response to Public Disclosure Requests since 2015.

In his January 28, 2021 intake meeting, 19B alleged as follows:

> KCSO continues to provide documents to Foss and Davy via PDR requests, when those requests are being used to harass him and serve no valid public purpose. 19B and his attorney allege that KCSO is failing to apply a recent (July 2020) exemption to the public disclosure act, RCW 42.56.660, that would permit KCSO to refrain from providing documents in response to PDR's by Foss and Davy that are designed to harass 19B and his attorney believe this exemption applies and that King County should not be providing documents to Maggie Foss or Jeremy Davy that are designed solely to harass him. They said they brought this issue to Chief 19B who forwarded the issue to either legal advisor Erin Overbey or Public Disclosure Manager Kim Petty. Petty told 19B the exemption, which became effective in summer 2020, did not apply. 19B alleges King County has failed to accurately assess the applicability of this PDR exemption, and properly use it to protect him from harassment by Davy and Foss.

IAPro Intake Summary. As referenced above, by the time Foss left her employment with the KCSO in late 2018, she and Davy had collectively served approximately 288 public disclosure requests ("PDRs"). Some requests were directly related to 19B others were indirectly related to 19B and some did not seem to bear a direct relation to 19B in turn made PDRs to find out what Foss and Davy were obtaining in their requests.

Erin Overbey;
KSCO/19B IIU2021-172 Summary Report
July 2, 2021
Page 34

On May 5, 2016, a KCSO Legal Advisor sent an email to 19B the HR Director, and a Detective Sergeant explaining that 19B could go to court to seek an order restraining the serial public disclosure requests:

> There is a statute in the PRA, RCW 42.56.540, that allows a person who is the subject of the record to seek an injunction against the agency to prevent the agency from releasing records. When people do that, they have to file a lawsuit, and pending resolution of the lawsuit they have to obtain and serve the KCSO with a temporary restraining order preventing release of documents pending the resolution of the lawsuit. The court may enjoin release or examination of documents if the court finds the release would clearly not be in the public interest and would substantially and irreparably damage any person.

                                   ***

In his May 4, 2021 interview, 19B told the Investigator that he never took any steps to seek a court order/injunction against the Foss/Davy PDRs.

GOM 15.04.010 addresses the KCSO's responsibilities under Washington's Public Records Act ("PRA"):

15.04.010
**PUBLIC DISCLOSURE AND OTHER RECORDS REQUESTS: 02/15**

**The Public Records Act**

1. Under the Public Records Act (PRA), the Office is required to produce "public records" unless specific exemption exists that allows redaction or withholding.
2. A "public record" is any writing that contains information that relates to the conduct of government or the performance of any governmental or proprietary function prepared, owned, used, or retained by our members of our office.
3. It does not matter what format the writing is in. It includes but is not limited to:

    a. Hard copies,
    b. Electronic records,
    c. Emails,
    d. Text messages,
    e. Phone messages,
    f. Logs of phone calls,
    g. Photographs,
    h. Audio and video records, and
    i. Documents in databases.

4. Members should assume that any information that is retrievable in any format is a "writing," a "public record" and subject to review and release.

Erin Overbey;
KSCO/19B  IIU2021-172  Summary Report
July 2, 2021
Page 35

5. The PRA is construed very liberally and the agency bears the burden of proving that a document is not subject to release.

6. Members do not have a right of privacy when using government equipment and any document created or stored on county equipment is subject to review and release without a member's consent.

**Responding to Requests for Documents**

1. The Sheriff's Office receives requests for documents under the Public Disclosure Act, subpoenas, discovery in civil litigation, and investigations.

2. The Sheriff's Office may face substantial penalties and fines if it fails to preserve documents, conduct a diligent search, or produce responsive records. Criminal and civil litigation can also be adversely impacted, including reversal of convictions, judgments, and settlements, and entry of adverse rulings during litigation.

3. All members shall preserve, search for, and produce records when asked to do so by the Public Disclosure Unit, Records Unit, Legal Unit, or the King County Prosecutor's Office when deputy prosecutors issue "Legal Holds."

4. If a member does not know how to search for documents, the member shall ask for help from the person who made the request or KCSO IT staff, or both.

***

This General Order, consistent with Title 42.56 RCW, presupposes that most KCSO records will be available to members of the public.

Last summer, the Washington Legislature enacted a new provision in the Public Records Act addressing the ability of a state agency to withhold records in specific harassing circumstances. RCW 42.56.660 (eff. date July 1, 2020). 19B  has stated his belief that this provision should apply to PDRs by Foss and Davy. However, the statute specifically states that "agency" "means a state agency…" An "agency employee" is defined as "a state agency employee." RCW 42.56.660(5)(a) and (b). The KCSO Public Disclosure Program Manager informed the Investigator that based on training provided to her by the Washington State Attorney General's Office, this new statute only applies to state agencies and state employees, and not to King County employees or the KCSO.

Five years ago, in the May 5, 2016 email referenced above, the KCSO Legal advisor informed 19B  that based on the state of the law, she would be advising the KCSO to continue providing public records to Foss and Davy. There was no choice. "…My advice to the office is to keep responding to the PRAs at this point and keep the two tracks separate. Whether they [Foss/Davy] know or should know that a likely outcome of making a PRA request is that the public records staff will contact you can be part of the IIU [based on 19B  harassment complaint]."

The KCSO PDR Program Manager has explained to the Investigator that due to volumes, the Public Disclosure Unit ("PDU") does not usually inform a Sheriff's Office employee every time they are the subject of a PDR:

Erin Overbey;
KSCO/<span style="background-color:red;color:white">19B</span>  IIU2021-172  Summary Report
July 2, 2021
Page 36

The PDU had explored the option of notifying employees about PDR's made for information pertaining to them, however, at the time we determined it was too disruptive and difficult to manage because of the sheer volume of requests. We had even considered just notifying command level staff (i.e. Captains and above) and it wasn't feasible. At the time of these discussions (mid/late 2014 to early 2015 date range), my team had 50-60 requests per person at any given time. Now, requests per person range in the 80-90 range, and then over 100 when folks are out of the office for extended periods.

As much as we would love to accommodate an employee notification beyond what is required, it's not realistic to maintain consistency and can be difficult logistically. In addition, updates to the PRA have occurred in the past year that require Third Party Notice to employees for requests seeking information for records held exclusively in their personnel, payroll, training, etc. files. So because we're already providing notice in those circumstances, it covers some of the more sensitive records. Reference RCW 42.56.250(12).

IIU files, on the other hand, are a commonly requested record that require very few redactions unless they contain employment investigations of sexual harassment, discrimination and retaliation. Reference RCW 42.56.250(6), also updated last year!

                                                        ***
5/11/21 email.

   In compliance with these recent changes to the PRA, in late 2020, in response to a newspaper reporter's PDR, the Legal Unit sent <span style="background-color:red;color:white">19B</span> the following December 4, 2020 email:

Good Morning!

On November 9, 2020, the King County Sheriff's Office received the following public records request from Lewis Kamb of The Seattle Times that includes information related to you; specifically records found *exclusively* in your *Personnel* file.

**Copies of any and all records contained in the personnel file for King County Sheriff's Deputy** <span style="background-color:red;color:white">19B</span>   <span style="background-color:red;color:white">19B</span> **from his date of hire until the present date.**

Pursuant to RCW 42.56.250(12), upon receipt of a request for information located *exclusively* in an employee's *personnel*, payroll, supervisor, training, safety, or medical file, the agency must provide notice to the employee, to any union representing the employee, and to the requestor. RCW 42.56.540 allows you to seek a court order enjoining release of these records. If you do choose to seek a court order you may wish to name both KCSO and the requestor, **Lewis Kamb/The Seattle Times (1000 Denny Way, Seattle, WA 98109)** as defendants in your lawsuit. *See Burt v. Dep't of Corr.*, 168 Wn.2d 828, 231 P.3d 191 (2010).

Erin Overbey;
KSCO█19B█ IIU2021-172  Summary Report
July 2, 2021
Page 37

We are offering you an opportunity to review the records **HERE** so you can determine whether to enjoin the KCSO from releasing them. These records have been reviewed for any redactions pursuant to applicable statutory exemptions to disclosure. Reference the enclosed exemption/privilege log for redactions made. If you believe we missed redactions based on exemptions allowed under the Public Records Act, it may not be necessary to seek an injunction, so please let me know and I will review for corrections and advise you. NOTE: partial date of birth (month/year) for employees of criminal justice agencies is typically exempt, *except to the media*, hence your date of birth has not been redacted. Reference RCW 42.56.250(8).

If you do not provide me with a court order enjoining the KCSO from releasing these records within 14 days from the date of this letter, **by 4:30 PM on December 21, 2020**, the King County Sheriff's Office will make these records available to the requestor no later than Tuesday, December 22, 2020. In the meantime, we have informed the requestor that we have given you this notice.

*NOTE: the records provided to you for review will be removed from the link above on December 21, 2020, so will no longer be accessible.*

If you have any questions or concerns regarding this matter, please feel free to contact me directly.

<div align="center">***</div>

Because no injunction was received by the PDU, the requested records were released.

**C. Failure to Support Chief** █19B█ **and Captain** █19B█ **Intention to Investigate** █19B█ **Harassment and Stalking Criminal Complaint and/or Deliver the Allegations and Timeline to Monroe PD in Late 2019.**

In █19B█ January 28, 2021 intake meeting, he explained his allegation as follows;

After █19B█ criminal complaint was taken by Det. █19B█ Shoreline's Chief █19B█ had planned to convey the complaint to the Monroe Police Dept. in person. █19B█ states that in addition to demonstrating support from KCSO's command staff, Chief █19B█ communication would have been a typical coordination between law enforcement agencies when an outside agency is asked to investigate a matter relating to the other agency's employee. █19B█ was ordered by KCSO Chief Howard not to personally convey the complaint. █19B█ believes this was improper, and that it demonstrates lack of support for him by the upper levels of KCSO command staff.

IAPro Intake Summary.

Erin Overbey;
KSCO/19B IIU2021-172 Summary Report
July 2, 2021
Page 38

Three of former employee Foss' more lengthy and troubling social media posts were put up on September 22, 2019, October 20, 2019, and January 20, 2020. 19B brought these posts to the attention of Sgt. 19B Capt. 19B Chief 19B and others in his Shoreline PD command staff. 19B preliminarily evaluated whether there was an applicable RCW crime for the presented factual allegations. RCW 10.99 *et. seq.* requires law enforcement to take a report of apparent DV crime. There is a consensus of evidence in this investigation that 19B has the training to know how to (i) initiate a criminal complaint and (ii) obtain a protection or anti-harassment order. Such training is provided in Basic Academy and such information is routinely provided by law enforcement officers to DV victims who have reported DV crimes. Various persons in this investigation, to include 19B 19B 19B 19B and Pingrey, have raised or had some discussion with 19B over the years about his option to seek a protection order from the court. This topic came up with 19B several times after the 2019 Foss social media posts were reviewed. As discussed below, the Shoreline PD Command Staff assisted 19B with navigating the criminal complaint process, providing 19B information directly to the Monroe PD (KCSO Case # C19046254), alerting him to EAP and Peer Support resources, and generally providing a sounding board to 19B concerns. Once criminal charges were received for review by the Snohomish County Prosecutor, 19B was assigned to a DV Advocate in Snohomish County. The fact of this advocacy assignment had been relayed back to 19B KCSO command staff.

On November 20, 2019, Chief 19B and Capt. 19B assigned KCSO Det. 19B to conduct a preliminary investigation into a potential criminal complaint of DV cyberstalking/harassment against Foss for targeting 19B On December 4, 2019, 19B met with 19B Over that month, 19B collected a timeline from 19B and preserved Foss' social media posts and tweets. Chief 19B explained to the Investigator that he also worked with the Legal Unit and others in his chain of command to draft a factual responsive post for the Shoreline PD FB page in support of 19B this was posted in late June 2020. This would have occurred after the June 2020 BLM rally in the City of Shoreline – and while the Monroe PD investigation was still pending review by the Snohomish County Prosecutor.

The KCSO has issued GOM 14.--.070 to address expectations towards employees' use or receipt of social media:

**14.00.075 USE OF SOCIAL MEDIA**: 03/13

For the purpose of this policy:

**Social Media means:** A category of internet-based resources that integrate user-generated content and user participation. This includes, but is not limited to, social networking sites, microblogging sites, photo and video sharing sites, wikis, blogs, and news sites.

1. When using any social media department members shall not:
a. Post confidential information about an ongoing criminal investigation.

Erin Overbey;
KSCO/⬛19B⬛   IIU2021-172  Summary Report
July 2, 2021
Page 39

   b. Post substantive information about an active court case, where the poster is likely
to be called as a witness.
   c. Post non-public information about other employees
   d. Post private information about victims.
   e. Post information about ongoing internal investigations.
   f. Endorse a product or vendor where the endorsement creates the appearance of a
conflict of interest.
   g. Post vulgar or obscene expressions.
   h. Post content containing excessive name calling, profanity, fighting words,
discriminatory epithets, sexual harassment, bullying, or gruesome language.
   i. Post content that amounts to advocating criminal activity or law violations.
   j. Depict the illegal use of controlled substances (examples: digital photos of
employees using suspected controlled substances or suspected drug paraphernalia)
where there is no operational need for the information.
   k. Speak for the KCSO without express written authorization from the KCSO to do so.

   2. When using any social media department members should be reminded that:
   a. Third-parties, including criminal defense investigators or attorneys may locate text
and graphic postings and use the content to impeach the credibility of KCSO witnesses
in a court case.
   b. Even if you think your posting is "private" you may not own that content and the
owner may change its status in the future or there may be a data breach.
   c. Content that you post may be available long after you have forgotten about it.
   d. Even if you think your posting can be viewed only by a limited group of "friends",
those friends might share your content with third parties without your knowledge.
   e. Posting personal information about yourself or your family may present a personal
safety risk.

   **3. Department members are encouraged to use official channels to raise
   complaints or concerns regarding their jobs or work environments.**

   **4. Nothing in this policy is meant to prevent a department member from
   exercising his or her right to make a complaint of discrimination or other
   workplace misconduct, engage in lawful collective bargaining activity, or to
   express an opinion on a matter of public concern in a manner that does not
   unduly disrupt KCSO operations.**

GOM 14.00.075 (BOLD added).

   As made evident above, the Foss social media tweets and posts in question were posted by a
private citizen, who is also a former KCSO employee.   The focal preliminary topic of the tweets and
posts concerned ⬛19B⬛   off-duty social interactions with Foss in 2010 that had already been
investigated by the KCSO IIU and the SAU; the tweets and posts also repeated allegations about

Erin Overbey;
KSCO/[19B]  IIU2021-172  Summary Report
July 2, 2021
Page 40

alleged official misconduct that had already been investigated by the KCSO IIU.  Foss was speaking as a private citizen arguably about topics of public concern regarding a public officer under the First Amendment.  [19B]  used official channels to raise his concerns about the harassment and cyberstalking by Foss that was impacting him in the community and in his workplace.  [19B]  and [19B]  took steps to look into [19B]  concerns as potential DV social media-based crimes.  Chief [19B]  told the Investigator that he recalled calling  then Chief Bryan Howard on January 7, 2020 to get input on the concept of personally delivering [19B]  harassment/stalking  complaint  as preliminarily  investigated by [19B]  to the Monroe Police Department:

> Yeah, I called him, it was actually January 7th, 2020, because we were going to go meet with Monroe to explain this case. And then I called him, he said he's going to run it up the flagpole, meaning up his chain of command. And then I called him back and he said he talked to the undersheriff and [a Legal Advisor] and they said negative, do not meet with Monroe. It'd be seen as you as the Chief influencing  the investigation.

*\*\*\**

The record is uncontroverted that in late December 2019 or early January 2020, then Chief Howard[20] called Chief [19B]  to inform him of the Executive Command Staff's decision to ask [19B] to provide his harassment and stalking criminal complaint  against Foss to the City of Monroe Police Department for Investigation.[21]   There were several reasons provided  for that decision: (1)  avoid the appearance of a conflict of interest,  (2) avoid the appearance of improper  influence  or bias, and (3) have the  law enforcement agency with jurisdiction  over [19B]   Monroe  residence  perform  the investigation.   This issue had been discussed with Executive Command staff, and Howard delivered the message to Chief [19B]  and [19B] conveyed the decision to [19B]  Per [19B] as a contract city Chief,  he had never delivered  a criminal case to another municipal  police department.  [19B]  indicated that on CID, delivering  criminal  cases to other cities is common.

In his interview  with the Investigator,  Major  Howard elaborated on this issue as follows:

> I reached out to Major [19B]  and I spoke with him about the nature of the allegations and the type of investigation  that would be needed. I shared with him that it would be really important to have a different agency investigate the allegations,  so there wouldn't be any kind of appearance of bias to the potential suspect, Ms. Foss. We talked about the fact that deputy [19B]  lived in Monroe, and these posts that occurred on social media. He had seen and viewed  many of those while  he was at home. Therefore, it seemed most appropriate,  and consistent with how we've handled other

---

[20] At the time of the interview, Major Howard was the Division Chief for the Technical Services Division. He reported to the Undersheriff.  Previously, he was the Division Chief for Patrol Operations.

[21] A few months earlier, Major Howard's calendar reflects that he made a note to call [19B]  "to recommend EAP process for [19B] issue."

Erin Overbey;
KSCO ███ IIU2021-172  Summary Report
July 2, 2021
Page 41

social media kind of criminal cases for a lot of employees, to have Monroe conduct
the investigation and not the city of Shoreline.

He shared with me that his detectives had already done some work. I said, that's fine,
but what they need to do is not do any additional work and cooperate with Monroe,
and provide to them anything that they, if they had obtained statements or any other
evidence, that they should just provide whatever they have to Monroe. Assuming that
Monroe asks. One of the other aspects of the conversation we had was, whether or not
Deputy ███ would be willing to be a victim and call, and file a report with Monroe.

I had offered to Major ███ to have a meeting with him and Deputy ███ and
explain why we felt it was most appropriate for Monroe to handle the investigation,
and offer some support to him just to let him know that we certainly are concerned
about what's been going on and want any criminal allegations properly investigated.
Major ███ told me he didn't think that would be necessary, that he would meet
with Deputy ███ Ultimately I think it took a week or so, Major ███ told me the
Deputy ███ did file a report with Monroe. So I thanked him for that information and
briefed the rest of the leadership team that Monroe was taking the lead on the criminal
investigation involving Deputy ███ and Ms. Foss.

<center>***</center>

Capt. ███ told the Investigator that he heard "second or third hand" that Howard had
commented to ███ that if this were a female employee complainant, the KCSO "would be looking
into it." In ███ written response to his A-150 Notice in IIU2020-419, ███ explained as
follows:

Deputy ███ came forward to Precinct #5 command regarding his concern as a
possible victim of harassment and/or cyberstalking. I had prior knowledge of his past
history with former Department member "Maggie" Foss, the complainant, due to my
assignment as the IIU Captain and as the Operations Captain at the City of Shoreline.
Understanding that there is a likely domestic violence nexus to ███ concerns, I took
this issue seriously. After listening to his issue, and review of current laws, there was
the appearance that he may be a victim of a domestic violence crime. Detective
███ was assigned to initially review the issue and to speak with ███ regarding
the details in a preliminary manner. The initial intent was to start the reporting process,
as some of the issues occurring could be tied to King County jurisdiction, treating it
the same as anyone reporting criminal activity.

It was communicated to me that Major ███ brought this concern to the chain of
command above him. It is my understanding that no action by the Department was
going to be taken and that was the direction he was given.

Erin Overbey;
KSCO/`19B`   IIU2021-172 Summary Report
July 2, 2021
Page 42

Command, including myself, met with `19B` ▮▮▮▮▮▮ initial review of information led me to believe that a crime did occur. Upon learning that the Department had no interest in following up with a criminal allegation reported by a Department member, with a connection to King County jurisdiction, and with the incident likely being domestic violence related, it was determined that the preliminary information gathered should be forwarded to the Monroe Police Department for review. Parts of `19B` criminal allegations appeared to have occurred within the city limits of Monroe. Major `19B` Detective `19B` and I planned to meet in person with Monroe Police, explain the situation, and provide them the information we had. The intent was to maintain transparency and to reduce conflicts of interest, while still acting as mandatory domestic violence reporters. Major `19B` notified me and said he was directed not to go to the meeting with the Monroe Police Department and the meeting was cancelled.

Deputy `19B` communicated to me that he reported his concerns to the Monroe Police Department and has an open case with them. I directed Detective `19B` to cooperate with any information requests, just as she would with any other investigation and outside agency Detectives, from Monroe Police.

January 7, 2021 OR `19B` IIU2020-419 (Case #: C19046254).

Howard and `19B` both told the Investigator that they treated `19B` concerns the same as they would treat any other employee's concerns and no differently than they would treat a female KCSO's criminal complaint. `19B` stated that over the years, he had provided more time to `19B` than he recalled providing to other employees. Howard disagreed that the Command Staff direction was somehow unfair to `19B`

Well, I'd say that our discussion was centered around A-supporting him and B-making sure that we didn't screw things up so that if he indeed was the victim of the crime, that he could see justice. So wanting to make sure that it didn't appear to be a biased investigation, and the conflict of interest and all the stuff we've discussed before, is why we gave the direction to Major `19B` that we gave. It was in an effort to treat this as serious as possible and ensure that the potential victim in this, Deputy `19B` didn't end up unhappy because the criminal charges couldn't be filed, because of the conflict or other things that we may have done.

*** 

On January 21, 2020, Detective `19B` drove to Monroe PD and delivered her DV cyberstalking/harassment reports, and debriefed the Monroe PD Detective on the status of `19B` complaints and the allegations generally (KCSO Case # C19046254). Per the assigned Monroe Detective and Detective `19B` had captured the majority of the Foss social media posts before some of them were taken down.

/

Erin Overbey;
KSCO/[19B] IIU2021-172 Summary Report
July 2, 2021
Page 43

**D.  Treating Him Differently than Similarly Situated Female Employees Since 2014.**

In the January 28, 2021 intake meeting, [19B] alleged that "…KCSO has been aware of Maggie Foss's harassment of him for several years, and feels KCSO has treated him differently than they would have treated a woman in a similar situation harassed by a fellow, or former, department member." IAPro Intake Summary.  No witness has provided to the Investigator an example of a factually comparable fact pattern that had opposite gender employees involved where the KCSO treated them differently in a material way.  Many witnesses pointed out that the fact pattern here, as described throughout this report, was very unusual.

GOM 3.03.000 speaks to the KCSO's administrative investigations of allegations of department members' official misconduct.   GOM 3.03.005 declares a broad policy statement in favor of investigating all allegations of official misconduct:

> The purpose of this section is to provide guidelines concerning the investigations of member alleged misconduct. It is the Sheriff's Office policy to promptly, thoroughly and fairly, investigate alleged misconduct involving its members. Supervisors and Commanders who are assigned to review complaints shall ensure that all complaints are appropriately investigated and documented according to the procedures established in this policy.

<div align="center">***</div>

Looking at the record as a whole and [19B] allegations, the public records requests and responses are gender neutral.[22] The PDU has responded to [19B] PDRs, and the Foss/Davy PDRs.  The KCSO has been investigating both Foss and [19B] allegations since 2014 much to the chagrin and dissatisfaction of each of them.  The IIU has also investigated [19B] allegations against Davy. Foss has lodged allegations against both male employees ([19B] Anderson, [19B] and [19B] and female employees (Carlson, Sullivan and [19B]  All allegations have been reviewed or investigated by the KCSO. [19B] (female) and [19B] (male) workplace harassment policy allegations against Foss (female) and Davy (male) were all investigated or reviewed by IIU.

Significantly, as to [19B] current gender-based complaint connected to not internally investigating or not having [19B] and [19B] personally deliver the [19B] criminal complaints to the Monroe PD, the KCSO had reasonable grounds to encourage [19B] to contact the Monroe Police Department to pursue criminal charges rather than investigate the charges internally or have [19B] and [19B] personally deliver the preliminary criminal fact gathering by [19B] to the Monroe PD. Foss alleged bias and favoritism against Det. Carlson and the KCSO in the aftermath of IIU2014-106. There, [19B] cross-alleged false reporting against Foss. Foss alleged bias against Capt. Sullivan and the KCSO in the aftermath of IIU2017-137.  [19B] now alleges potential improper influence against the KCSO for not serving proposed discipline within the 180-day contract timeline. Foss cross-alleged dishonesty and false statements in the aftermath of [19B] reporting his criminal

---

[22] The Investigator has reviewed the spreadsheets provided by the PDU summarizing relevant historical PDRs.

Erin Overbey;
KSCO/19B  IIU2021-172  Summary Report
July 2, 2021
Page 44

complaint to the Monroe PD (MPD 2020-3313).  "Bias" is repeatedly alleged in many of the 2019 – 2020 Foss social media posts and tweets. Looking at the record as a whole, seeking to have the law enforcement agency with jurisdiction over 19B  residence conduct the harassment/cyberstalking criminal complaint was an objectively reasonable step in order to avoid a repeat of such allegations, and cross-allegations, and to avoid providing a substantive basis for a conflict of interest, improper influence or bias allegations against the KCSO.  Viewing the record as a whole in the context of the entire history of these allegations and cross allegations since 2014, such direction by the KCSO provided assistance rather than a disservice to 19B

### E.  Failure to Appropriately Discipline Foss in 2018 (IIU2017-137).

In the January 28, 2021 19B  intake meeting, the following was alleged:

> 19B  alleges that former KCSO Undersheriff Somers, "sat" on an investigation against M. Foss so that it went beyond the 180-day timeframe, and therefore no sustained findings or discipline could be issued. [IIU2017-137 included allegations of Conduct Unbecoming, Ridicule, and Willful Violation, and recommended 5-day suspension; Somers signed the Notice of Loudermill on 1/5/18, before the expiration of the 180 days, but it was not served on Foss until 1/25/18; Her supervisor at the time was Captain J. Sullivan; No Findings were entered due to a 180-day violation]. 19B is concerned that Foss and her husband Jeremy Davy had made campaign donations to the current sheriff, and feels that may have influenced the inaction in this case. He said he was told by Capt. Chinnick that "they failed you."

IAPro Intake Summary.

It is undisputed that in January 2018, the new Undersheriff's IIU2017-137 findings memo and *Loudermill* Notice was not timely served on Foss within the 180-day window required by the applicable GOM: "Administrative Investigations must be completed within one hundred and eighty (180) days of the matter coming to the attention of the Sheriff's Office Command Staff/Captains." GOM 3.03.150.  As noted above, 19B  alleges that such was due to improper influence by Foss/Davy with the newly elected Sheriff.[23]  Based on a review of the IAPro record and witness interviews, it appears that the correct date for calculating the beginning of the 180-day deadline was when Communications Director Kathy Pompeo opened the IIU in Blue Team:  July 17, 2017. Unfortunately, the record appears to reflect that instead August 2, 2017 – the date that Captain Sullivan was informed of the misconduct – was used to calculate the deadline.

The written contemporaneous record reflects that Captain Sullivan prepared her December 19, 2017 findings memo before the 180-days expired, but was late in the process for review, drafting the

---

[23] The former Sheriff lost the November 2017 election, and the new Sheriff and Undersheriff assumed their roles at the start of 2018.

Erin Overbey;
KSCO█19B█ IIU2021-172 Summary Report
July 2, 2021
Page 45

Undersheriff's memo, and providing service to Foss. On January 5, 2018, Somers and his staff timely prepared his findings and recommendation memo to be provided to Foss.[24] This was Somers' first week as Undersheriff/Division Chief. In the transition period following the November 2017 election, the IIU evaluated pending matters and put together a spreadsheet summarizing the timelines and status of pending investigations. The spreadsheet noted the 180-day expiration for IIU2017-137 to be January 27, 2018.

A January 8, 2018 email from HR Associate █19B█ to Captain Sullivan states as follows:

> From: █19B█
> To: Sullivan, Jessica
> Subject: Loudermill Notice on its way for Foss, IIU2017-137
> Date: Monday, January 08, 2018 2:11:35 PM
> Hi, Captain Sullivan.
> Please send the original signed Notice back to me in IIU.

***

A January 12, 2018 email from █19B█ to IIU Captain Chinnick memorializes a phone call by Sullivan that states as follows:

> **From:** █19B█
> **To:** Chinnick, Rodney
> **Subject:** Jessica Sullivan and a case going over 180 days
> **Date:** Friday, January 12, 2018 1:04:35 PM
>
> Captain Sullivan called and asked me to double check the 180 day due date for a Maggie Foss case, IIU2017-137. I had sent out the Loudermill on the 8th (snail mail). The 180 days listed in IAPro is incorrect. It says 1/27/2018, but the real 180 days is January 9, 2018. So it's dead.
>
> She wants a phone call from you. She wants verification that it is indeed dead and asks if anything can be done as far as discipline, correction, etc. I told her I didn't think anything is done. It is declared "No finding-180 days".
>
> Her number is 206-235-4710.
> I also mentioned to her the due date memo I sent out to her today for IIU2017-171. It has a due date of February 8, 2017 (I blind copied you on that one). She can't guarantee that she will get it done because it's not enough time for her to review and get through the chain, etc. She is on her way to Walla Walla for some family matters...

***

---

[24] In late December 2017, Somers' Administrative Assistant had asked for this investigation and several others to hold for Somers to address as the new Undersheriff.

Erin Overbey;
KSCO/19B  IIU2021-172  Summary Report
July 2, 2021
Page 46

On January 15, 2018, Sullivan tried to schedule a meeting with Foss, but Foss declined the meeting. Foss wrote the Sheriff on January 17, 2018, to complain about retaliation by Sullivan. A meeting for Sullivan to serve the proposed discipline occurred on January 25, 2018. After Foss' March 16, 2018 *Loudermill* hearing, Foss wrote Somers alleging bias by Sullivan.

On May 8, 2018, 19B provided the following timeline in an email to Capt. Chinnick:

| IIU CASE NO. | 180 DATE DEADLINE | COMMANDER NAME | DATE SENT TO COMMANDER / NOTIFY OLEO (NEW 12/16) | ADVISORY DATE if APPLICABLE | DATE DUE TO CHIEF PINKHEY / CHIEF COX - FINDALL | DATE DUE BACK IN BU | Employee Name | DATE RETURNED TO BU | DATE TO CD | DATE RETURNED TO YU FROM CD/ NOTIFY DLEO if Loudermill recommendation | WHERE IN TRANSIT IS WRITTEN REP OR FINAL MEMO SENT? | DATE LOUDERMILL, WRITTEN REP OR LOUDERMILL NOTICE | DATE LOUDERMILL SIGNED, IF APPLICABLE | DEADLINE FO LOUDERMILL LOUDERMILL RESPONSE K RM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IIU2017-137 | 1/27/2018 | Captain Sullivan | 9/6/2017 | 11/14/2017 | 9/20/2017 | 10/6/2017 | Foss | 12/28/2017 | 12/28/2017 - Leonard asked me to wait until Scott Somers is the CD before giving it to him for review. | 10/24/2017 -Captain Sullivan emailed a request for Advisory 12/25/2017 -rocio will give it to her chief for review. | 1/3/2018 -sent out Loudermill Notice to Captain Sullivan for service on Foss | 1/12/2018- Captain Sullivan called, she asked me to check the 180 days, which was incorrectly input in IAPro. It expired on 1/9/2018 | 1/25/2018 Captain Sullivan hand delivered the Loudermill which was signed on 1/25/2018 | |

On June 4, 2018, Foss lodged her Claim for Damages against King County. On June 14, 2018, Somers' *Loudermill* decision letter noted that he had intended to impose 5-days suspension as discipline for Foss' misconduct, but due to the 180-day violation discussed above (he calculated the deadline to be January 13), he had to forgo imposition of discipline per the GOM.[25]

## F. Other Terms and Conditions of Employment.

19B agrees that he has not applied for a contract specialty assignment during his KCSO employment. He has primarily worked on the Traffic Unit and has served as a part of the RADAR program, as a Mentor, and as an EVOC Instructor. He has never tested for Sergeant. No one has told him to not apply for a promotion. 19B stated to the Investigator that he had been encouraged by Chief 19B to prepare to test for Sergeant, but after the Foss social media posts were circulated, 19B decided testing would not be worthwhile. No command staff person told 19B not to test.

After the fall 2019 Foss social media posts were circulated, 19B was put into contact with Peer Advisory Team ("PAT") contact Sergeant 19B 19B has a leadership position in PAT. 19B told the Investigator that afterwards, there was a "conflict of interest" when 19B later was assigned to an IIU investigation against 19B 19B told the investigator that he facilitated 19B filling out a PAT form to obtain a formal PAT counselor assignment or other services referral information. Per Sgt. 19B he was not an assigned PAT counselor for 19B When later 19B was briefly assigned to investigate an allegation against 19B stemming from a vehicle towing complaint (IIU2019-541), 19B described that he kept that role as distinctly separate from the earlier PAT role. 19B described that he considered 19B to be a friend and such was also reciprocated and articulated by 19B Because the towing complaint had been earlier investigated by IIU, the matter ultimately was closed as a NIM.

---

[25] Based on the language in the Somers' 6/14/18 *Loudermill* decision letter, it appears that Sheriff Johanknecht was ill and Somers stood in for her for this process.

Erin Overbey;
KSCO███ IIU2021-172  Summary  Report
July 2, 2021
Page 47


## V.     CONCLUSION

There is a protracted history of back and forth allegations and PDRs brought forward by former Dispatcher Foss and current Deputy ███ This history stems from a brief 2010 dating relationship, and subsequent 2014 workplace allegations concerning a 2010 off-duty sexual interaction between Foss and ███ alleged false reporting. Foss alleged rape. Two related criminal investigations have resulted in a Prosecutor's Decline memo (one in 2015 and one in 2021). Close to 300 Foss/Davy PDRs have been burdensome to the KCSO records unit. These PDRs, serial administrative and criminal investigations, and related social media posts have been worrisome and burdensome to ███ and the KCSO. A 2018 claim for damages and lawsuit by Foss and her spouse against the KCSO were settled; Foss agreed to separate employment and Foss/Davy agreed to withdraw all then-pending PDRs. This resulted in peace to ███ and the KCSO for the better part of a year.

In fall 2019, former employee Foss launched a new social media campaign attacking ███ individually and the KCSO generally. Many persons within the KCSO have raised or discussed with ███ his options regarding (i) seeking a court order to oppose the PDRs; (ii) seeking a court order regarding the social media posts; (iii) initiating civil or criminal complaints; (iv) meeting with KCSO Detective ███ (v) meeting with Monroe Det. ███ (vi) seeking resources with the Employee Assistance Program; (vii) allowing ███ to work a 2-person patrol detail for a brief period; (viii) allowing ███ to not work the OT detail at the June 2020 BLM rally; (ix) referring ███ to Peer Support; and (x) generally being a sounding board for ███ concerns.

In the early years of the Foss/███ dispute (2014-2018), the KCSO command staff took steps to (i) direct Foss not to discuss the administrative investigations in the workplace; (ii) keep Foss from working the North Radio post so there were fewer opportunities to talk to ███ (iii) try to separate co-workers ███ and Foss and keep Foss working the graveyard shift to reduce opportunities for work conflict with ███ then girlfriend ███ (iv) administer early stages of progressive discipline when Foss violated directions and expectations; and (v) enter into a separation agreement to facilitate peace for ███ and the KCSO. The 2018 Agreement and Release specifically required Foss and Davy to withdraw all then pending PDRs.

**2020 Referral of Potential DV Cyberstalking Harassment Charges to Monroe P.D.** The weight of the evidence supports a finding that Major Howard called Chief ███ to pass on Executive Command Staff direction to not conduct the DV cyberstalking/harassment complaint at the KCSO CID, and to not personally deliver the ███ DV police reports to Monroe PD. Instead the expectation was to encourage ███ to bring his criminal complaint to the local police jurisdiction where he lived. ███ in fact designated the potential cyberstalking and harassment charges as DV crimes (KCSO Case # C19046254). Howard also urged ███ to bring EAP services to ███ attention. These events occurred in fall 2019 and January 2020. There is agreement on these facts and these findings are supported by clear and convincing evidence. This issue may raise internal disagreements about the fairness of this direction, but the weight of the credible evidence does not support a finding of illegal gender based animus as a motivating factor for this direction. Instead, the

Erin Overbey;
KSCO/19B IIU2021-172 Summary Report
July 2, 2021
Page 48

record supports a finding that Howard relayed this direction in order to avoid the appearance of bias, undue influence, conflict of interest and potential civil liability. The evidence supports a finding that the command staff viewed the 2019 and 2020 Foss social media posts and tweets to potentially constitute DV criminal behavior, and such was documented in the police report and criminal referral to Monroe PD.[26]

**2019-20 Foss Social Media Posts.** 19B has not provided any suggestions for how the KCSO could have responded to former employee Foss' posts and tweets in a different manner. In fall 2019 and January 2020, Foss was no longer an employee; she was a private citizen, and she was arguably raising issues that were a matter of public concern. In 2019 and 2020, the KCSO facilitated gathering factual information using KCSO Det. 19B to document 19B DV criminal complaint, preserve and compile the social media, and deliver the same to Monroe PD (KCSO Case # C19046254). In June 2020, the KCSO reasonably posted a counter statement on the Shoreline PD FB page. DV civil court orders were raised and/or discussed with 19B by several members of the command staff. The KCSO Media Relations Officer is not empowered to scrub or remove Foss' individual social media from the internet. According to current Media Relations Officer 19B 19B it is the protocol of the KCSO generally to not remove from the KCSO FB page social media comment by the public. The KCSO offered support in many forms to include EAP services, criminal referral, Peer Support, a Shoreline PD FB page counter statement, and a sounding board by several members of the Shoreline chain of command and leadership.

**2020 Transfer Request.** The weight of the evidence supports a finding that Chief Pingrey did not grant 19B July 2020 request to transfer to the Sammamish PD day shift patrol. This point is agreed and supported by clear and convincing evidence. Though the request was not ever specifically denied, when two night shift patrol vacancies opened up in early 2021, Pingrey selected two deputies that were still in their probationary period instead of 19B As outlined above, there are a number of reasons why this occurred. One reason is that Chief Pingrey maintains that a day shift patrol position was not available. The Investigator finds that a part of the rationale had to do with wanting to avoid the kind of drama then connected to 19B (Shoreline social media and ugly protest signs) being moved to Sammamish. Such is supported by clear and convincing evidence. This issue may raise questions about Pingrey not strictly following the GOM procedural policy pertaining to transfer requests, but the record does not support a finding that such decision-making was motivated by gender animus. Pingrey has asserted that his process was typical in the department for filling openings in a contract city. There is every reason to conclude that if 19B had been a female employee being targeted by hateful private party social media and ugly protest signs -- with this same 10-year history-- Pingrey would have made the same decision. There is no contrary evidence.

---

[26] Between 2015 through 2017, 19B primarily raised gender bias as a complaint. Back in 2017, the KCSO reasonably did not initiate a criminal DV harassment investigation against Foss based on the factual allegations then presented by 19B

Erin Overbey;
KSCO/█19B█  IIU2021-172  Summary Report
July 2, 2021
Page 49

**IIU2017-137 180 Day Violation.**  The weight of the evidence additionally  supports a finding  that in January 2018, then Captain Sullivan  and then Undersheriff Somers did not get the Foss *Loudermill* notice served by January 13, 2018 – the date that equated to 180 days after the Foss misconduct came to the attention of the Communications  Center Director.  These facts are agreed to and supported by clear and convincing evidence.  The reason this occurred stems from a confluence of factors to include (i) entering the incorrect 180 day deadline into the IAPro software program; (ii) apparently counting the date that Captain Sullivan  learned of the misconduct  instead of when Pompeo learned of the misconduct; (iii) the November 2017 election  results and new Sheriff's Office staff and officials transitioning  into place; (iv) the wrong date being entered into relevant spreadsheets; (v) Sullivan leaving for a brief time in early 2018 for family matters; and (vi) no one double checking the 180 day deadline at the time Somers signed the findings  memo and █19B█ delivered it to Sullivan.   Nonetheless, there is no evidence to support a finding that this procedural mistake occurred due to gender bias in favor of Foss and against █19B█    The Investigator's review of compiled  information  of other matters that have had 180-day violations  under the 2018 then-new KCSO administration  shows that such occasionally  occurred irrespective of gender.

**Historical, Serial PDRs and IIU Investigations.**  The KCSO generally responded to the Foss/█19B█ PDRs described in this investigation  due to mandates of Title 42.56 RCW.  Such is also consistent with the KCSO policy.  The KCSO IIU investigated  the Foss/Davy issues and complaints by investigating  them. Such is consistent with the KCSO policy.  █19B█ has provided  no example of any other person at the KCSO who was exempt in some fashion from the mandates of law and policy. █19B█ has provided  no legal mechanism that would allow the KCSO to not provide public records or not investigate issues or complaints  as described above. There is no evidence of any comparable fact pattern or other employee that has not had similar complaints investigated  or similar PDRs acted upon.  █19B█ himself opted to not seek an injunction  or other civil court order throughout all of these years.  The preponderance of the evidence supports a finding  that the PDRs and IIU investigations were gender neutral.

Current Subject Employees:

Bryan Howard;
Daniel Pingrey;
Patrick Butschli;
Kimberly Petty;

Former Subject Employees:

Scott Somers;
Jessica Sullivan;
Lance King.

The IAPro Intake summary for IIU2021-172 provided the following  potential policy violations for the Investigator's  analysis:

Erin Overbey;
KSCO/█19B█ IIU2021-172 Summary Report
July 2, 2021
Page 50

**1- Disparate treatment based on sex, harassment based on sex (GOM 3.01);**

Based on the available evidence evaluated in this investigation, regarding the investigation subjects, the weight of the evidence does not provide a factual predicate to support violations of the following policy provisions: the King County HR policy on nondiscrimination (2018-0001) (**EXONERATED** (the alleged incident occurred, but was lawful and proper)); or the KCSO General Order on non-discrimination (3.01.000) (**EXONERATED** (the alleged incident occurred, but was lawful and proper)).

**2- Acts in violation, re DV harassment (GOM 3.02);**

3.02.050
**VICTIMS OF DOMESTIC VIOLENCE:** 02/15
1. The confidentiality and safety of the victim are of the utmost importance to the Sheriff's Office.
2. The supervisor of the Domestic Violence Intervention Unit shall designate a contact person for the victim to be available for victim's questions and concerns.
☐ This person should not be involved in the investigation of the incident.
3. This person shall be responsible for:
a. Checking on safety of victim.
b. Outlining for the victim the parameters of criminal and internal investigations.
c. Potential repercussions.
d. Providing copies of Sheriff's Office DV policies.
e. Conveying victim's input.
f. Informing victim of next steps throughout the process.
g. Providing information about public and private domestic violence advocacy resources, including Domestic Violence Leave if the victim is employed by King County.
h. Provide information related to the relevant confidentiality policies related to the victim's information and public disclosure laws.
                                          ***
The weight of the evidence supports a finding that because the DV cyberstalking and harassment crimes were not investigated by the KCSO CID, but were instead referred to the Monroe PD, the KCSO DVIU was not contacted to provide additional services to █19B█ in fall 2019 or in 2020 while the Monroe PD investigation was pending. During that period of time, the Shoreline PD command staff seemed to fill that victim support role by providing the above-described support, communications and services to █19B█ Given █19B█ role as an experienced law enforcement officer, DVPA procedural information and policy provisions were readily available to him. Based on the available evidence evaluated in this investigation, regarding the investigation subjects, the weight of the evidence does not provide a factual predicate to support violations of GOM 3.02) (**EXONERATED** (the alleged incident occurred, but was lawful and proper)).

/

Erin Overbey;
KSCO/IIB  IIU2021-172  Summary Report
July 2, 2021
Page 51

**3- Conduct unbecoming (GOM 3.00.015(2)(k));**

k. Conduct Unbecoming: means behavior that generally tends to:
- Diminish respect for the Sheriff's Office or member.
- Diminish confidence in the operation of the Sheriff's Office.
- Adversely affect or impair the efficiency of a member.
- Adversely affect the morale or discipline of the Sheriff's Office.

As to most subjects: **NON-SUSTAINED** (there is insufficient factual evidence either to prove or disprove the allegation). As to Bryan Howard and Kimberly Petty: **EXONERATED**. As to Chief Pingrey: **SUSTAINED.** The evidence supports a factual predicate that Chief Pingrey did not strictly comply with the transfer policy (GOM 2.00.080 – 085).

**4- Performance standards, Failure to supervise (Foss and Davy) (GOM 3.00.020(4));**

As to the supervisory subjects Patrick Butschli, Scott Somers and Jessica Sullivan: **NON-SUSTAINED** (there is insufficient factual evidence either to prove or disprove the allegation). As to Bryan Howard, Daniel Pingrey, Kimberly Petty, and Lance King: **UNFOUNDED.**

Please advise should you need further clarification, amplification or investigation.

47713113.1

EXHIBIT 6

## EXHIBIT 6



## GARRITY ADMONISHMENT

I wish to advise you that you are being questioned as part of an official investigation of the King County Sheriff's Office.  You will be asked questions specifically directed and narrowly related to the performance of your duties or fitness for office.  You are entitled to all the rights and privileges guaranteed by the law of the State of Washington and its Constitution and the Constitution of the United States.  This includes the right not to be compelled to incriminate yourself and to have an attorney of your choice during questioning.

However, I further wish to advise you that if you refuse to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to department charges, which could result in your dismissal from the department.  If you do answer neither your statements nor any information or evidence which is gained by reason of such statements can be used against you in any subsequent criminal proceedings.  However, these statements may be used against you in relation to subsequent departmental charges.

At this time, you should understand that I am ordering you to truthfully answer the questions put to you.

**IIU Form  - Garrity04**